UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

   -v.-

DARIUS PADUCH,

        Defendant.

S2 23 Cr. 181 (RA)


**THE GOVERNMENT'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE EXPERT TESTIMONY
OF DR. DERYN STRANGE**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


Marguerite B. Colson
Elizabeth A. Espinosa
Ni Qian
Jun Xiang
Assistant United States Attorneys
- *Of Counsel* -

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .................................................................................................**1**

**I.       BACKGROUND**.................................................................................................**1**

A.       Expert Disclosure ................................................................................................ 1

B.       Legal Standard.................................................................................................... 4

C.       Discussion .......................................................................................................... 9

        1. Opinions as to False Memory Formation ............................................... 10

        2. Memory Distortion in People with History of Trauma ......................... 18

        3. Commonsense Principles Within the Ken of the Jury........................... 22

        4. Opinions Bearing on Witness Credibility............................................... 23

        5. Factual Narratives About the Case ...................................... **Error! Bookmark not defined.**

**CONCLUSION** ....................................................................................................................**25**

# TABLE OF AUTHORITIES

## Cases

*Adams v. Lab. Corp. of Am.*,
    760 F.3d 1322 (11th Cir. 2014) .......................................................................... 23

*Amorgianos v. Nat'l R.R. Pass. Corp.*,
    303 F.3d 256 (2d Cir. 2002) ................................................................................. 5

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) ..................................................................................... 7

*Bourjaily v. United States*,
    483 U.S. 171 (1987) ............................................................................................. 4

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .................................................................................... passim

*deWit v. UPS Ground Freight, Inc.*,
    No. 16 Civ. 36, (N.D. Fl. 2017) ......................................................................... 23

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ............................................................................................. 4

*Highland Capital Mgmt.* v. *Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008) ................................................................. 7

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992) ................................................................................. 6

*In re Fosamax Prod. Liab. Litig.*
    645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ...................................................... 24

*Island Intell. Prop. LLC v. Deutsche Bank AG*,
    No. 09 Civ. 2675 (KBF), (S.D.N.Y. 2012) .................................................. 6, 24

*Kumho Tire Co., Inc. v. Carmichael*,
    526 U.S. 137 (1999) ............................................................................................. 5

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
    No. 08 Civ. 8426 (WHP) (HBP) (S.D.N.Y. 2012) .............................................. 6

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016) ........................................................... 7, 12

*Marx & Co. v. Diners Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977)...................................................................... 6

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir. 2005)........................................................................ 5

*R.D. v. Shohola, Inc.*,
    3:16-CV-01056 (M.D. PA 2017)............................................................. 8, 9

*Robertson v. McLoskey*,
    676 F. Supp. 351, 354 (D.D.C. 1988)..................................................... 8, 9

*Shatkin v. McDonnell Douglas Corp.*,
    727 F.2d 202, 208 (2d Cir.1984).............................................................. 7

*United States v. Carter*,
    410 F.3d 942 (7th Cir. 2005) .................................................................... 7

*United States v. Curry*,
    977 F.2d 1042 (7th Cir. 1992) ................................................................. 7

*United States v. Duncan*,
    42 F.3d 97 (2d Cir. 1994)......................................................................... 6

*United States v. Heine*,
    No. 15 Cr. 238 (SI), (D. Or. Nov. 13, 2017)........................................... 8, 9

*United States v. Labansat*,
    94 F.3d 527 (9th Cir. 1996) ................................................................ 7, 22

*United States v. Libby*,
    461 F. Supp. 2d 3 (D.D.C. 2006) ..................................................... passim

*United States v. Mathis*,
    264 F.3d 321 (3d Cir. 2001).................................................................... 9

*United States v. Maxwell*,
    534 F. Supp. 3d 299 (S.D.N.Y. 2021)............................................ 8, 19, 24, 25

*United States v. Mulder*,
    273 F.3d 91 (2d Cir. 2001)...................................................................... 23

2

*United States v. Redwood,*
   216 F. Supp. 3d 890 (N.D. Ill. 2016) ........................................................................ 8

*United States v. Shiraishi,*
   No. 17 Cr. 582 (JMS) (RLP) (D. Haw. 2019) ..................................................... 7, 8

*United States v. Smith,*
   148 F. App'x 867 (11th Cir. 2005) ........................................................................... 7

*United States v. Welch,*
   368 F.3d 970 (7th Cir. 2004) ................................................................................. 22

*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003) ...................................................................................... 5

## **Rules**

Fed. R. of Evid. 401 ............................................................................................... 1, 6

Fed. R. of Evid. 403 ........................................................................................... passim

Fed. R. of Evid. 702 ........................................................................................... passim

<u>**PRELIMINARY STATEMENT**</u>

The Government respectfully moves, under Federal Rules of Evidence 401, 403, and 702, to the defense from eliciting certain opinion testimony from Dr. Deryn Strange, including her assessment of the Victims' credibility. According to the expert disclosure, the defendant intends to elicit opinion testimony from Dr. Strange on a variety of topics related to memory formation, including false memory formation. The Government does not object to the introduction of reliable opinions that are relevant to issues in this case, such as the formation and retrieval of memories. The Government does, however, object to other opinions the defense seeks to offer through Dr. Strange, namely opinions that do not fit the facts of this case, opinions that are unreliable and unsupported by the cited literature, opinions on matters that fall squarely within the ken of the average juror, or opinions that would invade the province of the Court and the jury.

