```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         23 CR 181 (RA)

5   DARIUS A. PADUCH,

6              Defendant.                 Trial
    ------------------------------x

7
                                          New York, N.Y.
8                                         April 24, 2024
                                          9:15 a.m.
9

10  Before:

11
                       HON. RONNIE ABRAMS,
12
                                          District Judge
13
                           APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  MARGUERITE COLSON
         ELIZABETH A. ESPINOSA
17       JUN XIANG
         NI QIAN
18       Assistant United States Attorneys

19  BALDASSARE & MARA, LLC
         Attorneys for Defendant
20  BY:  MICHAEL BALDASSARE
         JEFFREY HAWRILUK
21

22

23

24

25
```

1          (In open court)

2          THE COURT:  Good morning, everyone.

3          I was going to supplement my rulings before we got

4    started with *voir dire* this morning.  But if there are any or

5    issues, I know we were asked to come earlier today, as we are

6    now.  If there are any other issues you want to raise first,

7    I'm happy to address those first and then get to my rulings, if

8    you would prefer.

9          MS. ESPINOSA:  Your Honor, we just have a number of

10   housekeeping items we wanted to raise.  We are happy to do it

11   now or after your Honor's rulings, as you prefer.

12         THE COURT:  Why don't I start with my rulings so that

13   you have them.  But if it seems close to when the jury pool is

14   going to get here, then we will stop and address your issues.

15         I issued that order so you knew what the rulings were,

16   but I do want to state my reasoning for the record.  Again, I

17   know it can be a little tedious to listen to oral rulings, but

18   it's important to get it on the record as soon as possible.

19         So the government moves to admit evidence of

20   defendant's other alleged sexual assault and abuse crimes,

21   wrongs, and other acts, under Federal Rules of Evidence 413,

22   414, and 404(b), in addition to the seven victims specified in

23   the indictment.

24         For its case in chief the government seeks to admit

25   the testimony of at least seven additional victims of alleged

1    sexual abuse.  It notes that beyond its case in chief it may

2    seek to call seven other additional witnesses.

3              In support of its motion, the government argues that

4    evidence of defendant's sexual assaults of nonstatutory victims

5    is plainly admissible under Rule 413 and, with respect to

6    victims 10, 20 and 25, also admissible under Rule 414.  It

7    further maintains that the evidence is also admissible under

8    Rule 404(b), arguing that the evidence is highly probative of

9    defendant's guilt and relevant to his propensity, character,

10   motive, opportunity, intent, preparation, plan, knowledge,

11   identity, absence of mistake or lack of accident.

12             The government further moves to admit the testimony of

13   two of defendant's former coworkers at a medical institution

14   located on Long Island.

15             The first coworker, an ultrasound technician, is

16   expected to testify about an instance where she says she saw

17   the defendant manually masturbate a patient.  During this

18   incident the defendant allegedly told the coworker that he was

19   masturbating the patient in order to induce an erection.

20             The second coworker is a human resources professional

21   who was tasked with investigating the event described.  She is

22   expected to testify that defendant denied that he had

23   masturbated the patient or that he used the phrase whack off

24   with that patient.

25             The government seeks to admit the testimony of the

1    first coworker under Rules 413 and 404(b) and the testimony of

2    the second coworker under Rule 404(b).  Defendant meanwhile

3    moves to preclude the government's introduction of this

4    evidence under Rule 413.  He argues that Rules 413 and 414 are

5    not satisfied because defendant is not accused of a sexual

6    assault or child molestation, as required by Rules 413 and

7    414(a), relatedly.  He contends that the testimony of the first

8    coworker is admissible because she did not in fact observe a

9    sexual assault.  In addition, he argues that the evidence

10   should be excluded under Rule 403, contending that the low

11   probative value of the evidence is substantially outweighed by

12   the dangers against which Rule 403 is intended to protect,

13   namely, unfair prejudice, confusing the issues, misleading the

14   jury, undue delay, wasting time, or needlessly presenting

15   cumulative information.

16           For today the Court is only to address the seven plus

17   additional witnesses the government wants to include in its

18   case in chief, as well as the two coworkers.  I'll defer ruling

19   on the victims intended for beyond the government's case in

20   chief until the government finishes presenting its case in

21   chief and clarifies whether in it indeed seeks to introduce the

22   testimony of any additional victims.

23           Defendant's motion on Rule 413 is granted in part and

24   denied in part without prejudice.  The government's motion with

25   respect to the nonstatutory victims is granted in part and

denied in part without prejudice as well.  The government's
motion with respect to the two coworkers is granted.  The
government will permit the testimony of four nonstatutory
victims and the two coworkers.

Rule 413 instructs that in a criminal case in which a
defendant is accused of a sexual assault the Court may admit
evidence that the defendant committed any other sexual assault.
The evidence may be considered on any matter to which it is
relevant.

Similarly, Rule 414 instructs that in a criminal case
in which a defendant is accused of child molestation, the Court
may admit evidence that the defendant committed any other child
molestation.  The evidence may be considered on any matter to
which it is relevant.

I'll start with defendant's argument that he is not
accused of a sexual assault or child molestation as envisioned
by Rules 413 and 414.  I will use the term child molestation
today, but, as I noted previously, I am not going to use it
during *voir dire* or before the jury.

Although the defendant cites *United States v. Frank*,
No. 04-CR-20778, 2006 WL 8434880, (S.D. Fla. Nov. 15, 2006),
and *United States v. Courtright*, 632 F.3d 363, 368-69 (7th Cir.
2011) -- and, like before, I am not going to say the case
citations, but I am going to have the court reporter add them
in, unless there is any objection to that practice -- in

1    support of his interpretation of Rule 413, but I find more

2    persuasive *United States v. Foley*, 740 F.3d 1079, 1086 (7th

3    Cir. 2014), which reasons that Rule 413's emphasis is on

4    whether the crime involved sexual assault.  As the Court in

5    *Foley* explained, the focus is on the conduct itself rather than

6    how the charges have been drafted.  This reason applies with

7    equal force to Rule 414.  Judge Furman similarly found this

8    reasoning persuasive in *Boyce v. Weber*, 740 F.3d 1079, No.

9    19-CV-3825, 2021 WL 2821154, at *9 (S.D.N.Y. July 7, 2021),

10   albeit with respect to Rule 415.  Moreover, Judge Berman, in

11   the *Hadden* case, rejected the argument that Rule 413 was

12   inapplicable because the defendant was not charged with sexual

13   assault in the indictment.  So does this Court.

14          The question then is whether the alleged conduct

15   constitutes sectional assault or child molestation as defined

16   by Rules 413 and 414.  The Court finds that it does.

17          Rule 413 defines sexual assault in part as a crime

18   under federal law or under state law involving contact without

19   consent between any part of the defendant's body or an object

20   and another person's genitals or anus.

21          Rule 414 defines child molestation, in part, as a

22   crime under federal law or under state law involving contact

23   between any part of the defendant's body or an object and a

24   child's genital or anus.  This is precisely the conduct that is

25   being alleged in this case.

 1          Notably, as previously discussed, violations of New

 2    York Penal Law 130.55 underlying the Mann Act counts here,

 3    which makes it a crime to subject another person to sexual

 4    contact without the latter's consent.  Under New York Penal Law

 5    130.003, sexual contact is defined as any touching of the

 6    sexual or other intimate parts of a person for the purpose of

 7    gratifying sexual desire of either party, and a person is

 8    deemed incapable of consent when he is a patient and the actor

 9    is a healthcare provider charged with sexual abuse in the third

10    degree as defined in Section 130.55, and the act of sexual

11    contact occurs during a treatment session, consultation,

12    interview, or examination.

13          In short, each count involves conduct that falls under

14    Rule 413's definition of sexual assault, and the 2422(b)

15    counts, which allege conduct against minors, involve conduct

16    that falls under Rule 414's definition of child molestation.

17    In light of these definitions, defendant's contention that the

18    testimony of the first worker is inadmissible because she did

19    not in fact observe a sexual assault also lacks merit.

