```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        23 CR 181 (RA)

5    DARIUS A. PADUCH,

6              Defendant.               Trial
     ------------------------------x
7
                                        New York, N.Y.
8                                       April 25, 2024
                                        9:45 a.m.
9

10   Before:

11
                        HON. RONNIE ABRAMS,
12
                                        District Judge
13
                           APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  MARGUERITE COLSON
          ELIZABETH A. ESPINOSA
17        JUN XIANG
          NI QIAN
18        Assistant United States Attorneys

19   BALDASSARE & MARA, LLC
          Attorneys for Defendant
20   BY:  MICHAEL BALDASSARE
          JEFFREY HAWRILUK
21

22

23

24

25
```

```
 1                    (Trial resumed)

 2                    THE COURT:  Good morning.

 3                    Can we bring the new jury pool until?

 4                    MS. QIAN:  Yes.

 5                    THE COURT:  You can keep talking.

 6                    MR. XIANG:  Your Honor, before the new jurors pile in,

 7     if we could be heard about jury selection.

 8                    THE COURT:  Sure.

 9                    MR. XIANG:  The government had a couple thoughts with

10     respect to qualifying jurors today in order for us to be able

11     to start the trial on time I think.  We did a little bit of

12     math yesterday and this morning.

13                    Our understanding is that yesterday there was a pool

14     of 69 jurors that would qualify 22.

15                    THE COURT:  Is that right, Allison, we qualified 22?

16                    THE DEPUTY CLERK:  Yes.

17                    They are bringing over now 41.

18                    THE COURT:  They are bringing over 41 this morning.

19                    MR. XIANG:  41 this morning.

20                    So I think, which is, I think, better than what the

21     government had understood, which is that we would only have

22     about 30.  I think, even so, kind of based on the qualification

23     rate, we understand it may be better today, better or worse.

24     It seems like there is some possibility we may not be able to

25     qualify 36 today.
```

1           So the government's proposal, in order to start today,

2    would be first, as discussed I think a little bit yesterday, to

3    reduce the number of alternates to three.  And if that doesn't

4    do it, the government is prepared to give up both a number of

5    its peremptory challenges as to alternates and as to the

6    principal jury pool, so that whatever number we are able to

7    qualify is sufficient for us to have a full jury today.

8           THE COURT:  That's fine.

9           I mean, in terms of the alternate pool, so -- I mean,

10   because I think you can make the decision about your

11   peremptories once we see how fast it goes.  I don't think you

12   need to commit to that now.  I think we can see how fast we go

13   today and then you can decide on that.

14          But on the alternates, I do think we want to make a

15   decision now.  If we are all agreed three alternates is fine,

16   then that's what we'll do, right.  And that will then reduce

17   the number of jurors to 34 that we need to -- well, to each get

18   a peremptory -- to 35, correct?

19          MR. XIANG:  Correct, your Honor.

20          THE COURT:  Sorry.  Yes.

21          MR. XIANG:  Yes.

22          The government is making that proposal.

23          MR. BALDASSARE:  We're fine with going to three,

24   Judge.

25          The question is what would we do with strikes to the

1    alternates.  Right now I think we have two and two.

2              Would that change?

3              THE COURT:  I think it's the same.

4              Let's check the rule, but I think it's the same for

5    three or four alternates.  Each side gets two whether it's

6    three or four.

7              MR. XIANG:  Correct, your Honor.

8              To be clear, I want the record to be very clear on

9    this, we are not asking the defense to give up anything on

10   anything.

11             THE COURT:  Understood.  Understood.

12             For now, all we're doing differently is we are only

13   qualifying, meaning questioning, 35 prospective jurors.

14             Agreed?

15             MR. XIANG:  Thank you, your Honor.

16             THE COURT:  All right.  So, Allison, only 35.

17             MR. XIANG:  Just a few other small timing and process

18   suggestions.

19             THE COURT:  Sure.

20             MR. XIANG:  I think for the part of the process in the

21   beginning when your Honor goes through and reads aloud each of

22   the questions, the government's request would be that, rather

23   than specifically directing that process to whoever the first

24   juror is, that it be framed as your Honor going through it with

25   everyone and saying:  Basically, I'm about to read aloud all of

1    these questions.  Please, all of you, closely follow each of

2    the questions, and as there are yes answers, including the

3    sub-questions, please circle those on your sheets.  Because at

4    the end of this process, I'm going to go through each of you

5    sequentially and ask whether you have any yeses.

6              I think that would avoid --

7              THE COURT:  Just save a little time.

8              MR. XIANG:  Save a little time, I think.

9              For example, Juror No. 1 had a lot of no answers to

10   the first sub-question and that necessitated your Honor saying

11   well, if the answer had been yes, I would have asked.  It would

12   be a little clearer for everyone.

13             THE COURT:  That's fine.

14             Do you have any problem with that?

15             MR. BALDASSARE:  I'm not 100 percent sure what's

16   different, but if it's OK with the court, it's going to be

17   faster, it sounds generally fine.

18             THE COURT:  I think it will be about the same, but we

19   won't hear one juror answer the questions.

20             So I think I'm happy to do that.

21             MR. XIANG:  And the last thing along these lines, your

22   Honor, is I think there were a number of jurors yesterday who,

23   as it turns out, had scheduling conflicts, you know, question

24   number 63, but that didn't come out until after, I think, a

25   number of them had had substantive colloquies about the case,

1    etc.

2         It may make sense, when addressing yes answers, to

3    maybe first ask everyone about question 63, excuse those for

4    whom that question is dispositive, and then as to the remaining

5    pool, go through the rest of the substantive questions.

6         THE COURT:  Look, I'll do that if you want me to, but

7    there is a real risk that if I start excusing people based on

8    their schedules, everyone will have a scheduling problem.

9         So what I try and do is set the tone that I'm not

10   excusing people based on scheduling issues.  But if you want me

11   to do that, I will.

12        MR. XIANG:  We take your Honor's point.  We're happy

13   to remain with how your Honor has been doing it.

14        MR. BALDASSARE:  Judge, whatever everybody wants.  I

15   know the government wants to move the case on.  Fine.

16        I can tell you, the last jury I picked when the judge

17   did that, the line went out the door around the block, and we

18   lost almost everybody when they started with scheduling.

19        THE COURT:  Right.

20        MR. BALDASSARE:  Whatever the court...

21        THE COURT:  It sounds like they are in agreement that

22   I shouldn't raise that issue.

23        But why don't we all also just try to move as quickly

24   as we can.  I mean, I can also take a shorter lunch break.  I'm

25   happy to.  As you saw, I didn't take any breaks yesterday other

1     than lunch.  If you want a shorter lunch break, I'm happy to do

2     it.

3               I mean, I'm happy to defer to you all on how to make

4     it move as quickly as possible.  I'm happy to stay late tonight

5     if we have to, if the jurors are willing.

6               MR. XIANG:  I think we're in the same position, your

7     Honor.  We're happy to take whatever schedule that the court is

8     willing to accommodate in order for us to get this done.

9               MR. BALDASSARE:  On the shorter lunch break, I'm

10    generally fine.  I guess it just depends on where we are in the

11    process.

12              I doubt we're going to get a jury, have the government

13    open, and then me be opening after lunch.  If that is the case,

14    I may want a little bit more time.

15              THE COURT:  That's fine.

16              MR. BALDASSARE:  It's aspirational.

17              THE COURT:  The other thing, folks, if you wanted to

18    start earlier tomorrow, we can start at nine tomorrow.

19              I mean, there are other things that we can do to

20    accommodate the scheduling issue.  I understand it won't solve

21    the problem if we don't get enough jurors today.  I get that.

22    If it just took the day and you're worried about getting all

23    the witnesses you wanted to put on tomorrow and we don't have

24    time for openings this afternoon, for example, I'm happy to

25    start earlier and end a little later, take a shorter break.

1          We don't need to decide it right now.  We can see how
2    things go.  I'm amenable to that as well.
3          MR. XIANG:  We appreciate that, your Honor.  I think
4    as long as we begin the trial in some fashion either today or
5    tomorrow, we'll be fine.  I think our primary concern was juror
6    qualification issues that would lead to the trial not beginning
7    until Monday.
8          THE COURT:  Not beginning until Monday.
9          MR. BALDASSARE:  I'll be here whenever you say, Judge.
10         THE DEPUTY CLERK:  Do we not have to replace 36?
11         THE COURT:  We do not have to replace number 36 now.
12         We're ready, Allison, whenever you want to order the
13   jury.
14         THE DEPUTY CLERK:  They're on their way.
15         THE COURT:  They are?
16         Great.
17         MR. XIANG:  I apologize, your Honor.  Just one process
18   point.
19         THE COURT:  Yes.
20         MR. XIANG:  In terms of the new folks that are being
21   qualified today, are they being slotted into the empty slots,
22   you know, at seat number one, seat number five, etc.?
23         THE COURT:  I mean, that's what I was going to do,
24   yes.
25         MR. XIANG:  OK.  That's fine.

1              THE COURT:  If you want it differently, I'll hear you

2     out.

3              MR. XIANG:  That's fine with the government.  We're

4     planning our charts.

5              THE COURT:  We're obviously not going to replace, as

6     we just talked about, 36.

7              MR. XIANG:  Understood, your Honor.

8              Thank you.

9              (Jury selection followed)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Give me your attention for just another

2    minute or two, and then Ms. Cavale will show you the jury room,

3    and then we will break for an hour for lunch.

4          What I am going to do now is, I am going to swear you

5    in as jurors, so this is the second oath that you will take.

6          Can you all stand and raise your right hand.

7          (A jury of 12 and four alternates impaneled and sworn)

8          THE COURT:  As I said, we are going to take a break

9    for lunch.  We are going to start again promptly at 3:00.

10         As I will discuss with you in more detail this

11   afternoon, from this point on, until you retire to deliberate

12   on your verdict, it is your duty not to discuss the case and to

13   remain outside the presence of others who may be discussing the

14   case.

15         In that regard, please understand that the parties and

16   counsel in this case have been instructed to have no contact

17   with any of you, so if you happen to see one of them in the

18   hallway or outside the courtroom and they don't acknowledge you

19   or say hello, please don't take offense.  They are only

20   following my instructions.

21         Further, unless and until you're excused as a juror,

22   you should not attempt to gather any information on your own

23   relating to this case.  Do not engage in any outside reading on

24   the case.  Don't attempt to visit any of the places that might

25   be mentioned.  Don't use the Internet or social media or

1    anything to learn anything about the case or anyone involved in

2    the case or talk about the case.

3          Again, just to hit this point home, you must not talk

4    to anyone about the case until after your deliberations are

5    concluded, including just what I have told you so far about the

6    case, and the information that you learned during the trial.

7    You can advise the people in your life that you've been chosen

8    to sit on a criminal trial, but you can't talk at all about the

9    substance of the case until it's over.

10         The reason I give this instruction to you is because

11   you have to decide the case based on the evidence introduced in

12   this trial and only the evidence introduced at the trial, so

13   not based on anything you may learn from outside sources.

14         Keep an open mind also throughout the trial.  Reserve

15   judgment until all of the evidence is in because unless you

16   have heard all of the evidence, closing arguments, and the

17   instructions on the law, you really won't be in a position to

18   reach any conclusions about the case, so do keep an open mind.

19         With that, Ms. Cavale is now going to show you the

20   jury room, and I will see you back here for opening statements.

21   Thank you again.

22         (Jury not present)

23         THE COURT:  I did just want to say one thing about the

24   *Batson* challenge, which is that I was satisfied with the

25   explanations given by defense counsel.

1          As we discussed, one of the jurors had been abused

2     himself as a child, as the government recognizes.

3          For the other two, I take counsel's word that the

4     defendant himself felt like one of the jurors was looking at

5     him in a very negative way, and that the other one seemed

6     angry.  I don't know that I would specifically characterize it

7     that way, but I will say that the one who is characterized as

8     looking angry had his arms crossed for the entirety of the

9     process.  Neither of those two jurors were speaking to the

10    folks next to them.  Not that they have to, but I think that at

11    least kind of supports the position that there was no

12    purposeful discrimination, so I did want to note that for the

13    record.