## I.     BACKGROUND

### A.  Expert Disclosure

The defense seeks to offer expert opinions of Dr. Strange to "assess any memory factors that were present in the case and to offer opinions regarding the relevance of scientific research in the area of human memory to the facts of the case itself. (Ex. A at 1). Specifically, the defense seeks to offer testimony from Dr. Strange regarding:

1.  "General Overview of How Memory Works," specifically:

    a.  Memory works in a "three-stage process: encoding, storage and retrieval."

        ▪ "First is *encoding*, for something to be remembered later, we must enter it into our memory system."

        ▪ "Second is *storage*: the act of retaining information in memory for any period of time."

        • "Every time the memory is activated in some way—such as, reading an article about the event, watching video footage,

discussing it with therapists, investigators, or family members, or merely thinking about it—it will be slightly altered."

- "Third is *retrieval*: reporting on the event or simply thinking about it. Retrieval will be affected by the kinds of questions we are asked, the goals of the conversation or retrieval attempt, and our emotions."

b. "Memory retrieval is subject to . . . Forgetting.  Memory weakens over time."

- "Indeed, the more time that passes, the more susceptible our memories are to suggestion."

c. "Goals and attitudes are central to the dynamic and reconstructive nature of autobiographical memory."

- "Information acquired over time can change how people interpret earlier events; a benign interaction can be reinterpreted as something criminal."

- "[R]esearch shows that people can recall only the autobiographical memories that support their current goals."

- "Motivations can lead to remembering the past in a distorted manner beyond simply biasing memory selection and search."

2. Traumatic memory "is just as susceptible to the general principles outlined above and below."

a. "[I]f an event was not processed as traumatic at the time it was occurring, to remember it as traumatic later is a memory distortion."

b. "Stress can negatively affect a person's memory for both the minor and major details of an event."

c. "[A]t very high levels of stress and arousal, human attention is typically narrowed to the most immediately important features of the event—survival, for example-at the expense of all others."

3. "[I]nformation we absorb from others—via conversations media reports, film and television, therapy, etc.—can influence what we later recall about an event."

a. "[R]esearchers have used a particular methodology termed 'the misinformation effect' for over forty years to demonstrate the kinds of details that can be absorbed into our memories and how that can happen.  It is important to note that

2

> people can falsely remember minor details . . ., and they can also come to remember <u>entirely false events.</u>"

b. "[A]fter a false event has been suggested (explicitly or implicitly) four processes must occur. First, people must come to believe the event was plausible, and second, they must also develop an autobiographical belief that it actually occurred. . . . Third, people must construct a detailed memory of the event . . . . Fourth, and finally, people must commit a source monitoring error."

c. "[C]ognitive dissonance could also underlie the development of false memories."

d. "Information acquired over time can change how people interpret earlier events."

e. "[T]he amount of detail a person reports is not a proxy for memory accuracy."

4. "There are a variety of specific suggestive influences that play a role in the creation of a false or distorted memory."

a. "Media can distort the memory of witnesses or alleged victims."

b. "[R]etellings of an event can result in a rich and fluent narrative emerging over time that implies, but does not necessarily reflect, the memory's veracity."

c. "Repression and dissociation largely endorsed by the public enjoy no scientific support."

d. "[A] wide variety of therapeutic and/or interviewing techniques can affect the level and accuracy of the detail that adults report, and aid the creation of false memories," including "group therapy," "guided imagery/visualization and journaling/writing," "EMDR and BLS," "interpreting dreams and nightmare," and "false feedback."

5. "[P]eople who score in the borderline range [on an IQ test] are more prone to suggestibility, confabulation and are more acquiescent."

6. "[A] history of trauma can increase the likelihood of memory distortion for that and other traumatic experiences." In particular, "the more symptoms people experience, particularly the re-experiencing symptoms (e.g., flashbacks, intrusive thoughts) the more likely they are to recall experiencing *more* trauma."

7. "[T]here is reason to believe alleged victim's memories could have been distorted by the therapy they underwent, the discussions they had with other victims and civil lawyers, and the media and legal advertisements they saw regarding Darius A. Paduch."

For the reasons below, the opinions contained in paragraphs 1(b) and 3(d) should be precluded because they are commonsense principles within the ken of the jury; the opinions described in paragraph 7 invade the province of the jury in assessing witness credibility and demeanor; the opinions contained in paragraphs 3 through 6 should be precluded because they lack fit with this case and are used merely as vehicles to insert a speculative factual narrative about the case, and thus are both irrelevant and confusing to the jury; and the opinions contained in paragraph 4 should be precluded because they are unreliable and unsupported by literature.

### B. Legal Standard

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The party that proffers the testimony bears the burden of showing that it is admissible by a preponderance of the evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). A district court exercises discretion in admitting expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

A threshold issue is, of course, whether the witness "is qualified to be an 'expert'" in the subject matter at issue. *See Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005). Testimony from a qualified expert is admissible only if the trial court determines that it is both relevant and reliable. *Daubert*, 509 U.S. at 589-90; *see Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire*, 526 U.S. 137. The reliability inquiry is flexible and "must be tied to the facts of a particular case." *Id.* at 150 (citations and internal quotation marks omitted). The Second Circuit has emphasized that "it is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Pass. Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* Minor flaws with an otherwise reliable expert opinion will not bar admission of that evidence; however, the Court should exclude the expert evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* (quotation marks omitted).

Rules 401 and 403 of the Federal Rules of Evidence state that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (quoting authority omitted).