20          The proffered evidence is also clearly relevant here.

21    The government argues that the testimony of the nonstatutory

22    victims is relevant because it will demonstrate defendant's

23    propensity to allegedly (i) leverage his position of trust and

24    power as a urologist at a premier medical institution; (ii)

25    take steps to build rapport with the victims, including by

texting them over his personal cell phone and inviting them to

spend time with him outside of medical institution 1; (iii)

manually masturbate patients under the guise of medical care,

often without warning or explanation; (iv) digitally penetrate

victims' rectums while masturbating them or instructing them to

masturbate; (v) probe victims' sexual preferences, masturbation

habits and pornographic preferences; and (vi) prescribe

medications that necessitated follow-up visits at which he

abused victims.  It further contends that the testimony will

corroborate the testimony of the statutory victims.

        In its April 18 letter, the government refined these

arguments somewhat.  In principle, it argues that the evidence

is relevant in two ways.

        First, it argues that the testimony of all the

nonstatutory victims is highly relevant to the core issues

before the jury, namely, whether defendant sexually assaulted

the victims for his own sexual gratification and whether

defendant induced the victims to return for follow-up visits in

part so that he could commit the sexual assault.  It notes that

each of the nonstatutory victims will testify that defendant

manually masturbated him and that almost all of them will

testify that he did so during follow-up appointments.

        Second, it argues that the specific details of

defendant's abuse vary between victims, and, thus, the

nonstatutory victims are necessary to corroborate specific

1   portions of the statutory victims' anticipated testimony.  For

2   example, it notes that only two of the nonstatutory victims,

3   victims 11 and 12, will testify about defendant telling them

4   that they were masturbating incorrectly.

5        Separately, as to the first coworker, the government

6   argues that her testimony will be particularly powerful as

7   corroborative evidence because, unlike the other instances of

8   sexual assault, a person other than a victim witnessed the

9   abuse.

10       In view of these arguments and the government's

11  descriptions of the evidence set forth in its memorandum of law

12  and letter, the Court finds that, and here I'm quoting from the

13  Second Circuit's decision in the *Vickers* case, the proposed

14  evidence of defendant's other alleged sexual assaults and child

15  molestation crimes wrongs and acts is plainly admissible

16  because it is probative of his propensity for committing acts

17  of sexual assault and child molestation, including in a manner

18  similar to that alleged here.  The Court also finds that the

19  proposed evidence is inadmissible because it is relevant to the

20  jury's assessment of the victim's credibility.  *See* the

21  *Donaldson* case.

22       Defendant seeks a Rule 104(c) hearing seemingly under

23  the theory that he must know the specific dates of the alleged

24  assaults of the minor statutory victims to know whether Rule

25  414 is applicable.  The Court disagrees.  The specific dates of

1  the alleged assaults of the minor statutory victim are not

2  necessary to prove that the minor victims were indeed minors

3  when the alleged abuse occurred.

4       The testimony of the nonstatutory victims and the

5  coworkers is also admissible under Rule 404(b).  404(b)(2)

6  instructs that any evidence of any other crime, wrong, or act

7  is admissible for purposes other than to prove a person's

8  character in order to show that on a particular occasion the

9  person acted in accordance with that character.  Admissible

10 purposes include proving motive, opportunity, intent,

11 preparation, plan, knowledge, identity, absence of mistake or

12 lack of accident.

13      The government argues that the testimony of

14 nonstatutory victims is admissible under Rule 404(b) because

15 it's probative of defendant's idiosyncratic means and methods

16 of abuse constituting a common scheme or plan, defendant's

17 knowledge that certain victims would travel interstate for

18 appointments with him and/or were under age, defendant's

19 opportunity to commit the charged crimes by creating occasions

20 to be alone with victims during exams and outside the clinical

21 setting, defendant's intent and motive for sexually assaulting

22 patients, including for the purposes of his own sexual

23 gratification and desire and the absence of mistake or lack of

24 accident.

25      As to the first coworker, the government argues that

1    evidence that defendant explained to the ultrasound technician,

2    as he was masturbating a patient, that he was doing so in order

3    to induce an erection in the patient, is extremely probative of

4    defendant's intent as he allegedly touched and masturbated the

5    statutory victims and of defendant's plan to manually

6    masturbate patients.

7         As to the second coworker, the government argues that

8    the evidence that defendant denied masturbating any patient at

9    all is reflective of the defendant's consciousness of guilt and

10   probative of the defendant's knowledge that masturbating

11   patients was not in fact medically acceptable and would rather

12   reflect the defendant's intent to do so for his own sexual

13   gratification rather than any medical purpose.

14        In addition, it argues that evidence that defendant

15   claimed to not understand the phrase whack off to refer to

16   masturbation in his statement that he would not use such

17   language to a patient is inadmissible under Rule 404(b) to show

18   knowledge, intent, lack of mistake, and state of mind.

19        Furthermore, it argues that the evidence that

20   defendant denied using this language is probative of

21   defendant's consciousness of guilt and the fact that he did not

22   mistakenly use crude and colloquial language since it comports

23   with the sexual gratification he sought from masturbating and

24   otherwise touching patients.

25        Defendant is correct that the government may not

1    invoke Rule 404(b) and proceed to offer carte blanche any prior

2    act of the defendant in the same category of crime.

3            As the Court in *Garcia* explained, for the 404(b)

4    evidence to be admissible, the government must identify a

5    similarity or connection between the two acts that makes the

6    prior act relevant to establishing knowledge or the other

7    admissible purposes.

8            In light of the government's description to the

9    evidence set forth in its March 20 and April 5 memoranda of law

10   and the just-recited explanations for how the evidence is

11   probative it is inadmissible under Rule 404(b).

12           That said, the protections provided in Rule 403 still

13   apply and the testimony of all seven nonstatutory victims

14   would, in my view, be substantially more cumulative and

15   unfairly prejudicial than probative.

16           As you know, under Rule 403, the Court may exclude

17   relevant evidence if its probative value is substantially

18   outweighed by a danger of one or more of the following:  Unfair

19   prejudice confusing the issues, misleading the jury, undue

20   delay, wasting time, and needlessly presenting cumulative

21   information.

22           Starting with the probative value of the evidence

23   here, under *United States v. Spoor*, in determining the

24   probative value of prior act propensity evidence, the district

25   court should consider such factors as the similarity of the

1   prior acts to the act charged, the closeness in time of the

2   prior acts to the acts charged, the frequency of prior acts,

3   the presence or lack of intervening circumstances, and the

4   necessity of the evidence beyond the testimonies already offer

5   at trial.  Applying the *Spoor* factors, the evidence appears to

6   be highly probative.  Specifically, there are sufficient

7   similarities between the prior acts regarding the nonstatutory

8   victims and the acts charged.

9       Similar to the statutory victims, each of the

10  nonstatutory victims will testify to being sexually abused

11  while a patient of defendant.  More specifically, as the

12  government observes, each will testify that defendant manually

13  masturbated him and that almost all will testify that he did so

14  during follow-up appointments.  In addition, what the first

15  coworker purports to have observed is also sufficiently similar

16  to what the alleged victims allegedly experienced.  That the

17  first coworker worked at a different medical institution than

18  the one visited by the victims in the indictment does not

19  change my analysis.

20      The alleged acts are also within the relevant temporal

21  scope.  The allegations in the indictment span from 2007 to

22  2019.  The allegations of the conduct committed against the

23  nonstatutory victims fall within that time range.  The conduct

24  that the first coworker allegedly observed, which occurred in

25  late 2020, is not far outside that range.  Also, given the

number of nonstatutory victims, the frequency of the prior acts

also appears to be high.

Finally, the Court is not aware of any intervening

circumstances that diminish the probative value of the others.

Likewise, the evidence is highly probative 404(b) evidence

because of the close parallel between the crimes charged and

the acts to be shown by the evidence.  *See* the *Curley* case.