14         When we come back, we will have opening statements.

15    We will come back at 3:00.

16         Is there anything that you need to do?  Are there any

17    issues we need to discuss or resolve before opening statement?

18         MR. XIANG:  No, your Honor.

19         MR. BALDASSARE:  Two quick things.  I believe we are

20    going to work them out.

21         One of them is the government had given us a picture

22    of Dr. Paduch that they were going to ask the victims, the

23    alleged victims, to identify so that they didn't have to

24    actually look at our client.

25         After looking at it last night and this morning, it

1    clearly looks like a mugshot.  It's a cinderblock wall behind

2    him.  But I think we are just going to come up with something

3    where we may just stipulate that the person they are talking

4    about is the defendant, or something like that.

5            I don't know, but I don't care that they are going to

6    show that picture to the witness.  But showing that picture,

7    just upon reflection, especially when you look at the other

8    pictures, it's a mugshot.  There is no number under it.  It

9    doesn't look like a driver's license picture.  It doesn't look

10   like a passport photo.  I don't know if there is a way to just

11   say that we are OK with it rather than try to agree on a

12   picture, but I don't know if they are going to be OK with us

13   just stipulating that the person who the witness just testified

14   and used the name Dr. Paduch is sitting to my left, so that's

15   one issue.

16           The second issue --

17           THE COURT:  Just so I understand it, you don't want

18   them to admit the photo at all and use that photo.

19           MR. BALDASSARE:  If they want to use the -- the only

20   thing I don't want is, I don't think the jury should see the

21   photo.  I just can't imagine closing in this case and saying

22   that they never got the alleged victims to look at him and say

23   that he's Darius Paduch.

24           The truth of the matter is is that the Darius Paduch

25   who treated them, every picture I have seen actually looks very

1    different from the picture of him standing in front of a

2    cinderblock wall.  I don't know.  I am going to try to work it

3    out with them.  I did just raise it, and I have had the picture

4    for a while.  But trials are crazy and you get to what you get

5    to as quickly as you can.  That's one issue.

6              The second issue is, and I don't know if this is going

7    to matter for today, if we get to Dr. Herati today.

8              Do you think?

9              No.

10             Again, I apologize to the Court.  I know we owe you

11   and probably for a week have owed you a proposed limiting

12   instruction on standard of care.  It doesn't sound like we are

13   going to get to Dr. Herati today, so we will get to that to you

14   with all deliberate speed and have several days for the

15   government -- first, I'll try to agree with them.

16             THE COURT:  In terms of the photo, I assume you're not

17   admitting the photo in opening anyway.

18             MR. XIANG:  Not in the opening, but we were expecting

19   to offer the photo during our very first witness, your Honor.

20             THE COURT:  Do you have any other photos of him that

21   would work?

22             MR. XIANG:  Your Honor, this specific photo, which we

23   produced and marked as a government exhibit many weeks ago, is

24   the photo we have used with our witnesses, as reflected in

25   their 3500, as a photograph of the defendant that they

1    recognize.  The defendant has, I think, gained and lost weight

2    over the years.  He has looked different over the years, and

3    this was a photo that we had -- our witnesses had gotten

4    comfortable that we are sure this is him.  That's why we

5    produced it, and that's why we marked it.

6            I will note that the photo is on the screen for

7    everyone.  There is nothing to indicate that this is a mugshot.

8    This is a closely cropped professional photo of the defendant.

9            THE COURT:  I don't know what you mean by

10   professional.  He's wearing a T-shirt.  I don't think it looks

11   like he's at work.

12           But that being said, I don't think it's unduly

13   prejudicial, so I will allow the use of the photo, particularly

14   if this was the photo that was shown to witnesses, and the

15   defense has had it for sometime.  That motion is denied.

16           MR. BALDASSARE:  Judge, I don't want to press it.  I

17   understand that.  I guess I just don't understand why we can't

18   just stipulate that it's him rather than the jury see this

19   picture.

20           THE COURT:  You can talk to the government about that,

21   if they are willing to do that, but I am not going to prevent

22   them from using a photo, even if they don't need to use it.

23           MR. BALDASSARE:  My only point, Judge -- and I

24   understand that it is a late objection.  But when the

25   government first asked, I tried to be reasonable.  I said I am

1    not going to force these alleged victims to look at him.  If

2    they don't want to look at him, I'm not looking to hurt

3    anybody.

4         It's my fault I didn't raise it sooner, but I did try

5    to be reasonable.  They asked for it.  We said OK, let them

6    look at a picture, for what it's worth.

7         MR. XIANG:  We are happy to speak to defense counsel

8    about the number of times we need to publish it to the jury,

9    but our view remains that it's properly admissible as the Court

10   already ruled.

11        THE COURT:  Are there any other issues we need to

12   discuss before opening statements?

13        MR. XIANG:  No, your Honor.

14        MR. BALDASSARE:  No, Judge.

15        THE COURT:  We will see you at 3.  Thank you.

16        (Luncheon recess)

17

18

19

20

21

22

23

24

25

```
 1                           AFTERNOON SESSION

 2                               3:00 p.m.

 3             (Jury not present)

 4             THE COURT:  Is everyone ready for opening statements?

 5             MR. XIANG:  Yes, your Honor.

 6             MR. HAWRILUK:  Just wait for Mr. Baldassare.

 7             THE COURT:  We'll wait.

 8             THE DEPUTY CLERK:  I don't know that they are all back

 9   yet.

10             THE COURT:  We're getting the jury for opening

11   statements.

12             I did want to briefly advise you that I'm not going to

13   allow in the e-mails of the private investigator.  You can, you

14   know, ask questions of the witnesses, as we discussed, about

15   their willingness to speak with defense counsel, but I'll read

16   my ruling later.  But it's just based on 803(6).

17             (Pause)

18             We're still waiting for three of the jurors.  I am

19   just going to read this ruling briefly.

20             Yesterday I said I would decide whether the e-mails of

21   defense counsel's private investigator are admissible, and if

22   so, whether counsel can reference them in opening statements.

23             I reviewed the samples of the e-mails, and I find that

24   they are not admissible, so defense counsel cannot reference

25   the e-mails themselves in his opening.
```

1          Yesterday, Mr. Baldassare argued they should be

2    admitted under the business record exception to the rule

3    against hearsay 803(6).  However, because the business records

4    exception requires business records to be kept in the regular

5    course of a business activity, records created in anticipation

6    of litigation do not fall within its definition.  And that is a

7    quote from the James case from 2013 of the Second Circuit.

8    E-mails by private investigator in advance of a criminal trial

9    are records created in anticipation of litigation and,

10   therefore, not admissible under 803(6).

11         Counsel also argued that statements in those e-mails

12   made by patients' lawyers were adopted by the patients.  Even

13   if that is the case, the statements are not admissible under

14   Rule 801(d).

15         801(d)(1)(A) does not apply because the e-mail

16   responses were not made under the penalty of perjury at a

17   trial, hearing, or other proceeding or in a deposition.

18         801(d)(1)(B) also does not apply because the patients

19   were not the opposing party here.

20         So, as I noted previously, this does not preclude

21   counsel from asking the witnesses if they decline to speak with

22   counsel.  I'm just saying the e-mails themselves aren't coming

23   in.

24         MR. BALDASSARE:  Judge, just so we're clear, I don't

25   want to obviously run afoul of the court's decision in a half

1    hour.

2            In the opening, is it the court's position that I'm at

3    least permitted to say we tried to reach out?

4            THE COURT:  Yes, if you expect that.  If you have a

5    good faith basis for saying we tried to reach out and they

6    refused to speak, I think that's fair game.

7            MR. BALDASSARE:  Thank you, Judge.

8            (Pause)

9            MR. XIANG:  Your Honor, while we have some time,

10   before the first witness takes the stand, the witness, because

11   of the anxiety of testifying, has asked us there be some rubber

12   bands available he can fidget with his hands.

13           I assume there is no objection to that.

14           THE COURT:  No objection from me.  You can make an

15   objection, but it will be overruled.

16           MR. BALDASSARE:  I'll tell you what, Judge, tell me

17   what ones I have a shot at, and then I'll make those.

18           THE COURT:  Fair enough.

19           In terms of timing, does starting at ten a.m. tomorrow

20   still work?

21           MR. XIANG:  That's fine for the government, your

22   Honor.

23           THE COURT:  All right.

24           THE DEPUTY CLERK:  Ready?

25           THE COURT:  We're ready.

1          (Jury present)

2          THE COURT:  Welcome back, folks.

3          We are going to begin the trial this afternoon with

4   opening statements.  Opening statements are neither evidence

5   nor arguments.  They are simply outlines of what the attorneys

6   expect the evidence in the case will show in a way to help you

7   process it as the evidence is presented.

8          With that, whenever the government is ready.

9          MR. XIANG:  Thank you, your Honor.

10         When patients got appointments with Darius Paduch, the

11  defendant, they thought they had found the answer to their

12  problems.  The defendant was a prominent doctor in urology and

13  sexual medicine.  He worked for Weill Cornell Medicine at New

14  York Presbyterian Hospital here in Manhattan.  He regularly

15  spoke at conferences about the treatments he offered and the

16  results he delivered.

17         And so patients from all over, many of them just boys,

18  thought they would be safe in the hands of the defendant.  They

19  went to him with their most private medical concerns:  Trouble

20  having erections, trouble ejaculating, a genetic disorder

21  called Klinefelter syndrome, or XXY, which can lead to

22  infertility.  These were issues touching on the most private

23  aspects of their lives.  Their sexual development as they

24  entered adulthood.  Their ability to be intimate with romantic

25  partners.  A chance to one day father children.

1          And now, finally, an accomplished doctor, the

2    defendant, was going to help.  But the defendant had other

3    plans, because the defendant's interest in his patients was

4    more than medical.  It was sexual.  For years, in appointment

5    after appointment, the defendant touched his patients in ways

6    that had nothing to do with medical treatment.  In ways that no

7    urologist would approve of.  He would masturbate them with his

8    hands, often without wearing gloves, often until they

9    ejaculated in front of him.  Sometimes he would even have

10   patients ejaculate on him, into his hands, on his shirt.

11         What the defendant did was not sexual medicine.  It

12   was sexual assault.  That is what this trial is about.  How the

13   defendant used his position as a urologist as cover to sexually

14   abuse his patients, men and boys alike, repeatedly for his own

15   sexual gratification.

16         This trial is about what the defendant did to Sam

17   Lenox.  Sam's family took Sam to see the defendant when Sam was

18   16.  At the time, Sam was living every teenage boy's deepest

19   anxiety.  He had trouble getting erections.  Sam and his

20   parents were desperate for help.  And they found the defendant.

21   The defendant did provide medical care to Sam.  He prescribed

22   medications, ordered tests, and performed procedures.

23         But the defendant did more than that.  He had Sam

24   visit him for what the defendant described as erection

25   practice.  And during those appointments, the defendant

insisted on masturbating Sam himself to the point where he made
Sam ejaculate.

One time after the defendant made Sam ejaculate on the
defendant's hands, the defendant smeared the semen on Sam's
face and commented that he thought Sam would have tasted it
before.  The defendant came up with ways to see Sam outside of
the office.  He invited Sam to be his summer intern when Sam
was 17, and he masturbated Sam during that internship.  He
exchanged sex messages with Sam, messages in which he expressed
jealousy that other urologists got to see Sam's penis.
Messages in which he offered to see Sam after hours and free of
charge.  Messages in which he asked Sam to FaceTime or Skype
him while masturbating.

This trial is about what happened to Sam Lenox.

This trial is about what the defendant did to Luke
Bevin.  Luke was in grade school when he was diagnosed with
Klinefelter syndrome, a disorder that leads to an extra X
chromosome in males.  Klinefelter syndrome often leads to
infertility, and Luke's mom was desperate to find some way to
preserve her son's ability to have kids later in life.

When she heard the defendant speak at a medical
conference, he sounded like a godsend.  The defendant claimed
he had found treatments to preserve fertility for Klinefelter
patients just like Luke.  So Luke's mom pleaded to get Luke in
the door to see the defendant.  Luke began seeing the defendant

1   when Luke was only 14.  And for seven years his mom brought him

2   to regular appointments with the defendant believing that the

3   defendant was helping her son.