Among other things, the Court "must consider whether an expert's proposed testimony would usurp the province of the judge to instruct on the law, or of the jury to make factual determinations." *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675 (KBF), 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012) (citations omitted). While Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," the Second Circuit has admonished courts to take care "lest [the expert] be allowed to usurp the function of the judge." *Marx & Co. v. Diners Club, Inc.*, 550 F.2d 505, 511 (2d Cir. 1977). Accordingly, courts must not admit "opinions which would merely tell the jury what result to reach." *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992) (quoting Fed. R. Evid. 704 advisory committee's note); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (emphasis in original)). Nor may an expert opine as to a party's state of mind, credibility, intent, or motive. *See LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *7

(S.D.N.Y. Feb. 14, 2012) (collecting cases); *see, e.g.*, *Highland Capital Mgmt.* v. *Schneider*, 551 F. Supp. 2d 173, 182-183, 187 (S.D.N.Y. 2008).

Finally, expert opinion should not be offered where it does not fit the facts of the case. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks omitted); *cf. Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("expert testimony should be excluded if it is . . . [*inter alia*] in essence an 'apples and oranges comparison'" (quoting *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984))); *see also LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 642 (S.D.N.Y. 2016) (expert opinion inadmissible where it is "a mismatch for the facts" of the case).

As a general matter, memory, perception, and the fallibility of human recall—that is, how people may remember, misremember, or forget past events—are within the ken of the jury. *See United States v. Carter*, 410 F.3d 942, 950 (7th Cir. 2005) ("In general . . . jurors understand that memory can be less than perfect."); *United States v. Smith*, 148 F. App'x 867, 872 (11th Cir. 2005) (affirming district court's exclusion of expert testimony on memory and perception, including the impact of stress on memory, in context of eyewitness reliability because proposed testimony would not assist the jury); *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) ("It is common knowledge that memory fades with time."); *United States v. Curry*, 977 F.2d 1042, 1050-53 (7th Cir. 1992) ("[S]uch testimony may be properly excluded where the testimony addresses an issue of which the jury is generally aware."); *United States v. Shiraishi*, No. 17 Cr. 582 (JMS) (RLP), 2019 WL 1386365, at *5 n.7 (D. Haw. Mar. 27, 2019) (where testimony "falls within the common knowledge of the average layman, [it] is improper testimony under Rule 702"); *United States v.*

*Heine*, No. 15 Cr. 238 (SI), 2017 WL 5260784, at *3 (D. Or. Nov. 13, 2017) (finding expert testimony concluding that memories are fallible and may deteriorate over time to be "within the ken of the ordinary juror"); *United States v. Redwood*, 216 F. Supp. 3d 890, 897-99 (N.D. Ill. 2016) (excluding memory expert under Rules 702 and 403, and noting that "[w]hile in unique circumstances expert testimony regarding memory and perception may be warranted, this is not one of those cases"); *United States v. Libby*, 461 F. Supp. 2d 3, 12 (D.D.C. 2006) ("[J]urors inevitably encounter the frailties of memory as a commonplace matter of course.").

Federal courts have allowed expert testimony that go beyond general principles of human recall on a case-by-case basis, depending on the special circumstances or particular facts of a case and only when such opinions are based on reliable science and fit the facts of the case. *See, e.g.*, *United States v. Maxwell*, 20 Cr. 330 (AJN), Nov. 21, 2021 Opinion and Order at 16, Docket No. 541 (S.D.N.Y.) (clarifying that its decision to admit certain parts of Dr. Loftus's opinion "is by no means an invitation for memory experts to be admitted in every future use"); *Libby*, 461 F. Supp. 2d at 9-10 ("There is no clear case authority, or absolute rule, on when an expert should be permitted to testify on issues regarding memory and perception. . . . [T]here is no *per se* rule for or against the admissibility of such testimony [on memory and perception]. And a court presented with a proffer of expert testimony must determine its admissibility on a case-by-case basis." (citing cases)); *Shiraishi*, 2019 WL 1386365, at *3 (discussing the need for the expert testimony to "fit" the evidence or facts of the particular case); *United States v. Redwood*, 216 F. Supp. 3d 890, 897-99 (N.D. Ill. 2016) *R.D. v. Shohola, Inc.*, 2019 WL 6053223, at *10-13 ("First, courts have recognized that expert testimony concerning the vagaries of human recollection that is stated with sufficient certainty, is grounded upon reliable science, and fits the facts of the case satisfies

the *Daubert* standard and should be admitted at trial. In contrast, expert opinions regarding the science of human recollection that are not presented with certainty, lack scientific rigor, or possess only a tenuous factual fit are often excluded from evidence." (citing *United States v. Mathis*, 264 F.3d 321, 336 (3d Cir. 2001))).

When expert testimony on memory and perception is permitted, courts must exercise "judicial oversight" in this area. *See Shohola*, 2019 WL 6053223, at *10-13. "Left unregulated, memory expert testimony can invade the fundamental province of the jury—determining witness credibility," and must be excluded as unduly prejudicial under Rule 403. *Id.* at *6 (citing cases); *see also Heine*, 2017 WL 5260784, at *2 (excluding expert testimony under Rules 702 and 403 under the same principles as *Libby* because it would not be helpful to the jury and would "invad[e] the jury's role in assessing the credibility of witnesses," and because the trial did "not involve issues of repressed or recovered memories," among other things); *Libby*, 461 F. Supp. 2d at 14 (excluding memory expert's testimony because it would not be helpful to the jury, invaded the province of the jury, and was likely to confuse, mislead, or unduly influence the jury, among other things).