Let me now move to whether the probative nature of the

evidence is substantially outweighed by the dangers specified

in Rule 403.  I am going to begin with the danger of

cumulativeness, which I find to be the most significant danger

here.  Based on my examination of the law, I do not believe

that there is a maximum limit on the number of witnesses who

can testify under Rule 413 and 414.  *See* the *Never Misses a*

*Shot* case.  At the same time, however, the witnesses inject

cumulative evidence with little additional probative value when

viewed in the aggregate.  *See*, again, *Never Misses a Shot* at

1028.  In other words, the marginal return on each additional

witness' testimony starts to diminish.

In the *Perrault* case the introduction of testimony

from seven witnesses gave this Tenth Circuit pause.  In *It*

*Never Misses a Shot*, the Eighth Circuit was troubled by the

admission of testimony from six witnesses.  Indeed, in many

cases, including the *Shaw* case, *Kindley* case, *Carter* case, and

*Crow Eagle* case, courts limited the testimony of witnesses

1    under Rules 414 and 413 to three or four.  The Court finds

2    those cases persuasive and it also finds the approach

3    persuasive with respect to evidence admissible under 404(b).

4         This case involves seven victims squarely referenced

5    in the indictment, as I noted.  The government seeks to

6    introduce testimony from at least seven nonstatutory victims.

7    Based on the government's proffer, the testimony of the seven

8    victims will be similar in kind to the statutory victims.  Like

9    the statutory victims, each of the nonstatutory victims will

10   testify to being sexually abused while a patient of defendant.

11        More specifically, as the government observes, each

12   will testify that the defendant manually masturbated him.

13   Almost all will testify that he did so during follow-up

14   appointments.

15        To be sure, I appreciate the government's argument

16   that specific portions of the nonstatutory victims' anticipated

17   testimony corroborates specific details of certain nonstatutory

18   victims' testimony, since the way the alleged abuse was carried

19   out varied, but that does not erase the aspects of the

20   proffered testimony that will still be very similar, and, thus,

21   my concern is, again, about their cumulative nature, and at

22   this point I don't find the additional testimony necessary in

23   light of that.

24        In view of the similarities, the Court will allow four

25   of the nonstatutory victims to testify.  The government may

1    choose the four nonstatutory victims it wishes to call.  I find

2    that with four nonstatutory victims testifying the risk of

3    cumulativeness will not substantially outweigh the probative

4    value of the proffered evidence.  The Court will also permit

5    the two coworkers to testify.  Here, I note that the first

6    coworker may have observed alleged sexual abuse.  While she may

7    have done that, she did not, as the nonstatutory victims did,

8    experience it herself as a patient during purported treatment.

9          The testimony of the second coworker differs in that

10   she neither witnessed nor experienced any masturbation.

11   Accordingly, her testimony is not being offered under Rules 413

12   or 414.  Unlike the other witnesses, moreover, the second

13   coworker interacted with defendant through an investigation

14   rather than in a treatment setting and, unlike the other

15   witnesses, the coworker will testify about his denial of use of

16   crude language and masturbating the patient.

17         As to the two coworkers, the risk of needless

18   cumulativeness will not substantially outweigh the probative

19   view of the proffered evidence.

20         I also find that the probative value of the evidence I

21   have declined to exclude is not substantially outweighed by

22   danger of unfair prejudice, as the Second Circuit said in

23   *Schaffer*.  The fact that evidence may be highly prejudicial

24   does not necessarily mean that it is unfairly prejudicial and,

25   as in *Schaffer*, I find that the evidence described will not be

1   more inflammatory than the conduct for which the defendant is

2   being tried.

3            Given the number of witnesses I'm permitting to

4   testify, I find that I have adequately limited the risk that

5   the prior-act evidence will lead the jury to convict out of

6   passion or bias or because they believe the defendant is a bad

7   person deserving of punishment.  I'm prepared to give a

8   limiting instruction to reduce the risk of prejudice.  If you

9   want to propose language, feel free to do so, but please do it

10  in advance.

11           As to the risks of confusing the issues and misleading

12  the jury, I'm unpersuaded by the citation to the *Guardia* case.

13  I'm also unpersuaded by defendant's argument that the jury will

14  be confused or misled by the fact that the coworker's testimony

15  will relate to an incident that occurred at a different medical

16  institution in 2020.  I also don't see any merit in this

17  argument that the unknown identity of the patient involved in

18  that incident will confuse the jury.  In short, I find little

19  risk of confusion or misleading the jury.

20           In addition, I don't find there to be significant risk

21  of undue delay or waste of time.  The government has

22  represented, for instance, that it intends to introduce limited

23  testimony from the coworkers.  If I find that as the trial

24  proceeds the risk of undue delay or time wasting have grown, I

25  will direct the government to tailor its line of questioning.

1          Finally, I, just on this issue, want to make clear

2     that the government may renew its motion to admit additional

3     nonstatutory victims, should evidence presented at trial call

4     for the Court to reassess its ruling.  It may be that evidence

5     is presented that changes my assessment of whether evidence is

6     substantially more needlessly cumulative or unfairly

7     prejudicial.

8          That's my ruling on that.

9          When can you inform defense counsel of which

10    witnesses, which four nonstatutory victims you intend to call?

11         MS. ESPINOSA:  Your Honor, yesterday we gave him a

12    list of five from which we will be selecting.  The government

13    intends to make a final decision as we see how the beginning of

14    the trial plays out so that we can determine exactly who to

15    call, but we have given him five, and four will be selected

16    from this group.

17         THE COURT:  I have a couple more rulings, but I just

18    want to hold off just to make sure that we talk about things

19    that are more time pressing.

20         MR. BALDASSARE:  Your Honor, there is just one thing I

21    want to clarify.

22         Your Honor mentioned you were withholding onto one --

23    at the very beginning of what your Honor read, that you were

24    withholding as to one ruling.

25         THE COURT:  Because the government said, there is

1    seven nonstatutory victims that they seek to call in their case

2    in chief, but there are others that they may seek to call,

3    which I assume meant on rebuttal.  I'm not dealing with any

4    rebuttal issues now.

5              MR. BALDASSARE:  Yes, Judge.  Thank you.

6              THE COURT:  I'll read my rulings which, just for the

7    record, are shorter, as to the iCloud note, the URL and the

8    other pending issues, but I just want to make sure before the

9    jury pool gets here that we talk about some logistical issues

10   in jury selection.

11             If you want to go ahead with your issues, I'm happy to

12   do them first.

13             MS. ESPINOSA:  However your Honor prefers.

14             THE COURT:  Let me get through these, and then we will

15   hear from you.

16             Let's just talk about jury selection for now, and then

17   we will come back to the other things.

18             I know we discussed the jury selection process at

19   Friday's conference, but I just want to go over it one more

20   time because I was just thinking through the logistics based on

21   your requests.

22             I plan to hand out the questionnaire as I said, walk

23   through it with the first juror, and then ask whether any of

24   the other jurors answer yes to any of the questions, and then

25   we will inquire further.

1          Each juror will, number one, have the proposed

2    questionnaire but also have -- and we made them in pink, the

3    list of patient and patient family list.

4          With regard to exercising peremptories, I think the

5    following process will be the smoothest.  The 12 jurors will be

6    chosen from potential jurors numbered 1 through 28.  We had

7    talked about maybe if you didn't exercise all of your

8    peremptories, if the jurors who may be prospective jurors,

9    number 27 or 28 or whoever at the end of that go to the

10   alternate pool, I actually think it's cleaner to just have two

11   pools.

12         We are going to have prospective jurors 1 through 28

13   be in the prospective juror pool, and the alternates will be

14   chosen from potential jurors number 29 through 36.  So even if

15   you all don't exercise all of your peremptories, with the

16   alternates we are going to be looking at 29 through 36.

17         Is everyone OK with doing that?

18         MS. ESPINOSA:  Yes, your Honor.

19         MR. BALDASSARE:  Yes, Judge.

20         THE COURT:  We will have questioned all 36 prospective

21   jurors by the time you are making these decisions, to be clear.