4          Instead, at the majority of these appointments, behind

5   closed doors and with mom out of the room, the defendant would

6   masturbate Luke until Luke ejaculated, often on the defendant's

7   body.  Luke didn't realize these appointments were out of the

8   ordinary.  He was only 14 years old when they started.

9          This trial is about what happened to Luke Bevin.

10          This trial is about what the defendant did to James

11  Brent.  James was a 20-year-old college kid when he found the

12  defendant.  He had just lost a relationship due to erectile and

13  ejaculatory dysfunction, and he badly wanted medical help.  The

14  defendant seemed like the perfect doctor.  He was well-known

15  and he treated the exact conditions that James was suffering

16  from.

17          So James went along with it, when at their very first

18  appointment, the defendant masturbated James and then asked

19  James to masturbate in front of him.  James went along with it,

20  when over the course of two years of treatment, the defendant

21  repeatedly masturbated him, sometimes for hours at a time.

22  James went along with it, when the defendant brought James to

23  the defendant's boat for more appointments.  When the defendant

24  gave James a Valium to get him to relax.  When the defendant

25  texted James that James should not share their out-of-office

1   appointments with the defendant's coworkers.  James went along

2   with it because the defendant told James that the defendant was

3   going the extra mile to help James.  That this was medical

4   treatment.

5        This trial is about what the defendant did to James

6   Brent.

7        This trial is about what happened to Sam Lenox, Luke

8   Bevin, and James Brent, and to Matt Cirillo, Connor Gannick,

9   Evan Stewart, Matthew Colon, and other young men who came to

10  the defendant for care.

11       As a result of the defendant's actions, he's charged

12  with inducing his patients to see him for medical appointments

13  with the intent to sexually abuse them at those appointments.

14  And the evidence in this case will prove that beyond a

15  reasonable doubt.

16       What will that evidence include?

17       First, you will hear from at least ten former patients

18  who were sexually abused by the defendant.  The specific

19  federal charges in this case are based on seven of those

20  patients, including Sam, Luke, and James.

21       All of those former patients will take the stand in

22  this very large and public courtroom and tell you what the

23  defendant did to them.  The specifics of each victim's

24  testimony will, of course, vary.  Some saw the defendant only a

25  few times.  Others saw him many times over many years.  Some

1  saw him as children.  Others saw him when they were young

2  adults.

3        But over the course of the patients' testimony, you

4  will start to see patterns, behaviors that the defendant would

5  engage in with patient after patient, boasting about his

6  prestige in the field.  Telling them that they were

7  masturbating the wrong way.  Masturbating them himself.

8  Inserting his finger in their rectums, including while

9  masturbating them.  Having them ejaculate on his body.  Texting

10  to try to see them outside of the office.

11        The victim's testimony in this case will be disturbing

12  and powerful.  As you listen to it, consider what it takes for

13  each of these victims to testify in this courtroom full of

14  strangers about what they endured in the hands of the

15  defendant.

16        In addition to hearing from the victims themselves,

17  you will see and hear other evidence of the defendant's

18  conduct.  You will see each of the patients' medical records,

19  and you will see the defendant never once documented manually

20  masturbating Sam, Luke, or James.  You'll be able to compare

21  those medical records with the private text messages that the

22  defendant exchanged with his patients.  Text messages with Sam,

23  asking Sam to FaceTime him while masturbating.  Text messages

24  with James, asking James to keep quiet about the out-of-office

25  medical appointments.  Text messages with a patient named Evan

1   Stewart, implying that the defendant was masturbating himself

2   while texting with Evan.  And more.

3       You will also hear from an expert witness, a professor

4   of psychiatry, who will explain to you the different ways that

5   victims respond to sexual abuse.  The reasons why a victim of

6   abuse may not immediately realize that the abuse has occurred.

7   And the reasons why a victim who recognizes abuse may be

8   reluctant to report it.

9       You will hear testimony from some of the victims'

10  parents, who will tell you that the defendant never told them

11  that he was masturbating their children behind closed doors.

12  You will hear testimony that the hospital, New York

13  Presbyterian, had special rooms for patients to provide semen

14  samples on their own in private without a doctor present.

15      You will hear from the defendant's coworkers at

16  another hospital.  One coworker will testify about a time when

17  she saw the defendant masturbating a patient.  Another coworker

18  will testify that afterwards, the defendant tried to deny it.

19      You will hear testimony from experts in the field of

20  urology that no urologist ever needs to manually masturbate a

21  patient.  That doing so is not and has never been part of the

22  practice of urology or sexual medicine, period.  That doing so

23  is not necessary to treat or diagnose any of the conditions

24  that the defendant's patients came to him with, period.  That

25  what happened here cannot be justified on medical grounds,

1    period.

2            In short, the evidence will prove that what the

3    defendant had in mind when he masturbated his patients was not

4    medicine.  And you will see evidence of what was going on

5    inside the defendant's head.  His own sexual gratification.

6    That evidence will come from the defendant's personal computer

7    and his iCloud account.  A photograph of a fully nude patient

8    behind a privacy screen.  A photograph of someone dressed up

9    like a doctor about to examine a long line of nude male

10   patients.  A URL for a video called "doctor fucking teen."

11           All of the evidence in this case will prove beyond a

12   reasonable doubt that the defendant induced the victims to see

13   him for medical appointments again and again in order to

14   sexually abuse them.  And the evidence will prove beyond a

15   reasonable doubt that the defendant, in fact, sexually abused

16   them as part of a pattern the defendant engaged in for years.

17           We will have an opportunity to speak with you again at

18   the end of this trial and explain how the evidence fits

19   together.  Until then, we ask that you do three things:

20           First, pay close attention to the evidence;

21           Second, follow Judge Abrams' instructions on the law;

22   and

23           Third, use your common sense, the same common sense

24   you use in your everyday lives.

25           If you do those three things, you will reach the only

1   verdict that is consistent with the evidence, the law, and your

2   common sense.  That man, the defendant, Darius Paduch, is

3   guilty.

4           THE COURT:  Thank you.

5           Since the defendant has no burden whatsoever, he need

6   not make an opening statement, but he can if he wants to.

7           Would you like to make an opening statement?

8           MR. BALDASSARE:  Yes, Judge.

9           So, good afternoon, everyone.

10          This case is about money, a flawed and unreliable

11  investigation, and the government's inability to meet the

12  requirements that you have taken an oath to uphold.

13          So, first off, my name is Mike Baldassare.  And just a

14  reminder, Jeffrey Hawriluk and I represent Dr. Paduch.

15          Thank you for your time away from your family and your

16  jobs.  And, to be honest, thank you for not getting out of jury

17  duty.  Because the truth is, if you really wanted to, you may

18  have been able to.  And we appreciate that.

19          So what I'm going to talk to you about this afternoon

20  are those three things:  Money, a flawed and unreliable

21  investigation, and why those two things mean that the

22  government is not going to be able to meet its burden to show

23  to each and every one of you, unanimously, for every element

24  beyond a reasonable doubt, that they have the proof.

25          Now, before I talk a little bit about the money, I

1    want to talk about these individuals.  They are not yet

2    victims.  They are not victims during our opening statements.

3    They are not victims during their testimony.  They are not

4    victims during my cross-examination.  They are not victims

5    during closing arguments.  They are not victims during the

6    judge's jury charge to you at the end.  They are not victims at

7    the start of your deliberations.  They only convert from former

8    patients, which is currently the accurate term, to victims is

9    when each and every one of you unanimously agrees that all the

10   elements have been proven beyond a reasonable doubt.

11           And the reason for that is that Dr. Paduch starts

12   presumed innocent.  He was presumed innocent from the first

13   time you saw him, and he remains there even after you first

14   start your deliberations until later.

15           Now, I've said that this case, the first thing, is

16   about money.  And the evidence will show the why, the when, and

17   the how, of how this case and how we know that it's about

18   money.

19           The why will show the former patients became a group

20   of people blaming Dr. Paduch for a federal crime, with one

21   exception that I'll talk about.  Every single former patient is

22   suing Dr. Paduch and/or Weill Cornell for money.  Every one of

23   them.  The ones in the indictment and the additional ones that

24   the prosecution just spoke about.  The one individual who is

25   not was unable to, and you'll learn why, it's because of a

1   legal technicality.  But he is represented by the same lawyers

2   who represent other former patients and his family has numerous

3   lawsuits against Dr. Paduch and/or Weill Cornell for money.

4           The lawsuits remain pending in court.  The lawsuits

5   are currently unresolved.  The lawsuits are brought by a

6   specific group of lawyers who sue for money.  You'll learn that

7   there are primarily two law firms who represent all of the

8   former patients who you're going to hear from.  One is called

9   PCVA.  It's a shorthand term for a bunch of long names.  And

10  the other one is the Law Offices of James DiPietro.  PCVA and

11  DiPietro.  You're going to hear it over and over and over

12  again.  There are one or two other law firms, but those are the

13  two that are primarily important for today.

14          You're going to hear and the evidence will show that

15  what these former patients are going to say from that witness

16  stand is exactly what they are saying in their lawsuits for

17  money.  There's nothing new.  There's nothing shocking.

18  There's nothing different.  Their testimony is going to mirror

19  what's in their currently pending lawsuits for money.

20          Now, the government has alluded to the fact that the

21  stories, the testimony you're going to hear, is similar with

22  some differences.  The evidence will show that that's true.

23  But the evidence will show that that's precisely why these

24  cases that are brought here are brought in furtherance of the

25  lawsuits for money.

1              You'll hear that the former patients know that if you

2      convict Dr. Paduch, they believe they have a better chance of

3      winning money.  That's one of the reasons why we know it's

4      about money.

5              Another reason why has to do with the when, with when

6      the lawsuits were filed.

7              One former patient saw Dr. Paduch for two years, from

8      2012 to 2014, drove from Bergen County, New Jersey.  Last visit

9      with Dr. Paduch was approximately 2014.  Last contact was

10     approximately 2015, at which point this individual who now

11     claims in his money lawsuit and here, all of these terrible

12     things.  After he saw Dr. Paduch, he texted Dr. Paduch, and he

13     asked Dr. Paduch for advice on a very, very personal course of

14     medical treatment that may or may not come up.  But the truth

15     is what it was about doesn't really matter.  What matters is

16     that after he left Dr. Paduch's care, he texted him and he

17     asked him about a course of medical treatment and for a

18     recommendation.  Dr. Paduch gave him the recommendation.  He

19     took the recommendation and the recommendation worked.

20             That was 2015.  And then, September 27, 2023, the

21     lawsuit is filed.  And I'll get back to the timeline, because

22     the timeline in this case tells the tale.  And before you even

23     think about it, if you think you're going to see me get up here

24     and beat up on these former patients, that's TV.  We all know

25     that.  That's not going to happen.  And it doesn't have to

1  happen because the timeline tells the tale, and the timeline

2  explains why we're really here and why the government simply

3  doesn't have the proof.

4      Another former patient saw Dr. Paduch for eight years.

5  And some of the patients you'll hear about, some of them were

6  minors for the whole time.  At least one was of the age of

7  majority, I believe, for the whole time.  And a lot of them

8  turned 18 during the course of the treatment.

9      One patient saw him for eight years, from

10 approximately '09 to 2017, '18.  Turned 18 years old in 2011.

11 Drove to see Dr. Paduch from Monmouth County, back and forth,

12 either with his parents or later alone.  His last visit with

13 Dr. Paduch is 2017.  But his last contact with Dr. Paduch is

14 2020, when he texts him about refills and the like.

15     2020.  Until August 21, 2023, when the lawsuit is

16 filed.

17     Another patient saw Dr. Paduch for seven years, 2015

18 to 2022.  That patient turned 18 in 2019, and that patient came

19 from Maryland to see Dr. Paduch for seven years.  His last

20 contact with Dr. Paduch was in 2022, and that patient followed

21 Dr. Paduch to the hospital he went to after Weill Cornell.

22 That patient once texted Dr. Paduch, You are the best doctor in

23 the world.

24     Until March 23, 2023, when the money lawsuit gets

25 filed.

1          And the evidence will show that all of the other

2     former patients who have these lawsuits follow the same

3     pattern.  Lengthy period of treatment, period of quiet, similar

4     filing dates years later.  And many of them traveled from

5     various points that, in New York and New Jersey, saying

6     Morristown or a place like that might not sound far.  We know

7     the reality of what that is.  It's a full day driving here,

8     going to see the doctor, and driving home.