## C. Discussion

The Government agrees that opinion testimony about memory may be proper in some respects.[1] That said, significant swaths of Dr. Strange's proposed testimony do not satisfy the *Daubert* standard. Specifically, the Government objects to any attempt by the defense to offer her testimony as to (a) opinions as to false memory formation, including potential sources of

---

[1] The Government does not object to Dr. Strange's opinions regarding how memory works generally, including trauma memory (paragraphs 1 and 2).

suggestive influence and the susceptibility of individuals with low IQ scores, that do not fit the facts of the case, are unreliable, and are otherwise within the ken of the jury, (b) opinions as to the likelihood of memory distortion for people with a history of trauma, which do not fit the facts of this case; (c) opinions that are commonsense principles within the ken of the jury, such as forgetting and hindsight, and (d) opinions on witness credibility, such as Dr. Strange's opinion that "there is reason to believe the alleged victims' memories could have been distorted." (Ex. A at 9-10).

### 1. Opinions as to False Memory Formation

#### A. General Principles of False Memory Formation

Dr. Strange seeks to offer opinions general opinions on the formation of false memories. (Ex. A at 4-8). These opinions either lack fit to the case or else are unreliable.

To start, Dr. Strange's opinion that false memory may be implanted is based primarily on research studies wherein the researchers *purposefully lied* to participants—by either showing the participants doctored photographs or else telling the participants false narratives that the researchers claimed had happened to the participants. (*See* Amanda J. Barnier, et al., *A Conceptual and Empirical Framework for the Social Distribution of Cognition: The Case of Memory*, Cognitive Systems Research March 2008 (Exhibit B) at 14-15 (in Study 1 participants were asked about an event in their lives, after which a researcher would share their own stories about a similar event in their own lives and then summarize to the participants the details that the participants had supposedly shared but with *purposeful lies added*; these other studies discussed did not appear to measure accuracy of memory when discussed in a social setting); Alan Scoboria et al., *A Mega-Analysis of Memory Reports from Eight Peer-Reviewed False Memory Implantation Studies*, Memory 2017 (Exhibit C) at 25-27 (conducting a "mega-analysis" of eight studies in which the

participants were told false narratives that allegedly happened to them, and some were also provided self-relevant details, doctored photos, and/or told to imagine a false narrative); Deryn Strange, et al., *False Memories*, Do Justice and Let the Sky Fall: Elizabeth Loftus and Her Contributions to Science, Law, and Academic Freedom, 2007 (certain excerpts available at https://www.google.com/books/edition/Do_Justice_and_Let_the_Sky_Fall/I4HytppAceMC?hl=en&gbpv=1&dq=Do+justice+and+let+the+sky+fall&printsec=frontcover) (summarizing studies in which researchers successfully planted false memories in participants by feeding them false pictures and false narratives)).

Other research relied upon by Dr. Strange is even farther afield to the extent it involved testing individuals' memories of a movie—containing events that *did not happen to them*—and whether their own recollection of a movie they watched once held up when exposed to the recollections of others who watched different versions of the movie containing different details. (*See* Garry L. French et al., *You Say Tomato? Collaborative Remembering Leads to More False Memories for Intimate Couples Than for Strangers*, Memory 2008 (Exhibit D) at 4-7 (intimate couples and pairs of strangers were shown, without their knowledge, two different versions of a movie and then asked to discuss the movies as if they had watched the same movie to study the likelihood of memory contamination); Fiona Gabbert, et al. *Memory Conformity: Can Eyewitnesses Influence Each Other's Memories for an Event?* Applied Cognitive Psychology April 2003 (Exhibit E) at 3-4 (pairs of strangers were shown different versions of a single event and then told to discuss, believing that they had seen the same version)).

In short, all of the studies relied on by Dr. Strange for these opinions involved scenarios in which the researchers went through extraordinary lengths to lie to participants about what had

happened to them—at times, using fabricated evidence—*in order to confuse participants* and implant memories into their mind.

The trial evidence in this case will not contain any analogues to the cited research studies whatsoever. There is *no evidence* that any of the Victim witnesses were told what the defendant did to them by anyone else (much less that someone who purposefully lied to the Victim witnesses about the Victims' own experiences with the defendant), that any of the Victim witnesses were shown *doctored photos* purporting to depict what happened to them, or that any of the Victims discussed what had happened to them with persons who claimed also to have seen what happened. In other words, Dr. Strange has based her opinion regarding the implantation of false memories on studies involving conditions that are entirely absent in this case.[2] Thus, the proffered expert testimony "does not relate to any issue in the case," and, ergo, "is not relevant" and "non-helpful." *Daubert*, 509 U.S. at 591 (internal quotation marks omitted).

On the other hand, introduction of such an opinion would not only be unfairly prejudicial but would also create a huge risk of misleading the jury in thinking that the conditions mentioned in the studies exist here. Absent evidence that third parties lied to the Victim witnesses in order to deliberately plant false memories in them, Dr. Strange should not be permitted to opine on the formation of false memories. *See,* Fed. R. Evid. 702 advisory committee n. (stating that "generalized" expert testimony must "'fit' the facts of the case"); *LVL XIII Brands, Inc.*, 209 F.