22         Then we had talked about the order of going back and

23   forth.  I think that since we are going to basically have you

24   come up and look at the board and take turns with the board,

25   looking at the names of the jurors on the board, I think that

1    what makes sense -- again, the government will have six

2    peremptories with respect to the 12 jurors and the defendant

3    will have 10, and then each side also gets 10 more peremptories

4    for the four alternates.

5          Given the defendant has more -- sorry.  I misspoke.

6    Two more.  Excuse me.  Two more each for the four alternates.

7          Given that the defendant has more peremptories, he is

8    going to go first.  So for the 12-person jury he will have the

9    opportunity to exercise two peremptories.  Then the government

10   is going to come up, look at the board.  The government will

11   exercise one peremptory.  Then it will go back to the defendant

12   for two, back to the government for one, the defendant has two,

13   the government has one, the defendant has two, the government

14   has one.  Then the defendant has one, the government has one,

15   the defendant has one, and the government has one.  We are just

16   going back and forth.

17         For the alternates we are going to also go back and

18   forth with one peremptory at a time.

19         Then you will be able to look at the board and see

20   that everyone agrees.  We will excuse the jurors who have been

21   struck.  We will have them stand in the back of the courtroom,

22   and I'll ask you all if this jury is acceptable to everyone.

23         That's how we are going to do it.  Obviously, there

24   will be sidebars as appropriate, and we will deal with

25   sensitive issues at sidebar.

1          I did want to make one just quick disclosure before we

2   proceed.  One of my law clerks informed me that one of the

3   medical records, GX-206 on the government's exhibit list

4   received last night, belongs to an individual that attended my

5   law clerk's high school.  The patient is not on the witness

6   list.  My law clerk has informed me that the patient was not in

7   their grade and that they haven't spoken to them in over a

8   decade.  But I did just want to make that disclosure for the

9   record.

10          Why don't I hear from the government what issues you'd

11   like to raise, and then we will proceed from there.

12          MS. ESPINOSA:  Thank you, your Honor.

13          First, we wanted to put on the record that in this

14   case a plea offer was extended to the defendant.  On January 5

15   of this year, the government extended the defendant a plea

16   offer to one count of 2422(a), which is enticement across state

17   lines.  It carries no mandatory minimum and a 20-year statutory

18   maximum sentence.  The defendant rejected that plea offer.

19          THE COURT:  I am going to ask Dr. Paduch.

20          Was that plea offer relayed to you and did you discuss

21   it with your attorney?

22          THE DEFENDANT:  Yes, and I read it.

23          MS. ESPINOSA:  Thank you, your Honor.

24          THE COURT:  I also actually want to ask just one more.

25          Mr. Baldassare, did you discuss with Dr. Paduch

1    whether he intends to waive his right to be present for

2    sidebars?

3             MR. BALDASSARE:  Yes, Judge, and he is.

4             THE COURT:  He is waiving his right?

5             MR. BALDASSARE:  Yes, he is waiving.

6             THE COURT:  That's both during *voir dire* and during

7    the course of the trial?

8             MR. BALDASSARE:  Yes, for both.

9             THE COURT:  Thank you.

10            MS. ESPINOSA:  Your Honor, the government has

11   discussed with defense counsel that we intend to introduce

12   certain records pursuant to certifications under Rule 902.  We

13   understand from those conversations that defense counsel has no

14   objection to that.  I'll let him clarify if there is any

15   difference.  But our understanding is, they are not objecting

16   to admissibility of those records under the certifications.

17            MR. BALDASSARE:  Yes.  There is a lot flying, but I

18   made it clear to the government the ones, which may have been

19   all of them, and I think the government is representing that

20   correctly.

21            THE COURT:  Thank you.

22            MS. ESPINOSA:  The government also wanted to address

23   the Court's order from yesterday about Dr. Strange and the

24   basis for cross-examining certain witnesses.

25            Now, it's the government's view that defense counsel

1    can properly inquire into whether or not the victims learned

2    the facts of their abuse through some other source or discussed

3    that.

4            But one thing we do want to be aware of is that many

5    of these victims are represented by civil counsel, and we want

6    to be cautious of any questions that would necessarily require

7    victims or would get into attorney-client privileged

8    conversations between those victims and their counsel.

9            While we have no objection, we think it's proper to

10   cross-examine them about the source of the information that

11   they are testifying to today, we want to avoid needing to

12   needlessly object to questions that stray into attorney-client

13   privileged conversations.  We would ask that defense counsel

14   attempt to formulate those questions to get at the facts,

15   rather than any legal advice, legal strategy between counsel

16   and client.

17            MR. BALDASSARE:  Judge, on that issue, I think a

18   witness knowing a fact is fair game.  I think how they came to

19   learn that fact, if it was the lawyer, isn't, because it is not

20   fair game because it's protected by the privilege.  Sussing out

21   how they got that fact, I am going to have to figure out a way

22   to do that, which may be a question like -- I don't know.  If I

23   ask, is the source of that information other than your lawyer,

24   well, that answers the question in a way that the government is

25   not going to be happy with, but I'm open.

1          MS. ESPINOSA:  I think, your Honor, an option simply

2     could be, as a source of that information, anyone other than

3     yourself, any other individual and, depending on the answer, if

4     counsel could inquire further.  If we have any reason to think

5     that we are getting into dangerous territory, we can address

6     it.

7          Maybe I'm misunderstanding this issue, but my sense is

8     that defense counsel is seeking to inquire of anyone else who

9     has influenced the memories of these particular victims.  It is

10    less important to exactly who that other individual is.

11         MR. BALDASSARE:  I don't think the question can be

12    limited to, is the source anyone other than yourself.  I can

13    think of at least two who have a source that is other than the

14    attorney.  So I think -- I don't think it's fair to say -- I

15    can't ask, was it other than yourself.  I could ask, was the

16    source of that information X.  I'm not going -- then I won't

17    ask -- for example, if let's just say I'm the witness and Mr.

18    Hawriluk, who is not my lawyer, was the source of the

19    information, I think I could say, isn't it true that the source

20    of your information, Mr. Baldassare, was this guy Jeff.  I

21    think that's fair because people don't always learn things just

22    from themselves, and in fact in this case they didn't.

23         THE COURT:  Do you have any problem with that?  I

24    think it seems fair to ask specific questions of, was it this

25    person if that person is not the lawyer.  But if it's a more

1   open-ended question and you are not asking about a specific

2   person other than the lawyer, I think it should be more

3   open-ended.

4           MS. ESPINOSA:  I think that's fine, your Honor.  I

5   think where we want -- we are merely trying to avoid questions

6   that would call for an answer that necessarily gets into

7   attorney-client conversations.

8           MR. BALDASSARE:  Yes.  And it would also matter, I

9   think, if there was an attorney conversation, whether there

10  were third parties there who would blow the privilege, as we

11  say, colloquially.  But I am going to be careful with the

12  privilege, Judge.

13          THE COURT:  Let's all be sensitive to this issue.

14  Thank you for raising it.

15          MS. ESPINOSA:  Your Honor, just a couple of more

16  things.

17          We would ask that the Court, if a sketch artist

18  attends, and I don't know that they will, we would ask that the

19  Court direct them not to sketch the victims' faces, which we

20  believe is customary in cases of this nature.  I don't know

21  that one will attend.

22          THE COURT:  Yes.  If you see -- obviously, we will all

23  see them, but call it to my attention, and I'll make sure that

24  my deputy speaks to that individual.

25          MS. ESPINOSA:  We would also ask the Court each day to

1    just remind everyone to not, including any members of the press

2    who are present, to not print any victim's real names other

3    than those who are testifying under their real names if they

4    consent.  If they are inadvertently mentioned, we are all going

5    to do our very best to avoid any slips, but every now and then

6    sometimes mistakes are made.  We would that ask the Court issue

7    a reminder.

8             THE COURT:  If there is a slip, you'll let me know and

9    then I'll announce it.  But if there isn't, I won't say

10   anything.