9          So why then was there this long wait?

10          And the government is going to have an expert talking

11     about something called grooming, and I'll talk a bit about that

12     later.  But the primary thing that I have to say today, the

13     evidence is going to show that the government is going to argue

14     that grooming is the answer to every flaw in their case.  The

15     evidence will show that the government is trying to plug every

16     hole in its evidence with grooming.

17          The real reason there was the delay in the lawsuit is

18     that, until a gift from the legislature in Albany came, the

19     lawsuits couldn't have been filed.  The allegations were too

20     old.  The statute of limitations had run out.  Until one day

21     the legislature in Albany says, we're changing the law, and if

22     your claims are from an adult period, there's basically no

23     statute of limitations.  No matter how old, no matter how long

24     ago, there is a brief window, not-so-brief window.  Get your

25     lawsuits in because time is running.

1          And that's what happened.  And a few law firms took

2     notice of that.  PCVA took notice, the DiPietro law firm took

3     notice, and a couple of others.  And those law firms went on an

4     immediate blitz worthy of Coca-Cola.  Worthy of Nike.  Pop-up

5     ads.  Radio ads.  DrPaduchlawsuit.com.  YouTube.  Everywhere.

6     It was widespread.

7          It was so widespread that one patient Googled

8     Dr. Paduch to get his phone number to make an appointment and

9     got a pop-up ad.  Were you a patient of Dr. Paduch?  You may be

10    entitled to money.  And in an instant, that individual went

11    from being a former patient to a plaintiff in a lawsuit for

12    money.

13         Another patient's mom was in the process of getting

14    Dr. Paduch's address to send him flowers.  There were no

15    flowers because there was an article up.  The next thing that

16    happened -- no flowers.  The next thing that happened was a

17    phone call to PCVA.

18         And you're going to hear time and time again that

19    that's how the former patients converted into plaintiffs for

20    money lawsuits.  Government, the evidence is going to show the

21    government is going to have a grooming expert to try to explain

22    away the timing.

23         There's another reason showing that the lawsuits are

24    about money is to consider the timing of the filing of the

25    lawsuits with the former patients' very first meetings with the

1    federal prosecutors seated to my right.

2              One patient, Mr. Stewart.  First meeting with the

3    prosecutors 7/28/23.  Lawsuit filed 8/21/23.

4              Mr. Brent.  Lawsuit filed September 27, 2023.  First

5    meeting with the prosecutors, October 16, 2023.

6              Mr. Bevin.  First meeting with the prosecutors

7    February 8, 2023.  Lawsuit filed February 13, '23.

8              Mr. Gannick.  First meeting with the prosecutors,

9    June 1, 2023.  Lawsuit filed June 2, 2023.

10             Mr. Lenox.  First meeting -- excuse me.  Lawsuit filed

11   December 12, 2022.  First meeting, February 9, 2023.

12             And none of that can be changed.  The evidence is

13   going to show none of that can be changed by arguments about

14   grooming, arguments about standard of care, etc.

15             Those are the dates.  That's the timeline.  And that

16   timeline will be fairly consistent throughout.  That's another

17   reason why the government is not going to be able to prove its

18   case to all of you for every element beyond a reasonable doubt.

19             So the investigation.  So the investigation in this

20   case is biased, flawed, and was done with the Department

21   Justice's mind made up.

22             So how do I stand here and say that?  And why is it

23   important?  It's important because the evidence will show that

24   that type of investigation is insufficient to overcome the

25   presumption of innocence and to move Dr. Paduch from

1    presumptively innocent to a guilty man.

2         Let's talk about witness bias.  You are going to hear

3    and you'll hear account of how many times each former patient

4    met with the government.  That's not one.  It's not two.  It's

5    five, six, seven, eight, up until about a half hour ago was the

6    most recent meeting between the government and their first

7    witness.

8         So these meetings.  Who was there?  Who was at these

9    meetings?

10        Four federal prosecutors.  Not always all four.

11   Sometimes two, sometimes three.  Sometimes they would swap out.

12   They were there.  Often FBI Agent Turansky was there.  And

13   sometimes there was another FBI agent there.

14        You know who wasn't there, right?  I wasn't there.

15   Jeffrey wasn't there.  Obviously, Dr. Paduch wasn't there.  And

16   obviously nobody on Dr. Paduch's behalf was there.

17        Do you know who else was there, though?

18        The money lawyers.  Not every time, but enough to make

19   the point that the FBI, the DOJ prosecutors, the former

20   patient, and the money lawyers were in the same room.

21        The evidence will show that anytime, anyplace,

22   anywhere that the prosecutors wanted to meet or talk with the

23   former patients, they were available.  Made themselves

24   available.  Webex, telephone, in person.

25        So here's the bias.  What does everyone think the

1    evidence is going to show happened when we tried to talk to the

2    former patients?

3            The answer is nothing.  The answer is either a

4    rejection flat out or no response at all.  Nobody was willing

5    to talk to us.  The refusal to do so, the evidence will show,

6    that's bias.  And at the end of the case, we expect that the

7    court will instruct you that bias is something to consider when

8    deciding if the government proved its case.

9            Let's talk about the investigation in another way.

10   Let's talk about how the Department of Justice allocated its

11   resources.  And this goes to the point that it's unreliable,

12   that it's bias, and that the investigation was done with its

13   mind made up.

14           Yesterday and today you heard that, in addition to the

15   prosecutors, you heard that these were the people who were

16   involved in the case in one way or another.  It's worth

17   revisiting in this context.

18           Stacy Turansky, Sean Valverde, Justine Atwood,

19   Alexandra Chacon --

20           MR. XIANG:  Your Honor, objection.  That's not

21   accurate.

22           MR. BALDASSARE:  What's the objection?

23           THE COURT:  Yes.

24           I think what they heard is that the government would

25   be assisted by the following members of law enforcement.

1          MR. BALDASSARE:  OK.

2          THE COURT:  Just clarify that.

3          MR. XIANG:  I'll put on the record that the vast

4    majority of those names are individuals who are escorting

5    witnesses to and from the courtroom.  That's their role in the

6    case.

7          THE COURT:  You may proceed.

8          MR. BALDASSARE:  Stacy Turansky, Sean Valverde,

9    Justine Atwood, Alexander Chacon, Michael Buscemi, Angela

10   Tassone, Matt Deragon, Walter Harkins, Antonio Pagan, John

11   Zavala, William Perez, Michele Gulino, Michelle Mezzina, Kelly

12   Noh, Martin Stallone, Danielle Marsh.

13          You'll also hear that there were resources allocated.

14   And let me be clear, I'm not saying that the resources

15   allocated are illegal.  They weren't.  But it goes to how the

16   investigation happened.

17          Phone extractions.  Specialized knowledge used.  All

18   legal.  But here's what matters.  There is one piece of

19   technology that the government didn't use.  And, again, it's

20   not illegal, but it's certainly something you can consider when

21   you're deciding whether this is a trustworthy investigation,

22   and it's one piece of technology that we all have.  And the

23   evidence will show it's the one thing that the government

24   didn't do.  And that was make any recording of any statement

25   that any former patient made during any visit, during any

1    interview ever.

2          The evidence will show, and the court recently just

3    said, we all come here with common sense.  We all come here

4    with life experience.  How long would it take for anyone to

5    start recording me right now?  Ten seconds?  There is no audio

6    recording of these interviews.  There is no video recording of

7    these interviews.

8          So if it became necessary to hear what one of the

9    former patients said during their many interviews that were

10   only attended by usually some federal prosecutors, perhaps an

11   agent, and their money lawyers, we have one thing to rely on.

12   Well, two.  One of them is something you're going to hear about

13   called a 302.  A 302 is simply a shorthand way of referring to

14   a particular type of an FBI report.

15         You're going to hear that usual protocol is an FBI

16   agent, like Agent Turansky, attends the interviews, takes

17   notes, types up a 302.  And that happens sometimes, but a lot

18   of times it didn't.  Sometimes Agent Turansky was there and

19   there is no 302.  Sometimes Agent Turansky isn't there and

20   there is no 302.

21         What you're going to hear oftentimes is the only

22   recording of what happened at those meetings are the notes of

23   the prosecutors seated to my right.  Make no mistake, those

24   notes were turned over to us.  The prosecutors complied with

25   their obligation to give us those notes, and I'm not saying for

1    one second they didn't.  What I am saying is that those notes

2    are made and given in a way that I think is worth considering.

3         There are also likely notes that we'll never see.

4    Obviously, nor would we be entitled to them.  But, again, it's

5    worth thinking about.  There's notes that the money lawyers

6    made, but we'll never get those.  Another reason why the

7    investigation is biased, unreliable, and sort of done with its

8    mind made up, was that parts of it, not all of it, but enough

9    to consider were simply outsourced.

10        Sometimes the government took possession of people's

11   phones.  They legally took possession of them.  Make no bones

12   about it.  Downloaded them.  You'll hear a little bit, I think,

13   about that.  Sometimes they took them and downloaded them.  But

14   plenty of times they didn't.  Plenty of times things would

15   happen like, Can you look through the phone?  See if you have

16   anything.  I'll check with.  where is the phone?  The money

17   lawyer has it.  We'll have the money lawyer check.  That's who

18   was checking.

19        In one instance, the government had one patient's mom

20   check a whole bunch of phones because, remember, we all know,

21   common sense, we all change phones.  Common sense, where are

22   phones from eight years ago?  Did the government take

23   possession of those and run them through the FBI Cellebrite or

24   other procedure?

25        No.  No.  The government asked.  They were checked and

1   they were given or not given, as the case may be.  But there is

2   no record of how the search was conducted, what words were

3   used, whether the text messages only were checked.  There's

4   none of that.  There is, Do you have anything.  In fact, we

5   don't even really know what was said and to whom.  And that

6   outsourcing is worth considering.

7        Another reason why the investigation is biased,

8   untrustworthy, is the lack of investigation to corroborate what

9   the former patients say.

10       (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. BALDASSARE:  The government got records, legally,

2    from Weill Cornell, but there was never any dispute that Dr.

3    Paduch saw them at Weill Cornell.  There was never any dispute

4    about these medical records.  So they got those.

5           They got text messages, not all of which are as

6    favorable to the government's theory of this case as might

7    appear so far.

8           What he didn't do in any way was have any patient

9    evaluated by an expert in the field of sexual abuse, sexual

10   abuse as a minor, delayed disclosure, because, in the

11   government's view, the grooming person they are going to

12   have -- who will be partly qualified as an expert on grooming.

13   We are not going to stand up here and fight about that for a

14   half a day.  But the way they try to plug that hole about lack

15   of corroboration is with a grooming expert saying, grooming

16   explains it all.  Sometimes the former patients told the

17   government that they actually had spoken to somebody about it,

18   a therapist, a friend, a family member.  You don't see any

19   interviews of any of those people.

20          You will learn and you heard a little bit about the

21   fact that Klinefelter syndrome strikes right before, during,

22   and perhaps after adolescence, as somebody is changing from a

23   pediatrician to an adult doctor.  You don't see the government

24   getting the records from the pediatrician to look at.  You

25   don't see the government interviewing, by and large, as far as

1    I can remember, the pediatrician, talking to the pediatrician.

2              As a matter of fact, some of the pediatricians are

3    people who either ultimately recommended Dr. Paduch or

4    recommended the parents, if the patient was a minor, to go see,

5    in one instance, say, an endocrinologist.

6              One thing I agree with my colleague about, Dr. Paduch

7    was the doctor of last resort.  That's how they got to him.

8    They met him -- in one instance a mom met him at a conference.

9    Time and time and time again you are going to hear, we went

10   everywhere and no one would listen.  No one offered any hope.

11   No one offered any course of therapy.  But we don't see any

12   records about that.

13             The government thinks that grooming can explain the

14   years and years and years during which former patients saw Dr.

15   Paduch, both as minors and as adults.  The government thinks

16   the grooming expert can explain the delay that just so happens

17   to coincide with the ability to file a lawsuit for money.  But

18   the grooming doesn't cover up what we believe the evidence will

19   show.  It's the holes in the investigation.