---

[2] Even if someone had lied to the Victims regarding their experience with the defendant, the research indicates that such lies would result in false memories for only a minority of Victims. (*See* Barnier 2008 (Exhibit B) at 15 (approximately 30% of participants included a false memory that was suggested by the researcher); Scoboria et al. 2017 (Exhibit C) at 25-27 (the false memory rate was between approximately 19% to approximately 46.1 % when all three misinformation techniques were used).

Supp. 3d at 642 (finding testimony fails *Daubert*'s "fit" requirement where there is a lack of "record foundation"); *Libby*, 461 F. Supp. 2d at 10-11 (excluding expert testimony regarding memory errors for several reasons, including that expert opinions are based on research examining juror understanding impacting the reliability of eyewitness identifications, but eyewitness identifications were not the subject of witness testimony in that case). Any opinions Dr. Strange seeks to offer on false memory formation should be limited to those as to which there is a clear evidentiary predicate establishing their "fit" to the case.

Finally, even if a factual foundation can be laid, the general principle that a person may sometimes adopt a *suggested* false memory as his own, especially when that person was given falsified evidence of that event occurring to him, is common knowledge within the jurors' ken, even if they are unfamiliar with the scientific bases, research, and labels used to describe the phenomenon. "[It] is no secret that memory decreases over time, that individuals can selectively remember or even [unintentionally] fabricate events, or that stress can have an impact on memory or perception." *Libby*, 461 F. Supp. 2d at 13 (quoting *Robertson v. McLoskey*, 676 F. Supp. 351, 354 (D.D.C. 1988)).

### B. Potential Sources of Suggestive Influence.

As a corollary to Dr. Strange's opinion that false memories may be implanted, she also opines on potential sources of suggestive influence, including (1) media; (2) retelling/discussion; (3) therapy; (4) dreams and nightmares; and (5) false feedback. These opinions should also be precluded on the ground that they are unreliable and do not fit the facts of this case.

First, Dr. Strange opines that "[p]eople can mistakenly classify an externally experienced event—hearing other people's stories in tv reports, reading comments on social media, seeing

adverts, hearing radio interviews—as a personally-experienced memory to the extent that it has 'realistic' characteristics." (Ex. A at 6). On its face, that broad statement is strains credulity. The Court has undoubtedly seen movies or TV shows about trials and court cases; it is doubtful that the Court has ever once mistaken fictional cases in popular media with its own docket.

The statement is also unsupported by the literature Dr. Strange purports to rely on. Dr. Strange cites a 1994 book by Robert Belli and Elizabeth Loftus titled "Recovered memories of childhood abuse: A source monitoring perspective." As the name suggests, this book focuses on a very rare phenomenon: the "*recovery*" of otherwise repressed memories of childhood abuse. Though some forms of childhood abuse may have been initially suggested by media reports of similar events occurring to others, this book studies the drastic therapy techniques—such as repeatedly ignoring the patient's lack of recollection, suggesting that the patient's symptoms are consistent with someone who had suffered childhood abuse, and preexisting bad relationship between the patient and the person later accused—to "recover" potentially false memories of childhood abuse. There is no evidence that any of the Victim witnesses in this case were subjected to therapy of this nature.[3] In fact, three of the victims (Minor Victim-1, Victim-10, and Victim-11[4]) reported the abuse they suffered *prior* to any media report of the defendant's behavior. Other victims, such as Minor Victim-1, Minor Victim-2, Minor Victim-4, Victim-7, Victim-12,[5] report

---

[3] For the same reason, the Court should preclude any opinion relating to repression and dissociation, which is referenced in Dr. Strange's expert disclosure under "Potential Sources of Suggestive Influence." (Ex. A at 6-7).

[4] Victim-10 and Victim-11 are non-statutory victims that the Government seeks to introduce under Rule 413.

[5] Victim-12 is a non-statutory victim that the Government seeks to introduce under Rule 413,

they had positive memories and views of the defendant until they learned that what the defendant did may not have been medically necessary.  Indeed, one of the authors of the book, Robert Belli, later published an article acknowledging the limited applicability of the research.  Belli stated that "the considerable majority of individuals who are victimized by [child sex abuse] have continuous memories in which there is an ongoing awareness of the abusive events.  Hence the debate regarding the fidelity of recovered memories concerns a small proportion of those who claim victimization."  (Robert F. Belli, *Toward Reconciliation of the True and False Recovered Memory Debate*, Chapter 19 in Wrongful Allegations of Sexual and Child Abuse 2016 (Ex. F) at 10).

The second article Dr. Strange cites is even less applicable.  In *Virtually True: Children's Acquisition of False Memories in Virtual Reality* (Ex. G), the researchers used immersive virtual environment technology ("IVET") to study how preschool and elementary school children responded to memory prompts, including where they were shown IVET simulation of another child engaged in the suggested memory prompt and IVET simulation of the child himself engaged in the suggested memory prompt.  (Kathryn Y. Segovia and Jeremy N. Bailenson, *Virtually True: Children's Acquisition of False Memories in Virtual Reality*, Media Psychology 2009 (Ex. G) at 1).  None of the Victim witnesses are remotely close to being preschool or elementary school-age children, and there is no evidence that any of the Victims were shown virtual simulations of being masturbated by the defendant.  Moreover, the study itself makes clear that more false memories were reported in the interview *immediately after the memory prompts* than in later interviews— implying that the effect of seeing even highly suggestive imagery diminishes over time.  (Ex. G at 16).  Accordingly, the defense has not shown that Dr. Strange's opinion that media reports can

create, out of whole cloth, a false personally experienced memory "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