11            MS. ESPINOSA:  That's fine, your Honor.

12            Thank you.

13            One last item from us.  Understand we received a

14   witness list from the defense.  We are just going to put this

15   on the record.  We have begun discussions with him.  We have

16   received a witness list from the defendant of a number of

17   witnesses he would like to call from Northwell.  And I think

18   that in advance of that we would like to discuss with him the

19   relevance and admissibility, nonhearsay testimony those

20   individuals would like to offer, and we have suggested to

21   defendant that prior to opening, if he intends to open on

22   anything related to those Northwell witnesses, we would like to

23   discuss the relevance and admissibility of that evidence.

24            THE COURT:  Let him respond on this issue.

25            MR. BALDASSARE:  I usually don't like giving a preview

1    of anything, but in this case I think it's a fair request.  So

2    I am going to look through -- because it really comes down to,

3    Judge, what's in Ms. Williams' report.  And if I find something

4    in there that I think is fair game and that isn't hearsay,

5    because it's simply not hearsay or because it's not hearsay due

6    to an exception, I'm happy to raise it for the Court, and I'll

7    only open on what the Court says.

8         If I could ask, because I was scribbling -- if there

9    is a slip, obviously, number one, I am going to be very careful

10   and, number two, I really can't envision talking to the press.

11   And if I do, I am not identifying any of the individuals who

12   are testifying under pseudonyms, nor will I identify the people

13   who are not testifying under pseudonyms, even if they choose to

14   speak to the press in their own names.  It's just not something

15   I'm interested.  It's just not my style.  And the last question

16   was, there was something said, and I just didn't get it.

17        After the ACP, the privilege, there was something

18   either about pictures or identifying them.  I didn't get that

19   one.

20        MS. ESPINOSA:  Your Honor, just to clarify, sometimes

21   a sketch artist may attend.  And in cases where victims are

22   testifying, routinely the sketch artist obscures the face of

23   the victim or does not sketch the victim.

24        THE COURT:  If we have a sketch artist, we will just

25   ask the sketch artist to obscure the face of the victim.

1          MR. BALDASSARE:  That's fine, Judge.

2          MS. ESPINOSA:  I have one more quick item, your Honor.

3     We are happy to discuss further with defense counsel, but we

4     understand that defense counsel has added a private

5     investigator to the names and places list, as well as marked a

6     number of emails, as potential exhibits from that private

7     investigator to attorneys for the victims.

8          At this time we don't see a relevant or nonhearsay

9     basis for any of those to be admitted.  We are happy to discuss

10    further, and defense counsel can bring any to our attention,

11    but we would ask until that issue has also been sorted out,

12    defense counsel not open on anything from the private

13    investigator.

14         MR. BALDASSARE:  Judge, I think that the documents I

15    have given them are fair game for opening.  They are clearly

16    business records.  I just think that they are fair for opening.

17    I just disagree.  I'm happy to tell you what they are.

18         THE COURT:  Tell me what they are.

19         MR. BALDASSARE:  They are emails from our private

20    investigator requesting, and we tried to do this in the most

21    professional way possible -- they are emails requesting from

22    the lawyers for the former patients.  Today I understand, even

23    though I object, we are using victims for shorthand.  They are

24    emails from our investigator to the alleged victims asking if

25    they will sit with us.  To the extent that no response was

1    received or in other cases we were told flat out no, we will

2    not sit with you, but we are willing to sit with the government

3    17 times, I think that goes to bias, and I think it's fair

4    game, and I think it's an email that the jury should see.

5            MS. ESPINOSA:  Your Honor, we, of course, have no

6    objection to me inquiring of the victims whether they met with

7    him, eliciting the fact that they did not meet with him.  I

8    would note that some of these emails are to -- I believe they

9    are to counsel for the victim.  There is no evidence that any

10   of the victims saw or even were aware of these emails.

11           I think it is certainly fair to cross on the fact that

12   they did not meet with the defendant.  I don't think that an

13   email from the investigator to an attorney is -- the fact of an

14   email conceivably could be a business record.  But the

15   substance of any email would not be a business record, and we

16   don't think that it is --

17           THE COURT:  We are not having any exhibits shown to

18   the jury on opening anyway.

19           Were you intending to read the email or were you just

20   going to get out the fact that they were unwilling, in your

21   view, to meet with you or someone from your office or the

22   investigator?

23           MR. BALDASSARE:  Here is what I would say about that,

24   Judge.

25           Number one, I'm in a tough spot, right, because I

1    can't violate the ethics rules and go to people I know are

2    represented by counsel.  I can't do it.  When I talk to -- for

3    example, a specific example, our investigator very early on

4    contacted someone.  I got a call from Mr. Fishman at Fried

5    Frank -- Paul Weiss.  I always get that messed up -- from Paul

6    Weiss.  He said:  Mike, I'm sure this was inadvertent.  I

7    represent that person, this person, this person.

8            So I have to go to the lawyer.  So it can't be, I went

9    to the lawyer and I didn't go to the victim.  I am not allowed

10   to, number one.

11           Number two, the fact -- I get that the government

12   would like to not use this exhibit because they think I can get

13   the information out a different way.  Well, that just reminds

14   me of the age-old argument, when a defense attorney sees

15   something they don't like and says to the government, I'll stip

16   to that and the government says no.  We don't want a stip.

17           THE COURT:  Back to my question.  Just for purposes of

18   opening today, were you intending to read from the emails, or

19   were you just going to get out the fact that certain people

20   were unwilling to meet with your investigator or your office?

21           MR. BALDASSARE:  No.  I wouldn't read from anything

22   that's not in evidence.  The short answer is, the latter.

23           THE COURT:  It's not really an issue for openings, to

24   the extent we get to openings today.  But it sounds like it

25   will be an issue for cross-examination.

1              MS. ESPINOSA:  Perhaps, your Honor.

2              THE COURT:  I would like to see the email.  If you

3    want to be heard further on it, I'm happy to hear you further.

4    The emails that I understand were sent to a host of different

5    folks.

6              MR. BALDASSARE:  Yes.  And as I sit here, I believe we

7    would have to probably redact because we weren't sure -- for

8    example, in the Weill Cornell email, I don't know if we knew or

9    to the attorneys for the alleged victims, I think we may

10   have -- I don't remember if we used the real name in there or

11   the alias, because we weren't sure if they had it.  Obviously,

12   if our investigator says, we want to interview these people,

13   and we used the real names, obviously, we are going to redact

14   that.

15             THE COURT:  How are you going to authenticate the

16   emails, if they weren't sent to the victims themselves, on

17   cross with the victims.

18             MR. BALDASSARE:  Because they are business records of

19   our investigator, and I have no choice but to -- I have no

20   choice.  Obviously, I know the Court knows I have a right to

21   investigate and present a defense.  Under the law, I have to go

22   to the lawyer unless I want to violate the RPCs.

23             I would respectfully say, I can't be hamstrung in

24   those constitutional rights and say, do you go -- did I go?

25   I'm happy to do it.  I'll call my investigator and before lunch

1   I will find -- because I have them, I have the email for every

2   single alleged victim.  I have the home address for every

3   alleged victim.  I have the phone number not only for every

4   alleged victim but for the minors, for their parents.  And if

5   the government and the Court wants me to send out a wave of

6   will you sit with us, but I don't see how -- I think that's

7   exactly what they wouldn't want.

8          MS. ESPINOSA:  Your Honor, respectfully, I think that

9   perhaps defense counsel is missing the point.  We have

10  absolutely no objection to him eliciting from the victims that

11  they did not meet with him, and in fact in certain cases, if

12  they refused to meet with him, that is also certainly --

13         THE COURT:  Or if someone from his office or his

14  investigator reached out to them, that's OK too as well.

15         MS. ESPINOSA:  Yes, your Honor.  They may or may not

16  know that outreach was made.

17         What we are objecting to is the process of a

18  authenticating and admitting the emails themselves, not the

19  underlying facts, which I believe are the key point here, which

20  is that they refused to meet or did not meet with defense

21  counsel.

22         THE COURT:  Your basis is what?

23         MS. ESPINOSA:  Our basis for the emails is that we

24  believed that they -- we believe that it is not properly

25  admitted as a business record because it is testimonial in

1    nature.