20             The government also essentially asking you to rely on

21   some porn, and that porn was accurately described to you this

22   morning, whether it's straight porn, gay porn.  You'll see it.

23   It's a couple of pictures.

24             But here is what we should fill in about the porn.

25   The government and the FBI, they know, and the evidence will

1   show, there is no evidence that Dr. Paduch took these pictures.

2   There is no evidence that Dr. Paduch showed these pictures to

3   any former patients.  There is no evidence that Dr. Paduch sent

4   these two images of porn to anyone.

5        I am going to ask Agent Turansky, when she takes the

6   stand, we will see what the evidence will show.  I think the

7   evidence is going to show that they didn't even do a reverse

8   image search where you can find the image like that five

9   seconds on Tumblr.  How about Doctor Fucking Teen.  OK.  That's

10  what the URL says.  But let's talk a little bit more about

11  that.  Doctor Fucking Teen is a dead URL.  The click on it,

12  there is nothing there.

13       So what does that mean?  Especially what does that

14  mean in the realm of beyond a reasonable doubt?  Well, it could

15  be a doctor having sex with an 18-year-old woman, a 19-year-old

16  woman, could be a doctor having sex with an 18-year-old man, a

17  19-year-old man, could be a female doctor.  You can fill it in.

18       Now, could it be a doctor having sex with 14, 15, 16?

19  Sure, sure.  That may fly and many of you, we talked about,

20  common sense, civil lawsuits.  That might fly there, but it

21  doesn't fly with reasonable doubt.  It doesn't fly with beyond

22  a reasonable doubt.  The fact that they are relying on these

23  two pictures of porn, one of them I think the evidence will

24  show is fairly tame, and I think that the evidence will show

25  that it is a pretty staged picture.  And the evidence will show

and the other one might be a little rough to look at.  But I

believe that that evidence is going to show that it is simply a

picture of staged gay porn, no more, no less.

The last thing and the third reason why the government

is not going to prove its case, I am going to return to where I

started, which is you took an oath, we all worked, and you did,

very hard to be here, and you took an oath to uphold several

bedrock principles, and we all know them.  We know them from

TV.  We know them forever.  The presumption of innocence, the

presumption that it's not him, the burden of proof beyond a

reasonable doubt.  And you will be instructed that is not

beyond all doubt because very little is beyond all doubt,

right.  We love our kids.  After that, I am not so sure, beyond

a reasonable doubt.

Unanimity.  All 12, everyone has to agree that the

presumption of innocence has been overcome beyond a reasonable

doubt, and at the end of this case I anticipate that I'll be up

here filling in, referring back to testimony, referring back to

exhibits.

By the way, and I appreciate the judge said this, I

don't even have to be up here right now.  I could sit over

there with Jeff and Dr. Paduch.  I don't have to give an

opening statement.  I don't have to cross-examine the

witnesses.  I expect I will.

I think I have told you what those are going to look

1  like.  It's not going to be TV stuff.  I don't have to put on a

2  case.  I don't have to object.  I could sit there and do

3  nothing, and still they have to prove it.  I don't have to

4  prove anything.

5          And the risk in making an opening statement like this

6  that's fulsome and detailed is that it's possible, I don't

7  think it's happening here, because we took our time to pick the

8  jury, but it's possible that somehow it could look like I have

9  to prove the case, and I don't, and I know you are going to

10 honor that, and I appreciate your time.  Thank you.

11         THE COURT:  Thank you.

12         That's the close of opening statements.

13         Before we hear from the government's first witness, I

14 am going to give you some preliminary instructions just to

15 guide you during the participation of the remainder of the

16 trial.

17         As I said during jury selection, it will be your duty

18 to find from the evidence what the facts are.  You, and you

19 alone, are the judges of the facts.  From the evidence

20 presented at trial you will decide what happened, and then you

21 will have to apply those facts to the law as I will give it to

22 you at the end of the trial.  You must follow the law as I

23 explain it, whether you agree with it or not.  Nothing I say or

24 do during the trial is intended to indicate what your verdict

25 should be, so please don't speculate as to what I may be

1    thinking.

2         The evidence from which you will find the facts will

3    consist of the testimony of the witnesses and the documents and

4    other things received into the record as exhibits.  The lawyers

5    may also agree or stipulate is the word we use to certain

6    facts.  You are to accept those facts as true, although you

7    still must decide the weight, if any, to be given to those

8    facts.

9         Certain things are not evidence and must not be

10   considered by you as evidence, and I am going to list them for

11   you now.

12        First, the statements, arguments, and questions of the

13   lawyers are not evidence, nor are any statements I make or

14   questions I ask of the witnesses.

15        Second, objections to questions are not evidence.

16   Lawyers have an obligation to their clients to make an

17   objection when they believe that evidence is improper under our

18   Federal Rules of Evidence.

19        You should not be influenced by an objection or my

20   ruling on it.  If the objection is sustained, the witness will

21   not be permitted to answer the question, and you must ignore

22   the question.  If the objection is overruled, the witness will

23   be permitted to answer the question, and you should treat the

24   answer like any other.

25        If you are instructed that an item of evidence is

being received for limited purposes only, you must follow that

instruction and just consider that evidence for that limited

purpose.

Third, if I strike an answer or instruct you to

disregard an answer, because it's the answers that are the

evidence, then that testimony is not evidence if I strike it,

and must not be considered by you.

Fourth, anything you may see or hear outside the

courtroom is not evidence and must be disregarded for, as I

said earlier, your verdict must be based solely on the evidence

or lack of evidence presented here in this courtroom in this

trial.

It would improper for you to consider, in reaching

your decision as to whether or not the government sustained its

burden of proof, any personal feelings you may have about the

race, religion, national origin, sex, sexual orientation, or

age of the defendant or anyone else involved in this trial.  In

weighing whether the government has carried its burden, do not

allow yourself to be improperly influenced by personal likes or

dislikes, sympathy, prejudice, fear, public opinion, or biases.

Your verdict must rest only on the evidence or absence of

evidence.  All persons stand equal before the law.

One of your most important tasks will be to evaluate

the credibility of the witnesses who will testify here at

trial.  It will be up to you to decide which witnesses to

1   believe, which witnesses not to believe, and how much of any

2   witness' testimony to accept or reject.  I will give you some

3   guidelines for determining the credibility of witnesses at the

4   end of the case.  In the meantime, please just watch and listen

5   carefully to the witnesses as they testify, for you will be

6   called upon to evaluate the truthfulness of their testimony.

7           It's important for you to remember that this is a

8   criminal case.  In such cases the government bears the burden

9   of each essential element of the crimes charged beyond a

10  reasonable doubt.  As I have said before, the burden never

11  shifts to the defendant, for the simple reason that the law

12  presumes a defendant to be innocent and never imposes upon a

13  defendant in a criminal case the burden or duty of calling any

14  witness or producing any evidence.  In other words, as to each

15  charge against the defendant, the defendant starts with a clean

16  slate and is presumed innocent until such time, if ever, that

17  you, as a jury, are satisfied that the government has proven

18  the defendant guilty of that charge beyond a reasonable doubt.

19          Now, the question naturally arises, what exactly is a

20  reasonable doubt?  The words almost define themselves.  It's a

21  doubt based on your reason, judgment, experience, and common

22  sense.  It's a doubt that a reasonable person has after

23  carefully weighing all of the evidence.  Proof beyond a

24  reasonable doubt must therefore be proof of such a convincing

25  character that a reasonable person would not hesitate to rely

1    and act upon it in the most important of his or her own

2    affairs.

3         I must emphasize that beyond a reasonable doubt does

4    not, however, mean beyond all possible doubt.  It's practically

5    impossible for a person to be absolutely and completely

6    convinced of any disputed fact.  That, by its very nature,

7    cannot be proved with mathematical certainty.  In the criminal

8    law, guilt must be established beyond a reasonable doubt, not

9    beyond all possible doubt.

10        If, after a fair and impartial consideration of all

11   the evidence, you do have an abiding belief of the defendant's

12   guilt, a belief that you would be willing to act upon without

13   hesitation in important matters in the personal affairs of your

14   own life, then it's your sworn duty to convict the defendant on

15   that count of the indictment.  If, however, you do not have an

16   abiding conviction of the defendant's guilt, if you have such a

17   doubt as would cause you to hesitate before acting in matters

18   of importance to yourselves, then you have a reasonable doubt,

19   and in that circumstance it's your sworn duty to return a

20   verdict of not guilty on that count.

21        Unless and until you're excused as a juror, you should

22   not attempt, as I have noted earlier, to gather any information

23   on your own relating to the case.  Do not engage in any outside

24   reading on the case.  Do not visit any places mentioned in the

25   case.  Do not use the Internet, Google, Facebook, X, or any

1  other social media site to learn anything about the case or

2  anyone involved in the case or to talk at all about the case.

3          You must not talk to anyone about the case, including

4  what I told you thus far, and the information that you will

5  learn during the trial and have already through opening

6  statements.  This includes your family and friends.  You may

7  advise the people in your life that you've been chosen to sit

8  on a criminal jury, but you may not talk about the case.  That

9  applies equally to communications made in person or by tools of

10  technology.

11          If at any time during the course of the trial any

12  person attempts to talk to you or communicate with you about

13  the case, either in or outside of the courthouse, you should

14  immediately report such an attempt to me by telling Ms. Cavale.

15          The reason I give you this instruction is that you

16  must decide this case based on the evidence offered at trial

17  alone and not based on anything you may learn from outside

18  sources.  Also, please keep an open mind throughout the trial

19  and reserve judgment until all the evidence is in, until you

20  have heard all of the evidence, closing arguments, and my

21  instructions on the law.  You really won't be in a position to

22  reach any conclusions in this case, so do keep an open mind.

23          I want to talk for a minute about notes.  You are

24  permitted to take notes during the trial.  Ms. Cavale has given

25  each of you a notepad and a pen or pencil.  Write your name on

1    the cover of the pad.  If you do take notes, please do so only

2    on these pads and don't remove the notepads from the courtroom

3    or jury room.  You should leave your pads in the jury room or

4    give them to Ms. Cavale at night.  Any notes that you might

5    take, and you're, by no means, obligated to take them, but if

6    you want to, they are for your use only, and they are only to

7    be used as an aid to your memory, but your memory will control.

8    So if you take notes, just be careful not to get so involved in

9    taking notes that you are not paying attention and you are not

10   watching the witnesses, you're not listening to the evidence.

11        Once you're in deliberations, if there is a

12   disagreement about one juror's notes and another juror's notes

13   or between one juror's notes and another juror's recollection,

14   you can ask to have the court reporter read back the testimony,

15   because it is the official court transcript that controls, not

16   any particular juror's notes.

17        During the course of the trial, exhibits will be

18   received into evidence.  They will be marked by exhibit number.

19   If there is an exhibit that you're particularly interested in

20   seeing, feel free to write down the exhibit number in your

21   notepad, and you can ask to see that once you're in

22   deliberations.  But at the end of the trial I am going to

23   provide you with a list of all the exhibits received in

24   evidence, as well as a list of all the witnesses who testified,

25   so you need not keep track of these if you don't want to.

1          In this trial, and I think I mentioned this during

2    *voir dire*, but with few exceptions, we are going to sit Monday

3    through Friday each day at 10 a.m. and continue to 5 p.m.

4    Please plan to arrive at 9:45 each day.  As an incentive I'll

5    have breakfast waiting for you.

6          We can't start until you are all here.  So if any of

7    you are late, just keep in mind that all of us, like the

8    lawyers, the court reporter, the witnesses, myself, and your

9    fellow jurors are all going to be waiting for you, so please

10   try and be on time.

11         Now, just lastly, I am going to tell you briefly how

12   the trial will proceed.  As you know, we just had opening

13   statements.  The opening statements, as I noted, are neither

14   evidence nor argument.  They were simply outlines of what the

15   attorneys believe the evidence will show, and they are given to

16   help you follow the evidence as it is presented.

17         Now, the government will begin to present its case.

18   The government will call its witnesses.  And after each witness

19   testifies on direct examination, counsel for the defendant will

20   have an opportunity to cross-examine that witness.  After

21   cross-examination, there may be a little bit of what we call

22   redirect, and even recross-examination.