Second, Dr. Strange seeks to opine that repeated retellings of "an event can result in a rich and fluent narrative emerging over time that implies, but does not necessarily reflect, the memory's veracity," and specifically finger "therapy or meetings with lawyers" as times of retelling that may cause memory distortion. (Ex. A. at 6). Dr. Strange does not support this proposition with *any* literature. Dr. Strange does cite literature that supports the principle that "memory tends to become better for details that are selectively and repeatedly recalled, but worse for details that are not." (*Id.*). But the principle that some memories become stronger over time with retelling and other memories diminish over time—another commonsense principle within the ken of the jurors—is not the same as her proffered opinion that retelling memories *can create false ones*. Indeed, elsewhere in the same paragraph, Dr. Strange offers the general opinion that "[a]lthough retelling an event does not necessarily lead to new and inaccurate supplementary details being added, it can." (*Id.*) Leaving aside that this opinion is devoid of any details under which "retelling" can lead to inaccurate details, Dr. Strange did not cite any articles to supporting so general a proposition. As such, this opinion is supported by nothing and should be precluded.

Third, Dr. Strange offers that another potential source of suggestive influence is therapy, specifically group therapy, therapy techniques involving guided imagery/visualization and journaling/writing; and EMDR (eye movement desensitization and reprocessing) and BLS (bilateral stimulation). Again, this opinion does not comport with the facts of this case. There is no evidence that any of the Victim witnesses participated in group therapy—especially group therapy that would have exposed them to others with similar stories of abuse—or EMDR and BLS

therapy. As to the idea that guided imagery/visualization and journaling/writing may be a source of suggestive influence, the studies that are cited for this proposition are premised on research participants being first fed a false event and then later asked to imagine or visualize that false event, which then increased the likelihood of the implantation of a false memory pertaining to the event. (Exhibit E at 27; Stefanie J. Sharman and Alan Scoboria, *Imagination Equally Influences False Memories of High and Low Plausibility Events*, Applied Cognitive Psychology, September 2008 (Exhibit H) at 3). But again, there is no evidence that any of the Victim witnesses here were first told that they suffered sexual abuse and then asked to imagine what that sex abuse would look like.

Fourth, Dr. Strange proposes to offer opinions about the reliability of memories recovered in dreams or nightmares. There is simply no evidence that any of the victim witnesses in this case based any of their recollections on dreams that they had regarding the event.

Finally, Dr. Strange seeks to offer an opinion that people presented with false information about themselves may develop a false belief or memory that a certain event occurred to them. As explained above, there is no evidence of that occurring with any of the Victim witnesses in this case.

Accordingly, the Court should preclude Dr. Strange's proffered opinions regarding potential sources of suggestive influence because those opinions are either based on totally insufficient "facts or data" within the meaning of Rule 702 or have no application to the case here.

### C. Individuals with Low IW Are More Suggestible

Dr. Strange would opine that individuals who score in the borderline range on IQ tests are more prone to suggestibility. First, there is no evidence that any of the Victim witnesses here are

in this category of vulnerable individuals. To be sure, certain victims suffer from Klinefelter Syndrome, which may cause some cognitive issues primarily having to do with processing, communication, and expression. But such cognitive issues are not synonymous with lower IQ scores and there is no reason to believe that any of the Victim witnesses that the Government anticipates calling have borderline IQ scores. In fact, literature on Klinefelter Syndrome has found that "the general cognitive ability of patients with [Klinefelter Syndrome] is not typically in the intellectual disability range," with "most studies [showing] that the mean cognitive ability in patients with [Klinfelter Syndrome] falls in the average to low average range . . . which is thought to be driven by deficits in the verbal conceptual domain, rather than the nonverbal reasoning or spatial domain." (Richard Boada R et al., *The Cognitive Phenotype in Klinefelter Syndrome: A Review of the Literature Including Genetic and Hormonal Factors*, Developmental Disabilities Research of Reviews 2009 (Exhibit I) at 2)). Second, the principle that those with intellectual disabilities are more prone to suggestion and more acquiescent is, at this point, a commonly understood phenomenon within the ken of the juror.

## 2. Memory Distortion in People with History of Trauma

Dr. Strange also offers at least two sets of opinions regarding possible memory distortion with respect to individuals who suffered some trauma and may have distorted intrusive thoughts or memories. These opinions are without any factual foundation in this case and are otherwise unreliable. As such, Dr. Strange's opinions on this topic should be precluded at least until a factual predicate has been established.

First, Dr. Strange offers opinions that intrusive thoughts or images—a symptom of posttraumatic stress disorder ("PTSD")—may contain erroneous or exaggerated details regarding the underlying trauma. As an initial matter, there is no factual basis to suppose that any of the