2            MR. BALDASSARE:  Judge, business records are

3    exceptions to the hearsay rule, number one.

4            Number two, those statements by the lawyers are not

5    hearsay because they are statements from an authorized

6    representative.  The lawyers should have thought about what

7    they said before they didn't.  They don't want the jury to see

8    them, respectfully, because looking at something in a visual

9    world, now more than ever, is powerful evidence than just, I

10   reached out.  It also ensures the credibility of a defense

11   investigator that it happened.

12           I see no reason why she can't authenticate it as a

13   business record.  There are at least two exceptions to the

14   hearsay rule.  And also I have no other way to do this.  And I

15   don't want a situation where somebody says, oh, I don't

16   remember that, or I didn't hear from that.  I know this is

17   never a compelling argument, but I sometimes see it work for

18   the government.  I have never had an issue with putting in

19   these.  They are business records, they are statements from

20   authorized representatives, and they are the only way I can get

21   them.

22           I understand that the government would like just the

23   testimony.  I want the exhibit.  It's important for the jury to

24   see it because it goes to bias.

25           THE COURT:  Give me a couple of examples of those so I

1    can take a look at them, and I'll rule by tomorrow morning in

2    advance of any testimony.

3          MR. BALDASSARE:  Yes, Judge.

4          THE COURT:  Are there any other issues?

5          MS. ESPINOSA:  Not from the government.

6          MR. BALDASSARE:  Judge, I have a couple of them.

7          We will have to do and submit a new order for MDC.  I

8    am going to talk to the client today to see what we think is --

9    quite frankly, what we think is reasonable and even to be fair

10   to MDC.  I don't know what's going to happen during a trial

11   day.  Obviously, we will have some sort of an order in place

12   for the weekend.  To the extent that that order is in play for

13   today, or until we get a new order, we understand that there is

14   no way to comply with it.

15         THE COURT:  Why don't you talk to the government about

16   that, ideally submit a proposed order, and the government can

17   also coordinate with folks at the MDC to make this move

18   smoothly, hopefully.

19         MR. BALDASSARE:  Judge, just for the witness or the

20   individual that I think it was GX-207, who went to high school

21   I think with the law clerk, I'm happy to accept whatever

22   representation or info the Court can give as to whether there

23   is any likelihood, from being in clubs or the same group or

24   anything, that somebody could recognize somebody.  I understand

25   they have not been in school for 10 years and that they were in

```
 1   a separate grade.  But I think if you ask and tell us no, I'm
 2   fine with that.
 3            THE COURT:  What I understand, what my law clerk said
 4   to me is that they would recognize the person.  So it's not
 5   that they wouldn't recognize each other or that they don't who
 6   each other are.  But they have not been in touch for 10 years
 7   and were never close friends or anything of that nature.
 8            MR. BALDASSARE:  Do we voir dire that individual on
 9   it?
10            MS. ESPINOSA:  Your Honor, if I may, the government is
11   not intending to call that witness at trial at this time, so I
12   think that should moot the issue.
13            MR. BALDASSARE:  That was easy.
14            THE COURT:  We have jurors.
15            Are there any issues related to jury selection?
16            MR. BALDASSARE:  Yes.  Just one.
17            THE COURT:  Sure.
18            MR. BALDASSARE:  I hate to beat a dead horse, but it
19   has never stopped me before.  I still have concerns about how
20   the Court, respectfully, intends to handle questions like
21   question 2 because I understand that the Court is going to say,
22   do you have yes to any of 1, 2, or 3?  And my concern is that
23   someone could read -- by the way, the commercials, the media,
24   continue to this day -- is somebody could 2 to say:  Have you
25   ever heard, etc.  Their answer could be yes.  But the final
```

1    question they could say:  Well, I think I could be fair.

2           THE COURT:  As I said, I am going to break them down.

3    I am going to ask one question at a time.  And then I am going

4    to make clear that if you have any answers, even if your

5    ultimate answer is that it won't affect your ability to be fair

6    and impartial, I still want the answer to the first question.

7    So even when I go to prospective jurors number 2, 3, etc., I am

8    going to be making that clear.

9           MR. BALDASSARE:  My only concern was, I think the

10   Court is only reading the question to prospective juror 1, but

11   if the Court is going to say exactly as you did, even if your

12   ultimate answer regarding the ability, if you have a yes answer

13   to a preceding question, we can then suss it out that way.

14          THE COURT:  Yes.  It even says that in the

15   questionnaire.  It says:  Please indicate if your answer to any

16   of the questions or sub-questions is yes, so I'll highlight

17   that.

18          MR. BALDASSARE:  Thank you, Judge.  We have nothing

19   further.

20          (Jury selection under separate cover)

21

22

23

24

25

1          THE COURT:  So I understand that there is a for-cause

2     challenge for Ms. Thottam, for Prospective Juror No. 31, the

3     one that we just spoke about at sidebar.  I understand there is

4     a for-cause challenge.

5          I'll think about that overnight.  I'm going to look

6     back at the transcript.  I'm going to think about it.  I'll let

7     you know in the morning.  As is, she's coming back tomorrow.

8          Is there anyone else, any other for-cause challenges

9     among these folks?

10          MS. QIAN:  Not from the government, your Honor.

11          THE COURT:  OK.

12          MR. BALDASSARE:  No, Judge.  I just remember there

13     was --

14          THE COURT:  Bring the microphone a little closer,

15     please.

16          MR. BALDASSARE:  Yes.

17          Judge, I don't know if it was for cause, but there is

18     one juror who has the daughter coming home.

19          THE COURT:  Yes.

20          So that was the lawyer, Ms. Danzillo, I think.  I

21     don't know if that is who you're talking about, Prospective

22     Juror No. 10.

23          MR. BALDASSARE:  Yes.

24          THE COURT:  So initially, when she talked to us, she

25     said, you know, that she had something on May 9, and then a

1    graduation on May 16 and May 26.

2             But then towards the end she made it seem like, you

3    know, her daughter is coming and she has more conflicts.  I

4    don't know that she can't get around them, but I'm happy to

5    hear you out, if you are asking that she be excused.

6             MR. BALDASSARE:  Well, I would just kind of defer to

7    the court.  As to the government's position, it just sounded to

8    me like when she did get back in the box, somehow now the

9    rollup to May 9 with her daughter's coming home may cause her

10   to be distracted.

11            I think it did change from sidebar to up there, but it

12   seemed a lot more -- seemed like she really didn't want to be

13   here or run that risk an awful lot more when we were

14   questioning her in the box.

15            I don't know if anyone else had that perception.

16            THE COURT:  No, I had the same perception, but I don't

17   know that that means we shouldn't keep her.

18            I'm happy to hear the government out.

19            MS. QIAN:  Your Honor, we have no preference on this

20   issue.  We understand that she has a hard conflict on the 9th,

21   which I think we can deal with.  The other something she

22   mentioned about her daughter coming, sounded like things that

23   could, you know, be worked around.

24            But we also, again, have no strong preference on this

25   point.

1                    THE COURT:  I think so, too.  I think we leave her for

2    now.

3                    I'll consider that one for-cause challenge starting at

4    ten tomorrow, go through the questionnaire with the 30 jurors

5    tomorrow.

6                    Is that right, Allison?

7                    THE DEPUTY CLERK:  Approximately.

8                    THE COURT:  Approximately 30 jurors tomorrow,

9    Hopefully that will fill the remaining spots.  That is all they

10   had, frankly, because of the Passover week.

11                   THE DEPUTY CLERK:  If we don't get it tomorrow, we

12   have to resume Monday.

13                   THE COURT:  If we don't fill them tomorrow, we have to

14   resume on Monday.

15                   They unfortunately don't have any other prospective

16   jurors coming until Monday.

17                   MR. XIANG:  So, your Honor, if we're in the

18   contingency where, based on the jurors available tomorrow, we,

19   you know, we can't qualify 36, I think the government's request

20   at that point would be that we lower the number of alternates

21   in order to be able to impanel a jury and begin this week.