23         Following the government's case it will rest.  The

24   defendant may, but need not, but may present a defense case,

25   and counsel for the government will have the opportunity to

1    cross any witnesses testifying for the defendant.

2         But as we discussed, it's important to remember that

3    in a criminal case a person charged with a crime has absolutely

4    no burden to prove that he's not guilty.  If the defendant

5    chooses not to present any proof, that decision cannot be held

6    against him and may not enter into your deliberations at all.

7    I will instruct you again on the burden of proof after all the

8    evidence has been received.

9         After the presentation of evidence is complete and

10   both sides have rested, the attorneys will deliver the closing

11   arguments and summarize and interpret the evidence for you.

12   Just as lawyers' opening statements are not evidence, the

13   closing arguments, they are arguments, but they are not

14   evidence either.

15        Following closing arguments I will instruct you on the

16   law, and then you will then finally retire to deliberate on

17   your verdict, which must be unanimous, and must be based on the

18   evidence presented at trial.

19        You have a tremendously important task as jurors.

20   It's to determine the facts.  You, and not the Court, are the

21   sole judges of the facts.  The Constitution itself recognizes

22   your unique role in our system of justice, so please just pay

23   careful attention to the witnesses and the evidence received at

24   trial, as well as my instructions on the law.

25        The government may call its first witness.

1          MR. XIANG:  Thank you, your Honor.  The United States

2    calls Sam Lenox.

3    SAM LENOX,

4          called as a witness by the government,

5          having been duly sworn, testified as follows:

6          THE COURT:  Before we begin, I would like to meet the

7    lawyers very briefly about a logistical issue at sidebar.

8    Thanks.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Are you going to use any exhibits in the

3  next half hour?

4          MR. XIANG:  Yes, your Honor.

5          THE COURT:  Just make sure that you get the system

6  right.

7          Why don't you just talk about this for a moment.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (In open court)

 2                 THE COURT:  Are we all set?

 3                 MR. XIANG:  Yes, your Honor.

 4                 MR. BALDASSARE:  May we move around a little bit?

 5   With the screen, I just can't see.

 6                 THE COURT:  Go ahead.  You can sit wherever you want.

 7                 Sorry about that delay, everybody.

 8                 You can begin whenever you're ready.

 9                 MR. XIANG:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. XIANG:

12   Q.  Good afternoon, Mr. Lenox.

13   A.  Good afternoon.

14   Q.  How are you feeling?

15   A.  OK.

16   Q.  How old are you, Mr. Lenox?

17   A.  I'm 25.

18   Q.  What state do you currently live?

19   A.  New Jersey.

20   Q.  For how long have you lived in New Jersey?

21   A.  All my life.

22   Q.  What's your education background?

23   A.  I graduated high school, and I graduated a four-year

24   university.