18

Victim witnesses that the Government now intends to call in this case suffers from PTSD. [6]  And while the cited articles appear to support this general proposition, they also make clear that not every victim with PTSD suffers from inaccurate recall and many victims with PTSD actually recognize that the intrusive thoughts and images are exaggerated.  (*Compare* Richard Bryant and Allison Harvey, *Traumatic Memories and Pseudomemories in Posttraumatic Stress Disorder*, Applied Cognitive Psychology 1998 (Ex. J) at 4-5 (finding that PTSD patients with accurate recall reported consistent intrusive thoughts, PTSD patients with inaccurate recall reported inconsistent intrusive thoughts, and PTSD patients with amnesia also reported intrusive thoughts that were inconsistent with true events, but all sets of PTSD patients appear to have some belief that the intrusive thoughts are based on historical accuracy) *with* Brad Grunert et al., *Flashbacks After Traumatic Hand Injuries: Prognostic Indicators*, Journal of Hand Surgery 1988 (Ex. K) at 2-3 (some people who have suffered hand injuries report intrusive images where the injury is worse than actually suffered, but at least some of those who report exaggerated intrusive images acknowledge that the intrusive images were exaggerated) *and* Harald Merckelbach et al., *Traumatic Intrusions as 'Worse Case Scenario's'*, Behavior Research and Therapy 1998 (Ex. L) at 3-4 (the study asks participants to rate whether their intrusive thoughts and images are exaggerated) *and* Jacinda Oulton et al., *PTSD and the Role of Spontaneous Elaborative*

---

[6] Before the Court can make the determination whether the factual predicate has been established, the Court must make a finding as to what an expert in psychology would use to diagnose an individual with PTSD and whether those methods were reliably applied in this case to arrive at the diagnosis of PTSD as to any individual Victim witness.  *See Maxwell*, Nov. 21, 2021 Opinion and Order at 7 (precluding expert testimony applying the "halo effect" to Epstein where that opinion is based on the expert diagnosing Epstein with a variety of personality disorders but there was no showing that the expert used reliable and accepted methods to make the diagnosis).

*'Nonmemories'*, Psychology of Consciousness: Theory, Research, and Practice, May 2018 (Ex. M) at 8 (the study is designed to rely on participant answer as to whether the intrusive thoughts or involuntary cognitions describe actual events or are "nonmemories")). Indeed, the studies make clear that the term "intrusive cognitions" encompasses thoughts that have nothing to do with memory, such as "imagined future events" and "imaginary worst-case scenarios" that are "ubiquitous in everyday cognitive experience." (Oulton et al. (Ex. M) at 2.).

Accordingly, not only is there no factual predicate—again, there is no evidence that any Victim suffers from PTSD or PTSD symptoms or that any of the Victims are testifying regarding what they learned from the intrusive thoughts and images they experience—the cited studies appear to say simply that some people with PTSD have good recall and others do not, and people who do have good recall of the underlying traumatic event may nonetheless have exaggerated intrusive thoughts or images that *they recognize to be exaggerate*d. This opinion is therefore of little to no value to the jurors.

Dr. Strange's second set of opinions is centered around the idea that the more PTSD symptoms people experience, the more likely they are to recall experiencing more trauma. As with the prior opinion, there is no factual basis to suppose that *any* of the Victim witnesses the Government intends to call at trial experiences PTSD or PTSD-like symptoms. In fact, one of the cited studies showed that people with no PTSD symptoms "did not change their memory for the objective facts of the event." (Sharon Dekel and George Bonanno, *Changes in Trauma Memory and Patterns of Posttraumatic Stress*, Psychological Trauma: Theory, Research, Practice, and Policy 2013 (Ex. N) at 6).

Furthermore, the research Dr. Strange herself cites challenges the reliability of her opinion that more PTSD symptoms equate to more recalled trauma. Nearly all the cited studies involved questionnaires provided to people who suffered some traumatic event—often, participation in a war. Specifically, questionnaires were provided fairly close in time to the traumatic event and then at a later time. Some of the cited studies found some correlation between more PTSD symptoms and more self-reported trauma experienced at the later time. (*See* Steven Southwick et al., *Consistency of Memory for Combat-Related Traumatic Events in Veterans of Operation Desert Storm*, American Journal of Psychiatry 1997 (Ex. O); Dekel & Bonnano, 2013 (Ex. N); Lizabeth Roemer et al., *Increases in Retrospective Accounts of War-Zone Exposure Over Time: The Role of PTSD Symptom Severity*, Journal of Traumatic Stress 1998 (Ex. P); Cezar Giosan et al., *Relationships Between Memory Inconsistency for Traumatic Events Following 9/11 and PTSD in Disaster Restoration Workers*, Journal of Anxiety Disorders 2009 (Ex. Q)). But other studies found that there was little to no amplification of traumatic memories, especially objective events, even with PTSD symptoms. (*See* Inge Bramsen et al., *Consistency of Self-Reports of Traumatic Events in a Population of Dutch Peacekeepers: Reason for Optimism?*, Journal of Traumatic Stress 2001 (Ex. R); Elise Bolton et al., *A Cross-Lagged Analysis of the Relationship Between Symptoms of PTSD and Retrospective Reports of Exposure*, Journal of Anxiety Disorders 2006 (Ex. S)).

Most damning, however, is that even in those studies which found amplification of traumatic memories, the authors acknowledge that simply because *more* trauma was reported at the later time does not mean that the later responses were the untrue ones. (*See, e.g.,* Roemer et al. 1998 (Ex. P) at 7 ("The findings of this study should be interpreted with caution. These data do not speak to the accuracy of frequency reports. Participants' reports may have become inflated

over time; conversely, individuals may have underestimated their reports initially and later given more accurate appraisals.")). Almost all of these studies acknowledge that the study cannot determine which memories are true and which, if any, are false. Indeed, some studies explicitly acknowledge that the study participants were accessing true memories *at both times*, despite apparent discrepancies. (*See, e.g.*, Southwick et al. (Ex. O) at 175-76 (positing several reasons for changed answers to questionnaires that do not involve false or inaccurate memories).)