22                   I think I mentioned before, we have very serious

23   concerns about witness availability going over the next couple

24   days.

25                   THE COURT:  Do you have a view on that?

1           MR. BALDASSARE:  No, Judge.

2           THE COURT:  OK.  So why don't we see.

3           We'll keep our fingers crossed, hoping we can get at

4    least three alternates, which I think frankly would be fine

5    anyway.  But why don't we see how things go in the morning, and

6    we will keep Prospective Juror No. 10 for now, Ms. Danzillo.

7           I think the only other thing that, I just want to say

8    a few things, and then we'll adjourn for the day.  But I just

9    wanted to finish my rulings.  This should be a lot shorter than

10   this morning.

11          So the government's Daubert motion regarding

12   Dr. Strange is pending.  It was filed recently, you know,

13   because of the late notice.  And per my order of yesterday, the

14   defendant's response is due Monday at nine.

15          Given that it's pending, I'm only going to permit the

16   defendant to open on portions of her expected testimony to

17   which there is no objection.

18          OK.  Is there an issue with that?

19          MR. BALDASSARE:  No.

20          THE COURT:  OK.  All right.  I mean, the government

21   does not object to her opinions regarding how memory works

22   generally, including trauma memory.

23          That's my understanding, correct?

24          MS. QIAN:  That's right, your Honor.

25          THE COURT:  OK.  I'm not going to decide the

1    government's Daubert motion until I receive the defense

2    response, but because we will likely hear from witnesses before

3    then, I will, consistent with *Maxwell*, allow defendant to ask

4    questions about activities or events that he believes led to

5    false or distorted memories.

6            We're all on the same page with that and OK with that?

7            MS. QIAN:  Yes, your Honor.

8            THE COURT:  OK.  Then with respect to the motion to

9    admit the defendant's iCloud note, in which he in part

10   describes some of his sexual fantasies to his then boyfriend,

11   now husband, I deny the government's motion.

12           As explained in the final pretrial conference,

13   although the iCloud note mentions watching pornography with his

14   partner, masturbating together, and stimulating his partner's

15   prostate, which in some ways mirrors the alleged assaults, in

16   the note he also describes how his flight was, his romantic

17   feelings towards his then boyfriend, and his desire to set up

18   two friends on a date.

19           The government argues that the note is a catalog of

20   the ways in which defendant sought sexual gratification.  In

21   particular, defendant's note to his then boyfriend states:  I

22   want to watch the most secret porn with you which you would

23   normally not share with anybody.  Your dirty little porn

24   fantasy.  I want to get Fleshlight vagina and vibrator and try

25   on you and myself, and we jerk off each other.  I want to

1    massage your prostate and your butt as you jerk off and see if

2    you like it.  I want to come home and see you continue jerking

3    off to your porn.

4         The government organizes that such fantasies mirror

5    the alleged acts of assault because defendant allegedly

6    directed some of the victims to watch porn, told some victims

7    to purchase a fleshlight, used a vibrator on some victims, and

8    performed prostrate massages on some as well.

9         The court finds the note, which outlines different

10   sexual practices defendant sought to engage in with his then

11   boyfriend, as well as discussions -- sorry, as well as

12   discusses a myriad of other non-sexual topics, to be of limited

13   probative value as to defendant's motive or intent regarding

14   his conduct towards his patients.

15        In any event, to the extent that it is admissible

16   under 402 and 404(b), any probative value is substantially

17   outweighed by danger of unfair prejudice.  In an effort to

18   diminish the prejudicial nature of the note, the government

19   proposes admitting an excerpt of the note, which would omit any

20   discussion of non-sexual topics or references to defendant's

21   then boyfriend, but the court finds that doing so would only

22   increase the danger of unfair prejudice.  I'm excluding the

23   note pursuant to Rule 403.

24        The government further moves to admit a URL found on

25   one of defendant's devices entitled Doctor Fucking Teen.  For

1    the same reasons discussed by the court in admitting what it

2    referred to as doctor-patient pornography, the court grants the

3    government's motion regarding this URL.  Indeed, the URL

4    describes conduct that is substantially similar to the conduct

5    at issue, and the similarity between the other act and a

6    charged offense will make the other act highly probative as to

7    defendant's intent in a charged offense.

8          Defendant argues that the government's motion should

9    be denied because the video underlying the URL is no longer

10   available.  However, evidence need not be conclusive in order

11   to be relevant.  Nonconclusive evidence should still be

12   admitted if it makes a proposition more probable than not.

13   Factors which make evidence less than conclusive affect only

14   weight, not admissibility.  Accordingly, the fact that the

15   government has not produced the actual video may go to the

16   weight of the evidence does not bar admission.  See the *Hite*,

17   H-i-t-e, case.  Indeed, other courts admitted evidence of the

18   defendant's search history.  See, for example, *United States v.*

19   *Ingram* and *United States v. Hite*.

20         The URL is thus admissible pursuant to 404(b), being

21   probative of defendant's motive and intent.  Nor is the

22   probative value substantially outweighed by danger of unfair

23   prejudice.  The URL is not worse or more shocking than the

24   charged conducts.  So the government's motion is granted.

25         And finally, the government moves to admit sexually

explicit photos that defendant appears to have taken of himself
at a Medical Institution 1.  The government's motion is denied.
This was admittedly a very close question in my view, and there
is probative value in that the evidence suggests the defendant
was sexually aroused at work.  However, on the whole, the court
finds that the probative value of these photographs is
substantially outweighed by danger of unfair prejudice with
regard to the photographs numbered 603 and 607.  The court
finds them to be of limited probative value given the gap in
time between when the photographs were taken and the closest
patient appointments.  Photographs 603 was taken at 7:48 a.m.,
more than an hour before defendant's closest appointments.
Photograph 607 was taken at 10:30 a.m., the closest
appointments being 8:30 a.m., two hours later and then 11:00
a.m.

        Photographs 601 and 606 potentially have a closer
nexus in time with a patient appointment.  However, the
government is not represented any of the photographs were taken
near in time to an appointment where abuse is alleged to have
occurred.  The court is also not been provided with any
information regarding what occurred during the relevant
appointments.  Indeed, the court does not know, for example,
whether, for how long, or in what way defendant physically
examined the patients during those appointments.  Moreover,
none of the relevant appointments for any of the photographs

1    were with a statutory or nonstatutory victim, nor has the

2    government represented that any of the photographs were shown

3    or sent to any alleged victim.

4              In my view, the photographs are of substantially more

5    prejudicial -- are substantially more prejudicial than

6    probative.  As I explained in the final pretrial conference in

7    the *Hinkel* case, the First Circuit considered the district

8    court's admission of photographs which demonstrated the

9    defendant's sexual practices, some of which showed his erect

10   penis, and the court held that, in most circumstances, the

11   prejudicial impact of these photos would be patent and

12   substantial.  That's from *Hinkel*.

13             The court thus excludes these photographs pursuant to

14   Rule 403.  That said, if there is other information which

15   increases the probative value of these photographs or if the

16   defendant testifies and opens the door to them, the government

17   may renew its motion.

18             Just lastly, I briefly want to address my ruling

19   regarding the government's motion to preclude cross-examination

20   of Victim 7, about his encounters with is a sex surrogate after

21   concluding treatment with defendant, which I granted.

22             When I made that ruling, I was not aware of numerous

23   text messages between the defendant and a patient suggesting

24   that defendant himself may have acted as a sex surrogate for

25   that patient.  I'm referencing pages 119 through 127 of

 1 | Government Exhibit 410.

 2 |          So do these text messages pertain to Victim 7?

 3 |          If you don't know offhand, you can tell me.

 4 |          MS. QIAN:  They do.

 5 |          Government Exhibit 410 are the text messages between

 6 | Victim 7 and the defendant.

 7 |          THE COURT:  OK.  I mean, I feel like this additional

 8 | context makes a difference, and I would like to hear you out on

 9 | that.  Because it seems like here, what he's talking about is

10 | defendant himself acting as a sex surrogate.  If that is going

11 | to come in, I don't know why it would be so prejudicial to have

12 | any other form of sex surrogacy.