25   Q.  What did you studdie in college?
```

1  A.  Communication studies.

2  Q.  Are you currently working, Mr. Lenox?

3  A.  Yes, sir.

4  Q.  What's your line of work?

5  A.  I'm in sales.

6          MR. XIANG:  Ms. Vuckovich, if we can please pull up

7  for the witness and the parties what's been marked for

8  identification as Government Exhibit 101.

9  Q.  Mr. Lenox, do you recognize the individual in that

10  photograph?

11  A.  Yes, sir.

12  Q.  Who is it?

13  A.  Me.

14  Q.  Is this a fair photograph of what you look like?

15  A.  Yes.

16          MR. XIANG:  Your Honor, I offer GX-101.

17          THE COURT:  Any objection?

18          MR. BALDASSARE:  No.

19          THE COURT:  Admitted.

20          (Government Exhibit 101 received in evidence)

21          MR. XIANG:  Ms. Vuckovich, if we can please publish.

22          Ms. Vuckovich, if we could please pull up now what's

23  been marked for identification as sealed Government Exhibit

24  301, just for the witness and the parties.

25  Q.  Mr. Lenox, do you recognize this document?

1    A.  Yes.

2    Q.  What do you recognize it to be?

3    A.  It's my driver's license.

4    Q.  Is it a fair and accurate depiction of the front side of

5    your driver's license?

6    A.  That is correct.

7            MR. XIANG:  Your Honor, I offer this sealed exhibit,

8    Government Exhibit 301, and I ask that Ms. Vuckovich please

9    publish it to the jury, and I understand the gallery screen

10   will be turned off during this exhibit.

11           THE COURT:  It should be turned off on the screens

12   back there too.

13           Any objection?

14           MR. BALDASSARE:  No objection.

15           THE COURT:  It's admitted as sealed.

16           (Government Exhibit 301 received in evidence)

17   Q.  Mr. Lenox, does this document bear your true legal name?

18   A.  Yes.

19   Q.  Focusing your attention on the date next to DOB, is that

20   your true date of birth?

21   A.  That's correct.

22           MR. XIANG:  Thanks, Ms. Vuckovich.  You can take that

23   down.

24           Ms. Vuckovich, if we can please pull up what's been

25   marked for identification as Government Exhibit 100, just for

1   the witness and the parties.

2   Q.  Mr. Lenox, do you recognize the individual in this

3   photograph?

4   A.  Yes.

5   Q.  Who do you recognize it to be?

6   A.  Dr. Paduch.

7           MR. XIANG:  Your Honor, I offer Government Exhibit

8   100.

9           THE COURT:  Admitted.

10          (Government Exhibit 100 received in evidence)

11          MR. XIANG:  I understand there is a stipulation

12  between the parties that the individual depicted in the

13  photograph is the defendant.

14          MR. BALDASSARE:  Absolutely, Judge.

15          THE COURT:  Thank you.

16          MR. XIANG:  Ms. Vuckovich, if you can please publish

17  GX-100.

18  Q.  Mr. Lenox, in my questions, if I refer to Darius Paduch as

19  the defendant, will you understand what I mean?

20  A.  Yes, sir.

21  Q.  Mr. Lenox, how do you know the defendant?

22  A.  He was my physician.

23  Q.  Can you describe for the jury the medical issue that

24  initially led you to seek care from the defendant?

25  A.  Yes.  When I was roughly 15, I started dealing with

1    erectile dysfunction, and I had seen a couple of physicians

2    that didn't really know what was going on.  I was recommended

3    to go see Dr. Paduch at Weill Cornell.

4            MR. XIANG:  Before we begin, Ms. Vuckovich, we can

5    take that down.

6    Q.  How did you hear about the defendant?

7    A.  I was recommended or referred to his practice by another

8    physician at Dupont.

9    Q.  Do you remember the name of the physician who referred the

10   defendant?

11   A.  Yeah.  Dr. Maladuk.

12   Q.  What hospital or medical institution did you see the

13   defendant at?

14   A.  Weill Cornell Medical Center.

15           MR. XIANG:  Your Honor, at this time, pursuant to a

16   certification under Rule 902(11), in which we understand the

17   defense does not object, the government offers the following

18   sealed exhibits:  201, 202, 204, 205 and 205A, 207, 208, 209,

19   211, 212, 213, 214, and 215.

20           THE COURT:  Admitted as sealed, consistent with my

21   prior rulings.

22           (Government Exhibits 201, 202, 204, 205 and 205A, 207,

23   208, 209, 211, 212, 213, 214, and 215 received in evidence)

24           MR. XIANG:  Thank you, your Honor.

25           Ms. Vuckovich, if we can pull up what's been admitted

1    into evidence as sealed Government Exhibit 201 and publish that

2    to the jury.

3            If we can please may blow up the upper half of this

4    document.

5    Q.  Mr. Lenox, prior to your testimony today, did you have an

6    opportunity to review this document?

7    A.  Yes.

8    Q.  And, generally speaking, what type of document is it?

9    A.  Medical document.  I don't know.  It looks like records.

10   Q.  Whose medical records are these?

11   A.  Mine.

12           MR. XIANG:  Ms. Vuckovich, if we can please go to the

13   middle third of the document, the field under demographics.

14   Q.  Mr. Lenox, drawing your attention to the date next to date

15   of birth on this document, does that accurately reflect your

16   date of birth?

17   A.  That's correct.

18   Q.  Drawing your attention to the address, which I will not

19   read, next to the word address, does that accurately reflect

20   your address at the time you went to the defendant for

21   treatment?

22   A.  Yes, sir.

23           MR. XIANG:  Ms. Vuckovich, if we can please jump ahead

24   to page 65 of the same exhibit.  Perhaps blow up the top where

25   it says visit list as of 12/31/2017.

1   Q.  Mr. Lenox, prior to your testimony today, did you have an

2   opportunity to review this portion of your medical records?

3   A.  I believe so, yes.

4   Q.  And as you look at these dates, and we can scroll a little

5   bit, if it will be helpful to you, Mr. Lenox, is it fair to say

6   that these dates are in reverse chronological order?

7   A.  Yes.

8   Q.  Meaning that the most recent dates are on top and they get

9   older as you go down the table, is that right?

10  A.  Thank you.  Yes.

11          MR. XIANG:  Ms. Vuckovich, if we can please jump ahead

12  to the portion of this chart that's on page 68 and blow up the

13  two rows at the bottom.

14  Q.  Mr. Lenox, I want to focus your attention on the row that's

15  second from the bottom next to September 3, 2015.

16          Do you see that row?

17  A.  Yes.

18  Q.  Just going across the row, what is written in the second

19  column of that row?

20  A.  I'm sorry.  Can you repeat the question.  What I am

21  supposed to do?

22  Q.  No problem.

23          Focusing on the row that begins with September 3, 2015

24  and moving right along that row, what does it say right next to

25  it on the second column?

1    A.  Office visit.  Weill Cornell Medical Center Urology.  Weill

2    Cornell Urology, urology, mail infertility.  Darius A. Paduch

3    M.D., Ph.D.

4    Q.  Mr. Lenox, understanding this is difficult, if I could ask

5    you to please speak just a little bit slower.

6    A.  Yes, sir.  Should I repeat it?

7            THE COURT:  I think it was OK.

8            For the jurors, if you can't hear anything, just raise

9    your hand.  Otherwise, we will assume you can hear.

10   Q.  Mr. Lenox, as of September 3, 2015, how old were you?

11   A.  Sixteen.

12           MR. XIANG:  Thank you, Ms. Vuckovich.  You can take

13   down the exhibit.

14   Q.  Now, Mr. Lenox, I want to focus your attention on your

15   first medical visit with the defendant.

16           Did you go to that visit alone or with someone else?

17   A.  With my dad.

18   Q.  Did you travel to that visit from home or from someplace

19   else?

20   A.  From home.

21   Q.  During this first visit, was there a physical exam

22   component?

23   A.  Yes.  There was an ultrasound and -- yeah.

24   Q.  What part of your body was it an ultrasound of?

25   A.  My penis.

1  Q.  Who conducted that ultrasound?

2  A.  Dr. Paduch.

3  Q.  Can you describe to the jury how you remember the defendant

4  conducting that ultrasound.

5  A.  I don't really remember a whole lot about the first

6  appointment.  I remember I was asked to put pornography on the

7  screen, which I did, before the ultrasound, and at one point

8  during the ultrasound I remember a finger in my rectum.  That's

9  pretty much what I remember about the first appointment, I

10  guess the examination portion of it.

11  Q.  Now, focusing your attention on the ultrasound that you

12  recall, when the ultrasound was being performed, was your penis

13  flaccid or was it erect?

14  A.  It was erect.  I had been given medication to give me an

15  erection.

16  Q.  Who gave you that medication?

17  A.  Dr. Paduch.

18  Q.  How was that medication administered to you?

19  A.  It was an injection into my penis.

20  Q.  Did the injection of that medication successfully induce an

21  erection?

22  A.  Yes, sir.

23  Q.  Now, during the portion of this visit, where the ultrasound

24  was performed, was your father present in the room during the

25  ultrasound?

1    A.  No, sir.

2    Q.  Did someone ask him to leave?

3    A.  I don't recall.  It was just kind of -- I just remember him

4    leaving and not being there.

5    Q.  Following this first exam, did the defendant say anything

6    to you about what your medical condition was?

7    A.  Yeah.  He spoke to me and my dad.  We went -- we were in

8    the office or examination room, and he explained the ultrasound

9    findings.

10   Q.  What was his general explanation for your medical issue?

11   A.  From my understanding, there was blood vessels that weren't

12   shaped right, and that was why I was having my issues.

13   Q.  Did the defendant prescribe any course of treatment for

14   you?

15   A.  Yup.  I was put on, I think it was three months or six

16   weeks of Cialis to take every night.

17   Q.  To your understanding, what is Cialis?

18   A.  It's a vasodilator and erection medication.

19   Q.  Did you follow the defendant's instructions to take that

20   medication?

21   A.  Yes, sir.

22   Q.  Did it improve your condition?

23   A.  No, sir.

24   Q.  Mr. Lenox, did you continue to see the defendant for more

25   medical visits?

1   A.   Yup.

2   Q.   Were each of those to treat the same erectile dysfunction

3   issue that you described?

4   A.   Yes.

5   Q.   Did any of those medical visits involve surgical

6   procedures?

7   A.   Yes.

8   Q.   What kind of surgery or surgeries?

9   A.   I had two surgeries during that time of seeing Dr. Paduch.

10  I had a varicocelectomy, and I had veins taken out of my penis.

11  Q.   To the best of your memory, approximately when were those

12  procedures?

13  A.   The first one, the varicocele was first, maybe four or five

14  months after I started seeing Dr. Paduch, and the stripping

15  surgery was in April or May of 2017.

16  Q.   Apart from the medical visits that were related to those

17  surgeries, did you see the defendant for other medical

18  appointments?

19  A.   Yeah.

20  Q.   Did you go to those follow-up appointments alone or with

21  anyone?

22  A.   Most of the time with my mom or my dad.

23  Q.   Where did you travel from to get to those appointments?

24  A.   My house in New Jersey.

25  Q.   Were each of those appointments at the same medical office

1   as your first visit?

2   A.  Yes, sir.

3   Q.  Can you remind the jury of where that is.

4   A.  Weill Cornell Medical Center in Manhattan.

5   Q.  Mr. Lenox, sitting here today, do you have a distinct

6   memory of every single medical appointment you've had with the

7   defendant?

8   A.  No, sir.

9   Q.  Are there particular appointments or parts of appointments

10  that stand out in your mind?

11  A.  Yes, sir.

12  Q.  What about those specific appointments stands out?

13  A.  The ones where I was masturbated by the defendant.

14  Q.  Approximately how many times do you confidently remember

15  the defendant masturbating you?

16  A.  Three or four.  One memory.  I am not -- I have two

17  memories.  I am not sure if they were from the same incident or

18  different incidents, so either three or four.

19  Q.  Going in what you remember to be chronological order, can

20  you describe to the jury the masturbation appointments that you

21  remember.

22  A.  Yeah.  I have a very vivid memory of during an appointment

23  the defendant, Dr. Paduch, was masturbating me.  I had said

24  something along the lines of, hey, like, I can do this.  I'd be

25  more comfortable doing this myself, and he put his hand on my

1   stomach and he said, you need to relax.  This is why you're

2   having your problems.  You're too tense.

3        Later on, what I believe to be in the same

4   appointment, I vividly remember, after orgasming, the defendant

5   took my ejaculatory fluid and wiped it on my mouth and said

6   something along the lines of -- I said something like:  What

7   the hell?  I was confused and didn't really know how to react.

8   I wasn't expecting it.  And he said something to the effect of:

9   Don't tell me you've never tried it before.  I have a very

10  vivid memory of being masturbated by the defendant, a separate

11  time, and he was very focused on what he was doing.  I said:

12  Hey, I am going to ejaculate and I am going to finish, cum.

13  And he said -- he didn't say anything.  He was very focused on

14  what he was doing.  I ended up ejaculating, and my ejaculatory

15  fluid got on his shirt, and I remember that one very vividly

16  because my dad was in the waiting room, and I was really

17  worried that my dad would see a cum stain on the defendant's

18  shirt.

19       And the last, I guess, vivid memory I have of the

20  defendant masturbating me was, when I was an intern at Weill

21  Cornell Medical Center, at one point I was taken into a

22  separate room, and he asked if the examination room was empty

23  to one of the nurse practitioners.  They said yes.  So he asked

24  me to come in the room and lower my pants, which I did, and he

25  masturbated me.  At that time that was -- I wasn't given any

1    medication, so I didn't have an erection.  But if you're being

2    masturbated, a little bit of blood comes in.  So he said

3    something like:  See, you don't have an erection problem.

4    You're fine.  And he left and I left after him.

5            Those are the memories that really stick out in my

6    mind of my treatment with Dr. Paduch.

7    Q.  Mr. Lenox, understanding this is a very uncomfortable

8    question, when you said in your testimony that on these

9    occasions the defendant masturbated you, when you used that

10   word masturbated, can you explain to the jury what physically

11   the defendant did and to what part of your body?

12   A.  It's pretty much what you would imagine when I say it.

13   What I mean by that, he would take his hand, use it around my

14   erect penis because I had been given medication.  One time it

15   was around my flaccid penis, because I had not been given

16   medication, and he held my penis and moved his hand up and down

17   and masturbated me.  That's what I mean.

18   Q.  I believe in some of your answers you've touched on this a

19   little bit, but just so the record is clear, on the occasions

20   when the defendant masturbated you outside of the internship,

21   so setting the internship aside, do you recall whether on those

22   occasions he had injected you with the medication you referred

23   to from your first appointment that induced an erection?

24   A.  Yes, sir.  Those were administered prior, yes.  On those

25   same appointments they were given.

1  Q.  During those appointments when he masturbated you, did the

2  medication work as it had in that very first visit?

3  A.  Yeah.

4  Q.  On these occasions did the defendant explain why he was

5  doing this?

6  A.  Yeah, kind of.  I had at one point been told about that we

7  would be doing erection practice as like -- almost as a

8  physical therapy, where if I learned how to have an erection in

9  normal sexual function in an office that it would kind of carry

10  into my home life where I would -- I wouldn't be really having

11  these issues anymore.

12  Q.  Mr. Lenox, when you used the term erection practice, was

13  that a term that you came up with or that the defendant came up

14  with?

15  A.  I don't know, to be honest.  From my recollection, it's

16  what Dr. Paduch said, but he could have said it a little bit

17  more like physical therapy.

18  Q.  Focusing on what you believed at the time, at the time did

19  you believe that these erection practices were part of the

20  defendant's medical treatment of you?

21  A.  Yes.

22  Q.  During these appointments and setting aside the internship

23  occasion for the moment, when the defendant masturbated you,

24  was there anyone else in the room besides you and the

25  defendant?

1   A.  No, sir.

2   Q.  During the occasions that you remember when you ejaculated

3   on the defendant's body, did the defendant explain why he

4   wanted or needed to see you ejaculate?

5   A.  No.

6   Q.  Did the defendant ever offer any explanation, medical or

7   otherwise, about why he was asking you to taste your own

8   ejaculatory fluid?

9   A.  No.

10  Q.  I want to focus on your answers -- let me start again.

11          You mentioned in the course of one of your answers

12  that at some point you became the defendant's intern.

13          Do you recall that testimony?

14  A.  Yes, sir.

15  Q.  If we can back up, when was the first time the idea of an

16  internship for you came up?

17  A.  Either my first or second appointment.

18  Q.  Who brought up the idea?

19  A.  Dr. Paduch.

20  Q.  Do you remember the conversation in which the defendant

21  brought up that idea?

22  A.  Yeah.  It was vaguely, you're a bright kid, we have this

23  internship for high school students.  I think you could be a

24  good fit.

25  Q.  And at the time of your conversation, to your knowledge,

1    had you shared anything with the defendant that would make him

2    think you were a bright kid?

3    A.   I asked him a lot of questions about my own condition,

4    because I was concerned about it.  I was 15, and your friends

5    are having sex or at least interested in being able to do that,

6    and you can't, so sure I came prepared with an arsenal of

7    questions to ask him.

8    Q.   Beyond asking him those questions, did you express to him,

9    to your recollection, a particular interest in the medical

10   field or urology?

11   A.   No, sir.

12   Q.   How were your grades at the time?

13   A.   Average.  Not very good.

14   Q.   When the defendant asked whether you wanted to be his

15   intern, what was your reaction?

16   A.   I think I just -- in my last answer I said my grades were