Accordingly, based on the lack of fit between the proposed opinions and the facts of this case, as well as the unreliability in the data, the Court should preclude Dr. Strange from testifying regarding the effect of PTSD or PTSD symptoms on intrusive thoughts and memories.

### 3. Commonsense Principles Within the Ken of the Jury

The following opinions by Dr. Strange are commonsense opinions within the ken of the jury:

- How memory fades and weakens over time, as described in Paragraph 1(b) above.

- How information acquired over time can change how people interpret earlier events, as described in Paragraphs 1(c) and 3(d) above.

Any testimony from Dr. Strange with respect to these commonsense principles of memory and perception should be excluded under Rules 703 and 403 because such testimony would not aid the jury. "It is common knowledge that memory fades with time." *Labansat*, 94 F.3d at 530 (affirming district court denial of defendant's motion to retain an eyewitness expert). An expert is simply not needed to "point out that memory decreases over time." *United States v. Welch*, 368 F.3d 970, 973-75 (7th Cir. 2004) (excluding eyewitness memory and perception expert). In excluding a memory and perception expert in *Libby*, the court explained:

> [O]n a daily basis the average juror is personally faced with innumerable questions of memory and cognition, as everyone in their daily lives is called upon to store, encode, and retrieve information he or she has been subjected to. Although the average juror may not understand the scientific basis and labels attached to causes for memory errors, jurors inevitably encounter the frailties of memory as a commonplace matter of course.

*Libby*, 461 F. Supp. 2d at 12-13.

Similarly, the concept of hindsight bias is well within the ken of the average juror. "Hindsight bias is a common-sense concept—everyone knows that 'hindsight is 20/20.'" *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1335 (11th Cir. 2014). The prevalence of this common saying shows that jurors plainly understand the ways in which hindsight can bias one's perspective. As such, expert testimony on it is unnecessary and inappropriate. *See id.* ("[C]ommon-sense concepts are especially appropriate for consideration by a jury."); *see also, e.g.*, *DeWit v. UPS Ground Freight, Inc.*, No. 16 Civ. 36, 2017 WL 5905575, at *2 (N.D. Fl. Jul. 25, 2017) (excluding expert testimony on hindsight bias on that ground that it is not beyond the understanding of the average lay person) (citations and internal quotation marks omitted); *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001) ("[T]he district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." (citations and internal quotation marks omitted)).

### 4. Opinions Bearing on Witness Credibility

Consistent with clear caselaw from this Circuit, Dr. Strange should be barred from opining that the "alleged victim's memories could have been distorted by the therapy they underwent, the discussions they had with other victims and civil lawyers, and the media and legal advertisements they saw regarding Darius A. Paduch." This opinion is a thinly veiled credibility assessment of the Victim witnesses who are at the heart of this case. It is well-settled that "expert opinions that

constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." *Nimely*, 414 F.3d at 398.

To the extent that Dr. Strange is permitted to testify at all regarding false memory implantation and potential sources of suggestive influence, the defense is able to elicit the factual predicate for those sources of suggestive influence during cross-examination of the fact witnesses. Dr. Strange's opinion as to what events actually transpired—e.g., whether a Victim witness saw a billboard—is not an expert opinion. Instead, it goes directly to the heart of fact finding that is within the sole province of the jury. Allowing Dr. Strange to testify to the fact of suggestive influence on individual Victim witnesses would essentially grant the defendant an opportunity to present hearsay "evidence," under the cloak of expert testimony, regarding what each Victim witness experienced. As courts have repeatedly found, it is "inappropriate for experts to act as . . . vehicles for factual narrative . . . ." *Island Intell. Prop.*, 2012 WL 526722, at *2; *see also Maxwell*, Nov. 21, 2021 Opinion and Order at 15 (rejecting memory expert testimony that suggestive activities occurred in the current case); *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008); *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

Moreover, it is wholly unclear how Dr. Strange has arrived at her opinion that the statutory Victims' memories could have been distorted. Although Dr. Strange claims to have reviewed the files provided to her by defense for the statutory Victims, there is nothing in those materials that reveals the type of therapy, if any, they underwent; the substance of the conversations they had with civil lawyers; and what specific, if any, media and legal advertisements they saw regarding Paduch. Thus, Dr. Strange has no basis whatsoever to comment on whether or not certain "suggestive activities" may have influenced any of the Victims before the jury, much less a basis

to show that she has "reliably applied [her] principles and methods of the facts of the case." Fed. R. Evid. 702.

Finally, Dr. Strange's testimony on the subject should be precluded under Rule 403. There is substantial risk that jurors will substitute Dr. Strange's findings as their own in fact finding and evaluating the credibility of witnesses before them. "This risk of confusing or misleading the jury substantially outweighs the little permissible relevance that the opinion has." *Maxwell*, Nov. 21, 2021 Opinion and Order at 10 (precluding expert testimony on the indices of credibility).

## CONCLUSION

Accordingly, the Government respectfully requests that Dr. Strange be precluded from offering opinions regarding commonsense principles of memory, factors bearing false memory formation, trauma amplification for individuals with PTSD, or regarding any witness credibility or factual narratives.

Dated: April 22, 2024
     New York, New York

<div style="margin-left:40%">

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:       /s/
      Marguerite Colson
      Elizabeth Espinosa
      Ni Qian
      Jun Xiang
      Assistant United States Attorneys

</div>