13 |          MS. ESPINOSA:  Your Honor, we're recalling the

14 | messages you're referencing.  The defendant is not a sex

15 | surrogate and I don't believe explicitly claimed to be a sex

16 | surrogate.

17 |          Now, there were text messages during the time when

18 | Victim 7 was still seeing the defendant in person that

19 | discussed sex surrogacy.  The Victim 7 did not see a sex

20 | surrogate at that point in time.  He later did, but that was

21 | after he was no longer seeing the defendant for treatment, and

22 | the defendant was not that sex surrogate.

23 |          THE COURT:  OK.  But are these texts going to come in

24 | about sex surrogacy, the texts back and forth between the

25 | defendant and Victim 7?

1          MS. ESPINOSA:  Yes, your Honor.  And we have, to be

2   clear, we aren't objecting to him being crossed on those

3   particular messages.  I think what we think is less probative

4   and more embarrassing for the witness is whether or not he, in

5   fact, went to see a sex surrogate later in time after he

6   stopped seeing the defendant.

7          THE COURT:  OK.  Do you want to be heard on this?

8          MR. BALDASSARE:  Yes, Judge.

9          So what I'm hearing is we want the messages in where

10  they talk about sex surrogate.  We want to tell the jury that

11  he's not a sex surrogate, but we don't want to tell the jury

12  that after he left Dr. Paduch's care, he asked him about sex

13  surrogacy, he went to a sex surrogate, and then said it really

14  helped.

15         So, on the one hand, I had been originally, right, the

16  question and answer you remember was going to be:  Did you seek

17  him -- did you seek medical advice from Dr. Paduch on a medical

18  course of treatment?  And, you know, the answer likely would be

19  yes.  Did you do it?  Yes.  Did it help?  Yes.  But if we're

20  going to have, you know, the sex surrogate, and then it's going

21  to be, Oh, and he wasn't one.  At some point, I get that things

22  are embarrassing.  I'm trying to be respectful.

23         But we are telling the jury, on frequent -- on a lot

24  of topics we are sort of telling them half the story, and I

25  understand that sometimes the rules of evidence require that.

1    But, if anything, I think it's sort of either an all-or-nothing

2    proposition on the surrogacy.

3           THE COURT:  I have to say, I am inclined to agree with

4    that.

5           MS. ESPINOSA:  Can I just clarify?

6           THE COURT:  Sure.

7           MS. ESPINOSA:  I don't actually intend to elicit on

8    direct examination anything about these particular messages.

9           THE COURT:  Are the messages coming in?

10          MS. ESPINOSA:  Yes, your Honor.

11          THE COURT:  I mean, I think the messages are coming

12   in.  Number one, it's permissible for there to be cross about

13   the messages.  And then I do think it's really not unduly

14   prejudicial to be asking about, sort of -- I don't want to say

15   further surrogacy, I understand your position on that -- but

16   surrogacy after there are all these discussions about sex

17   surrogacy between them.

18          MS. ESPINOSA:  Your Honor, I think that I will take

19   another look because --

20          THE COURT:  OK.

21          MS. ESPINOSA:  -- there is a number of messages.  If

22   we wish to renew our application on that point, we'll raise it

23   later.

24          THE COURT:  That's fine.  Yes, yes.  Just let me know.

25          OK.  Anything else we need to talk about today?

1          (Counsel confer)

2          MS. QIAN:  Your Honor, as your Honor knows, I think we

3    flagged this earlier.  Some concerns regarding witness travel

4    and witness availability if we are to wait until the following

5    Monday to continue jury selection.

6          So we just want to flag for the court for now, that if

7    after we go through all 30 jurors, as you see, kind of, where

8    we are at that time, if it makes sense, we can begin the trial,

9    if we were to have fewer number of alternates or if the

10   government were to voluntarily reduce the number of peremptory

11   challenges we have, so we can seat the jurors and start

12   tomorrow, instead of waiting until Monday in just view of

13   witness availability.  We would do that.

14         THE COURT:  You don't have to exercise challenges for

15   sure.  That is entirely up to you.

16         MS. QIAN:  Your Honor, you had mentioned earlier that

17   even if we don't use all our challenges, you would still have

18   to qualify, I think, 36 jurors.  I think at this point --

19         THE COURT:  I see what you're saying.

20         You're saying if you affirmatively forego them, yeah,

21   then we can limit the number of people as well as, if we reduce

22   the number of alternates.  Like, if we agree on three, for

23   example, you know, or two, whatever it may be, then you're

24   right, we don't have to qualify as many people.

25         I'm happy to have that discussion tomorrow for sure.

1          MS. QIAN:  That's all we ask, your Honor.

2          MR. BALDASSARE:  So, two things, Judge.

3          The government can reduce alternates.  They do it in

4     my view, I'm happy to talk to them about it.  But what I don't

5     want to have, I don't think it will, but what I don't want to

6     have is a situation where we wind up, we burn through the

7     alternates, and God forbid we lose somebody, the court has the

8     authority -- although I've never actually understood how or

9     why -- the court has the authority to let 11 deliberate, and

10    we're not going to -- we would oppose that.

11         We want 12 deliberating, and if the government wants

12    to reduce the number of alternates to a number that's so low

13    that they run that risk, that can't be on us, number one.

14         Number two, I'm not sure I'm understanding what we're

15    going to do.  If the government says they want to give up --

16         THE COURT:  I think their point is that if they are

17    saying in advance, you know, we only are going to exercise four

18    of our peremptory challenges, then we don't have to sort of

19    qualify 36.  Like, right now, the idea was, we need to get 36

20    where, you know, they aren't being excused for cause that we

21    have examined.

22         But if the government says no, we're only going to

23    exercise at most four peremptories, that goes right to 34.  In

24    addition, if you all can reach an agreement with respect to

25    alternates and say, OK, we're comfortable with three

1  alternates -- I am comfortable with three alternates, by the

2  way -- or even comfortable with two alternates, that, again,

3  reduces the number of people we even need to sort of question

4  tomorrow and get in that pool from which you're making your

5  choices.

6          MR. BALDASSARE:  OK.  Thank you, Judge.

7          The last thing -- I was going to ask this tomorrow,

8  but I may ask it tonight since we might be talking about

9  peremptories -- is how does it work as far as -- does either

10 side, do they bank peremptories, or is it both?

11         If we have two one, two one, at some point what I

12 don't want to have happen is, if they -- if we both pass at the

13 same time, is that the jury that we have?

14         THE COURT:  I mean, I think so, because I don't know

15 why.  You know, what's your thinking on saving it?

16         So you want to skip around, and then the government

17 passes, but you might want to exercise one more, that's the

18 idea?

19         MR. BALDASSARE:  Yes, I think that's right, Judge.

20         I mean, my question is, if I exercise two, the

21 government exercises one, and then I say jury is acceptable, I

22 mean, and then they exercise one, do I lose those two?

23         THE COURT:  Well, I don't think you would be saying

24 the jury is acceptable.  I think you would just be giving up a

25 peremptory on that round.

1              But, I mean, you can keep your other peremptories and

2     see what the government does on its round and you can keep your

3     remaining ones.

4              MR. BALDASSARE:  Right.

5              But those two I lose if I say the jury is acceptable?

6              THE COURT:  If you say, if it's your round --

7              MR. BALDASSARE:  Right.

8              THE COURT:  -- you have two peremptories that round,

9     and you say, I'm passing for this round, you lose those two

10    peremptories.

11             MR. BALDASSARE:  OK.

12             THE COURT:  Right.

13             We're all on the same page about that, right?

14             MR. BALDASSARE:  Yes, yes.

15             THE COURT:  All right.  So why don't you be here no

16    later than 9:45, in case the jurors get here early.  If you

17    need to discuss any issues tomorrow morning, let me know, and

18    we'll meet earlier.

19             OK.  All right.  Thanks, have a good night.

20             (Adjourned to April 25, 2024, at 9:45 a.m.)

21

22

23

24

25