17   not good, so it was kind of like -- I guess it seemed like a

18   good opportunity for me.  My grades were only so-so.  And

19   having an internship at a big hospital, it seemed like a good

20   idea for me at the time.

21   Q.   Was there an application process for this internship?

22   A.   I don't remember much of it.  I recall it was very brief,

23   and maybe I sent a couple of paragraphs to his lab assistant,

24   Alex, and then I was accepted.

25   Q.   What, if anything, did the defendant tell you about the

1  competitiveness of this internship?

2  A.  After I got it, he told me it was very competitive, and I

3  bested 30 other students to get the internship.

4         MR. XIANG:  Ms. Vuckovich, if we can please pull up,

5  just for the witness and for the parties, what's been marked

6  for identification as Government Exhibit 701.

7  Q.  Mr. Lenox, do you recognize this document?

8  A.  Yes, sir.

9  Q.  What do you recognize it to be?

10  A.  An email to me.

11  Q.  What is the email in regard to?

12  A.  That I was accepted to the summer research student program

13  under Dr. Paduch's mentorship.

14  Q.  And apart from the black redactions on the document, is

15  this a fair and accurate copy of that email?

16  A.  Yes, sir.

17         MR. XIANG:  Your Honor, I offer Government Exhibit

18  701.

19         MR. BALDASSARE:  No objection.

20         THE COURT:  Admitted.

21         (Government Exhibit 701 received in evidence)

22         MR. XIANG:  Your Honor, I believe there is an

23  agreement between the parties that the redactions are either

24  names or email addresses that are irrelevant to the case other

25  than the first redaction under dear, which is the true legal

1    name of Mr. Lenox.  Just noting for the record.

2         THE COURT:  Thank you.

3         MR. XIANG:  Ms. Vuckovich, you can publish that to the

4    jury.

5    Q.  Mr. Lenox, who sent this email?

6    A.  Dr. Paduch.

7    Q.  Starting from the word dear, can you read this email aloud.

8    You can say the word redacted when you see that black spot

9    there.

10   A.  Understood.

11        Dear redacted, congratulations.  You have been

12   accepted for my summer research student program in male

13   infertility genetics lab to work under my mentorship.  As it

14   gets closer to summer, let us know when you can start.  Summer

15   scholarship for high school students is four weeks.  You will

16   be provided a stipend in the amount of $1200 for the summer

17   program to offset travel expenses.  Alex and Tanya will help

18   you with the rest of paperwork.  Alex and Tanya and I will give

19   you account for expenses.  Best, DAP.

20        MR. XIANG:  Your Honor, I see that it's 4:55.  I'm

21   happy to continue, but this might be a natural stopping point.

22        THE COURT:  That's fine.  We can end for the day.

23        I am just, folks, going to advise you, just remember,

24   don't discuss the case.  Don't do any research.  Keep an open

25   mind.  And we will see you in the morning.  Thank you.

1              You should be here at 9:45, and we are going to start

2      promptly at 10.

3              (Jury not present)

4              THE COURT:  Are there any issues we need to talk about

5      before tomorrow?

6              MR. XIANG:  There are, your Honor.

7              During the defense opening the government, both as a

8      courtesy and to avoid unduly drawing the jury's attention to

9      it, refrained from objecting to a number of clearly

10     objectionable statements.  I think our plan at this time is to

11     look at the transcript and to make an application to the Court

12     for appropriate curative instructions on a number of issues.

13             I think one of the many prominent issues is, there was

14     a lot of asserting from defense counsel about what did or

15     didn't happen at meetings involving the FBI, what the FBI did

16     or did not do.

17             I'm putting on the record that no *Touhy* notice has at

18     any point been served on the government for the testimony from

19     Special Agent Turansky or any other member of the investigative

20     team and that the prospect that any of them would be testifying

21     pursuant to a subpoena from the defense has never previously

22     been raised.  And absent testimony from either Agent Turansky

23     or that type of witness, the government cannot imagine how

24     evidence of a number of these assertions made by the defense

25     could possibly come up in this trial.

1             THE COURT:  Why don't we plan to be here -- if you

2     want to submit a letter, you can.  If you want to raise it

3     tomorrow, that will at least give counsel the opportunity to

4     prepare a response.  If not, we can just talk about it 9:30

5     tomorrow and then see where we are.

6             (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. XIANG:  I think the other, just to flag for both

2     the court and defense counsel the issues may well include.

3     There were assertions about when laws were passed by the

4     legislature and why they were passed, what attorneys or law

5     firms did or did not do in response.

6          Again, the government cannot imagine how any of that

7     evidence could possibly come in, and to the extent that defense

8     counsel was simply asserting those things, as an attorney,

9     that's clearly improper.

10         MR. BALDASSARE:  Judge, here is what I would say.

11         THE COURT:  Use the microphone, please.

12         MR. BALDASSARE:  Judge, they should have objected.  I

13    could have fixed it.  Could have rephrased.

14         Number one, I'll look at what they said.  They should

15    have objected then.  I understand the courtesy, but I don't

16    think it's going to be appropriate to tell the jury that I said

17    a whole bunch of things wrong.

18         Number two, they are not calling Turansky.  I'll serve

19    with a subpoena.  The Touhy notice, I have plenty of time.

20    I'll do it.  I couldn't imagine that they weren't calling her.

21         THE COURT:  Was she on the government's witness list?

22         MR. XIANG:  No, your Honor.

23         MR. BALDASSARE:  I didn't get a witness list, Judge.

24    I never got, like, a witness list of these are our witnesses.

25    I still don't have one.  I know who we are doing today and

1    tomorrow.  I'm not entitled a witness list.

2         If they are not calling the case agent, I'll call her.

3    I just didn't think that there was -- I couldn't imagine, to

4    use the government's phrase anyway, where they wouldn't.

5         I'll send them a subpoena tonight.  They can accept,

6    not accept.  The FBI can do what it always does.  I'll send in

7    my Touhy submission and go from there.

8         THE COURT:  Did they provide 3500 material for her?

9         MR. BALDASSARE:  Well --

10        MR. XIANG:  No, your Honor.

11        MR. BALDASSARE:  -- I don't know what 3500 material

12   would look like other than a couple of 302s that she wrote.

13        THE COURT:  Yes, but it would indicate that the person

14   is likely to be a witness.  That's what I'm getting at.

15        MR. BALDASSARE:  Yes.

16        THE COURT:  Just in terms of whether your expectation

17   was reasonable or not.

18        MR. BALDASSARE:  Yes.  Yeah, I mean, for sure.

19        Not everyone has 3500, but a lot of the 302 -- a 302,

20   but there are a bunch of them that did.  And also, you know,

21   Agent Turansky, we interacted with her a lot on what was

22   thought to be the see Sam.  It was really only recently that we

23   knew that that wasn't coming in.  I can't imagine it's going to

24   be a hardship to put the agent on the stand to talk about what

25   did or didn't happen.

1          There are other problems, too, Judge.  Here is one of

2    the problems.  I don't want to spring it on the court, and

3    maybe it won't be an issue.  But, you know, the government did

4    something in this case that, with all due respect, I think is

5    on lies, and that is that they interviewed and had a lot of

6    meetings with the witnesses with nobody there but them, which

7    means that if a witness says, I never said that to the

8    government, they have to get up and testify.  That's why there

9    is always an investigator or an FBI agent.

10         Now, if I made that motion earlier, it would have been

11   premature.  Maybe it is still premature.  Maybe when somebody

12   says something and I say, Well, didn't you tell the government?

13   If they say X and I say, Didn't you tell the government Y?  And

14   they say, Oh, yeah, I did.  Then we're fine.  If they say, no,

15   I never said that, we're going to have a problem in this case.

16         I'm not going to notice them because it's premature.

17   But they did that at their peril, Judge.  Where they didn't

18   have Agent Turansky there, there were no notes from Agent

19   Turansky.  Sometimes she's there, sometimes I had to ask the

20   government and they responded.  But plenty of times -- I'll

21   show them to you.  We don't know who wrote them and when I

22   asked them who wrote these, you know, short notes.

23         But there is plenty of interviews, Judge, where it's

24   just the government, and they did that at their peril.  So

25   tonight, I will notice, I'll send the subpoena, the FBI can do

1    what they always do.  I'll send what I always send and we'll go

2    from there.

3            As far as what I said, I don't think it's appropriate

4    to tell the jury anything.  I think if I get up and ask

5    questions, they can object.  I think if I don't show something,

6    depending on how close it goes to burden-shifting, they can say

7    it in closing.

8            MR. XIANG:  Your Honor, obviously we'll brief what we

9    need to brief.

10           Just to correct a couple things for the record.  It is

11   simply untrue, period, that the government met with witnesses

12   in this case without some sort of witness, either a witness

13   from the FBI or some other law enforcement agency or a

14   paralegal or someone else present.

15           That is untrue.

16           THE COURT:  So that solves that problem.

17           MR. BALDASSARE:  It doesn't, Judge.  It doesn't,

18   because I have plenty of witnesses where all I have is one

19   piece of paper and the names at the top are the AUSAs.  It just

20   doesn't.

21           I can probably pull ten of them out now.  I was

22   surprised to see it, but if I made noise about it earlier, it

23   would have been premature.  It's not --

24           THE COURT:  If the government represents that there

25   was an agent there, even if the person's name was not on that

1    document, are you questioning the veracity of that, whether

2    that person was there?

3              I mean, it may be premature because we need a specific

4    example.  But if you were to say, look, I want to call that --

5    the person to ask them if something was said.  To the extent

6    I'm going to let you do that and they represent that, you know,

7    agent so-and-so was there, are you not going to take that

8    representation if the name wasn't written down?

9              MR. BALDASSARE:  I'm not going to call them liars,

10   Judge.  How do I know?

11             If they met with a witness -- I've never seen this

12   ever.  I've never seen four AUSAs meet with someone, have only

13   their names on typed notes, not list the agent, and then how am

14   I supposed to know who to call?

15             If they want -- I'm not going to do it tonight, I'm

16   busy and this is on them.  If they want to go through every

17   attorney notes and add, there are plenty of times where we have

18   attorney notes and it says SA Turansky.  But those aren't

19   Turansky's notes.

20             So what do I do?  Call Turansky and say, Did you take

21   these notes?  Did you look at these notes?  I just --

22             THE COURT:  So, just to be clear, for some of these

23   instances, there was a Special Agent listed, but that isn't the

24   person who -- like, there was no 302.  That isn't the person

25   who took the notes.

1    So what you're objecting to is when the AUSA took

2    their own notes, even if there was a witness there?

3    MR. BALDASSARE:  No.

4    So there is a couple of buckets, right.  There is the

5    ones where we have the 302 and everybody is happy, and we'll go

6    off into the sunset.

7    THE COURT:  Got it.

8    MR. BALDASSARE:  Then there are some where there is a

9    302, and then there are handwritten notes.  They are not

10    necessarily shown who wrote them, but, kind of, looks like they

11    mirrored the 302.

12    But then there are plenty of them, not one or two,

13    where the only notes, the only names I see are --

14    Well, let me take a step back.  Then there are ones

15    that are written or typed.  And, by the way, Judge, these are,

16    like, shorthand.  They are not pages and pages.  Some of them

17    are.  most of them are pretty short.  And Turansky or Agent

18    Turansky or somebody else is there.

19    But my recollection is that we have looked through a

20    lot of these, what appear to be -- and we know that they are

21    attorney notes.  Sometimes it will say MC, Marguerite Colson,

22    MC notes, but there is no agent listed.  So who do I --

23    First of all, who do I call?

24    Second of all, let's say a witness says, I told the

25    government X.  And I said, Well, didn't you tell them Y?  What

1    do I do with these notes that maybe an agent was there, maybe

2    an agent wasn't?  If an agent was there and they say an agent

3    was there, I believe them.  But I don't know that.

4         If their name isn't on anything and all I see are

5    four -- the names of four AUSAs and the typed notes I have is

6    attributed to one of those AUSAs, OK.  Then if Turansky was at

7    every one, I'll deal with it.  I don't know how I cross-examine

8    her on somebody else's notes.

9         THE COURT:  Yes.

10        Go ahead.

11        MR. XIANG:  If I may, your Honor.

12        We have followed the U.S. Attorney's DOJ's standard

13   practice in this area, which is for the notes to reflect

14   everyone who was present, including the agents.  Sitting here

15   right now, we are not sure what notes the defense is talking

16   about where we are omitting the name of the non-attorney

17   witness who participated.

18        Obviously, if he shows us particular documents and has

19   questions and says, Hey, did you guys forget about it on this

20   particular occasion?  We're happy to deal with that.  But it is

21   not true that, as a practice or across these notes, that the

22   non-attorney witness's names have been omitted.

23        I think the defense has, perhaps, confused a number of

24   different issues.  There are numerous witness meetings for

25   which there is no 302 because the note-taker was one of the

1  prosecutors on the case, and that has been pretty consistently

2  the case in the leadup to trial.

3         THE COURT:  That doesn't mean that there wasn't a

4  non-AUSA witness there.

5         MR. XIANG:  Correct.

6         As he said before, where we've done that, we've noted

7  everyone who was present.  I don't think the issue of, you

8  know, how a defense lawyer wants to confront a witness with

9  what they believe to be prior inconsistent statements at a

10  meeting attended by not only prosecutors, but a law enforcement

11  officer, that is not a novel one in this district.

12         That happens in literally every criminal trial, and we

13  have followed our office's practice that we follow in literally

14  every criminal trial.  Again, if there is one or two notes that

15  the defense is contending we neglected to note who was present,

16  we're happy to engage offline on that and to figure that out.

17         But insofar as the representation is the government is

18  leaving off who was present for witness preps, that is simply

19  untrue.

20         MR. BALDASSARE:  Judge.

21         THE COURT:  Look, I think we can deal with this when

22  it comes up.

23         MR. BALDASSARE:  Yes, we can.

24         First off, for the record, I'm not saying that they

25  intentionally left anybody off.  I am not saying that they did

1    anything.  I'm saying there were certain instances, I don't

2    know.

3         What I would suggest is this.  First of all, it may

4    not come up at all.  I do think it's important as to whether or

5    not I believed Turansky, Agent Turansky, was going to testify.

6    I'll subpoena her tonight.  We can fight that fight out, I

7    guess, if we have to.  Hopefully, I won't.  I don't think I

8    should.

9         How I could cross Agent Turansky with notes that don't

10   appear to be hers.  We can deal with, I'll look through and

11   see.  Maybe it won't matter, because as I stand here today,

12   maybe some of those are 413s who are no longer testifying.  I

13   had every reason to believe that Agent Turansky was.

14        Let me be clear, I'm not saying that the government

15   did anything wrong.  And if they represent to me that, even if

16   the name was omitted here and there, somebody was there, I

17   100 percent accept that, and I actually applaud them for giving

18   me what is attorney notes.

19        But I don't, you know, I don't think that I should

20   have an issue subpoenaing Turansky.  And if there are some, if

21   I find some of these and I care about them, I'll ask him.

22        THE COURT:  All right.  Then you'll ask them and let

23   me know if that becomes an issue.

24        You'll follow up on the Touhy issue.

25        The government will respond and we'll see where we are

1    on that.

2            And then, lastly, the government will review the

3    transcript of the opening and see, you know, is there a good

4    faith basis for saying that certain evidence is going to come

5    in or not.  And we can address that, too.

6            Anything else you want to talk about now?

7            MR. XIANG:  Not from the government.

8            Thank you, your Honor.

9            MR. BALDASSARE:  No.

10            THE COURT:  All right.  I'll see you tomorrow at 9:30.

11            (Adjourned to April 26, 2024, at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                    Page

3    SAM LENOX

4    Direct By Mr. Xiang .........................110

5                          GOVERNMENT EXHIBITS

6    Exhibit No.                                    Received

7     101   . . . . . . . . . . . . . . . . . . 111

8     301   . . . . . . . . . . . . . . . . . . 112

9     100   . . . . . . . . . . . . . . . . . . 113

10    201, 202, 204, 205 and 205A,  . . . . . . . 114
              207, 208, 209, 211, 212, 213,
11            214, and 215

12    701   . . . . . . . . . . . . . . . . . . 127

13

14

15

16

17

18

19

20

21

22

23

24

25