```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        23 CR 181 (RA)

 5   DARIUS A. PADUCH,

 6              Defendant.               Trial
     ------------------------------x

 7
                                        New York, N.Y.
 8                                      April 26, 2024
                                        9:55 a.m.
 9

10   Before:

11
                          HON. RONNIE ABRAMS,
12
                                        District Judge
13                                      -and a jury-
                           APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  MARGUERITE COLSON
          ELIZABETH A. ESPINOSA
17        JUN XIANG
          NI QIAN
18        Assistant United States Attorneys

19   BALDASSARE & MARA, LLC
          Attorneys for Defendant
20   BY:  MICHAEL BALDASSARE
          JEFFREY HAWRILUK
21

22

23

24

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  A few quick things to talk

3     about, and then we will bring the witness back in.

4          First, I think that we should redact some of the

5     sidebars with prospective jurors where they talked about sexual

6     history of themselves or their family members or their medical

7     history so that it's not in the public record together with

8     their name.

9          Does anyone have any objection to that?

10          MR. XIANG:  No objection.

11          MR. BALDASSARE:  No objection.

12          THE COURT:  That is consistent with the law, and I

13     have an order to that effect citing the *Maxwell* case.  I think

14     there is a lot of law supporting the notion that you can

15     protect your privacy, at least for very sensitive issues.

16          MR. BALDASSARE:  Judge, we are happy to leave it to

17     the Court's discretion to do it.  We will do the work.

18     Whatever you want.

19          THE COURT:  If it's OK.  What I will do is ask you

20     both just to agree on them and just send the proposals.  If

21     they are fine -- you can do it over the weekend.  In the

22     meantime, what I am going to do is I am going to seal the *voir*

23     *dire* transcripts, but just temporarily, and hopefully we can

24     have the redacted versions up by Monday.

25          MR. XIANG:  Understood, your Honor.

1          THE COURT:  I am going to instruct the court reporter

2     not have to have the *voir dire* be on the docket until we redact

3     this very sensitive information about the prospective jurors,

4     given that their names are public.

5          MR. BALDASSARE:  Judge, we have not been ordering

6     dailies or the *voir dire*.  I'm happy to either take them from

7     the government, take a crack or look at what the government

8     does.  I just don't have them.  I know we want to expedite.  If

9     they want to do it, send it to me.  I can't imagine there is

10    going to be a dispute.

11         THE COURT:  I can't imagine there is going to be a

12    dispute.

13         MR. XIANG:  We will figure it out.

14         THE COURT:  Just get back to me Monday, if you can.

15    If not, I know you're busy on other things.  Just as soon as

16    you can.

17         Second, I understand that there may be a sketch

18    artist.

19         Hi.  How are you.  It's good to see you.  I am going

20    to ask you to -- technically direct you not to portray the

21    victims.  They are testifying under pseudonyms about very

22    sensitive information, so I am going to ask you not to portray

23    the patients' faces in your sketches.

24         SKETCH ARTIST:  May I ask a question.  Are we allowed

25    to have no face but hair or glasses this person has?

1          THE COURT:  I think that's OK.  As long as the case is

2     not at all identifiable.

3          SKETCH ARTIST:  Thank you very much.

4          MR. XIANG:  Fine with the government.

5          THE COURT:  Thank you for that.  I appreciate your

6     cooperation.

7          Next, I got the government's letter with respect to

8     the defendant's opening statement.

9          I'm not inclined to give a limiting instruction

10    specifically critiquing the defense opening statement.  But

11    what I was inclined to do is say something to the effect of, as

12    I said to you yesterday, opening statements are not evidence,

13    nor argument.  To the extent that any comments were made

14    yesterday that conflict with the legal instructions I have

15    already given you during *voir dire* or I give you in the future,

16    you must follow my instructions on the law.  And then, because

17    we did actually tell the jury during the *voir dire* process

18    that -- we gave a specific instruction about investigative

19    techniques, so I feel like they already know that law.

20         With respect to the lawyer's presence, I am not going

21    to raise it now.  But if that argument is made again or that

22    insinuation during cross-examination that there was something

23    improper about having an individual's lawyer present with them,

24    then I'll give a limiting instruction at that point in time.

25         MR. BALDASSARE:  Judge, just on that issue, I don't

 1    think -- I don't have the transcript, and if I did I would

 2    certainly do it differently on cross -- I don't think it's

 3    improper to have a lawyer there, and I don't think I argued

 4    that.

 5         I think my point is that having your money lawyer

 6    sitting there with them goes to bias.  I just think it does.  I

 7    think it goes to the process.  I think that the government does

 8    its investigations the way it wants.  I said more times than

 9    I've ever said before yesterday that what the government did

10    was legal, the searches were legal, how they did it was legal.

11         But I do think the jury has a right to know that the

12    lawyers are sitting there, and I think that -- certainly I

13    think I'm allowed to argue it in closing.  Maybe we are talking

14    past each other, but I do think it's OK and permissible for me

15    to ask who was there.  And I guess we can talking about

16    closings at the time, but I'm not saying it's improper for

17    anybody to have a lawyer ever, and we discussed that when we

18    talked about the appointed lawyer for the person who might have

19    immunity.

20         But I do think that, in this instance, given that this

21    was not just a personal lawyer who was there, these are

22    interested lawyers, they are there, I think it's appropriate to

23    ask about it, not to say I am not going to ask these witnesses,

24    don't you think you should have gone without your lawyer or

25    anything like that.  I think the jury should know it.  I think

1    it's true.

2              And I think that in closing, if I do my

3    cross-examinations right, I should be able to argue that it

4    goes to the manner in which the government conducted its

5    investigation.

6              MS. ESPINOSA:  Your Honor, if I could just respond

7    briefly to that.

8              The government excerpted relevant portions of the

9    transcript in its letter to the extent defense counsel wishes

10   to refer to that.  But the clear insinuation was that having

11   the lawyers, the money lawyers, as he repeatedly referred to

12   them, in the room, was somehow -- the atmospherics of his

13   statements indicated that it was somehow improper or unusual.

14   As your Honor knows, obviously, a witness is entitled to have

15   counsel if they wish to.  And because these were represented

16   parties in connection with a matter that we were investigating,

17   it was in fact improper for us to not have the attorneys there.

18             So the insinuation that creating the false idea that

19   the witnesses were somehow doing something wrong by choosing to

20   have their lawyer in the room is simply just improper.

21             THE COURT:  Would anyone object to my saying

22   something -- and we can talk about when this would be

23   appropriate, if it's on cross or some later time, but saying,

24   look, there is nothing improper in and of itself for an

25   individual to have his lawyer present when meeting with the

 1   government.

 2         MR. BALDASSARE:  Judge, I think that that's

 3   something -- I don't think it should happen anywhere near

 4   before closings.  I understand that the government thinks that

 5   how I said it and how I did it made it seem improper.  My point

 6   is every single thing I said was, this is -- and I knew -- I

 7   don't think I said it, but I know that you instructed them and

 8   are going to instruct them that no particular investigative

 9   tools are necessary.

10         But here is the problem.  The government wants the

11   people -- wants the lawyers, the third-party lawyers, to be a

12   shield when they want.  So, for example, when I want to talk

13   about a defense investigator who goes to the lawyers, somehow

14   they are going to argue that, I don't know, that the people are

15   going to either say, I don't know, I can't -- we know I can't

16   ask those witnesses, did your lawyer tell you we asked for an

17   interview, right.  So they have lawyers.  It's appropriate for

18   them to have lawyers.

19         Are we also going to tell the jury that I can't

20   contact the people directly and I have to go through these

21   lawyers?  And these lawyers said no.  And that these lawyers

22   said no.  One of the lawyers who represents about 150 people

23   said no in a minute and a half.  How do I get that to the jury?

24   I am not saying it's wrong to have lawyers.  I'm saying, it's a

25   relevant fact.  I don't think I said the government shouldn't

1    have them there.  I think it goes to how they conducted their

2    investigation, and they had to go through their lawyers.  I get

3    it.  I didn't say they didn't.

4         MS. ESPINOSA:  But the implication is clearly that by

5    going to their lawyers we were creating this inappropriate

6    situation where they had their biased lawyers there.  The

7    government ethically cannot speak to a represented party

8    without their lawyer there.  So the implication that we had any

9    other option on how to proceed is what's problematic here.

10   Because if those witnesses are a represented party, we, as the

11   prosecutors, cannot speak to them without their lawyer present.

12        MR. BALDASSARE:  I don't think the implication is that

13   it's inappropriate.  I think the implication is that their

14   lawyers, their money lawyers, were there.  I think it's

15   appropriate.  I think it goes to bias and I think at some

16   point, Judge, we have to tell this jury how this investigation

17   was conducted.  The government wants to conduct the

18   investigations they want to do it, OK, but we have to tell the

19   jury how it was done.

20        If before closings or if I make some huge mistake and

21   ask a question, I think I am entitled to ask who was there.

22   But I don't think that these alleged victims, the former

23   patients, are the kind of witnesses who I am going to delve

24   into specific nuances of legal arguments or whether they are

25   supposed to be there.  I agree.  They have to go through the

1    lawyers.

2         THE COURT:  If you were to ask a question and the

3    government were to make an objection, do you have a problem

4    with my instructing the jury, look, there is nothing improper

5    in and of itself of having an individual having his lawyer

6    present when meeting with the government?

7         MR. BALDASSARE:  I think it depends on the question.

8    I think if I ask, were the lawyers representing you in the

9    civil lawsuit present with you, I don't think that's an

10   objectionable question.  It's a fact.  It's true.  The

11   government can get up.  They can do whatever they want on

12   recross.

13        And we keep forgetting, there are closings.  If

14   everything I'm doing is so far afield, they can savage me in

15   their closing and their rebuttal.  They get two shots.  I just

16   don't think it's appropriate in the course of the trial.  As I

17   tell this jury the truth about the fact that they were there

18   and nothing further, I think I'm allowed to ask --

19        THE COURT:  I am going to let you get out that they

20   were there.  I am going to let you make the bias arguments that

21   you want to make.  But I also think it's important for the jury

22   to know, there is nothing improper about having an individual

23   witness having his lawyer present during a meeting with the

24   government.  There is nothing improper about that at all.

25        MR. BALDASSARE:  I agree, Judge.

1          THE COURT:  I'm just giving you advanced notice that,

2     given that you agree that that is the law, that if there is a

3     question that in my view suggests that that was improper in

4     some way, I am just going to say that, and you can still make

5     all the arguments you want to make.

6          MR. BALDASSARE:  You are going to say at with every

7     witness?

8          THE COURT:  Not every witness.  I'll say it once.  I

9     don't think I need it to say it every time it's said, but I

10    will make that clear to the jury.

11         MR. BALDASSARE:  I'll do my best to fashion the cross

12    in a way that doesn't draw an objection, and we will see what

13    happens.

14         MR. XIANG:  While we are on this subject, your Honor,

15    I think arguments were made in the defense opening that I think

16    reraise an issue that we previously discussed about

17    cross-examination that could possibly bear on the

18    attorney-client privilege as would exist between the victim

19    witnesses and their civil attorneys.

20         I think the previous kind of version of the issue that

21    had arisen was in connection with this false-memories theory

22    and the defense's ability to elicit whether or not anyone else

23    gave facts to these victim witnesses.  And I think we all agree

24    that the government thought, in consultation with the civil

25    attorneys, that there were ways to phrase that question to get

1    the answer without calling for privileged information.

2           However, the defense opening yesterday included themes

3    of, there were these two firms and they heard about changes in

4    the law and they got together and there was a media blitz and

5    this was all part of a plan that they hatched together in

6    connection with their clients in concert, as the government

7    understood the opening, with the government.

8           So the government is very much concerned about

9    cross-examination questions outside the kind of narrow scope we

10   had agreed to about facts that would seek to advance that

11   theme, and the government is particularly concerned because

12   ordinarily what would happen is the government would object to

13   questions that improperly call for privilege.

14          Our concern is that that kind of plays into what the

15   defense wants, which is the optics of asking that question and

16   the government objecting and feeding into this notion that

17   there is some sort of cabal between the government and the

18   plaintiff's firms.  So the government just wants to flag that

19   issue for the Court.  There is an ongoing objection to the

20   extent that those questions are asked.  In particular, we have

21   no objection to questions that ask of the witness, are you

22   doing this for the money?  Have you sued the defendant or the

23   hospitals?  To your understanding, is there financial gain?  To

24   your understanding, is there some connection between this

25   criminal case and what happens here and the civil case?  We

1    have zero objection to any of those questions.

2           As my colleague stated, and I think your Honor has

3    already ruled, we have no objection to fact questions.  When

4    you met with the government, were attorneys there, etc.  But

5    some of the themes that were suggested in the defense opening

6    about, well, the firms got together and got together with their

7    clients and did this, that, and the other, we don't see how

8    those types of themes can possibly be elicited on

9    cross-examination without calling for privileged information.

10          MR. BALDASSARE:  Couple of things, Judge.  I don't

11   think I said that the firms got together with the clients.  I

12   think that the firm -- what I said was that the firms saw an

13   opportunity.  I think that is true.

14          Number two, I think that the government would agree,

15   and I hope the Court would agree, that I've been very

16   reasonable about being protective of quite a bit of things.

17   I'm not looking to bait them.  That's not how I try cases, to

18   stand up every two seconds and look bad.  It's just not me.

19          What I would say is -- and I'm also being very careful

20   because the truth is, I don't want to keep losing objections in

21   front of the jury either.  As bad as that might look for them,

22   I'm being very careful.

23          I will say that there are things to do with the

24   lawyers and the interactions with the lawyers that are not

25   privileged.  I can tell you that there is at least one witness

1    who, while sitting with the government, said, my lawyer told me

2    to do this, and my lawyer said this.  I think that's fair game.

3    That privilege is waived.

4           By the way, I'm not even making the argument that they

5    don't even hold the privilege.  On other cases I would.  And

6    somebody can't stand up from the gallery, but I am also

7    respectful of the fact that the former patients in this case,

8    certainly the one on the stand now and others, are not in a

9    position to do that, and I think, under the ethics rules, I

10   shouldn't take advantage of that.  But there are things that in

11   at least one instance an alleged victim, a former patient,

12   said, well, my lawyer said that I should do this and that, and

13   it's material.  Maybe that person shouldn't have said that.

14          THE COURT:  Let's talk further before that witness,

15   just so we don't keep the jury waiting, if you want to talk

16   about that, and I'll see if the government has any objection to

17   that.

18          It does seem like, based on what you said, that the

19   privilege was waived in that situation, but I do want you to be

20   sensitive to the privilege issues with these individuals.

21          MR. XIANG:  Thank you, your Honor.

22          THE COURT:  Can we bring the jury in if they are

23   ready?

24          Do you want to bring the witness back on the stand?

25          MR. XIANG:  Yes, your Honor.

```
 1              THE COURT:  Thanks.

 2              When can the government respond to the Touhy motion?

 3              MS. QIAN:  Your Honor, we can address it now, or we

 4   can wait until the end of the trial day.

 5              THE COURT:  Why don't we wait until the end of the

 6   trial day.  Thank you.

 7              (Jury present)

 8              THE COURT:  Good morning, everyone.  I am sorry for

 9   keeping you late.  I assure you that we are working here, and

10   we very much value your time.

11              Everyone can be seated.

12              I am going to remind the witness he is still under

13   oath.

14              You may proceed.

15              MR. XIANG:  Thank you, your Honor.

16   SAM LENOX, resumed.

17   DIRECT EXAMINATION (cont'd)

18   BY MR. XIANG:

19   Q.  Good morning, Mr. Lenox.

20   A.  Good morning.

21   Q.  I believe when we left off yesterday you were testifying

22   about your discussions with the defendant regarding an

23   internship.

24              Do you recall that?

25   A.  Yes, sir.
```

 1   Q.  Now, did there come a time when you in fact interned for

 2   the defendant?

 3   A.  Can you repeat that for me, please.

 4   Q.  Did you intern for the defendant?

 5   A.  Yes, sir.

 6   Q.  Was that at the same hospital that you had seen him at as a

 7   patient?

 8   A.  Yes, sir.  Weill Cornell Medical Center.

 9   Q.  What were your hours during the internship?

10   A.  Usually, 9 to 4, 9 to 3, something like that.

11   Q.  Were there other interns in that internship program?

12   A.  No.  Just me.

13   Q.  When you say there were no other interns, are you referring

14   to just the department, or are you referring to the hospital

15   overall?

16   A.  In like my program, or at least under Dr. Paduch's

17   mentorship with that, there were other, I guess, interns doing

18   like other things.  Nothing like urology.  I met a few people

19   around lunch who seemed to be like in college.

20   Q.  Can you describe to the jury a little bit your day to day

21   during the internship?

22   A.  Yeah.  I guess I would get there, and some days I would

23   work in the lab with the lab assistant, Alex.  Most of the days

24   I would shadow Dr. Paduch and follow him around.

25   Q.  When you shadowed the defendant and followed him around,

1    did you ever see the defendant's physical examinations of other

2    patients?

3    A.   Yes.

4    Q.   Did any aspect of those examinations make you

5    uncomfortable?

6    A.   Yes.  One in particular.

7    Q.   What was that?

8    A.   There was a gentleman who was in there, I guess, for

9    erectile dysfunction.  When I went in there, from what I can

10   remember, Dr. Paduch had him put on what type of porn that he

11   liked.  For me it stands out because it was a little extra

12   uncomfortable for me because I have never been exposed to

13   homosexual porn.  That was like my first time seeing it.  So it

14   was playing on the screen.  I just remember being very

15   uncomfortable and either the patient was masturbating him or

16   Dr. Paduch was masturbating him.  I don't recall that detail.

17   But I remember when it was time for the patient to ejaculate or

18   finish the deed, the patient looked at me and said, can we get

19   the kid out of here, please.  I can't do this with the kid in

20   here.  Then I was excused.

21   Q.   Did you ever express to the defendant your discomfort with

22   viewing that experience?

23   A.   Yes.  The next day, or maybe not the next day or a couple

24   of days, I am not sure, but it was very uncomfortable for me.

25   So I did address it with Dr. Paduch.  I said that seeing porn,

1  like homosexual porn, it felt very uncomfortable to me.  And

2  Dr. Paduch brought up that, you know, being gay is a very

3  normal thing, and that when he was in the army in Poland that

4  they used to do circle jerks.  I'm sorry about the terminology.

5  That's what sticks out in my head.  When he was in the Polish

6  army, they did circle jerks, and that is when he told me that

7  he had a husband named Robert.  But he did, at the end of it,

8  after explaining that to me, said that he understood what I was

9  saying, and I wasn't exposed to that type of pornography after

10  that.

11  Q.  A few follow-up questions, Mr. Lenox.

12        When the defendant said that he had previously done

13  circle jerks, did he explain what that term meant?

14  A.  I don't recall, actually.  I was in, I guess, high school

15  when I did the internship, so I'm sure that I had heard the

16  term before, so I don't think that I would have asked for too

17  much of an explanation.

18  Q.  What was your understanding of what the term meant?

19  A.  It's uncomfortable.  If you look on the urban dictionary,

20  it's when you got a bunch of guys in a circle all masturbating

21  each other.

22  Q.  You testified just now that you believe you learned during

23  this conversation that the defendant had a husband.

24        Was that your testimony?

25  A.  Yes, sir.

 1   Q.  Prior to this point, did you have an understanding as to

 2   the defendant's personal life or marital status?

 3   A.  Before he had brought up that he had a wife and kids, so I

 4   assumed that it was still the case until roughly that point was

 5   the first time that I learned that he had a husband.

 6   Q.  I believe you testified yesterday, Mr. Lenox, about an

 7   occasion during the internship when the defendant masturbated

 8   you, was that right?

 9   A.  Yes, sir.

10   Q.  Can you remind the jury the circumstances under which that

11   happened.

12   A.  Yes.  I was still dealing with my medical issues.  I had

13   erectile dysfunction when I was like 15, since I was 15, and I

14   hadn't been helped or gotten any better since seeing Dr.

15   Paduch.

16          At the internship, I think we were in his office, and

17   I asked:  Hey, do we have any further ideas on what could be

18   like my issue?  And I brought up a couple of things that I

19   guess -- I was like, hey, could it be this problem?  Why am I

20   having my issues?

21          That's when he said:  Come with me.  And he took -- we

22   walked out of his office, and then he spoke to Jessica, who was

23   the nurse practitioner for the office.  I think she was the

24   nurse practitioner.  And he asked:  Is there a room available?

25   She said yes.

1          So we went into an examination room, and he asked me

2     to lower my pants, which I did, and he put his hand around my

3     penis and started to masturbate me.  I guess, because there was

4     physical stimulation when I started to get a little bit of

5     blood into my penis, he said, see, you don't have a problem.

6     And then he left and I followed suit, and I left the

7     examination room.

8     Q.  To your knowledge, was this interaction with you during

9     your internship documented in your medical files in any way?

10    A.  No, sir.

11    Q.  Mr. Lenox, I want to change topics for a moment.

12          During the time that the defendant was your urologist,

13    how did you communicate with him?

14    A.  I guess by text and by email, but more by text.  I only

15    emailed him a couple of times.

16    Q.  How was it that you were able to text message him?  Who

17    gave you his number?

18    A.  Dr. Paduch gave me his number early on.

19          MR. XIANG:  Mr. Glogoff, if we could please pull up

20    just for the witness and the party what's been marked for

21    identification as Government Exhibit 401.

22    Q.  Mr. Lenox, do you recognize this document?

23    A.  Yes, sir.

24    Q.  How do you recognize it?

25    A.  It's a text message, text message interaction between me

1    and Dr. Paduch.

2    Q.   Even though only the first page is on the screen, prior to

3    your testimony today, have you had a chance to review every

4    page of this document?

5    A.   I believe so.

6    Q.   From whose cell phone do these text messages come?

7    A.   Yes.  I'm the blue and Dr. Paduch would be the clear

8    messages, so from my cell phone to Dr. Paduch's.

9    Q.   Understood.  But these actual screenshots, whose device

10   would they have been pulled off of?

11   A.   My phone.  I'm sorry.

12              MR. XIANG:  Your Honor, the government offers GX-401.

13              THE COURT:  Any objection?

14              MR. BALDASSARE:  No.

15              THE COURT:  It will be admitted.

16              (Government Exhibit 401 received in evidence)

17              THE COURT:  This is not sealed.

18              MR. XIANG:  This is not sealed, your Honor.

19              THE COURT:  Thank you.

20              MR. XIANG:  And I believe there is a stipulation

21   between the parties that the only redactions on this document

22   are of the witness' real name.

23              THE COURT:  I can see.  Thank you.

24              MR. XIANG:  If we could publish that please, Mr.

25   Glogoff.

1    Q.  Mr. Lenox, now that the jury can see the exhibit, can you

2    explain a little bit again whose message bubbles are on the

3    right-hand side versus the left-hand side?

4    A.  Mine would be on the right, the blue messages, and Dr.

5    Paduch's would be on the left with the clear messages.

6    Q.  Drawing your attention, for example, to the first message

7    where at the bottom of the message it says, I had high hopes,

8    FO, and then underneath that it says, view all, having reviewed

9    the document, are there some messages like this, where the text

10   is cut off and there is a view all at the bottom?

11   A.  Yes, sir.

12   Q.  And what does the view all indicate?

13   A.  It indicates that there is more to the message and it had

14   been cut off.

15   Q.  Now, let's focus your attention on the message on the very

16   first page.

17          Before we do that, let me ask a preliminary question.

18          To the best of your recollection, are the messages in

19   this exhibit all of the messages that you have ever had with

20   the defendant, or, to your understanding, were there messages

21   that preceded what's in this exhibit?

22   A.  There were definitionally messages that preceded this text

23   right here, yeah.

24   Q.  Focusing your attention on the text that's blown up, what's

25   the date of this text?

1    A.  August 21, 2016.

2    Q.  As of that date, how old were you?

3    A.  I believe I was 17.

4    Q.  If I could please ask you to read this first message.  You

5    can stop essentially where it gets cut off.  I will read the

6    messages on the left.  OK?

7    A.  OK.

8            "Hey, Doc.  Sorry to bother you on your day off.

9    Quick question.  I tried having sex last night with the girl I

10   told you about, and I had a really hard time getting an

11   erection and keeping it.  I wasn't able to penetrate but made

12   sure she enjoyed herself.  I'm really struggling with this.  I

13   had high hopes and for, I'm assuming, and there is view all."

14   Q.  "Did you take Cialis or injection?  Redacted.  Last time

15   you were in my office you got semi-erection because I was

16   helping you to relax.  Don't stress about it.  You think too

17   much about pleasuring your girlfriend rather than telling her

18   what to do so you get hard.  Have her blow you or jerk you off

19   and, too be honest, maybe your BO -- it's cut off with the view

20   all."

21           Next message:  "Start searching your balls, LOL.

22   Nothing missed.  Scratching your balls for a change, I mean,

23   smiley face.  You have big penis, my friend, and, yes, vaginas

24   are tight, so don't worry."

25           Let's pause there for a moment.

1          In the message at the top of this page where the

2    defendant texted you, "you were in my office, you got

3    semi-erection, because I was helping you to relax," did you

4    have an understanding of what he was referring to there?

5    A.   Yeah.  Sitting here right now, I don't remember the exact

6    time, what exact instance he's referring to, because there were

7    a few times that I was masturbated by the defendant.  But he's

8    referring to either one of the erection practices or an

9    ultrasound or whenever he had masturbated me in his office.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. XIANG:

2    Q.  Directing your attention to the message from the defendant

3    at the bottom of the screen where he writes to you, You have

4    big penis my friend.

5           Did the defendant, apart from this message, comment

6    about your anatomy?

7    A.  Yeah.  At least from my recollection, on the first

8    appointment, just similar sort of things, that -- it's

9    embarrassing -- but that I had a big penis.

10   Q.  And understanding that it's embarrassing, do you recall,

11   apart from this message, the nature of those types of remarks?

12   A.  I just remember one time in the office, I guess it was.

13   Like -- not in his office, sorry -- in the examination room.

14   During one of the, um, physical exams.

15          I don't remember the exact context.  At one point I

16   had, you know, if you have an erection with my pants down, um,

17   yeah.

18          MR. XIANG:  Mr. Glogoff, if we can please jump ahead

19   to page six of this exhibit.

20   Q.  Mr. Lenox, I want to focus on the set of messages beginning

21   on Thursday, September 29, 2016.

22          Do you see those?

23   A.  Yes, sir.

24   Q.  And, again, if I could ask that you please read your

25   messages which are in blue, and I will read the clear messages

1    on the left which are clear, and I'll indicate where we can

2    stop.

3            OK?

4    A.  Yes, sir.

5            I said, Hi, Doc.  Can I call you today or tomorrow?  I

6    need to talk to you about the next step with my ED -- which

7    stood for erectile dysfunction -- I want this solved.  Saw

8    Dr. Steixner today and he sucks.

9    Q.  Really.  Winky face.  I was hurt that you would cheat on

10   my --

11           MR. XIANG:  If we can go to the next page --

12   Q.  -- I was hurt that you would cheat on me with someone else.

13   Smiley face.

14           No feelings??  Didn't you let him touch your penis:

15   (that's real grounds for divorce).  LAMOF.  Focus on your

16   studies and call me tomorrow evening.  I am busy tonight.  If

17   you stop worrying about your weiner so much I may take you

18   back.  Winky face.

19   A.  I'm sorry.  He actually didn't.  He had a super hot

20   Dominican ultrasound tech do the entire test, he injected me

21   and left the room.

22           MR. XIANG:  Mr. Glogoff, if we can go to the next page

23   which picks up.

24   Q.  WTF.

25   A.  Exactly.  Guy was no help whatsoever.

```
 1              MR. XIANG:  We can stop there.

 2   Q.  Focusing on that set of messages, who was Dr. Steixner?

 3   A.  He was a urologist that I saw.

 4   Q.  And, to your memory, when this ultrasound was performed by

 5   Dr. Steixner, did Dr. Steixner masturbate you in the course of

 6   that ultrasound?

 7   A.  No.

 8              MR. XIANG:  So if we can please leave that up,

 9   Mr. Glogoff.

10   Q.  The set of messages --

11              MR. XIANG:  Actually, if we can go to the previous

12   page.

13   Q.  The set of messages after you tell the defendant he

14   injected me and left the room, and the defendant responded

15   WTF --

16              MR. XIANG:  I'm sorry, Mr. Glogoff, now the next page.

17   Q.  -- and you responded, exactly.  Guy was no help whatsoever.

18              What was your understanding of why the defendant

19   responded WTF and what did you mean by, Guy was no help

20   whatsoever?

21   A.  Yeah.  I was under the impression that, um, that a doctor

22   or a physician should be doing, um, an ultrasound or, I guess,

23   that sort of examination.

24              So, um, I guess that's kind of what I meant, um, when

25   I said, Guy was no help.  Um, also, um, I don't know.  The
```

1   physician that I saw said that he didn't, um, didn't know what

2   was going on and that he was, um -- I don't know.  Just he

3   didn't know what was going on.

4           And then I guess WTF from Dr. Paduch was, from my

5   understanding at the time, was why wouldn't a doctor be doing

6   that.

7           MR. XIANG:  Mr. Glogoff, if we can please jump ahead

8   to page 29 of the exhibit.

9   Q.  So I want to focus your attention on the message beginning

10  at Tuesday, November 1, 2016.

11          Do you see that?

12  A.  Yes, sir.

13  Q.  And we'll just read these two messages, including your

14  response on November 2, 2016.

15  A.  Yes, sir.

16  Q.  So, I'll begin.

17          When are you coming again to my office so we can

18  practice more?  Did you get flashlight?

19  A.  In regards to practice, I get a decent amount at home,

20  laughy face.  Hope I am going to come up to pick up the letter

21  of rec next week because we have off from school if that's OK.

22  Q.  And the defendant responds, Sure.

23          Now, focusing on the defendant's first message, when

24  he asked when are you coming to my office so we can practice

25  more, what was your understanding of what the defendant was

1    referring to by practice?

2    A.   Um, that I would go in and have an injection put into my

3    penis and he would masturbate me.

4    Q.   And in that same message when the defendant wrote, did you

5    get flashlight, what was your understanding of what he was

6    referring to by flashlight?

7    A.   He -- that's a typo.  He asked me early on, he recommended

8    that I should get a Fleshlight, which is, like, I think, like

9    an article vagina to -- to -- yeah.

10             MR. XIANG:  Mr. Glogoff, if we can please jump to page

11   13 of this exhibit.

12   Q.   Mr. Lenox, we're going to focus on this message at the top

13   of the screen.

14             MR. XIANG:  But in order for everyone to see the date,

15   why don't we go back a page and, Mr. Glogoff, if you could just

16   blow up for everyone the date at the top of the set of

17   communications.

18   Q.   Is it October 4, 2016, Mr. Lenox?

19   A.   Yes, sir.

20             MR. XIANG:  All right.  So if we now go back to the

21   next page.

22   Q.   Again, I will read the message that the defendant sent and

23   you can read your own message.  OK?

24   A.   Yes, sir.

25   Q.   If you jack off tonight let me see what happens; Skype or

1  FaceTime is fine.  I am on my way to Washington, DC to give

2  testimony for congress so I will have some free time tonight

3  working from hotel.  I want to mostly see if your head get as

4  big when you JO standing up or sitting down.  I had one kid

5  with GL...

6         And then it's cut off with the view all.

7  A.  I would rather not.  I can self-report if that helps or

8  wait for the ultrasound.  That sounds awesome.  What are you

9  presenting?

10  Q.  Focusing on just these messages, when the defendant

11  messaged, If you jack off tonight, let me see what happens,

12  Skype or FaceTime is fine, what was your understanding of what

13  he was directing you to do?

14  A.  Um, go on Skype or FaceTime and masturbate with him on the

15  other end of the call, um, and show him my penis while

16  masturbating.

17  Q.  And a bit of context, if we go to the screen before these

18  set of messages.

19         Actually, maybe one before that.

20         Had you, in the leadup to these set of messages,

21  expressed medical concerns about your ongoing issues?

22  A.  Probably, yes.

23  Q.  And at the time these messages were exchanged, were you

24  interested in the defendant's opinion as to what was going on

25  with you medically?

 1    A.   Yes.

 2            MR. XIANG:   And now going back to page 13,

 3    Mr. Glogoff.

 4    Q.   When the defendant invited you to masturbate and FaceTime

 5    him while doing so, at the time did you believe he was making

 6    that request for a medical purpose?

 7    A.   I didn't think so at that time.   I -- I -- I don't want to

 8    say.   I didn't know what to think of it.   I just knew that it

 9    made me feel incredibly uncomfortable so that's why I said no.

10    Q.   In the defendant's message where he uses the term head,

11    where he says, I want to mostly see if your head get as big

12    when you JO standing up or sitting down.

13            What was your understanding of what head referred to?

14    A.   The glands of my penis.   The head of my penis.

15    Q.   In that same sentence when the defendant used the term JO,

16    what did you understand those abbreviations to stand for?

17    A.   Jack off.   It's earlier in the text message.

18    Q.   I'll just read for the record that in response to your

19    message at the bottom of the screen, the defendant wrote:   Wait

20    for ultrasound then.

21            MR. XIANG:   We can take that down, Mr. Glogoff.

22    Q.   Now, Mr. Lenox, I want to focus for a moment on how your

23    appointments with the defendant got scheduled.

24            Did you generally handle scheduling yourself, or did

25    someone else handle it for you?

1    A.  Generally, my mom.

2    Q.  And yesterday, I believe you testified that where you saw

3    the defendant in person, you would travel from your home in New

4    Jersey to New York City in Manhattan, is that accurate?

5    A.  That's correct.  My mom or my dad would drive me.

6    Q.  Would the purpose of those trips be to see the defendant,

7    or were you making those trips for some other purpose already?

8    A.  No.  We were going to a doctor's appointment.  The doctor's

9    appointment to see Dr. Paduch.

10            MR. XIANG:  Mr. Glogoff, if we could please publish

11   Government Exhibit 401 in evidence, and this time start at page

12   nine.

13   Q.  Again, Mr. Lenox, we'll read each of the messages on this

14   page starting with your message at the top.

15   A.  Yes, sir.

16            Hey, Doc.  Wanted to talk to you about the next step

17   in tackling the ED, my T level is 655, which is awesome.  It

18   got a bunch higher after the varicocelectomy.  But that raised

19   level hasn't translated into erections.  Should I call the

20   office and make an appointment?  Thanks.

21   Q.  Redacted.

22            What time are you done with school?  I have a dinner

23   to attend tonight.  I won't charge you since I don't take your

24   insurance, but best to see me in follow up.

25            MR. XIANG:  If we can go to the next page, please.

1   Q.  I believe the message I just read was repeated, but if you

2   can read that next one?

3   A.  Yes, sir.  Sorry, sir.

4           I'll get my mom to arrange an appointment.  What's the

5   next step with this?  Little lost and in need of a plan.

6   Smiley face.

7   Q.  Let's talk when you are done with school.  Don't have your

8   mom call office cause then they will charge you for visit.  I

9   can see you after hours in NYC or to chat as a friend in NJ.

10          So we can pause there.

11          At the time you exchanged these set of messages, did

12  you have an understanding as to why the defendant was

13  instructing you to tell your mom not to call the office about

14  this particular appointment?

15  A.  Um, at the time, I guess it was --

16          THE COURT:  I'm sorry.

17          MR. BALDASSARE:  Objection.

18          THE COURT:  Just give me one second.

19          MR. BALDASSARE:  Judge, I just want to object, to the

20  extent the question seems to call for what is in Dr. Paduch's

21  head as opposed to the witness' understanding.

22          THE COURT:  When you answer the question, just based

23  on what your understanding was, but don't speculate as to what

24  he may have been thinking.

25          THE WITNESS:  OK.  Sorry.

1    A.  Can you repeat the question for me, please?

2    Q.  Sure.

3            What did you understand the defendant was asking you

4    to do in this message when he says, Let's talk when you are

5    done with school, don't have your mom call office?

6    A.  Um, I -- I don't know.  Just to give him a call after,

7    after I was done with school.  Um, my understanding from the

8    next message, I can see you after hours in New York City or

9    chat as a friend in New Jersey, maybe was that it wasn't going

10   to be, like, a traditional appointment or -- or that it

11   wouldn't be, um, I guess at the hospital.  I wasn't sure what

12   that meant.

13   Q.  Now, I want to focus on this term friend that the defendant

14   used.

15           At the time of this text message exchange, did you

16   consider the defendant your friend?

17   A.  Um, yes.  Friend or somebody I looked up to, for sure.

18   Q.  What led you to believe that you were friends?

19   A.  Um, so there was the internship where I interned for a

20   month and I saw him a lot.  And then there is a lot of texting

21   exchanges and, I don't know, I guess kind of led me to have

22   that impression that I -- I don't know if I viewed him as a

23   friend.  I viewed him as a doctor and a mentor on my side.

24           MR. XIANG:  Mr. Glogoff, if we could please jump to

25   page 23 of this exhibit.

1  Q.  And we'll start with the message with the photograph dated

2  October 31, 2016.

3          Do you see that, Mr. Lenox?

4  A.  Yes, sir.

5  Q.  Is there any significance to the calendar date October 31?

6  A.  Yes, sir.  It's Halloween.

7  Q.  And is this a photograph that you sent to the defendant?

8  A.  Yes, sir.

9  Q.  Understanding that the face of the individual and the name

10 on the ID have been redacted, do you know who the individual

11 is --

12 A.  Yes.

13 Q.  -- in this photograph you sent?

14 A.  Yes.

15         Sorry to interrupt.  But yes, that was me.

16 Q.  And can you just describe for the record what you're

17 wearing in this photograph?

18 A.  Yes.  I've got on, um, I've got on scrubs and, um, I've got

19 on my -- the Weill Cornell ID badge that I had got and given

20 from the internship.

21 Q.  What was the reason you sent a photograph you yourself in

22 scrubs and wearing the ID to the defendant during Halloween?

23 A.  Yeah.  It was, like, a -- um, it was, like, a joke of,

24 like, hey, you know, I'm dressing up as a medical professional.

25 Um, more, like, in a reference to the internship that we had

```
 1   just finished and this is what I'm dressing up as for

 2   Halloween.

 3           MR. XIANG:  Mr. Glogoff, if we can go to the next

 4   page.

 5           Actually, the page after this, please.

 6   Q.  What did you write to the defendant immediately after

 7   sending the photograph?

 8   A.  Sweet costume, right?  Happy Halloween.

 9   Q.  And I'll read the next message.

10           That was Halloween in our house.  Looking at the

11   photograph, the immediately following photograph that the

12   defendant sent you, what did you understand this to be a

13   photograph of?

14   A.  Their Halloween festivities at Dr. Paduch and, I imagine,

15   friends.

16   Q.  Can you just describe for the jury where the defendant is

17   in that photograph?

18   A.  In the first one?

19           Yeah.  In the first one, he's in between the two

20   girls, women.

21           MR. XIANG:  Mr. Glogoff, if we could please jump ahead

22   to page 47 of the exhibit.

23   Q.  And, Mr. Lenox, let's focus here on this set of messages

24   beginning Thursday, November 24, 2016.

25           Do you see those?
```

1    A.  Yes, sir.

2    Q.  What's your very first message in this exchange?

3    A.  Happy Thanksgiving, man.  And then a Turkey emoji.

4    Q.  And the defendant responds, Same to you; don't stuff your

5    weiner into turkey.  LOL.

6    A.  Trust me, I definitely won't be doing that.  Will not be

7    doing that.  I don't know what Polish traditions you guys have,

8    but Thanksgiving in America doesn't usually imply that.  Have

9    the day off?

10            MR. XIANG:  Mr. Glogoff, if we could go to the next

11   page.

12   Q.  The defendant responds, It doesn't??  So you and your dad

13   doesn't jeez inside?  Your turkey must be really dry.

14   A.  Remind me to never come over your house for Thanksgiving.

15   Laughing face.

16   Q.  The defendant responds, You need to watch American Pie to

17   understand that it is common tradition.

18   A.  I heard it's a good movie.  I'll have to get around to it.

19   Working today or did you get the holiday off?

20   Q.  Pausing there.

21            What was the purpose of this exchange between you and

22   the defendant?

23   A.  Um, I said happy Thanksgiving, um...

24   Q.  Did you understand what he was talking about when he said,

25   So you and your dad doesn't jeez inside?

```
 1   A.  No.  I had no idea.
 2            MR. XIANG:  Mr. Glogoff, if we could jump ahead to
 3   page 50 of this exhibit.
 4            Actually, maybe the next page.  I apologize.  Sorry.
 5   We were on the right page before.
 6   Q.  So let's focus on the set of messages beginning on
 7   December 21, 2016.
 8            Do you see those?
 9   A.  Yes, sir.
10   Q.  Again, why don't you read yours and I'll read the
11   defendant's responses?
12   A.  Hey, will you still be at the office at 4:30?
13   Q.  What time did you send that message, Mr. Lenox?
14   A.  3:44 in the afternoon.
15   Q.  And at what time did the defendant respond?
16   A.  9:25 at night.
17   Q.  The defendant's response was, Tanks for stopping by.  Sorry
18   I could play with your penis.  Smiley face.
19            When the defendant wrote to you, I could play with
20   your penis or, Sorry I could play with your penis, what did you
21   understand him to mean?
22   A.  Um, sorry I couldn't play with your penis.  I think it was
23   meant to be that.  I don't want to speak for what I think the
24   other person could have intended, but I believed it was meant
25   to be, Sorry I couldn't play with your penis.
```

1    Um, sorry.  Can you repeat the question for me again?

2  Q.  I think you've answered the question, so I'm happy to move

3  to the next one.

4         How did you respond to this message?

5         MR. XIANG:  Mr. Glogoff, if we need to, we can jump to

6  the next page.

7  A.  Laughing face.  I do that well enough on my own.  Have a

8  Merry Christmas, Doc.

9  Q.  In response, the defendant sent you an image.

10        Do you see that image?

11 A.  Yeah.

12 Q.  Can you describe that image for the record?

13 A.  Um, sorry.  Can you repeat that for me, please?

14 Q.  Sure.

15        Can you just describe what that image looks like for

16 the record?

17 A.  Um, yeah.  It's a caricature of Dr. Paduch with an enlarged

18 comically enlarged proportions.

19 Q.  When you say enlarged proportions, are there particular

20 parts of the body emphasized in this image?

21 A.  Yeah, yeah.  Um, his genitals and his muscles.

22 Q.  Um, and he wrote underneath the message, Same to you.

23        MR. XIANG:  Mr. Glogoff, if we could go to the next

24 page to see what comes next.

25 Q.  How did you respond?

1                    THE COURT:  Sorry?

2                    (Discussion off the record)

3                    Can I see the lawyers at sidebar?

4                    Thanks.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (At at sidebar)
 2            THE COURT:  The witness is concerned that one of the
 3    photographs of him was not redacted, and he said he feels like
 4    he saw a photo that was not redacted.
 5            I'm not sure where he saw it, but is there anything
 6    that's not redacting?
 7            Can we double-check on this exhibit?
 8            MR. XIANG:  Yes.
 9            MR. BALDASSARE:  He doesn't know where, though, he saw
10    it?
11            THE COURT:  I'll ask him.  Just stay here.
12            (Discussion off the record)
13            He said he thought he saw his picture unredacted in
14    the bottom right.
15            MS. ESPINOSA:  We'll double-check the exhibit.
16            THE COURT:  Thank you.
17            MR. BALDASSARE:  Let me know before I start, because
18    obviously I'm going to look at these texts, so...
19            THE COURT:  OK.
20            MR. BALDASSARE:  Let me know.
21            MS. ESPINOSA:  We'll take a look.  There's enough of
22    us.  We'll take a look now.
23            MR. XIANG:  Thank you, your Honor.
24            THE COURT:  Thanks.
25                    (Continued on next page)
```

1          (In open court)

2          THE DEPUTY CLERK:  We're waiting for a juror that's in

3     the restroom.

4          MR. XIANG:  Your Honor.

5          THE COURT:  Yes.

6          MR. XIANG:  With respect to the issue that came up at

7     sidebar, does the court have any objection if we handed up a

8     hard copy of the Exhibit GX 401 to the witness?

9          THE COURT:  That's fine.

10          We're just dealing with a technology issue, folks, so

11     just give us a minute.

12          While we sort this issue, I was going to instruct you

13     as to this earlier.  It's unrelated.

14          But, as I said to you yesterday, opening statements

15     are neither evidence nor argument.  So to the extent that any

16     comments were made yesterday during opening statements that

17     conflict with the legal instructions that I already gave you

18     during the voir dire process or that I will give you in the

19     future, I just want to make sure that you follow my

20     instructions on the law.

21          OK.  Thanks.  Are we OK?

22          MR. XIANG:  May I approach the witness?

23          THE COURT:  Yes, you may.

24          MR. XIANG:  I'll just place on the record what I

25     handed up was just a hard copy of GX 401, which is the exhibit

 1   that we've been discussing.

 2          THE COURT: OK.

 3          MR. XIANG: Mr. Glogoff, if we could please go back to

 4   page 50 of GX 401.

 5          Actually, I don't see it on my screen. Thank you,

 6   Mr. Glogoff.

 7          All right. Going to the next page and the page after

 8   that. I apologize.

 9   BY MR. XIANG:

10   Q. How did you respond to the defendant sending you that

11   image?

12   A. I said --

13          Sorry. Should we go back to the reading?

14          Is this --

15   Q. Yes. If you could just read your message the very top of

16   this page, sir.

17   A. Yes, sir.

18          I said, Oh, what the hell is that? And two laughing

19   faces.

20   Q. The defendant responds, Me.

21   A. Who drew that? Laughing face. Lotta emphasis on the junk.

22   Q. The defendant responds, LOL.

23          What did you mean by the term junk?

24   A. Genitals. If you look at the last photo, they are very

25   enlarged.

1          MR. XIANG:  Thank you, Mr. Glogoff.  You can take that

2     down.

3     Q.   Now, Mr. Lenox, in the course of your communications with

4     the defendant, did he ever mention traveling for businesses?

5     A.   Yes, sir.

6          MR. XIANG:  Mr. Glogoff, if we could please go back to

7     GX 401 and start at page 31, please.

8     Q.   You can start with your message at the top of this set of

9     text messages?

10    A.   Yeah.  Hey, can I come in Friday to pick up the letter?

11    Q.   I am in China this weekend.

12    A.   You travel too much.  Throw me in the suitcase.  I'm easy

13    enough to fit.  When will you be back?

14    Q.   Monday.

15         MR. XIANG:  We can stop there.

16         Mr. Glogoff, if we could just scroll sequentially

17    through the next few pages of this exchange.

18         Maybe the one after this.

19    Q.   Do you see that as part of this exchange, the defendant

20    sent you a series of photographs?

21    A.   Yes, sir.

22    Q.   To your understanding, what were these photographs of?

23    A.   His -- his business trip in China, or hospital trip.

24         MR. XIANG:  Mr. Glogoff, maybe one more screen of

25    this, please.

1            Thank you.

2            If we could please now jump to page 69 of this same

3  exhibit.

4  Q.  What is the date of this exchange?

5  A.  This is Wednesday, May 10, 2017.

6  Q.  I believe you testified earlier about two surgeries that

7  the defendant had performed on you.

8            Do you recall that testimony?

9  A.  Yes, sir.

10  Q.  When was these set of messages in relation to those

11  surgeries?

12  A.  This would have been after the second one.

13  Q.  If you could please read your message at the top?

14  A.  Yes.

15            Hey.  When are my stitches to be taken out?  My

16  followup is at the six-week . and my mom wanted me to make sure

17  it wouldn't be an issue (with her being a nurse and she's been

18  persistent about it) and if needed, we could have them removed

19  here.  Thanks.

20  Q.  Ampersand parenthesis ampersand.

21            Let them fallow out:  We don't remover these stitches.

22  How are you doing?  I am in Bilbao to give talks.  Just came

23  here today and back in USA Saturday but I me.

24            Did you have an understanding of where Bilbao was?

25  A.  I don't remember if I knew at the time, but it's in Spain.

1    Q.  What was the impression that was left with you from these

2    communications from the defendant about traveling to China,

3    traveling to Spain, and testifying to congress?

4    A.  Um, that he travels a lot as a doctor and that he's very

5    important in the field.

6            MR. XIANG:  Thank you, Mr. Glogoff.  You can take that

7    down.

8    Q.  I want to return this second surgery, the one in 2017 that

9    you've testified about.

10            Can you remind the jury what type of surgery that was?

11   A.  Yeah.  It was supposed to fix my erection problems, and I

12   had veins taken out of my penis.

13   Q.  Who performed it?

14   A.  Dr. Paduch.

15   Q.  Do you know the name for that type of surgery?

16   A.  Yeah.  I think it was called, like -- I don't know how to

17   pronounce it.  HSU, venous stripping ligation.  I don't know

18   exactly the full name.

19   Q.  What was the effect of that surgery on your body?

20   A.  I had a lot of pain following the surgery.  It didn't help

21   with the erections, and I've been left with numbness and pain

22   in my genitals after, after the second surgery.

23   Q.  Did the surgery leave you with a difference in how your

24   genitals appeared, how they looked?

25   A.  Yeah, there is a scar.  There is, like, a circumcision type

1    of scar, but I'm not circumcised so it looks kind of funny.  I

2    don't know if that is too much information.

3    Q.  Did you reach out to the defendant about postoperative

4    concerns that you had?

5    A.  Yeah, definitely.  I was very scared at the time.

6         Right after the surgery, my -- my penis shrunk to less

7    than half of its size, and I was very scared about what was

8    going on and that there was new -- new numbness.  So, yeah, I

9    was very concerned.

10        MR. XIANG:  Mr. Glogoff, if we could please publish

11   again GX 401 in evidence and jump to page 68.

12   Q.  Focusing your attention on these set of messages beginning

13   on April 24, 2017, if I could ask you to please read your

14   message beginning at the very top?

15   A.  Hey.  Had some issues last night.  Nothing major but a

16   couple questions.  Do you have a time I could call you today?

17   Also when should I schedule a followup?

18   Q.  Follow up in four weeks.  Call me at 2:00 p.m.

19   A.  Great.  Call you then.  Thanks.

20        Call now?

21   Q.  Sure.

22        Mr. Lenox, following this second surgery that, as you

23   testified, changed the appearance of your genitals, did the

24   defendant continue to engage in erection practice with you?

25   A.  No, not after.  Not after the second surgery.

1    Q.  After the second surgery that changed the appearance of

2    your genitals, did you perceive any difference in the

3    defendant's behavior towards you?

4    A.  Um, sorry.

5            Can you repeat the question for me, again, please?

6    Q.  Sure.

7            After your second surgery, did you perceive any

8    difference in the defendant's behavior toward you?

9    A.  Yeah.  After the second surgery, um, I guess, yeah.

10   Later -- I brought up that, you know, the surgery hadn't helped

11   and, if anything, things were worse.  And, um, it was kind of,

12   like, at that point I was told, um, you know, there is nothing

13   else I can do, unless you want me to put an implant in your

14   penis, which is something that I had expressed for a while I

15   wasn't interested in.  So it was kind of, like, hey, there is

16   nothing I can do for you anymore.

17   Q.  Do you recall the very last appointment you had with the

18   defendant in person?

19   A.  Yes, sir.

20   Q.  Can you describe that appointment to the jury?

21   A.  Yeah.  So I was, at least from the best of my recollection,

22   I was asked to deliver a semen sample because I was dealing

23   with a lot of pain.  And after I ejaculated -- so this time

24   Dr. Paduch wasn't in the room when I was asked to deliver the

25   sample.  I was asked to do it myself.  And there was, um, a new

1     type of summer intern, I guess.  I don't know.  I don't know

2     how old the guy was, but he wasn't a medical professional yet.

3     He seemed, like, he was early 20s.

4          Um, and I still had numbness in my penis, so I wasn't

5     able to deliver that sample.  After that, I went back to his

6     office, which is right in the same hospital.  Like, it's such a

7     short walk.  I went back to his office and he said, like, you

8     know, there is nothing more I can do, really.  This is it.

9          I said, like, OK.  And I was pretty upset.  I was

10    upset.  So I went to shake his hand and he -- he opened his

11    arms and gave me a hug.  And then that's what I recall to be

12    the last appointment.

13    Q.  Now, I believe you testified just now that during this last

14    appointment, when you were asked to give a semen sample, that

15    the defendant was not in the room, is that your testimony?

16    A.  Yeah.  I think he dropped by at one point with the

17    gentleman, the kid he was with, whatever, that person was

18    following him was.  He dropped by to see if I had done it,

19    like, completed it.  I hadn't and, um, that was pretty much

20    that.

21    Q.  Do you recall for this last visit where you went in order

22    to try to produce the semen sample?

23    A.  Yeah, one of the examination rooms.  Same -- I think there

24    is two examination rooms that I had gone to.  One of the two

25    examination rooms I was left in.

1  Q.  And when you refer to examination room, are you referring

2  to the same type of examination room as from your prior visits

3  with the defendant?

4  A.  Yeah.  Yes, sir.

5      MR. XIANG:  Mr. Glogoff, you can take that down,

6  please.  Thank you.

7  Q.  Mr. Lenox, I want to focus on the three or four occasions

8  that you testified that you recall the defendant masturbated

9  you.

10     After each of those visits, did your parents, to your

11 knowledge, have an opportunity to speak face to face with the

12 defendant?

13 A.  Yeah, I think so.  Um, so after -- after the business

14 was -- after I was masturbated and had ejaculated, my parents

15 would speak to him about the results of, um, I guess, what his

16 medical opinion was and what to do at this point.

17 Q.  Based on your observation of the discussions between the

18 defendant and your parents, did the defendant ever tell your

19 parents that he had masturbated you?

20 A.  No, sir.

21 Q.  The defendant ever tell your parents that he had you

22 ejaculate in front of him?

23 A.  No, sir.

24 Q.  At the time of these masturbation appointments, these

25 erection practices, how did you feel about the fact that the

1    defendant was masturbating you?

2    A.  I was embarrassed.  I felt shame.  Um, there was pain --

3    you know, because you're having, um, a needle put into your

4    penis.  Yeah.  And, I guess, the effects kind of, um, at the

5    time it was kind of, like, I was very upset with my concern,

6    physical condition, you know.

7         I'm 16, 17.  I'm in high school.  I had girls that I

8    liked.  I had, you know, I wanted to feel like I could fit in.

9    So I didn't really care about anything that was going on on

10   that front.  OK.

11        If he can fix me, I'll deal with any of this stuff.

12   I'll -- you know, I'll just, whatever the doctor says, like, I

13   just want to -- I want to get fixed.

14        So, I guess it was more, like, as the years went on,

15   like, in the immediate aftermath of every appointment, you felt

16   physical pain and you felt shame and embarrassed.  Like, you're

17   driving home with your mom and you just, you know, ejaculated

18   in an office with a doctor.

19        But, I guess, in the moment, I was, like, all right,

20   it is what it is.  I just want to get fixed.

21   Q.  Mr. Lenox, have you taken any legal action against the

22   defendant or the hospital?

23   A.  Yes, sir.  Um, semi-recently, like, two years ago.

24   Q.  And is that legal action a civil lawsuit?

25   A.  Yes, sir.

1    Q.  What do you hope to achieve from that civil lawsuit?

2    A.  I was angry when it started.  I had gone to -- I had spent

3    a year with an amazing therapist, and I started feeling a lot

4    better.  Maybe when I was 19.  I started to see that therapist

5    when I was like 19 to 20, and she helped me a lot.

6            Um, and then I saw another therapist, and I guess it

7    got to the point where I saw -- I spoke to another physician,

8    urologist, who had always treated me with a lot of dignity and

9    respect with any of the appointments.  And I asked him, like,

10   hey, is there anything I can do about this physical numbness.

11   Like, I'm still numb.  I'm still getting pain.  Is there

12   anything we can do about this.

13           He said, hey, you know, that surgery, I don't know why

14   he did it.  No, this numbness will probably be pretty

15   permanent.

16           Sorry about that.

17           So, at that point I was pretty mad and, um, maybe I

18   was, like, 23.  I'm 25 now.  So, then I was very angry because

19   I was physically not only, um, mentally, kind of, like, I had

20   to go to a lot of therapy to deal with that stuff.  Physically

21   I was, that was kind of the last straw for me.  Like, I'm so

22   mad, um, I don't want this guy hurting anybody else or, um,

23   still practicing medicine.

24           So that was my -- I spoke to my dad and I was like,

25   hey, dad, what can we do?  Do you have any ideas?  Like, I'm

1    angry.  He was, like, yeah.  Let's see if we can find a lawyer

2    and go from there.

3            MR. XIANG:  No further questions, your Honor.

4            THE COURT:  All right.  Why don't we take a break

5    before cross-examination.

6            Just remember, don't discuss the case and keep an open

7    mind.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury not present)

 2                THE COURT:  You can step down, if you want to.

 3                Take a break.

 4                (Witness temporarily excused)

 5                Why don't we be back in about ten minutes.

 6                Thanks.

 7                (Recess)

 8                THE COURT:  Will you all make sure the redaction on

 9      page 51 is complete?

10                MS. ESPINOSA:  Yes.

11                THE COURT:  Just tell me when you're ready.  I don't

12      know if the witness needs a few minutes.

13                MR. XIANG:  Could we go to sidebar on the record on

14      evidentiary issue, your Honor, evidentiary issue related to

15      privilege, your Honor?

16                THE COURT:  Sure.

17                (At the sidebar)

18                MR. BALDASSARE:  So, Judge, this is the witness -- for

19      the record, I'm looking at the attorney notes/equivalent to a

20      302 of April 15, 2024, and the report reflects that this

21      witness, Mr. Lenox, notes say eventually disclosed to law

22      enforcement at urging of civil counsel.  Civil counsel

23      suggested that since filing suit might as well go all in.

24                I believe that I can ask one or two appropriate

25      questions that are not going to go beyond that, but I think
```

 1    since he said that, as to those two sentences, I don't think

 2    it's privileged.

 3            MR. XIANG:  Your Honor, the government has no

 4    objection to cross-examination by -- the government has no

 5    objection to cross-examination that will elicit just that

 6    statement that is reflected in the 3500 material.

 7            We will ask that the court consider issuing an order

 8    under Rule 502(d) which provides -- I have a copy of the rule

 9    in front of me -- a federal court may order that the privilege

10    of protection is not waived by disclosure connected with the

11    litigation pending before the court in which event disclosure

12    is also not a waiver in any other federal or state proceeding.

13            MR. BALDASSARE:  I mean, first off, if that means --

14    And I think I'm fine with it, I have to look at it -- if that

15    means that by discussing my questions here today, he can still

16    assert privilege in the civil suit, that's fine.  I don't care

17    about that.

18            And if that also means that, by asking about these, he

19    doesn't open up the privilege to everything else, I am fine

20    with that.

21            If the court could do that somehow outside the

22    presence of the jury, I would appreciate that.

23            MR. XIANG:  Of course.

24            THE COURT:  Yes.

25            Tell me, should that be in writing, should it be,

1    like, after we dismiss the jury and the witness?

2              MR. XIANG:  So, I think we're happy to look at it.  I

3    think just to preserve the record, for the witness's benefit,

4    if your Honor could orally so order now, and we can prepare an

5    endorsement later on.

6              THE COURT:  That's fine.

7              When you say now, you mean before the jury?

8              MS. ESPINOSA:  Before the jury.

9              MR. XIANG:  Before the jury and at sidebar right now,

10   so that way, to the extent it comes up, it's not already a

11   waiver.

12             THE COURT:  Yes.

13             MR. BALDASSARE:  You can just say I stipulate to

14   502(d) protection.

15             THE COURT:  Yes.

16             Tell me exactly which language you think I need to ...

17             MR. XIANG:  I think it's (d).

18             THE COURT:  OK.

19             MR. XIANG:  So however your Honor wants to address

20   that.

21             THE COURT:  Yes.

22             So I am ordering, consistent with Rule 502(d), that

23   the privilege or protection is not waived by the anticipated

24   disclosure connected with the litigation pending before the

25   court, in which event the disclosure is also not a waiver in

 1    any other federal or state proceeding.

 2              I'm happy to change the phrasing of that, but that

 3    order is in place.

 4              MR. XIANG:  Thank you, your Honor.

 5              MR. BALDASSARE:  Since it's privileged, and I want to

 6    be careful, I think the two questions here:  Isn't it true that

 7    you only disclosed this or that you eventually disclosed this

 8    to law enforcement because you were urged to do so by yourself

 9    counsel, right?

10              And then the second question would be:  And the civil

11    counsel suggested that, since you were going to file a lawsuit,

12    you might as well, quote-unquote, just say might as well go all

13    in?

14              I think those are two fair questions.

15              MR. XIANG:  I think those questions are both fair.

16              MR. BALDASSARE:  That's it.

17              MR. XIANG:  I would request, if the defense requests

18    that I be permitted to speak with the witness solely to address

19    that issue, because I think based on prior --

20              MR. BALDASSARE:  That's fine.

21              MR. XIANG:  -- prior meetings, he'll be under the

22    understanding that it's privileged.

23              THE COURT:  It's on consent.

24              Go ahead.  Thank you.

25              (Continued on next page)

1           (Jury present)

2           THE COURT:  Everyone can be seated.  Thank you.

3           Cross-examination.

4           MR. BALDASSARE:  Thanks, Judge.  Thank you.

5  CROSS-EXAMINATION

6  BY MR. BALDASSARE:

7  Q.  Good morning, Mr. Lenox.

8           Can you hear me OK?

9  A.  Yes, sir.  Thank you, sir.

10  Q.  My name is Michael Baldassare, and I represent Dr. Paduch

11  along with my colleague to my left.  His name is Jeff Hawriluk.

12  A.  Yes, sir.

13  Q.  If at any point you can't hear me, please let me know and

14  I'll do my best to speak up.

15  A.  Thank you, sir.

16  Q.  We have never met before, correct?

17  A.  No, sir.

18  Q.  Mr. Lenox, your mom is a nurse, correct?

19  A.  That's correct, sir.

20  Q.  And your father is an acupuncturist?

21  A.  Yes, sir.

22  Q.  Were you recommended to Dr. Paduch by Dr. Malatack?

23  A.  Dr. Malatack, yes, sir.

24  Q.  Who was he at the time he recommended you to Dr. Paduch?

25  A.  Yeah.  He was -- I actually don't remember what specialty

1    he was in.  I think he was an internist, which is a type of

2    doctor, and I was seeing him because I had high blood pressure

3    and because I was having the erection problems, so he

4    recommended me to go see Dr. Paduch.

5    Q.  To your recollection, did the government ever interview

6    that doctor?

7    A.  I don't think so.

8            MR. XIANG:  Objection, your Honor.  Calls for

9    speculation.

10           THE COURT:  Overruled.

11   Q.  In around 2015 or 2016, Mr. Lenox, did you go to a local

12   urologist?

13   A.  Probably.

14   Q.  Do you remember that around that time the doctors couldn't

15   figure out what issues you were facing?

16   A.  Yes, sir.

17   Q.  Did you feel brushed off by those doctors?

18   A.  Yes and no.  Some of them, yes.  It felt like the

19   appointments were -- I don't know.  They just couldn't figure

20   it out.  Not really brushed off.  More as confused or unable to

21   figure it out.

22   Q.  Do you remember using the phrase brushed off at any point

23   when you were being interviewed by the government?

24   A.  Exactly, no, but I could have done for sure.

25   Q.  Do you remember one of those prior doctors saying that you

1    would simply grow out of your issues?

2    A.   Yeah.

3    Q.   When you began your treatment with Dr. Paduch, did you feel

4    that he was on your side?

5    A.   Yes, sir.  From the beginning, yes.

6    Q.   Did you feel like he was a member of your team?

7    A.   My medical team, yes.  Yeah.  He was my doctor.

8    Q.   And were you in any way influenced with your opinion of Dr.

9    Paduch by the fact that he was director of sexual medicine at

10   Weill Cornell?

11   A.   Yes, sir.  That's a huge hospital.  It's a big hospital, a

12   big physician in a big hospital.  I thought he would -- I had a

13   lot of faith in him.

14   Q.   During your -- strike that.

15           When you began your treatment with Dr. Paduch, did you

16   feel believed?

17   A.   No.

18   Q.   Did you feel seen and heard?

19   A.   Not particularly, no.

20   Q.   Do you recall telling the government during one of your

21   interviews that you felt believed?

22           THE COURT:  At what point in time?  Do you mean by Dr.

23   Paduch or beforehand?

24           MR. BALDASSARE:  I'll start with the first question,

25   Judge.

1    Q.  When you began your treatment, the beginning, with Dr.

2    Paduch, did you feel that he believed what you were saying

3    about your symptoms?

4    A.  No.  If I can clarify, maybe if I said something in the

5    past, I would definitely like, for clarity sake, no.  In the

6    first appointment I was given an injection to induce an

7    erection.  There was an erection.  Dr. Paduch said:  See,

8    you're fine.  Take some Cialis.  You'll be OK.  I think a lot

9    of it was, I wasn't sure -- it felt like I was convincing the

10   doctor or trying to convince the doctor, hey, I do have a

11   problem, but I think with Dr. Paduch he was always willing to

12   make another appointment or maybe we could look at this from

13   another angle.  Let's make another appointment.  I think some

14   of it was from me fighting against feeling like I was not being

15   completely believed or understood, but he definitely gave me

16   more like, if you were to compare it like to the other doctors,

17   if that's what you're asking, he was definitely more willing to

18   make more appointments.

19   Q.  I believe you said that initially he prescribed Cialis.  Is

20   that correct?

21   A.  That's correct, sir.

22   Q.  You said that the Cialis didn't work, correct?

23   A.  No, sir.

24   Q.  Did you tell him the Cialis didn't work?

25   A.  Yes, sir.

1  Q.  And after that, did you begin a different course of medical

2  treatment with Dr. Paduch?

3  A.  I don't recall, but, yes, sir, to the best of my knowledge,

4  I think that I kept being prescribed the Cialis, but it was

5  like, OK, what are we going to do next sort of thing.  I don't

6  think it was, just keep on taking Cialis and things are going

7  to get better.  It's, we are going to change course of

8  treatment.

9  Q.  I want to talk to you a little bit about the internship,

10  Mr. Lenox, if that's OK.

11  A.  Please, sir.

12  Q.  You did graduate from college, correct?

13  A.  That's correct, sir.

14  Q.  And at the time you took the internship, you knew that

15  there were other interns at the hospital, correct?

16  A.  Yeah.  They were in college, and I was in high school.  I

17  don't know.  Yeah.  I met other interns when I started, if

18  that's -- if I'm not being clear.  I met other interns once I

19  started, but they weren't -- by interns, they were actually

20  college kids who were doing real stuff, yeah.  I was still -- I

21  was like 17 in high school.

22  Q.  Just so that we are on the same page, when I refer to

23  interns, I am talking about high school, college interns, not

24  physicians who are acting as interns.

25        Do you understand the difference when I say that, sir?

 1   A.  Yes, sir.  Yes, sir.

 2   Q.  So unless I say differently, interns will simply be

 3   internships for people who are not physicians acting as

 4   interns.  Is that OK?

 5   A.  Yes, sir.

 6   Q.  Thank you.

 7        In the lead-up to the internship, am I correct that

 8   you did deal with other people at Weill Cornell, correct?

 9   A.  Yes, sir.

10   Q.  And you exchanged emails with other individuals at Weill

11   Cornell, correct?

12   A.  Yes, sir.

13   Q.  And do you remember exchanging emails regarding filling out

14   forms for beginning employment?

15   A.  Yes, sir.

16        Just for clarity, I don't know if employment would

17   pertain to me because I wasn't being employed.  It was like a

18   stipend.  I remember filling out forms for that.

19   Q.  Am I correct that the stipend you were paid was $1200?

20   A.  Yes, sir.

21   Q.  And you were paid that, correct?

22   A.  Yes, sir.

23   Q.  And that was for working approximately Monday to Friday

24   9:30 to 3:30 or 4?

25   A.  Yeah.  Roundabout.

1  Q.  As part of your work as an intern, were you involved in

2  slicing lab cultures?

3  A.  Not slicing.  There was a gentleman, Alex, who was like the

4  lab tech.  If there was something cool he was looking at in the

5  microscope, he would show me.  I didn't really do anything like

6  that.  Again, I was in high school, and I didn't have any

7  science experience, so I would watch in the lab.  I wouldn't do

8  anything.

9  Q.  Did you have any involvement with biopsies?

10  A.  Just for clarity, what do you mean by involvement?

11  Q.  Obviously, I'm not asking if you were involved in assessing

12  or diagnosing biopsies.  Were you taught anything or shown

13  anything about biopsies?

14  A.  Yeah.  I had a distinct memory.  There was like -- I guess

15  like a project that I was put on, so it was kind of split in

16  between -- some days were lab days, other days I would follow

17  Dr. Paduch around, and there were testicular biopsies that I

18  had been looking at that I was told to look at.

19  Q.  Were you similarly involved in anything to do with counting

20  cells?  By that, sir, I'm not asking if you were responsible

21  for counting cells for purposes of a medical diagnosis, but

22  were you shown or taught anything about counting cells?

23  A.  Yes, sir.

24  Q.  And I think you said this as part of your internship you

25  shadowed Dr. Paduch?

1    A.   That's correct.

2    Q.   Did you shadow him regarding exams?

3    A.   Yes, sir.

4    Q.   Did you shadow him -- strike that.

5         Did you observe any surgeries?

6    A.   Yes, sir.

7    Q.   Did you observe Dr. Paduch engaged in any consults?

8    A.   Yes, sir.

9         MR. BALDASSARE:  At this time we are going -- I think

10   I need to use -- I'll do that later because I am going to have

11   to stop and open up --

12   Q.   At some point after the completion of your internship, do

13   you recall obtaining a plaque of any kind?

14   A.   From what I recall, there was like -- yeah, like a

15   certificate from Weill Cornell, and a few of the physicians had

16   signed it.

17   Q.   I'm sorry.  Did you say a few physicians?

18   A.   Yeah, yeah.  Couple of guys that I hadn't met before and

19   Dr. Paduch.

20   Q.   Was one of the individuals who signed the certificate Dr.

21   Paduch?

22   A.   Yeah, he was one of them.

23   Q.   Was another one Dr. Schlegel?

24   A.   From my recollection, but I wouldn't be like a hundred

25   percent certain on that, but from my recollection, yes.

1    Q.   After you finished your internship, did you at any point

2    ask Dr. Paduch for any sort of letter of recommendation?

3    A.   That's correct, sir.

4    Q.   And do you remember about how far after the completion of

5    your internship you asked Dr. Paduch for that letter of

6    recommendation?

7    A.   Yes, sir.  So if I finished the internship roughly early

8    July or June or July, it would have been -- you know what, to

9    be honest, I don't exactly have a clear -- I know I was getting

10   ready for college.  If I did the internship summer of my junior

11   year going into senior year, maybe it would have been a couple

12   of months later or maybe three or four months later, so maybe

13   November that applications are due.  So it would have been

14   around then, I would imagine, that I asked Dr. Paduch for a

15   letter.

16   Q.   Did Dr. Paduch provide the letter?

17   A.   That's correct, sir.

18   Q.   Did you make use of the letter in that application process?

19   A.   Yup.  I included it.  I think I needed two letters of

20   recommendations, so he was one of the two.

21   Q.   Did Dr. Paduch provide you that letter without any

22   questions?

23   A.   Yeah.  From my recollection, I went in, he was busy, so I

24   was told to wait a little bit.  I got it, and I left.  That's

25   to the best of my recollection right now.

1          MR. BALDASSARE:  At this time I would just ask --

2     there is back and forth about which versions.  To be safe, we

3     are going to go with the sealed version -- we are going to go

4     with sealed Exhibit --

5          THE COURT:  Just make sure the screens are off.

6          MR. BALDASSARE:  Sorry for the confusion, Judge.  We

7     just want to be very careful.

8          THE COURT:  I appreciate that.

9          MR. BALDASSARE:  We are going to ask that the

10    attorneys and the witness at first be shown sealed Exhibit

11    D301.

12    Q.  Mr. Lenox, can you see what's on the screen marked as

13    Defendant's Exhibit 301?

14    A.  Yes, sir.

15    Q.  Do you recognize the handwriting on this exhibit?

16    A.  Yeah.  Actually, to be honest, no.  What I mean, it looks

17    like it might be my parents', but it's not mine.

18    Q.  The handwriting here looks like it might be one of your

19    parents?

20    A.  Yeah.  I don't write in cursive.

21          MR. BALDASSARE:  If we can turn to the next page.

22          Actually -- I would move in D301.

23          MR. XIANG:  No objection, your Honor.

24          MR. BALDASSARE:  I would ask that it be published to

25    the jury.

1          THE COURT:  It will be admitted as a sealed document,

2    consistent with my prior rulings regarding sealing.

3          (Defendant's Exhibit 301 received in evidence)

4          MR. BALDASSARE:  I guess if we can go back to page 1.

5          Can we look at the top since, I believe, it's sealed

6    and it's only for those of us up here.

7    Q.  Do you recognize this as the application for the volunteer

8    service?

9    A.  That's what it reads.  I don't really remember much about

10   the application, but that's what it says at the top, yes, sir.

11   Q.  Do you remember filling out any forms for the internship?

12   A.  Yes.  This form was filled out, it looks like, by my mom,

13   but I would have printed out and given her the form.

14         MR. BALDASSARE:  If we could turn to the next page of

15   sealed Exhibit D301.

16   Q.  In the middle of that page, under volunteer signature, do

17   you see that box, sir?

18   A.  That's my signature, yes, sir.

19         MR. BALDASSARE:  We are done with that.  You can take

20   it down.

21   Q.  Mr. Lenox, can you describe for me, to the best of your

22   recollection, the layout of the exam room where you were

23   describing your visits with Dr. Paduch.

24   A.  Yeah.  I guess there were two examination rooms that I

25   remember going into.  There could have been -- I believe there

1    were four, and you walk in.  To the left there is like -- to

2    the left or to the right there is like a doctors' -- like a

3    patient examination thing.  If you go to a doctor's office,

4    like they have that tissue paper on it that kind of reclines a

5    little bit, and then you have a computer on the far side of the

6    office.  It's not that far.  On the opposite side of the door.

7    Q.  Can you tell me, what is right outside that door, a hallway

8    or a walkway?  Can you describe that, sir?

9    A.  Yeah.  There is like -- I'm sorry.  I am going to try and

10   explain it without using my hands, but there is a hallway,

11   there is like a little sitting area, there is another

12   hallway -- by another hallway, I mean the other side of the

13   sitting area, and that represents most of the exam -- if there

14   are like four exam rooms, one, two, three, four, yes.

15   Q.  If there were a sitting area on the other side, or whatever

16   was on the other side of, I think it was walkway, how far away

17   would that sitting area be?

18   A.  From my recollection, maybe like 10 feet.  That was for

19   like once a patient has already been admitted or like checked

20   in and completely like brought through, there was a waiting

21   area that's completely separate from all this description.

22   Q.  When you were going in or out of the exam rooms, did you

23   ever see any other people?

24   A.  Yeah, I'm sure I did.

25   Q.  Would you see nurses?

 1   A.  I'm sure.

 2   Q.  Would you see doctors?

 3   A.  Occasionally, potentially.  I primarily just remember

 4   seeing Dr. Paduch, but I'm sure other doctors could have walked

 5   through.

 6   Q.  Would you see people in street clothes who would appear to

 7   be patients?

 8   A.  Yeah.

 9   Q.  You've never made any claim, have you, that the door to the

10   exam room you were in was locked at any time, correct?

11   A.  From my recollection, no, I don't believe it was.  No, it

12   wasn't locked.  Yes.  Sorry.  I was just going to say, to the

13   best of my knowledge, sometimes I guess like you're not really

14   paying attention if you're like about to have an examination,

15   and I don't know how the doors lock at that building, but to

16   the best of my knowledge, no.  I remember it was always a

17   policy of knocking first.  Like you couldn't -- it seems like

18   you couldn't enter without a knock.

19   Q.  I believe you testified earlier -- you said something about

20   Dr. Paduch's husband, correct?

21   A.  Yes, sir.

22   Q.  And I think you said something about either his kid or

23   kids, correct?

24   A.  Yeah.

25   Q.  And I think you said that you also heard that he had a

1    wife, correct?

2    A.  At one point, yes.  That was originally, when I first

3    started seeing him, my family's impression.

4    Q.  Do you believe any of those three statements, wife,

5    husband, or kids, is a lie?

6    A.  No.  I just think chronologically, when we started

7    seeing -- when I starred seeing Dr. Paduch, and I guess when he

8    spoke to my parents at the beginning, he made a point of his

9    wife and kids and it was in the present tense.  Then later on I

10   was told that it was -- that he was married to Robert and it

11   was exwife and, I guess, kids.

12   Q.  Mr. Lenox, I am going to use a whole bunch of dates, and

13   I'm only asking approximate.  I do not expect nor am I going to

14   ask you an exact date from say 2015.  OK?

15   A.  Thank you, sir.

16   Q.  You're welcome.  Not a lot of people say thank you to me

17   for anything, so I appreciate that.

18           Do you remember your first visit with Dr. Paduch being

19   around September 3, 2015?

20   A.  That's correct.

21   Q.  And your next visit being a couple of months later, early

22   December of 2015?

23   A.  I would imagine so, yeah.  It was a short time period.

24   Q.  And am I right that within about a month after that second

25   visit you had surgery with Dr. Paduch?

1  A.  Timeline, I don't recall.  If that's what the dates say,

2  then I would imagine that's correct, but if you were to ask me,

3  I would imagine there would have been at least a couple more

4  appointments than just first appointment, second appointment,

5  surgery.  In my mind, I guess I would have thought that there

6  would have been at least one or two more, but if that's what it

7  says, then I'll go with that.

8  Q.  Do you remember the surgery being in early January of '16,

9  shortly after New Year's?

10  A.  Yeah, I would imagine so.  To the quite honest with you,

11  the first surgery wasn't particularly memorable, in my mind,

12  because I wasn't -- as far as like side effects or stuff

13  afterwards, my testicles swelled up, but they went right back

14  to normal, so it wasn't anything that was too traumatic for me.

15  Q.  Do you remember two -- strike that.

16       Am I correct that after the first two or perhaps a

17  couple of more visits with Dr. Paduch, you and your family were

18  comfortable with him performing surgery on you?

19  A.  No.  I don't think anybody is ever really comfortable with

20  it.  I know for me I wanted to be fixed.  In my head I wasn't a

21  medical professional.  I was like, OK, this isn't working.

22  Surgery should work.  In my mind I was like, you know -- I

23  guess what any kid of -- like your assumption of medicine.

24       So my family, no, they were not very comfortable, I

25  guess.  It was like -- I don't know.  It's all an uncomfortable

1    subject and nobody really -- we are not -- my parents are not

2    urologists.  My dad is an acupuncturist.

3         I don't anybody was really jazzed about surgery.  I

4    think in my mind I want to get fixed.  If it's surgery, it's

5    surgery.  I think I said earlier in my earlier testimony I had

6    a lot of faith in Dr. Paduch being the director of sexual

7    medicine at Weill Cornell Medical Center.

8    Q.  Do you recall, after the surgery, another appointment about

9    30 days after surgery for a checkup?

10   A.  Just for clarity, surgery number one, the first one?

11   Q.  Yes, sir.

12   A.  I would imagine, sir.

13   Q.  Do you recall another, post first surgery, in around -- in

14   around March of '16?

15   A.  No.  But if that's what the dates say, then I would

16   imagine, but I can't really recall that right off the bat what

17   that date was or what that appointment would have looked like.

18   Q.  I am not going to ask you for the exact -- one second.

19         MR. BALDASSARE:  I am going to ask Mr. Glogoff to

20   bring up sealed Government Exhibit 301, which is already in

21   evidence for the jury and the lawyers and the witness.

22   Q.  Do you see this, sir?

23   A.  Excuse me.  Yes, sir.

24   Q.  And based on your birthday, would you have become 18 on

25   XXXXXXXX?

1    A.  Yes, sir.

2           MR. BALDASSARE:  We can take that down.

3    Q.  So that would be approximately eight months after the first

4    surgery that you became 18, correct?

5    A.  I would imagine so.  Or like two or three months after the

6    internship.

7    Q.  You recall an appointment with Dr. Paduch around October of

8    2016?

9    A.  Not off the top of my head.

10   Q.  Do you recall there being a stretch of time between one of

11   your visits and then a new visit in 2017?

12   A.  Could you give me dates for clarity?  Maybe that will help.

13   Q.  I'm sorry.  I didn't hear your answer.

14   A.  Excuse me, sir.  Could you just repeat the question.  I

15   don't know if there is any dates -- just repeat the dates,

16   please.

17   Q.  Sure.  Do you recall a visit with Dr. Paduch in around

18   October '16 and then the passage of time until the end of

19   February of '17, before you saw him again?

20   A.  I would imagine that that's correct, if that's what the

21   records say.  Nothing really strikes me in my mind as like

22   thinking, oh, there is like pages in between appointments, off

23   the top of my head.  If that's what the dates say, I would go

24   with the dates.

25   Q.  Maybe if I work it backwards, it will be more helpful.

 1              You had a second surgery with Dr. Paduch, correct?

 2   A.  Yeah.  That was in April of 2017.

 3   Q.  So in April of 2017 you had your second surgery.  Do you

 4   recall two or three appointments in the months preceding that?

 5   A.  Yeah.  On the buildup to the surgery what sticks out in my

 6   mind is I had -- I don't know -- I think it was like an MRI

 7   that I went in and I had done at the Weill Cornell Medical

 8   Center.  I think -- yeah.  I had an MRI as far as like buildup

 9   to it.

10              Dr. Paduch, I spoke with him before and after, and I

11   think maybe one more in the buildup to that surgery.  I think

12   the MRI and then maybe one more, but I am not sure about the

13   other one after the MRI.

14   Q.  After that surgery, do you recall a couple of follow-up

15   visits with Dr. Paduch in the summer of 2017?

16   A.  Yeah.  I remember two.

17   Q.  And ballparking it, sound right that your last visit with

18   Dr. Paduch was around the 4th of July of 2017?

19   A.  I would imagine that sounds like that could be correct.

20   Q.  Now, earlier Mr. Lenox, you testified about a lawsuit.

21              Do you remember that?

22   A.  Yes, sir.

23   Q.  Would it sound about right to you that that lawsuit was

24   filed in December of 2022?

25   A.  Yes, sir.

1    Q.  After that lawsuit was filed, you met with the U.S.

2    Attorney's Office a number of times, correct?

3    A.  Yeah.

4    Q.  Do you remember your first meeting with them being in early

5    February of 2023, a couple of months after the lawsuit was

6    filed?

7    A.  Yeah.  There was a Zoom meeting, like a WebEx sort of

8    thing.

9    Q.  I didn't hear the end.

10   A.  Sorry.  It was either on Zoom or WebEx.  It's like a video

11   platform.

12   Q.  Right.

13          So your recollection is your first interaction or your

14   first interview with the U.S. Attorneys was over WebEx around

15   early February of '23, correct?

16   A.  Yeah.  That would make sense.

17   Q.  And would it be fair to say that about a year passed before

18   your next interview?

19   A.  Yup.  I don't know if it was exactly a year.  It could have

20   been a little less or a little more, but that sounds about

21   right.

22   Q.  Would it be fair to say that, in March of 2024, just this

23   past March, you met with the U.S. Attorney's Office four times?

24   A.  Yeah.  So there was a mixture of WebEx meetings, and I

25   believe I went in person twice.  But I think it was twice that

1    I went in person.

2    Q.  Was that during March that you remember the in-person, this

3    March?

4    A.  Yeah.  Maybe one in March, one in April.  Maybe they were

5    like three weeks apart, or something like that.

6    Q.  Do you remember meeting with the U.S. Attorney's Office two

7    times just this past April?

8    A.  I'm not sure.  I know I went in semi recently in person,

9    but I was getting a bit overwhelmed with all of it, so I asked

10   for a little bit of a break, and, yeah.  I don't know how many

11   times I was in April.

12   Q.  When was the last time you met with any of the prosecutors

13   sitting to my right today?

14   A.  Maybe about 10 days ago.  Like two weeks, probably.  I

15   don't have the exact date.  I don't have it off the top of my

16   head.

17   Q.  Did you have any conversations with them yesterday?

18   A.  No, sir.

19   Q.  Did you have any conversations --

20   A.  Sorry, sir.  Yeah.  After the direct, I was sitting in the

21   waiting room -- yeah.  It's a very short interaction yesterday.

22   Q.  If my math is correct, would it be about correct that your

23   first meeting with the government in 2023 be about six years

24   after your last appointment with Dr. Paduch?

25   A.  Sorry.  Could you repeat the question for me again, please.

1    I apologize.

2    Q.  Sure.

3        Let's do it this way.  Do you remember testifying a

4    minute ago that your last appointment with Dr. Paduch you

5    thought could be around the 4th of July 2017?

6    A.  That's correct.

7    Q.  And your first meeting with the U.S. Attorney's Office,

8    would it be fair to say, was around February of 2023?

9    A.  Yes.

10   Q.  At these meetings were some or all of the prosecutors to my

11   right in attendance?

12   A.  Sorry.  It's my left.  I wasn't sure where to look.  I

13   believe most of them were there for all of them, but, yeah, I

14   recognize all of them.

15   Q.  Do you remember any of the paralegals being there?

16   A.  Yeah.

17   Q.  Do you remember at some or all of them an FBI agent being

18   there?

19   A.  Yeah, I believe so.

20   Q.  And I don't want you to think, sir, that I'm suggesting

21   there is anything inappropriate about this.  In fact, it's

22   probably perfectly appropriate.

23       Were the lawyers for the lawsuit you filed, the civil

24   lawsuit, were they there?

25   A.  Yeah.  They were dialed in by phone, so, yeah, they were --

1    it was like a phone put on the table, at least the first one,

2    and I think they were dialed in over video call.

3    Q.  Were they personally present at any of the meetings?

4    A.  No.

5    Q.  Do you know, and this is just to your knowledge, were any

6    of the meetings recorded by video?

7    A.  I don't know.

8    Q.  How about by audio?

9    A.  I don't recall.  I would imagine so.  Like in my mind, I

10   guess, I assumed that it would have been if I'm speaking to the

11   Department of Justice.  In my mind it was like definitely a

12   possible.

13   Q.  With respect to the surgeries, the two surgeries that Dr.

14   Paduch performed, am I correct that he, for at least one of

15   them, offered you the information of someone who had already

16   had that surgery with him?

17   A.  Yes, sir.

18   Q.  Was it your understanding that he had given you that

19   information so you could talk to that person and possibly

20   assuage some concerns?

21   A.  Yes, sir.

22   Q.  Did you talk to that person?

23   A.  Yes, sir.

24   Q.  And did that person make you feel at all -- nobody wants to

25   go to surgery, right?

1    A.  I understand, yeah.

2    Q.  Did talking to that individual assuage any of your

3    concerns?

4    A.  Yeah.

5    Q.  And before calling that person, did Dr. Paduch ever say to

6    you, don't tell this patient about any of our office visits?

7    A.  No.  I don't think I called the guy that Dr. Paduch gave me

8    his number.  I believe I texted him.  But, no, Dr. Paduch

9    didn't tell me not to.

10   Q.  So Dr. Paduch never said, don't mention what happens during

11   our office visits when you're in contact with this person about

12   your surgery?

13   A.  No, sir.

14   Q.  During your office visits with Dr. Paduch, was he always

15   fully clothed?

16   A.  Yes, sir.

17   Q.  Am I correct you have never made a claim that Dr. Paduch

18   asked you to touch him in any way, correct?

19   A.  That's correct.  No, sir.  That never happened.  I was

20   never asked to touch Dr. Paduch.

21   Q.  With respect to what you testified about earlier about

22   semen being smeared on your face, do you remember, after that

23   happened, sort of pitching it as a joke to your mom?

24   A.  Yeah.  I remember I was completely like -- I was shocked

25   and I was like, you know -- I didn't know what was going on and

1    it was -- it was uncomfortable, and I needed to tell somebody

2    because I was 17 or 16.  I think I was 17.  I'm young.  I'm

3    scared and uncomfortable.  So I wanted to tell somebody and

4    after I told her, it was oh, shit, this is a huge -- physician

5    of a huge hospital.  I want to keep on seeing him.  It was a

6    joke.  He smeared my semen on my face in a joking manner.

7    Q.  At the time you told your mom this, was she a nurse?

8    A.  Yeah.

9    Q.  Do you know if she confronted Dr. Paduch about that?

10   A.  Yes and no.  At one point I remember my mom -- I think I

11   said earlier, I testified earlier that it felt like I was

12   convincing Dr. Paduch's points, like I wasn't fully believed.

13   And I remember one visit when my mom went in and we kept on

14   doing the same thing, whether it was more ultrasounds or

15   whether it was more erection practices.  I don't know what it

16   was for.  It could have been for one of the surgeries.  I don't

17   know.  My mom said, hey, we need to do something different

18   because this stuff isn't improving.  Besides that, my mom

19   didn't confront him, no.

20   Q.  Is it your testimony that that happened during the first

21   visit?

22   A.  No.  The semen smeared on my face was not on the first

23   visit, no.

24   Q.  Do you recall about how many visits in it was?

25   A.  Maybe about six to eight months in, I would imagine.  It

1    wasn't around the first visit, no.

2    Q.  You testified that it happened during a visit where you

3    were a minor?

4    A.  To the best of my recollection, yeah.  But I wouldn't --

5    yes, to the best of my recollection.

6    Q.  Am I correct that on at least one visit Dr. Paduch

7    recommended that your mom leave the exam room?

8    A.  I don't recall.  I don't recall.

9    Q.  You recall ever saying that to the government during any of

10   your interviews with them?

11   A.  Right now I don't recall, no.  I believe, as far as like

12   mom or dad being in the room, like it was kind of like put to

13   me, like, hey, like -- it almost felt like an agreed-upon

14   thing.  My pants are going to be down.  So, mom, dad, I don't

15   want you in the room.

16   Q.  I'm only asking to your recollection, not whether it

17   actually happened or not.  But to your recollection, did the

18   government ever interview your mother?

19   A.  No, they didn't.  They did not, to the best of my

20   recollection.

21   Q.  Again, to your recollection, did they ever interview your

22   father?

23   A.  No, sir.

24   Q.  We agree your mom accompanied you to some of the visits?

25   A.  Sorry.  Could I clarify something with the last answer?

```
 1              THE COURT:  Yes.  Go ahead.
 2   A.  So they did ask.  I was asked, like, hey, like how would
 3   you feel if we talked to your mom.  We'd like her to -- we'd
 4   like to speak with her and get some more information, but I've
 5   been really -- this is not an easy process.  And I felt
 6   strongly that I didn't want my parents really dragged through
 7   this.  So I said, when they asked -- they were very polite and
 8   they said:  It is up to you.  I said:  If you don't have to,
 9   that would be great.  So they did ask.  But in the end they did
10   me the courtesy of not forcing them to go through that.
11   Q.  Was that with respect to a request by the government to
12   interview your mom and your dad that that same process or that
13   same conversation happened?
14   A.  Sorry.  Can you repeat that for me?
15   Q.  Sure.  I'll just break it down.
16   A.  I just didn't hear you correctly.  I'm sure you said it
17   fine.
18   Q.  It was a bad question, so you're exactly right.
19              Am I right that the government at some point asked to
20   interview your mom, and you asked that they not do it, and they
21   didn't, as far as you know?
22   A.  To the best of my recollection, yeah.  It was a
23   professional courtesy.  I don't know if that's the right word,
24   but just that this is tough to go through, so it was like, you
25   know, thank you for doing this because, you know -- thank you
```

1    for stepping up.  We don't want to drag you through everything

2    that you're completely uncomfortable with.  That was that.

3    Q.  If I asked you that same slightly long-winded question with

4    respect to your dad, did the same thing happen with an

5    interview regarding your father?

6    A.  No.  I think I spoke more about my mom whenever I was

7    speaking to anybody.  My dad maybe took me to two appointments.

8    Majority of the time it was my mom that was taking me and

9    scheduling the appointments.

10   Q.  Did your dad ever accompany you to any appointments with

11   Dr. Paduch?

12   A.  Yes.  There are two specifically in my mind that I recall,

13   the first one and the second one, when the -- when I testified

14   earlier that my ejaculatory fluid got on Dr. Paduch's shirt.

15   Q.  If you answered this, I truly apologize, but did the

16   government ask to interview your dad?

17   A.  To the best of my recollection, no, they did not.

18   Q.  Do you recall, at some point during your course of

19   appointments with Dr. Paduch, being upset at the thought that

20   your mom might stop you from seeing him?

21   A.  Yeah.

22   Q.  Do you recall feeling that you would have hated her if she

23   put a stop to it?

24   A.  Yeah.  I think I said something along the lines of, I was

25   incredibly motivated to get fixed, right, and there is -- I had

1    a lot of faith in Dr. Paduch.  And if I like -- why I kept a

2    lot of it -- because I didn't go out -- the last part I said,

3    there was semen on my face, but I don't think I was like -- I

4    didn't go into detail about what happened at the appointments.

5    For the most part, I kept that detail to myself because I

6    didn't want to be stopped from going to the appointments.

7    Q.  Do you recall recently telling the government that the

8    first meeting with Dr. Paduch is something of a blur?

9    A.  A little bit.  I testified earlier it was my first meeting.

10   I don't remember -- I was really nervous, I remember.  I

11   testified earlier there was a finger in my rectum.  The first

12   meeting, besides that, there was no like -- it was a little bit

13   more blurry, the memory.

14   Q.  Am I correct that you don't recall if you saw any nurses at

15   all during that first meeting?

16   A.  I am not sure there would have been nurses in the building

17   or like in the waiting room, but, no.  The first meeting I

18   remember Dr. Paduch.

19   Q.  Am I correct that you don't recall whether or not Dr.

20   Paduch was wearing gloves during that first meeting?

21   A.  No, sir, that's correct.  I don't recall.

22   Q.  And am I correct that at the end of that first meeting your

23   dad came into the exam room?

24   A.  Yeah.  He either came into the exam room, or we may have

25   spoken in the office afterwards.

1  Q.  Mr. Lenox, am I correct that you occasionally are worried

2  about your ability to recall events accurately?

3  A.  Yes and no.  So if you were to -- the memories that I

4  testified to earlier are ones that like I have -- you can

5  picture them in your head and it's like playing a movie, like

6  the four times that I recalled.  If it's questions like, did he

7  wear gloves, that sort of thing, then I would be concerned if I

8  was able to answer that correctly, yeah.

9  Q.  Have you ever expressed concern about recalling something

10  incorrectly?

11  A.  Yeah.  I think that it's always a place of concern.  Just

12  in regards to questions like outside of that or like, oh, like,

13  if somebody, you know, was to ask, like, you know, was it more

14  than three or four times, then it's like, you know -- if

15  somebody was to ask, you know, was it more than three or four

16  times that you were masturbated, I'm very cautious about -- I'm

17  only speaking to the stuff that I clearly and vividly remember.

18          As far as other stuff, if I was at an appointment and

19  there was an ultrasound or something, like, oh, I don't know --

20  no.  I'm not particularly concerned about my clarity in the

21  time that I was masturbated.

22          And the other times I'm like, you know -- you

23  mentioned earlier a gap between October and February.  That's

24  something that isn't particularly clear in my head.  If

25  somebody asked me multiple questions about that, I would be

1    concerned about my recollectionability.

2    Q.   I believe you testified on direct examination that you have

3    had treatment with a therapist?

4    A.   Yeah.  Two.

5    Q.   Do you remember, again, ballpark, when that therapy began?

6    A.   Yes, sir.  I would imagine that the first time would have

7    been in 2018 or 2019 I started seeing -- I was having a really

8    hard time with these memories and these recurring thoughts and

9    memories, so I started seeing a therapist for about a year and

10   a half and then some time lapsed and I just had like, you

11   know -- I wouldn't say the term flareup, but I was started to

12   be bothered again by a couple of memories or things, so I saw

13   another therapist for a short amount of time.  Recently I have

14   been going to see him again because this is stressful.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1   BY MR. BALDASSARE:

2   Q.  By this, do you mean the proceedings that we're here for

3   yesterday and today?

4   A.  Yes, sir.

5   Q.  OK.  But, just so we're clear, so the start of the therapy

6   was around, you said, '18 or '19?

7   A.  Yes, sir.  That's correct.

8           MR. XIANG:  Sorry.  Just for the record, can we

9   clarify, does 18 or 19 refer to ages or 2018 or 2019?

10          THE COURT:  I assumed you meant 2018 or 2019.

11          MR. BALDASSARE:  You assumed correct, Judge.

12          THE COURT:  Is that right?

13          THE WITNESS:  Yes.

14  Q.  Now, just so we can remember, your last visit with

15  Dr. Paduch was sometime in 2017, correct?

16  A.  Correct, sir.

17  Q.  Did you make any report of Dr. Paduch's activity in 2018?

18  A.  No, sir.

19          Um, wait.  When you say report, I told the therapist.

20  I spoke with her about it.

21  Q.  OK.

22  A.  But, no, I didn't make any official reports or anything

23  like that.

24  Q.  Let me ask a better and more specific question.

25          Did you make any report to any law enforcement in

1  2018?

2  A.  No, sir.

3  Q.  OK.  Do you know if your family, to your knowledge, made

4  any report in '18?

5  A.  To law enforcement?

6        No, sir.

7  Q.  How about 2019?

8  A.  No, sir.

9  Q.  2020?

10  A.  No, sir.

11  Q.  2021?

12  A.  No, sir.

13  Q.  2022?

14  A.  As you mentioned, I -- yeah, it would have been around late

15  2022 that the police were, um, informed.

16  Q.  And would that be around the time of your -- of the

17  beginning of your meetings with the U.S. Attorney's office?

18  A.  Um, yeah.

19        As I think you mentioned it earlier, that I started

20  seeing them in February.  So that would have been around the

21  time.

22  Q.  Do you remember if that report was made around the time

23  that the civil lawsuit was filed?

24  A.  Yes, sir.  It probably would have been around maybe a few

25  months.

1   Q.  I'm sorry?

2   A.  Yeah.  Um, as far as, like, timeline goes with the civil

3   lawsuit, I remember, like, I -- I wasn't incredibly -- like, I

4   knew roughly what was going on.  But as far as, like, when

5   things were being filed, it was hard to keep up with -- because

6   it's, like, different processes.

7            Say that I started in, like, September of speaking to

8   somebody in 2022, I guess, or -- September, yeah.  Probably

9   September 2022, that I believe that I would have spoken with

10  the DOJ, as you said, around February 23, 2023.

11  Q.  OK.  In 2018, did you make any reports to any medical

12  boards about Dr. Paduch?

13  A.  No.

14  Q.  Do you know if anyone in your family did?

15  A.  No.

16           So, I started going to a therapist, as I mentioned,

17  and, um, so that would have been 2018 and 2019.  And she asked

18  me.  She said, hey, XX -- Sam -- said, hey, this is, like, a

19  good -- maybe you would want to do this.  And I said no.  Um,

20  like, should I feel guilty for not doing this?

21           What should I -- what should I do?  And, um, I was

22  very scared and I was having a hard time going through therapy.

23  It's not easy.

24           And she -- she said, listen, Sam.  You've got, you're

25  allowed to worry about yourself first before you worry about

1    anybody else.  Um, so, no.  It was brought to my attention that

2    that was an option for me and it was a scary prospect for me,

3    so I didn't, unfortunately.

4    Q.  And by an option, you mean, like, a licensing board?

5    A.  Can you repeat that, please?

6    Q.  Sure.

7    A.  I'm sorry.  I think I understand your question.

8            The option for me was to go to the police or, like,

9    FBI.  Um, the FBI, actually, I didn't know that was, like, a

10   thing.

11           Just the police, and I -- I said no because I was --

12   um, it was scary and it was really daunting.  So, then I didn't

13   make any reports to any medical boards because it was scary and

14   daunting, and I was having a really hard time dealing with it

15   with myself for -- before really speaking to any people about

16   it.

17   Q.  And I'll just ask one broad question so that we don't have

18   to go through every time.

19           Between 2018 and 2022, do you know if your parents or

20   anyone in your family went to any medical boards about

21   Dr. Paduch?

22   A.  Um, my mom went to therapy and, um -- but, no, she didn't

23   go to a medical board because this was my thing.  And it was,

24   like, if -- if -- if I was -- if I was uncomfortable with it,

25   and I'm sure my mom would have been on the side of, like, hey,

 1    let's do something about this.

 2         But if I said -- and I'm sure I said -- mom, like,

 3    I'm -- I'm struggling to deal with this.  I can't go forward.

 4    You know, I can't file reports or anything like that.  Like, I

 5    can't do this right now.  Um, so, um, no, she didn't.  And I'm

 6    sure it was partially out of respect or definitely out of

 7    respect for my wishes.

 8    Q.  I'm going to ask one combination question that may be

 9    compound, but I want to try to make this easy for you, sir.

10    A.  Thank you, sir.

11    Q.  All right.  From 2018 to 2022, to your knowledge, did you

12    or anyone in your family make any complaints about Dr. Paduch

13    to Weill Cornell?

14    A.  No, sir.

15    Q.  So, the same kind of question.

16         From 2018 to 2022, did you or anyone in your family

17    post anything anonymously or otherwise on Google or any

18    websites or anything about Dr. Paduch?

19    A.  No.  To my understanding, no.

20    Q.  Do you recall --

21         MR. BALDASSARE:  One second, Judge, please.

22         (Counsel confer)

23    Q.  Mr. Lenox, without the need for you to go into detail, do

24    you recall ever discussing Dr. Paduch with someone named Jamie?

25    A.  No, no.

1   Q.  Does the institution St. Francis ring a bell?

2   A.  Yes, sir.

3   Q.  Do you recall discussing Dr. Paduch with anyone at

4   St. Francis?

5   A.  Yeah.

6   Q.  To your knowledge, just to your recollection, did the

7   government ever interview anyone at that institution?

8   A.  I don't know.

9   Q.  Am I correct that you did mention that to the U.S.

10  Attorney's office during one of your meetings?

11  A.  Yeah.  I would have said that I went to -- who I had

12  therapy with and where I went to therapy.  I gave -- I

13  disclosed that.

14  Q.  Did you ever discuss your visits with Dr. Paduch with your

15  aunt?

16  A.  Yeah.

17          Um, no, that's a -- that's a poor way to phrase it.

18          Um, so when I was, um -- I was staying in -- the

19  internship that we spoke about earlier was at the Weill Cornell

20  Medical Center.  And, um, it was very far from where I live at

21  home, so I stayed with my aunt for, like, four weeks.

22          And after one of the occasions, um, I was 17, this is

23  when I had just seen the -- the -- the pornography, the

24  homosexual pornography.  And I don't have anything against

25  anything, but it just stuck out to me.

1          So, I was uncomfortable and I told my aunt that, that

2    night.  Um, we actually went out for Chinese food, of all

3    things, and I guess it was kind of an explosion of, like, this

4    happened at the internship today.  That's the only thing that I

5    would have discussed with her really, as far as that, and, you

6    know ...

7    Q.  And, again, not asking whether it actually happened or not,

8    but is it your recollection that you think that your aunt

9    called your mom about that?

10   A.  Yeah.  Yeah, I believe that my aunt was concerned.

11   Q.  Do you know if, after that, your mom took -- strike that.

12         Do you know if, after that, your mom contacted

13   Dr. Paduch?

14   A.  No.  She -- she -- well, she asked.  She was, like, what do

15   you want me to do?  I was, like, I don't know.  Well, you've

16   just got to really -- you've got to tell him that you're

17   uncomfortable with that and you're incredibly uncomfortable

18   with that, and I hadn't told her about being masturbated by

19   Dr. Paduch.  From her mind, it was seeing somebody else

20   watching porn.

21         And she told me, hey, you should -- you should tell

22   him that you're uncomfortable with that, which I did.  I

23   already testified about that earlier.

24   Q.  To your knowledge, did the government interview your aunt?

25   A.  No.

1   Q.  At some point, do you recall the government asking --

2   strike that.

3          At some point, do you recall discussing text messages

4   between you and Dr. Paduch with the government?

5   A.  Sorry.

6          Can you repeat that again?

7   Q.  Sure.

8          At some point during your meetings with the

9   government, do you recall discussing with them the existence of

10  text messages between you and Dr. Paduch?

11  A.  Yep.  Yes, sir.

12  Q.  And, at some point, did you either offer to give them the

13  text messages or they asked for them?

14  A.  Yeah.  So how they, um, got, um, those text messages was

15  originally I had -- I -- you know, all this was on an old

16  phone.  So, I gave my cellphone to my, um, my attorneys.  I

17  don't know how much I should --

18          But, like, yeah, my attorneys, I gave it to them, and

19  then the cellphone was out of my hands.  So, my, my -- I guess,

20  my attorneys would have given it or whatever messages were on

21  it to the Department of Justice.  But I didn't want that

22  cellphone back, so I just said that I don't have the phone

23  anymore.

24          So, you know, my attorneys who were also on the call

25  says, You guys can figure that out.  I mentioned that there

1    were with text messages, never gave it to them.  It was already

2    out of my hands at that point.

3    Q.  So I just want to break that down into a couple of steps,

4    if that's OK.

5    A.  Yeah.  Sorry.

6    Q.  No, don't apologize, please.  No worries.

7            So after the conversation with the government about

8    text messages, that phone was with the lawyers who

9    represented -- who represent you in the civil lawsuit, correct?

10   A.  Prior to meeting with the Department of Justice, if memory

11   serves me right on that.

12   Q.  OK.  So, meaning that before you even met with the

13   Department of Justice, your phone had been given to the lawyers

14   in the civil suit, correct?

15   A.  To the best of my knowledge, um, or it could have been

16   after.  To be honest, I don't recall.

17           But, yeah, sorry.  I can't stand on that one either

18   side.

19   Q.  OK.  Is the name -- is the short name for that firm PCVA?

20   A.  Yes, sir.

21   Q.  And is one of your lawyers Mallory Allen?

22   A.  That's correct.

23   Q.  And am I correct then, just to break it down by steps, then

24   did the government at some point --

25           I don't want to know what you said to your lawyers.

1    A.  OK.  I've been told that.  Thank you.

2    Q.  It bears repeating, right?

3          So, do you recall if the government went directly to

4    PCVA or if you went through them?

5    A.  So, from my understanding, um, they were, um -- we were

6    kind of on the call together when we had that first phone call

7    with the Department of Justice, from my understanding.

8          We were going to report it locally to, like, the

9    Manhattan police and then, um, the Department of Justice

10   called.  So that was my understanding of how it went forward.

11   I kind of did it hand in hand with my lawyers because I -- I

12   don't know how to do it, and it had been something that was

13   pretty -- pretty intimidating for me.  So, they kind of did it

14   with me.

15   Q.  And, to your understanding, are the text messages that were

16   ultimately given to the government by your lawyers the ones

17   that we looked at earlier this morning or earlier today?

18   A.  Yeah.  Again, I'm going -- so I gave my phone to my lawyers

19   and I have no idea how -- if they sent the phone to the

20   Department of Justice upon request, if it was sending pictures

21   or files.  I have no idea how that was done.  That was beyond

22   me.

23          MR. BALDASSARE:  Just one moment.

24          (Counsel confer)

25          Judge, I just spoke to the government.  I mean, if now

1    is a good time for lunch break, I may be able to trim a little,

2    to expedite things for the jury, if we have the break now.

3               THE COURT:  That's fine.

4               Why don't we do that.  We'll break for lunch.

5               Just remember, don't discuss the case and keep an open

6    mind, and we'll meet back here at two.

7               All right.  Two o'clock.

8               MR. BALDASSARE:  Two o'clock.

9               Thank you, Judge.

10              THE COURT:  Thanks.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    (Jury not present)

2               THE COURT:  You can step down, if you would like.

3               You can go.  We're going to meet again at two.

4               (Witness temporarily excused)

5               I want the witness's birth date, and he made a brief

6      reference to his name, redacted from the transcript.  So my law

7      clerk will work with the court reporter.

8               But I did want to, again, consistent with my prior

9      rulings, make that happen, so I want to advise you of that.

10              MR. XIANG:  Thank you, your Honor.

11              THE COURT:  Is there anything else we need to discuss?

12              MR. XIANG:  Not from the government, your Honor.

13              MR. BALDASSARE:  No, Judge.

14              THE COURT:  Thanks.

15              (Luncheon recess)

16

17

18

19

20

21

22

23

24

25
```

```
 1                         AFTERNOON SESSION

 2                              2:00 p.m.

 3          (Jury not present)

 4          MR. XIANG:  I believe the defense may have one issue

 5  before we bring the jury back in.

 6          Over the lunch break, the government communicated with

 7  PCVA, the firm that has been mentioned in this trial, and so we

 8  are communicating to the court their objection, their

 9  continuing objection, to cross-examination questions that would

10  call for any invasion of the attorney-client privilege.

11          I believe the government's understanding is, based on

12  the order that your Honor has already entered, that the

13  privilege won't be broken or violated in light of that order.

14          But, at their request, we are putting their continuing

15  objection on the record.

16          THE COURT:  All right.  Thank you for doing that.

17          MR. BALDASSARE:  Judge, they can keep telling me not

18  to violate the law, and that's fine with me.  I'm not going to

19  to.  I know the rules.  I'm going to keep going the way I've

20  been going.  I think I'm fine.

21          I have one issue.  We actually spoke about this, I

22  think, the very first time we met on this case.  Real quickly.

23  There is a laptop and the brand name of the laptop -- I think

24  it's sort of a gaming computer -- the brand name of the laptop

25  is a Predator laptop.  I had thought all along we were going to
```

 1    agree to call it something else.  The government offered a

 2    stipulation on the chain of custody or the authenticity, and

 3    for reasons I can't disclose, we didn't agree to that.

 4         Now they don't want to agree to not call it or not

 5    tell the witness to call it the Predator.  They can show it to

 6    him.  There's got to be another name besides calling it -- I

 7    get it.  It's called a Predator.  But unless we're going to get

 8    into gaming computers and the fact that it's called the

 9    Predator, I cannot possibly think of something that falls more

10    within 403.

11         It's got the Predator -- I don't know if the court is

12    a fan -- but the Predator alien from the movie, I think, you

13    know, I know they are upset that I didn't stip to it, but that

14    is still no reason to have the agent say this is the Predator

15    laptop.

16         THE COURT:  Were you really, I mean --

17         MS. ESPINOSA:  Your Honor, all we are planning to do

18    with this is authenticate the two laptops that were seized

19    during the search of the defendant's home.  One of the laptops

20    is this Predator laptop.  It says Predator on the front with

21    the Predator logo.

22         THE COURT:  OK.

23         MS. ESPINOSA:  I am not intending to deliberately

24    elicit this is a Predator.  When I ask the agent, hand it to

25    him and say, what is this, what do you recognize this to be, he

1    may say the name Predator.  It's also written in fairly large

2    letters on the front of the laptop.  I have it here, if your

3    Honor would like to take a look at it.

4           THE COURT:  Sure.

5           MR. BALDASSARE:  What I would say, Judge, I have had

6    plenty of cases where maybe we don't instruct lay witnesses not

7    to say something.  I think it's perfectly appropriate to tell

8    an agent -- yeah, I mean, I get it, it says Predator.  I don't

9    think it needs to be walked by the jury.

10          MS. ESPINOSA:  No.

11          MR. BALDASSARE:  I think he should be told, Don't say

12   Predator.  This is the computer I seized.

13          THE COURT:  I think you can tell the witness, unless

14   he's asked a specific question about the name of the laptop,

15   there is no need to mention the name.  I don't see the

16   relevance of that.

17          Can we bring the jury in?

18          (Pause)

19          So, just while we're waiting for the jury -- I'm going

20   to stop talking when they come -- but this new order regarding

21   access to a computer says at least five hours per day including

22   on weekends.

23          Can the BOP -- what time does he get back?

24          What time does he get back from court every day?

25          MS. ESPINOSA:  Your Honor, I think it is going to be

1    extremely difficult for them to give him five hours after the

2    trial day ends.

3              MR. BALDASSARE:  I don't mean to interrupt.

4              I agree.  I guess the question is, we were thinking

5    weekends, or maybe saying something, unless he's in court,

6    because there may be some days we're not sitting.

7              THE COURT:  OK.  Then I think you need to revise it.

8              MR. BALDASSARE:  We'll do a better job.

9              THE COURT:  OK.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury present)

 2                    THE COURT:  Everyone can be seated.  Thank you.

 3                    You may proceed.

 4                    (Witness resumed)

 5                    Whenever you're ready.

 6                    MR. BALDASSARE:  Thank you, Judge.

 7                    Judge, for expediency and to make sure everything is

 8      redacted appropriately, I'm going to use -- the government is

 9      going to bring up and work for me the exhibit, Government

10      Exhibit 401, which are the text messages.

11                    THE COURT:  Very well.

12      BY MR. BALDASSARE:

13      Q.  Mr. Lenox, can you see that text message there?

14      A.  Yes, sir.

15      Q.  I'm going to ask if we could turn to page three.

16                    Do you see the date at the top of this page?

17      A.  Yes, sir.

18      Q.  OK.  As of that date, were you 18 years old at some point

19      prior to that date?

20      A.  Yeah, yeah, yeah.  Yep.

21      Q.  So, I am going to endeavor to only look at texts today from

22      when you were 18 years old.  OK.

23                    If you see any that are when you were a minor, I'm

24      going to ask you to please let me know.  OK?

25      A.  Yes, sir.
```

1    Q.  OK.  I'm going to ask if we can just go to page four.

2            Before we look at that, Mr. Lenox, would you agree

3    with me that as we go through some more of these texts, that

4    during your course of texting with Dr. Paduch, you discussed

5    very intimate health issues about yourself, correct?

6    A.  That's correct, sir.

7    Q.  And would you also agree with me that you had some fairly

8    friendly exchanges, correct?

9    A.  Correct, sir.

10   Q.  And would you also agree with me that there was a fair

11   amount of adult joking between these texts?

12   A.  Yeah, definitely.

13   Q.  So, if we could look on page four, do you see where it says

14   cool?

15   A.  Yep.

16   Q.  Now is that, that side is you, correct?

17   A.  Yeah.  Yes, sir.  I'm the blue and Dr. Paduch is the clear,

18   yes, sir, on the left.

19   Q.  OK.  So can you read the cool text for me?

20   A.  Yes, sir.

21           Cool, if you and Alex can find a day where you both

22   don't have to stay too late I think that would be a bunch of

23   fun.  I'll ask him.

24   Q.  And do you remember what you were discussing there?

25   A.  No.  Maybe about -- um, no, I don't.

1   Q.  Was it about getting together socially, or did that have to

2   do with your treatment?

3   A.  That would have been -- I would have been suggesting, I

4   would imagine, seeing each other or, like, um, me and Alex and

5   Dr. Paduch, um, yeah, like, like a social non-appointment.

6   Q.  And Alex is somebody on your side, a friend or something

7   like that, it wasn't Dr. Paduch's friend, right?

8   A.  No.  Alex is the lab assistant who I was working with at --

9   at the internship.  So, Alex was really, um, always very

10  helpful and very, very nice to me and a little bit closer in

11  age.  Um, he would have been, like, like, early 30s.

12          Um, so, I liked him.  You know, I spent a month of the

13  internship and, um, I -- I looked up to both of them.  So that

14  was me initiating, hey, we should meet up for something.

15  Q.  Was this right after the internship or soon thereafter?

16  A.  Yeah, this is -- or, at least, I believe that the date you

17  brought up was September 26.  So that would have been maybe two

18  or three months after the internship.

19  Q.  OK.  If we could go to page six, please.

20          Can you read to me your text at the top of this page?

21  A.  Yes, sir.

22          Thank you.  I will.  And, actually, I'm going to see a

23  local urologist Thursday because of insurance coverage.  After

24  seeing one of the best, I'm not too excited for it, but I'm

25  trying to somehow get it working again.  If you have any ideas,

1    please let me know, but that's my plan for the short-term.

2    Q.  OK.  And your reference there to seeing one of the best,

3    who was that a reference to?

4    A.  Dr. Paduch.

5    Q.  If we could look at page seven.

6          Now, you see -- and I think the government went over

7    this with you at the bottom -- you're talking about a super hot

8    Dominican ultrasound tech?

9    A.  Yeah.

10   Q.  I mean, fair to say that that's you and Dr. Paduch joking

11   around?

12   A.  Um, yeah.  Yeah, I wasn't too concerned about, um, this

13   line of texting personally.  It was, like, um, the other text

14   messages about videos of me jacking off, I felt uncomfortable.

15   But this felt more, like, a friendly joke.

16   Q.  If we could look at nine, please.

17         At the bottom of that first blue bubble, that's you,

18   correct?

19   A.  Yes, sir.

20   Q.  And you're asking Dr. Paduch if you should call the office

21   and make the appointment, correct?

22   A.  Yes, sir.

23   Q.  OK.

24   A.  But, um, just for clarification, not that it matters or

25   anything, but by me, like, should I call the office, it would

1  have meant, like, me or my mom, to me at that time.

2  Q.  OK.  If we could look at page 15.

3       Can you read the blue bubble that is from you?

4  A.  Yeah, sure.

5       I will, what was the testimony about?  And I asked my

6  mom, your practice takes 80 percent of our insurance which

7  makes it no problem.  Just not the New York Presbyterian.

8  Should I just make it during the day?  Don't want to hold you

9  up.  I get out of school.  Smiley faces.

10      Yeah.

11 Q.  And is the discussion of the insurance because you were

12 concerned that insurance coverage might preclude you from

13 continuing to see Dr. Paduch?

14 A.  Yeah.  Um, it looks like it's, um, to that -- I don't

15 remember how much of an issue the insurance was for us at the

16 time, but just from reading these, maybe they weren't taking

17 very much of our insurance.  Um, yeah.

18 Q.  If we could look at page 22.

19      Now, does this appear to be a text from you to

20 Dr. Paduch?

21 A.  Yep.

22 Q.  And October 13, and I'll represent to you that when we look

23 at the next, the prior page, this appears to be from October of

24 2016.

25      So this is a text from you to Dr. Paduch, October 13,

1    2016, at 7:21 a.m.

2                Could you read that text, please?

3    A.   Yeah.   Sure.

4                On my resume I have the scholarship program I did with

5    you guys and that I'm starting volunteering as an EMT.   I want

6    to go into some sort of business degree while taking one

7    science course a year, so if I want to go into med school, I

8    can go straight into working if I'm tired of school.   I don't

9    know if you have to include anything about my resume or major.

10   I have to put that on my application.   Thank you so much again.

11   Q.   If we could just go to the next page.

12               And the prior text was at 7:21.

13               Did Dr. Paduch respond to you?

14   A.   Yes.

15   Q.   And he responded to you about, I don't know, a little over

16   ten minutes later?

17   A.   Yeah, I guess, 20 minutes.

18   Q.   And did you find Dr. Paduch to be responsive when you

19   texted him?

20   A.   Um, I don't recall particularly.   Um, I guess this was on a

21   school day for me, so that's why I would have been texting so

22   early, you know, because high school starts --

23   Q.   I'm sorry.

24               Is it fair to say here he's saying do business joking,

25   don't go to med school?

1    A.  Yeah, definitely.

2    Q.  If we can go to page 31.

3           And in the middle of that is a message from you that

4    we believe we looked at before where you say you travel too

5    much.  Throw me in a suitcase.  I'm easy enough to fit.  When

6    with will you be back?  With an emoji, seems to be a smiling

7    face.

8           Did I read that correctly?

9    A.  Yes, sir.

10   Q.  Is that an example of you and Dr. Paduch joking around?

11   A.  Yeah, it seems like it.  If I recall what the context of

12   the text message, I wanted to get the letter, so just trying to

13   figure out when he would be back and I could pick that letter

14   up.

15   Q.  If we could go to page 44 -- I'm sorry, 43.

16          Now, here on the bottom is a message from you that

17   starts I needed, correct?

18   A.  Yeah.

19   Q.  And it cuts off at the end, correct?

20   A.  Yes, sir.

21   Q.  So, I'm going to ask if we can go to page 44, which has the

22   full message.

23          And this is November 16, correct?

24   A.  Correct, sir.

25   Q.  I believe it is November 16, I will tell you if we look

1    back at November 16 of 2016.

2            Can you read that message, rather?

3    A.  Yeah, definitely.

4            I needed to talk to you about the third

5    cavernosometry.  I know you said summer, but I would really

6    rather it done -- sorry.

7            I would really rather it done sooner than later so I

8    can tackle it.  not as a patient but I'm asking as a friend.

9    It would be really helpful.

10           THE COURT:  Speak a little bit slower.  I know it's

11   hard.  Thank you.

12           THE WITNESS:  I'm going to restart from the beginning,

13   if that's OK.

14           THE COURT:  Thank you.

15   A.  I needed to talk to you about the third cavernosometry.  I

16   know you said summer, but I really would rather it done sooner

17   than later so I can tackle it.  Not as a patient, but I'm

18   asking you as a friend.  It would be really helpful.  I'm

19   hooking up with girls at school and I feel good about myself,

20   but it doesn't feel very pleasurable without a solid erection.

21   Q.  OK.  Now, when you sent this text, were you sending it to

22   Dr. Paduch as only a friend, only as a doctor, or as both, or

23   as some other way you would characterize?

24   A.  Yeah.  How I would characterize this is, I think I

25   mentioned it earlier, that a lot of the time it felt, like, I

1    was trying to get -- um, I was trying to convince Dr. Paduch

2    that I was having a problem and that this was, like, you know,

3    a real issue for me.

4            So, when I said as a friend, I didn't mean it as,

5    like, a, you know, we're best friends or anything.  I meant it

6    as, like, I really need this and I'm, like, I need this fixed

7    and I'm asking for something to be done.

8            Um, so I didn't mean it as, like, we were -- I was 18

9    at the time, so I guess I wasn't very good with my words.  But

10   I meant it, like, I really need this, please.  I need a test.

11   I need something, please.

12   Q.  And did you, in fact, have a second surgery with Dr. Paduch

13   after that text?

14   A.  Yeah.  We had a second surgery in April of -- of 2017.

15   Q.  '17?

16   A.  Yes, sir.

17   Q.  OK.  If we can go to page 51.

18           Can you see this?

19   A.  Correct.  Yep.

20   Q.  And it's dated December 22, 2016, correct?

21   A.  Correct, sir.

22   Q.  And we looked at this during your direct examination,

23   correct?

24   A.  That's correct.

25   Q.  OK.  And am I correct, do you remember that after you got

1    this picture, you joked about what is that, talked about junk,

2    etc., etc.

3          Remember that?

4    A.  Sure, yep.

5    Q.  OK.  Am I right that after December 22, 2016, you saw

6    Dr. Paduch about another six or seven times?

7    A.  I don't know exactly.

8    Q.  Do you remember seeing him --

9          Well, let me work it this way.

10         After this is December 22, 2016.  Do you recall having

11   surgery with him in April of the following year?

12   A.  Correct.  So, a few months, four months later, yeah.

13   Q.  And do you recall appointments leading up to that surgery

14   in February and March and earlier in April?

15   A.  I think that we spoke about it before break.  I remember

16   having, like, an MRI done, or I remember going in for that.

17   And I remember, um, I think I maybe went to one appointment

18   after that, at least from the best of my recollection.

19         But those are the appointments that stand out between

20   those, I guess, that timeframe or, I guess, precluding the

21   surgery.  Those appointments stand out.

22   Q.  And do you recall going to see Dr. Paduch in June and July,

23   after your surgery in April, those two visits?

24   A.  Yes, sir.

25   Q.  If we can go to page 63, please.

1            So if you could read the top bubble.

2            That's from you, correct?

3  A.  Yes, sir.

4  Q.  OK.  Can you read that?

5  A.  Yes, sir.

6            I'll call you after five to review the options, is

7  circumcision that bad?  I've done some reading and some guys

8  claim sex is the same while others claim their penis is a

9  sensationless meat stick ...

10 Q.  And would you agree with me that that's you joking around

11 with that phrase with Dr. Paduch?

12 A.  Yes and no.  Um, so I knew that I was going for surgery and

13 I was nervous about it, about all aspects of it.  So, the

14 laughing face -- as you can see I texted a lot with those as if

15 I was, I guess, uncomfortable or, I don't know, but, yeah, I --

16 I -- as a physician, I wanted his opinion if that would be a

17 big deal for me or something that was important.

18 Q.  If we could go to page 71.

19           Now, we don't have to, but if we go back, we'll see

20 that this text is from May, I believe, May 10 of 2017, and this

21 text at the top cuts off.

22           I'm going to ask if we can go to page 72 to see the

23 full text.

24           If you could read that text?

25 A.  Yes, sir.

1          You did, I guess they don't send you around the world

2    for nothing.  Emoji.  Still waiting to see how masturbating is

3    and what my erections --

4          THE COURT:  Sorry.  Slow down a tiny bit.

5          Sorry about that.

6          THE WITNESS:  Sorry.  Bad habit of it.

7    A.  Still waiting to see how masturbating is and what my

8    erections are like while standing, but all signs are very

9    positive so far.  Thank you so much for performing the surgery.

10   Five hours is a long operation, but if it works as well as I

11   think it will, my life will definitely have been changed in

12   such a huge way.  I seriously can't thank you enough.

13   Q.  OK.  I'm done with 401.  Thank you, by the way.

14         Mr. Lenox, would you agree with me that when the

15   defense asked to meet with you, you declined?

16   A.  Could you -- I don't --

17   Q.  Yeah.

18   A.  Yeah, sorry.  I don't think I declined.

19   Q.  Do you remember declining a request from Dr. Paduch's

20   lawyers to meet with you in advance of trial?

21   A.  Oh, OK.  No.  No, I don't.

22   Q.  OK.

23   A.  Um, I -- no.

24   Q.  Did you ever learn whether or not we tried to interview

25   you?

 1   A.  From my understanding, somebody reached out to my civil

 2   attorneys, um, and they threw it out --

 3   Q.  Let me stop you there as a courtesy to everyone.

 4         I don't want to know anything that your lawyers said

 5   to you other than, I guess, if that is how you learned about

 6   it, and then nothing further than that.

 7   A.  I -- I never had any firsthand experience of anybody trying

 8   to contact me, no.

 9   Q.  OK.  Only spoke about that with your lawyers?

10   A.  Yeah.

11   Q.  OK.  And were you content to not meet with us before trial?

12   A.  Yes, very much so.  Not that I have anything against you,

13   but, just, I didn't want to ...

14   Q.  I'm sorry.  I didn't hear you.

15   A.  No, I didn't mean -- in case that sounded like, like, a,

16   no, it was --

17         But, no, I did not want to meet with anybody, um, from

18   Dr. Paduch's side before this.  No.

19   Q.  OK.  Thank you.

20         THE COURT:  I think what you missed is he said, Not

21   that I have anything against you.

22   A.  Yeah, that's it.  Yeah, I didn't mean to say it, like, an

23   aggressive way or, like, you know, nothing against...

24   Q.  Thank you.

25   A.  Sorry.

1    Q.  So, not to ask you to remember the exact date, but tax day,

2    April 15, 2024, do you recall meeting with the government on

3    that day?

4    A.  Yes, sir.

5    Q.  And do you recall them doing sort of a practice

6    cross-examination as to what might happen when I got up here to

7    cross-examine you?

8    A.  Yes, sir.

9    Q.  Am I correct that, during that meeting, you told the

10   government that you eventually disclosed this information to

11   law enforcement at the urging of your civil attorneys?

12   A.  Yes and no.  Um, urging is a tough word.  Um, my -- my --

13   and I'm going to try to balance this with what you just advised

14   me with earlier, but, um --

15   Q.  And I don't want to interrupt you, but I want us all to be

16   on the same page.

17        I don't want you to tell you anything that you

18   discussed with your lawyer other than what was said in the

19   presence of a third party.  So if it's with the government and

20   it has to do with your lawyer, that you can tell us.  But if

21   it's just you and your lawyer, don't.

22   A.  OK.  In that case, to be completely, in transparency, when

23   my lawyers were dialed into the phone call, they pretty much

24   just listened.  There really were no discussions or anything

25   like that.

1    Q.   OK.  But did you say to the government that you decided to

2    disclose this because your civil attorney said something to you

3    to do it?

4    A.   Um, yeah.  And, again, I'm going to rely on your expertise,

5    but from -- from at least how things were -- were put to me, it

6    was, um, if we're going to do this, we're going to go forward,

7    we may as well do it the right way.  And we may as well, you

8    know, not just go civilly, but go criminally as well, so...

9            Sorry.  I just want to clarify.  It was suggested to

10   me, never pushed upon me or told, hey, you really have to do

11   this.  It was, hey, we think you should do this and we're going

12   to be here to support you.  So that's how that process started.

13   Q.   OK.

14           THE COURT:  Sorry.

15           MR. XIANG:  We don't have an objection, your Honor.

16   Just so the record is clear, if a question could be posed when

17   the term "it" or "this" is being used either in a question or

18   an answer, what is the "it" that is being referred to?

19           THE COURT:  Can you answer what is the "it?"

20           THE WITNESS:  I don't recall what I said in regards to

21   it.  Sorry.

22           THE COURT:  No, it's OK.

23           You said something along the lines of, we'll do it the

24   right way.

25           THE WITNESS:  Thank you.

1  A.  Do it the right way, it's -- this process, let's, um, let's

2  go forward and do it criminally and -- and civilly.

3          So it was, like, our lawsuit that we were doing

4  against -- that is going on, that not only do we do it civilly,

5  but we pursue it in a criminal manner as well.

6  Q.  And during your meeting with the government on April 15, do

7  you remember telling them that your civil lawyer said, if we're

8  going to do it, we might as well go all in?

9  A.  If that was my quote, then I would imagine that's correct.

10  Um, I don't remember exactly saying that, but I'm sure I could

11  have said it.

12          MR. BALDASSARE:  Mr. Lenox, thank you very, very much

13  for your time.

14          I have nothing further.

15          THE COURT:  Any redirect?

16          MR. XIANG:  Very, very briefly, your Honor.

17          THE COURT:  OK.

18  REDIRECT EXAMINATION

19  BY MR. XIANG:

20  Q.  Mr. Lenox.

21  A.  Yes, sir.

22  Q.  You were asked on cross-examination about the process of

23  getting text messages from your phone.

24          Do you recall those questions?

25  A.  Yes, sir.

1   Q.  The text messages exchanges that you've testified about

2   today in Government Exhibit 401, when you reviewed them prior

3   to your testimony, did you believe that any of them had been

4   altered in any way?

5   A.  No, sir.

6   Q.  Had they been doctored in any way?

7   A.  No, sir.

8   Q.  Was anything missing from within those exchanges, to the

9   best of your memory?

10  A.  No, sir.

11  Q.  I believe on cross-examination you were asked about

12  conversations that you may have had in therapy in which the

13  therapist suggested to you that you might want to go to law

14  enforcement.

15          Do you recall that testimony?

16  A.  Yes, sir.  That's correct.

17  Q.  And just to remind the jurors, to the best of your memory,

18  when were those conversations that you had with the therapist?

19  A.  Yeah.  So I saw two therapists, but the first one was in

20  early 2019 or late 2018.  Yeah, that's when I -- when I saw a

21  therapist and started doing that process.

22  Q.  I believe also in the course of cross-examination you

23  testified that the masturbation appointments that you had with

24  the defendant came up during those therapy sessions.

25          Was that your testimony?

1   A.   Yeah.  I mentioned those quite a few times at therapy.

2   Q.   And just so the record is clear, those memories of what the

3   defendant did to you, according to your testimony, were those

4   memories that you brought into those therapy sessions, or were

5   those memories that were uncovered in the course of those

6   therapy sessions?

7   A.   Brought into it.  I didn't have to uncover.  Um, I -- I --

8   it wasn't very long after what had happened, I guess, in the

9   grand scheme of things, a year and a half.  Um, so I didn't

10  have to uncover anything.  Everything was still incredibly

11  fresh.

12  Q.   And I believe you testified on cross-examination that those

13  memories were, in fact, part of the reason you sought therapy

14  in the first place, is that accurate?

15  A.   That's accurate.  Yes, sir.

16  Q.   Now, finally, Mr. Lenox, I believe you were asked questions

17  on cross-examination about whether, to your knowledge, the

18  doors of exam rooms were locked.

19       Do you recall those questions and that testimony?

20  A.   Yes, sir.

21  Q.   Focusing on the times when the defendant masturbated you,

22  was the room to those -- I'm sorry -- was the door to those

23  rooms open or closed?

24  A.   Closed.

25  Q.   Who closed the door?

1    A.  Dr. Paduch.

2              MR. XIANG:  No further questions.

3              THE COURT:  Anything else?

4              Any recross?

5              MR. BALDASSARE:  No.  Thank you.

6              THE COURT:  OK.  Thank you, you can step down.

7    Thanks.

8              (Witness excused)

9              Leave everything there.  Don't worry about it.

10             THE WITNESS:  Thank you.

11             THE COURT:  Government can call its next witness.

12             MS. ESPINOSA:  The government calls Michael Buscemi.

13    MICHAEL BUSCEMI,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16             THE DEPUTY CLERK:  Please state and spell your name

17    for the record.

18             THE WITNESS:  Yes.  Michael, M-i-c-h-a-e-l, Buscemi,

19    B-u-s-c-e-m-i.

20    DIRECT EXAMINATION

21    BY MS. ESPINOSA:

22    Q.  Good afternoon, sir.

23             Where do you work?

24    A.  Good afternoon.

25             Federal Bureau of Investigation.  The FBI.

1    Q.  How long have you worked at FBI?

2    A.  14 and a half years.

3    Q.  What's your title there?

4    A.  Special Agent.

5    Q.  Are you assigned to a particular squad or group at the FBI?

6    A.  Yes, the violent crimes against children and human

7    trafficking task force.

8    Q.  At a high level, what are your duties and responsibilities?

9    A.  Investigation, investigate crimes against children, like,

10   child pornography, distribution, receipt, production,

11   kidnappings and human trafficking, which is forcing victims

12   into forced labor and prostitution.

13   Q.  Turning your attention to April 11, 2023, did you

14   participate in a search that day?

15   A.  I did.

16   Q.  Where did you search?

17   A.  A home in Liberty, New York.

18   Q.  You said in Liberty, New York?

19   A.  Yes.

20   Q.  And what type of structure did you search?

21   A.  A single-family residence.

22   Q.  Did other people participate in the search with you?

23   A.  Yes.

24   Q.  And were they also from the FBI?

25   A.  Yes.

1   Q.  What was your role on the search team?

2   A.  Search.

3   Q.  Approximately what time did you arrive the residence to do

4   the search?

5   A.  Approximately six a.m.

6   Q.  When you first arrived at the residence, what did you do?

7   A.  We established a perimeter and called the residence of the

8   home to effectively come out and surrender.

9   Q.  And how many residents were in the home at the time?

10  A.  Just one.

11  Q.  Who was that person?

12  A.  Darius Paduch.

13  Q.  Did you and -- how did you come to personally enter the

14  premises?

15  A.  Um, after he was secured, the entry team came in and we

16  cleared, cleared the establishment.

17  Q.  Was anyone else inside the residence when you entered it?

18  A.  No, ma'am.

19  Q.  What did you do during the search itself?

20  A.  Um, just search for items of the crime.

21  Q.  And what, if anything, was done to document the search?

22  A.  Normal course of action is evidence is found, it's placed

23  in an evidence bag, it's labeled correctly, and then when we go

24  back to the office, a document is written up about it.

25  Q.  Is anything done during the course of the search to

1    document the search as it goes along?

2    A.  Labels are placed on the device.

3    Q.  Are any photographs taken in the course of the search?

4    A.  Yes, ma'am.

5    Q.  And did you take photographs during this search?

6    A.  I did not.

7    Q.  To your knowledge, did someone else take photographs during

8    this search?

9    A.  Yes.

10   Q.  Now, did you review a number of those photographs prior to

11   your testimony today?

12   A.  Yes.

13   Q.  If you look there is a binder in front of you, sir.

14           Could you please open that and just flip through the

15   documents inside.

16           Agent Buscemi, do you recognize those documents?

17   A.  I do.

18   Q.  What are they?

19   A.  They are photographs of the residence that we searched.

20   Q.  And when you say the residence that we searched, which

21   residence do you mean?

22   A.  Darius Paduch's.

23   Q.  Are these true and accurate copies of the photos taken

24   during the search of Darius Paduch's residence?

25   A.  Yes, they are.

 1              MS. ESPINOSA:  Government offers Governments Exhibits

 2    503 through 511.

 3              THE COURT:  Any objection?

 4              MR. BALDASSARE:  No objection.

 5              THE COURT:  They will be admitted.

 6              (Government's Exhibits GX 503-511 received in

 7    evidence)

 8              MS. ESPINOSA:  Mr. Glogoff, could you please pull up

 9    Government Exhibit 503 and publish it.

10    BY MS. ESPINOSA:

11    Q.  Agent Buscemi, do you recognize this?

12    A.  I do.

13    Q.  What is this?

14    A.  Darius Paduch's residence.

15    Q.  Is this the residence that you searched?

16    A.  It is.

17              MS. ESPINOSA:  Mr. Glogoff, you can take that down

18    now.

19              Could you please pull up what is in evidence as

20    Government Exhibit 505.

21    Q.  Agent Buscemi, do you recognize this?

22    A.  I do.

23    Q.  What do we see in this photo?

24    A.  Game room.

25    Q.  Did you participate in a search of this room?

 1  A.  Yes, ma'am.

 2  Q.  Now, drawing your attention to the screen at the back of

 3  this photo, could you describe that?

 4  A.  It's a computer desk.

 5          MS. ESPINOSA:  OK.  You can take that down,

 6  Mr. Glogoff.

 7          Could you please pull up Government Exhibit 507.

 8  Q.  And, Agent Buscemi, what do we see in this photo?

 9  A.  The same computer desk which we just saw.

10  Q.  Take this -- I apologize.

11          Was this taken before, during, or after the search?

12  A.  During.

13          MS. ESPINOSA:  You can take this down, Mr. Glogoff.

14          Please pull up Government Exhibit 508.

15  Q.  Agent, can you please describe what we see in this photo?

16  A.  A computer -- a computer monitor and a laptop underneath

17  that.

18  Q.  Where was this found?

19  A.  In the game room.

20          MS. ESPINOSA:  Your Honor, may I approach?

21          THE COURT:  You may.

22  Q.  Agent Buscemi, I've handed you what is marked for

23  identification as Government Exhibit 1.

24          Do you recognize that?

25  A.  Yes, I do.

1   Q.  What is it?

2   A.  Acer laptop.

3   Q.  And where was this laptop found?

4   A.  On the computer desk in the game room.

5   Q.  And is this the same laptop as the one we see in the

6   photograph here?

7   A.  Yes, ma'am.

8           MS. ESPINOSA:  Your Honor, may I collect the --

9           THE COURT:  Sure.

10          MS. ESPINOSA:  Mr. Glogoff, you can take that photo

11  down.

12          Could you please pull up Government Exhibit 509.

13  Q.  Agent Buscemi, what do we see in this photo?

14  A.  A laptop in a bin.

15  Q.  Where was this laptop found?

16  A.  Also in the game room.

17          MS. ESPINOSA:  And, your Honor, may I approach?

18          THE COURT:  You may.

19  Q.  Agent Buscemi, I handed you what's marked for

20  identification as Government Exhibit 2.

21          Do you recognize that?

22  A.  I do.

23  Q.  What is that?

24  A.  An ASUS laptop.

25  Q.  Where was that laptop found?

1   A.  In the game room on top of the bin.

2   Q.  Is this the same laptop we see in the photograph here?

3   A.  It is.

4   Q.  Agent Buscemi, directing your attention to the top of that

5   laptop, do you see a label there?

6   A.  I do.

7   Q.  Could you please read what it says on that label?

8   A.  Dr. Paduch, private property.

9   Q.  Thank you.

10          Now, what, if any, steps were taken to secure these

11  computers after they were found?

12  A.  They were labeled, placed in evidence bags, and the bags

13  were labeled.

14          MS. ESPINOSA:  No further questions, your Honor.

15          THE COURT:  All right.  Any cross-examination?

16          MR. BALDASSARE:  Just briefly, Judge.

17          MS. ESPINOSA:  Your Honor, may I approach to collect?

18          THE COURT:  You may.

19  CROSS-EXAMINATION

20  BY MR. BALDASSARE:

21  Q.  Good afternoon, Agent.

22  A.  Good afternoon.

23  Q.  When you were on site, you didn't conduct any forensics of

24  any of the laptops on site, correct?

25  A.  Correct.

1    Q.  And that's normal that you wouldn't do that, correct?

2    A.  It depends on the situation.  Sometimes we do, do forensics

3    on site, depending on the abundance of evidence that we're --

4    that's at the scene.

5    Q.  OK.  In this case you didn't?

6    A.  Correct.

7    Q.  OK.  And then after you located the laptops, did you just

8    put them both in evidence bags?

9    A.  I -- I don't recall exactly what I did.  I might have given

10   them to somebody to do that, but they ended up in the evidence

11   bag.

12   Q.  And then where would they go, to the FBI offices?

13   A.  Correct.

14   Q.  And whatever was going to happen would happen there,

15   correct?

16   A.  Correct.

17   Q.  OK.  The last thing, when you said you went inside the

18   house after you secured Dr. Paduch, is this, like, a Hannibal

19   Lecter situation where we've got to --

20        MS. ESPINOSA:  Objection.

21        MR. BALDASSARE:  Well, I want to know what "secured"

22   means.

23        THE COURT:  Just rephrase it.

24        MR. BALDASSARE:  Yeah.  All right.

25   Q.  When you say secured Dr. Paduch, does that mean just, you

1    know, take him outside, if you're going to --

2              MS. ESPINOSA:  Objection.  The attorney is testifying.

3              THE COURT:  What do you mean by "secure?"

4              THE WITNESS:  Just to make sure the scene is safe,

5    that the residence is cleared, scene is safe, Mr. Paduch is --

6    I don't recall if he was in handcuffs, but not a threat to

7    agents on site or himself.

8              MR. BALDASSARE:  Thank you.

9              I have nothing further.

10             THE COURT:  All right.  Anything else from the

11   government?

12             MS. ESPINOSA:  No, your Honor.

13             THE COURT:  You can step down.  Thank you.

14             THE WITNESS:  Thank you.

15             (Witness excused)

16             THE COURT:  The government can call its next witness.

17             MS. QIAN:  Thank you, your Honor.

18             The government calls Dr. Amin Herati.

19    AMIN HERATI,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22             THE DEPUTY CLERK:  Please state and spell your full

23   name for the record.

24             THE WITNESS:  Amin Herati.  A-m-i-n, last name is

25   H-e-r-a-t-i.

1          THE COURT:  Good afternoon.

2          THE WITNESS:  Good afternoon.

3   DIRECT EXAMINATION

4   BY MS. QIAN:

5   Q.  Good afternoon.

6          Dr. Herati, where do you currently work?

7   A.  I work in Baltimore, Maryland, in the Johns Hopkins

8   Hospital.

9   Q.  What is your position there?

10  A.  I am a urologist.  I'm an assistant professor of urology.

11  Q.  At a very high level, what is the field of urology?

12  A.  So urology is a surgical field.  We deal with disorders of

13  the kidney, the bladder, the prostate, the ureter, the

14  genitalia, and we encompass all the surgical and medical

15  aspects of those organs.

16  Q.  Dr. Herati, do you have a subspecialty within urology?

17  A.  I'm fellowship trained in the fields of male infertility

18  and men's health.

19  Q.  When you say men's health, can you explain to us what that

20  encompasses?

21  A.  Sure.

22          So men's health is a very broad term.  It involves any

23  condition that can be affected by testosterone.  So we deal

24  with erectile dysfunction, ejaculatory dysfunction, we deal

25  with any condition within sexual dysfunction, such as curvature

1   of the penis, abnormal ejaculation.  We also deal with enlarged

2   prostate, low testosterone, pelvis pain disorders.  Anything

3   that can be influenced by testosterone, we consider that men's

4   health.

5   Q.  Now, how long have you worked as a urologist at Johns

6   Hopkins?

7   A.  I started working at Johns Hopkins in 2017.

8   Q.  Dr. Herati, can you explain -- describe your educational

9   background to us?

10  A.  Sure.

11          So I went to medical school in Kansas City starting in

12  2003.  I finished in 2010 from the University of Missouri –

13  Kansas City accelerated BA/MD program.

14          I went to North Shore LIJ, now Northwell, for a

15  urology residency in 2010.  I finished that in 2015.  I went to

16  Baylor College of Medicine for a fellowship in male

17  reproductive medicine and surgery.  And then in 2017, I

18  finished my fellowship and I went to Hopkins to join faculty

19  there.

20  Q.  Dr. Herati, just now you referenced completing your

21  residency between 2011 and 2015, as well as your fellowship

22  from 2015 to 2017, correct?

23  A.  Correct.

24  Q.  Can you explain to us the difference between a residency

25  and a fellowship?

1    A.   So a residency is training that encompasses all of urology.

2    We're learning about every condition in the field.  We're

3    learning how to take care of patients in the hospital, in an

4    outpatient setting.  We're learning all the surgeries and how

5    to manage patients before and after.  It's the entire spectrum

6    of urologic conditions that we're managing.

7    Q.   Can you explain what is different about a fellowship?

8    A.   Sure.

9         So a fellowship is more specialized training.  And

10   with the fellowship, we will learn more details, more

11   techniques under a specific condition.  So for my particular

12   case, I did male infertility and men's health.  I learned all

13   the different microsurgeries for infertility and the surgeries

14   for men's health conditions, such as enlarged prostate or

15   erectile dysfunction.

16   Q.   Did you receive any certifications in your chosen medical

17   field?

18   A.   Yes.  I'm board certified as a urologist.

19   Q.   And what is the process of becoming a board certified

20   urologist?

21   A.   The requirements for getting board certification is that

22   you have to complete a residency and you have to complete the

23   written boards and the oral boards.

24   Q.   Now, did your medical training cease after you completed

25   your fellowship?

1    A.   No.   The requirements for ongoing certification is that we

2    must continue our education through reading journal articles,

3    attending conferences, and maintaining our educational credits.

4    Q.   Earlier you testified that after your fellowship, you

5    started your current position at Johns Hopkins, correct?

6    A.   Correct.

7    Q.   As part of your medical practice at Johns Hopkins,

8    approximately how many patients do you see in a day?

9    A.   20 to 25.

10   Q.   What are the general types of conditions that you treat?

11   A.   So I see a number of conditions.   The breakdown is one

12   third male infertility, one third are going to be men's health,

13   so that would include erectile dysfunction, ejaculatory

14   dysfunction, Peyronie's disease, and then the other third is

15   going to be pelvic pain disorders.

16   Q.   Now, focusing on just your clinical duties at Johns

17   Hopkins, do you hold any clinical leadership roles there?

18   A.   So, at John Hopkins, I'm the director of male infertility,

19   the director of men's health.   And in the medical school, I'm

20   the course director for the second-year medical students.   I

21   direct the urology education for them.   I'm also part of the

22   clinical competency committee.   I make sure that our residents,

23   when they finish the training, they are competent physicians

24   and they are able to practice.   And also, I'm part of the

25   program evaluation committee, which will review the curriculum

1    for the residents and make sure that their educational needs

2    are met.

3    Q.  Focusing first on your duties as a professor, can you

4    explain, do you teach a course at Johns Hopkins Medical School?

5    A.  Yes.  The second-year medical students have a block of

6    classes called a reproductive section of their Genes to Society

7    course.  I'm in charge of that.

8          And within that section, I teach a number of classes.

9    I teach the class on the male sexual response, male

10    infertility, erectile dysfunction, BPH, benign prostatic

11    hyperplasia, which is enlargement of the prostate.  I teach all

12    of those classes, and then I also oversee the lectures that my

13    colleagues give as well.

14    Q.  Now, you also mentioned your position on the clinical

15    competency committee.

16          What are the primary duties and responsibilities of

17    this committee?

18    A.  So the clinical competency committee will evaluate each

19    resident year by year.  We have a number of different matrices

20    that we will evaluate each resident.  We look at their clinical

21    skills, their clinical knowledge, interpersonal communication,

22    professionalism, and make sure that at each level of the

23    development, they are reaching the milestones that we expect

24    them to reach.

25    Q.  What are your specific duties and responsibilities as a

1  member of the clinical competency committee?

2  A.  I work with the residents that are in the first, second,

3  and third year of their training.  And so I will make sure

4  that, as they are moving from each year, that they are reaching

5  their milestones and directly observing their clinical skills

6  and their communication to know that they are achieving those

7  milestones.

8  Q.  And, just to be clear, these residencies are in which field

9  of medicine?

10  A.  Urology.

11  Q.  Now, in this role, approximately how many residents have

12  you, whose training have you overseen?

13  A.  We train three residents per year and it's a six-year

14  program at Hopkins.  So, currently we have 18 residents.  But

15  I've been there for seven years, so there have been a lot of

16  residents that have come and gone.  I would say approximately

17  30, 30 to 40.

18  Q.  Are you also involved in the training of fellows?

19  A.  Yes.

20  Q.  What is the focus of the fellowship you're in charge of?

21  A.  So, I am the co-director of the men's health and sexual

22  dysfunction fellowship that's through the Sexual Medicine

23  Society of North America.  And my co-director of the fellowship

24  is Dr. Arthur Burnett.

25  Q.  What are your primary duties and responsibilities as the

1    co-director of the fellowship?

2    A.  The fellows that come through will scrub with me on cases

3    that involve erectile dysfunction.  So I have cases where we're

4    treating men with erectile dysfunction and putting in penile

5    prosthesis, so they will scrub with me on those cases.  They

6    will work with me on infertility surgeries and also attend my

7    clinics as I work these patients up so they can get experience

8    through training.

9    Q.  In your role as co-director of the fellowship, how many

10   fellows have you trained approximately?

11   A.  Approximately five.

12   Q.  I'm going to turn your attention now to academic

13   publications.

14        Have you heard of the term medical journal?

15   A.  Yes.

16   Q.  What is it?

17   A.  So a medical journal is a collection of articles that are

18   published, oftentimes on a monthly basis, and they are

19   typically peer-reviewed.  And a reviewer would go in, and a

20   reviewer is not related to the article and who is often unaware

21   of who the author is.  They will review the article to that

22   make sure that it meets the scientific merits to be published.

23   Q.  You mentioned the term peer-reviewed.

24        Can you just explain that for us, please?

25   A.  Peer-reviewed means that there are reviewers who will

1    examine the article to make sure there are no major

2    deficiencies of the article and no major statistical flaws,

3    make sure that the study was done correctly.  And if there were

4    any limitations, they will ask the authors to clarify those,

5    and then they will report back.  And if the reviewers think

6    that the paper is acceptable for publication, they will accept

7    the publication, or they may say that the paper is not

8    acceptable.

9    Q.  And who are among the reviewers for these peer-reviewed

10   journals?

11   A.  The reviewers are people who are experts in the field who

12   have published on the topics.

13   Q.  Are you currently a reviewer for any journals?

14   A.  Yes.

15   Q.  Which ones?

16   A.  I've reviewed recently for a number of different journals.

17   I've reviewed for the Prostate Journal, I've reviewed for

18   Fertility Sterility, Human Reproductive, Urology, Journal of

19   Urology, American College of Obstetrics and Gynecology, Urology

20   Case reports, there are many, many more.

21   Q.  Now, have you yourself ever authored any articles that have

22   been published in any peer-reviewed medical journals?

23   A.  Yes.

24   Q.  Approximately how many articles?

25   A.  Close to 60.

1    Q.  What are some of the topics that you have focused on in

2    your published articles?

3    A.  So the publications span the range of men's health and male

4    infertility.  I've published on the management of

5    Klinefelter's, I have published on telemedicine and access to

6    care for people who are dealing with sexual medicine

7    conditions.  On the use of antidepressants for men undergoing

8    sexual dysfunction treatment.  That paper has been accepted but

9    will be published soon.  A number of case reports.  The

10   spectrum is there.  BPH articles, erectile dysfunction, and

11   male infertility.

12           MS. QIAN:  At this time, the government moves to

13   qualify Dr. Herati as an expert in the field of urology.

14           THE COURT:  Any objection?

15           MR. BALDASSARE:  No objection.

16           THE COURT:  He'll be so qualified.

17   BY MS. QIAN:

18   Q.  Dr. Herati, outside of this case, are you aware of Darius

19   Paduch?

20   A.  Yes.

21   Q.  How are you aware of Darius Paduch?

22   A.  Dr. Paduch and I spent six months working together when I

23   was a resident at North Shore LIJ.

24   Q.  What did you do during those six months?

25   A.  I worked in his lab.

```
 1   Q.  What did you do in this lab?

 2   A.  We worked on two projects.

 3          One was a study looking at the tissue, the penile

 4   tissue of men who were to undergo erectile dysfunction surgery.

 5   And our project was just to map out where microRNAs were

 6   identified within the tissue.

 7          And then the other was to analyze the microRNAs, which

 8   are small little RNA pieces that are in the sperm of men with

 9   abnormal sperm morphology.

10   Q.  And how close are you to Dr. Paduch?

11   A.  We have not communicated in several years.

12   Q.  Now, in preparing to testify here today, have you

13   interviewed any witnesses in this case?

14   A.  No.

15   Q.  Are you aware of who they are?

16   A.  No.

17   Q.  Have you sat through any witness testimony?

18   A.  No.

19   Q.  Have you reviewed any patient medical records in this case?

20   A.  I have not.

21   Q.  Has the government provided you with any details about what

22   any witness in this case has alleged to have occurred?

23   A.  No.

24   Q.  Are you aware of any press or news reporting relating to

25   the allegations in this case?
```

1   A.  I have seen what's been in the news.

2   Q.  What is the extent of your knowledge of what you have seen

3   in the news?

4   A.  My understandings are there that are patients who were

5   under the age of 18 who came in.  One of them came in to work

6   with Dr. Paduch as a 16-year-old, and he had gone through

7   two years of training with him, and there had been some sexual

8   impropriety during that two-year experience.

9   Q.  To be clear, when you were testifying here today regarding

10  your urological practices, what will your testimony be based on

11  today?

12  A.  The testimony will be based on my clinical experience, my

13  training, guidelines, and recent publications.

14  Q.  Now what, if any, type of compensation are you receiving

15  for testifying here today?

16  A.  $500 an hour.

17  Q.  And does this amount that you get paid depend in any way on

18  the outcome of this trial?

19  A.  No.

20  Q.  Dr. Herati, are you familiar with the term standard of

21  care?

22  A.  Yes.

23  Q.  What is the standard of care?

24  A.  If I had to summarize it, I would say if there were 100

25  people who were experts in a room, if at least 51 of them

1    agreed that something is the right way to do something, that

2    would be considered the standard of care.

3            MR. BALDASSARE:  Judge, if we could be heard briefly

4    at the sidebar on the standard of care.

5            THE COURT:  Sure.

6            All right.  If you want all to stand and stretch, feel

7    free.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2              MR. BALDASSARE:  Judge, this one is on me for not

3    bringing it up sooner.  There's a lot going on.

4              We have agreed on an instruction regarding the

5    standard of care.  I was originally going to ask that it be

6    given before and after Dr. Herati's completes his testimony.  I

7    realize that as soon as he said it.

8              I'm wondering if it could be given now.

9              THE COURT:  This is on consent, this language?

10             MR. XIANG:  The language is on consent, your Honor.

11   As to timing, I'll defer to Ms. Qian.

12             MS. QIAN:  I mean, it's up to your Honor.

13             I think we can for the sake of clarity, we can just go

14   through it as we're going to be talking a lot about what are

15   medically appropriate and inappropriate practices.

16             I think the instruction can stand to wait until the

17   conclusion of that testimony.

18             THE COURT:  Would you rather me give it now?

19             MR. BALDASSARE:  Yes, because I think his whole --

20             THE COURT:  OK.

21             MR. BALDASSARE:  I think of lot of his testimony -- I

22   may come back and ask for it again, I don't know -- but I think

23   it really has to come in.  A lot of the testimony is standard

24   of care.  I mean, that is what we know it is going to be about.

25   We agreed on that language, the typed part there, the pen, and

1    we agreed on it.  I just think that --

2            Look, it's Friday, Judge.  They are going to hear

3    this.  They are going to go home over the weekend.  I think

4    it's important that they know this, because I believe that the

5    government's direction of this case is going to be this is the

6    standard of care, he deviated from it.

7            THE COURT:  Sounds like it's on consent.  I understand

8    you would have preferred I give it later.  I'm happy to give it

9    now.

10           MR. HAWRILUK:  Your Honor, if the witness can pull the

11   microphone closer to his mouth.

12           THE COURT:  Sure.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  So, folks, you are about to hear testimony

3  which will use the phrase "standard of care".  You are not

4  required to find what the standard of care is in the urology

5  setting.  If you do make such a conclusion, I instruct you that

6  a finding by you that Dr. Paduch deviated from the standard of

7  care is not, standing alone or in and of itself, sufficient to

8  establish any element of the charged offense.

9          If you find that the government has provided

10  sufficient evidence of a standard of care and that Dr. Paduch

11  deviated from it, you may consider that evidence as relevant to

12  the defendant's intent or other elements of the charged

13  offenses.

14          All right.  You may proceed.

15          I'm just going to ask you to get a little closer to

16  the mic, perhaps.

17          Thank you very much.

18          MR. BALDASSARE:  I'm having trouble hearing.  I

19  apologize.

20          THE COURT:  OK.  I've said this before, if anyone has

21  trouble hearing us or if your computers aren't working, just

22  raise your hand.  Thanks.

23          THE WITNESS:  Is this better?

24          THE COURT:  I think that's better.

25          Thank you.

 1          MS. QIAN:  Thank you, your Honor.

 2    BY MS. QIAN:

 3    Q.  Dr. Herati, before just now, we discussed what is the

 4    standard of care.

 5          My question to you now is, are you familiar with what

 6    the standard of care in the field of urology and, in

 7    particular, in the subspecialty of men's health and male

 8    infertility?

 9    A.  Yes.

10    Q.  And how are you familiar with the standard of care in this

11    field?

12    A.  I would qualify that with, through my training and my

13    experience, having gone through a fellowship and having gone

14    through conferences to understand what other urologists are

15    doing, that I have learned what the practice patterns are of

16    most urologists to understand how they practice.

17    Q.  Now, are you familiar with an organization called the

18    American Urological Association?

19    A.  Yes.

20    Q.  What is it?

21    A.  The American Urological Association is a governing body

22    that overseas urologic care, research, and they will give us

23    policy.  They will help direct things at a very high level so

24    that we, as urologists, can practice more seamlessly.

25    Q.  Are you a member of the American Urological Association?

 1    A.  I am.

 2    Q.  Are you familiar with the clinical guidelines that have

 3    been published by the American Urological Association?

 4    A.  Yes.

 5    Q.  Who are the authors on those guidelines?

 6    A.  The authors of guidelines are experts in the fields.  So it

 7    depends on what the condition is, but they will invite authors

 8    to come in based on their publications, their training, and

 9    their experience.

10    Q.  Based on your training and experience as a urologist,

11    generally speaking, what would the AUA, meaning the American

12    Urological Association, guidelines represent?

13    A.  So the guidelines represent the recommendations for how a

14    urologist should practice.

15          People can deviate from those guidelines if they think

16    that it is warranted on a case-by-case basis.  But, generally,

17    it's intended to be a framework for urologists to use in their

18    care of patients.

19    Q.  Dr. Herati, are you familiar with the concept of consent in

20    the medical context?

21    A.  Yes.

22    Q.  What is consent?

23    A.  So consent is a process of explaining what the procedure

24    is, what the benefits are, what the risks are, and allowing a

25    full discussion of alternatives to that procedure or that

1    intervention that a patient may be undergoing, and then getting

2    their written consent.

3    Q.  For what types of examinations or procedures would consent

4    typically be necessary?

5    A.  We typically get consent for anything that is more than

6    just communications.  If we're doing a procedure on a patient

7    or doing a surgery on a patient, then we have to get consent

8    for those things.

9    Q.  In your practice of treating male infertility and other

10   men's health issues, what are some typical procedures that

11   would require consent?

12   A.  So, for male infertility procedures, if we're doing

13   anything invasive, such as sticking a needle in a patient to

14   express sperm from their testicle or if we're opening their

15   scrotum to identify the testicle or there is to drain the sperm

16   from the testicle epididymis.  Those would be example

17   procedures of what would require consent.

18          For men's health, we do a number of things in the

19   office that would require consent.  We, in some cases, inject

20   the penis with a medication, and that would require consent.

21   We will take the patients to the operating room to operate on

22   their prostate, on their penis for erectile dysfunction.  All

23   those require consent.  Those are some examples.

24   Q.  Now, how much information do you need to disclose to the

25   patient regarding what will be done in order to obtain consent?

1  A.  We want the patient to be fully informed so that they can

2  make the decision, with our guidance, for what the procedure

3  is, what the risks are, the benefits, and the alternatives.

4  Q.  Now, if a patient is a minor, from whom would you obtain

5  the consent?

6  A.  If the patient is a minor, the parent or guardian.

7  Q.  Now, would both the patient and the patient's parent or

8  guardian be present during the explanation of the procedure?

9  A.  Yes.

10  Q.  And would the minor patient have an opportunity to agree or

11  deny, agree to, or deny a particular procedure?

12  A.  Yes.

13  Q.  As a physician, have you ever treated a patient anywhere

14  not in a medical clinic or at a hospital?

15  A.  No.  Well, sorry, yes.  I have taken care of two patients

16  in their house.

17  Q.  Did you say two patients?

18  A.  Two patients during my training.

19  Q.  What were those circumstances?

20  A.  One was a gentleman in his 90s who had had a recent

21  catheter placed in his lower abdomen, and because of the COVID

22  pandemic, I did not feel comfortable with him coming into the

23  clinic.  So I went to his house to exchange his catheter.

24         And the other was a patient who was discharged from

25  the hospital with incorrect tubing.  So I had to go to his

1   house and reconnect the tubing from the drainage from his

2   kidney coming out the back.

3   Q.  And were those visits documented in the medical records?

4   A.  Yes.

5   Q.  Have you ever treated a patient in your home?

6   A.  No.

7   Q.  Why not?

8   A.  I would not feel comfortable with a patient coming to my

9   house.

10  Q.  If you had treated a patient in your home, would you

11  document that in the medical records?

12  A.  Yes.

13  Q.  I'm going to now ask you some questions regarding some

14  conditions that you treat.

15          Are you familiar with the term erectile dysfunction?

16  A.  Yes.

17  Q.  What is -- well, why don't we, can you define for us

18  erectile dysfunction?

19  A.  Sure.

20          So erectile dysfunction refers to the inability to

21  obtain and/or maintain an erection sufficient for a sexual

22  performance.

23  Q.  What are the most common causes for erectile dysfunction?

24  A.  The causes can be psychological, they can be neurologic,

25  they can be vascular, they can be metabolic, they can be

1    structural.  Those are the broad categories.

2    Q.  Now, when confronted with a patient with erectile

3    dysfunction issues, what are the first steps that a urologist

4    would take to go about diagnosing the degree and cause of the

5    erectile dysfunction?

6    A.  The first part of the evaluation is to obtain a history to

7    understand when the condition started, what are the

8    circumstances that precipitated it, did it start suddenly or

9    gradually.  We want to know about what type of erectile

10   dysfunction the patient is experiencing, difficulty obtaining

11   or maintaining.  We want to know about their relationship

12   history with their partner, if that is contributing.  We want

13   to know about any psychosocial stress that could be influencing

14   the erectile dysfunction.  We will also administer

15   questionnaires as well as part of that.

16   Q.  Are there any other initial steps that you would take other

17   than obtaining a medical history?

18   A.  In addition to obtaining the medical history, we will also

19   do a focused urologic exam.

20              (Continued on next page)

21

22

23

24

25

1   Q.  Dr. Herati, earlier you testified about the AUA clinical

2   guidelines, correct?

3   A.  Correct.

4   Q.  Are aware whether the AUA has put out guidelines on the

5   diagnosis and treatment of erectile dysfunction?

6   A.  They have.

7          MS. QIAN:  Mr. Glogoff, can you please pull up for the

8   witness, the parties, and the Court only what's been marked for

9   identification as Government Exhibit 901.

10  Q.  Dr. Herati, do you recognize the document that's on your

11  screen?

12  A.  Yes.

13  Q.  What is it?

14  A.  It's the American Urological Association erectile

15  dysfunction guidelines.

16  Q.  Is this considered an authority that a urologist would rely

17  upon to determine the reasonable standard of care?

18  A.  Yes.

19  Q.  Is it widely accept authority in the urological community?

20  A.  Yes.

21  Q.  Did you rely in part on these guidelines in reaching your

22  opinions today?

23  A.  Yes.

24  Q.  Directing your attention now to guidelines statement 2 --

25          THE COURT:  Are you going to seek to admit it, or no?

 1              MS. QIAN:  Your Honor, I believe under the rules I am

 2    allowed to read from it.

 3              THE COURT:  Yes, that's true.  You may proceed.

 4    Q.  Drawing your attention now to guidelines number --

 5    statement 2 --

 6              MS. QIAN:  Mr. Glogoff, you can scroll down to, I

 7    think, the next page.

 8              THE COURT:  Just to be clear, the rule allows, if

 9    admitted, it can be read.  I don't know if you were seeking to

10    admit the entirety of the document.

11              Is there any objection to that?

12              MR. BALDASSARE:  Which exception, the learned

13    treatise?

14              THE COURT:  Exactly.  803(18) as a learned treatise or

15    periodical or pamphlet.

16              It doesn't need to be received as an exhibit into

17    evidence, but it must be admitted.

18              So just to be clear, is there any objection to the

19    admission of this portion of the document?

20              MR. BALDASSARE:  Yes, Judge.  The rule, we all just

21    looked at it.  The document --

22              THE COURT:  Fine.  You may proceed.  It will be

23    admitted, but it won't be technically received as an exhibit.

24              Please proceed.

25              MS. QIAN:  Thank you, your Honor.

1    Q.  Now, directing your attention, Dr. Herati, to guidelines

2    statement 2, it states:  For the man with ED, validated

3    questionnaires are recommended to assess the severity of ED to

4    measure treatment effectiveness and to guide future management.

5         Did I read that correctly?

6    A.  Yes.

7    Q.  What does ED stand for in this statement?

8    A.  Erectile dysfunction.

9    Q.  What is a validated questionnaire?

10   A.  Validated questionnaire are questionnaires that will assess

11   the severity of symptoms.  They will go through what's called a

12   Likert scale so that patients can self-select how severe their

13   symptoms are based on the question.

14        These questionnaires are validated, which means that

15   they have been tested, and they are reproducible, so if the

16   same questionnaire is given to a patient two different dates

17   and the condition has not changed, it will get approximately

18   the same score.

19   Q.  Now, you also testified that initial an diagnostic step

20   would involve a focused urological exam, correct?

21   A.  Um-hum.

22   Q.  Can you describe what that would consist of.

23   A.  Sure.  As part of any visit, we will assess the vital

24   signs, so I'll make sure that the patient's blood pressure,

25   heart rate are assessed.  We will do a head-to-toe evaluation

1    to see if the patient is obese.  We will look at -- after we

2    have done the general assessment, we will do a focused urologic

3    assessment, which involves the patient dropping their trousers

4    and their undergarments, and then we will look at the

5    genitalia.  We will look at the penis.  We will look at the

6    opening of the penis, called the urethral meatus, the opening

7    of the urethra, where the urine passes through.  We will

8    examine the consistency of the penis.  We will see how much

9    elasticity it has or how rigid it is, and we will feel for

10   plaques in the penis, and then we will also examine for any

11   curvature that may be present in the penis, and we will also

12   examine the scrotum to look at the consistency of the

13   testicles, the present of abnormal blood vessels that may be in

14   the scrotum called varicocele veins.  We will also assess for

15   the presence of the vas deferens, which is the tube that

16   carries the sperm from the testicle to the outside world.

17          MS. QIAN:  Mr. Glogoff, you can take off the document.

18   Thank you.

19   Q.  When you are referring to just now regarding the

20   examination of the patient's genitals region, how is a patient

21   dressed during his exam?

22   A.  So a patient will drop trousers, so they will keep their

23   shirt on, they will keep their slacks on, but they will just

24   lower their pants and undergarment.

25   Q.  When you're conducting an exam of the patient's penis, is

1  the penis flaccid or erect?

2  A.  Flaccid.

3  Q.  What is the medical reason for why the examination should

4  be conducted while the penis is in the flaccid state?

5  A.  One of the conditions that can cause erectile dysfunction

6  is a scar tissue condition called Peyronie's Disease.  With

7  that condition it's characterized by scar tissue or plaque that

8  can be felt only through a flaccid penis.  It would be very

9  unusual to feel that through a rigid penis.  You have to feel

10 the soft tissue.  If the penis is distended and rigid with an

11 erection, it can be hard to feel.  You may miss a plaque.

12         MS. QIAN:  Your Honor, may I approach the witness?

13         THE COURT:  You may.

14 Q.  Dr. Herati, I just handed you an item that's been marked as

15 Government Exhibit 3.

16         Dr. Herati, what is Government Exhibit 3?

17 A.  This is a model of the penis, the scrotum, and that's

18 basically it.  It has a prosthesis within it, and it comes from

19 a called from a company called Coloplast, which is a maker of

20 prosthetics.

21         MS. QIAN:  The government offers Government Exhibit 3.

22         MR. BALDASSARE:  No objection.

23         THE COURT:  Admitted.

24         (Government Exhibit 3 received in evidence)

25 Q.  Now, Dr. Herati, using Government Exhibit 3, can you please

1  demonstrate for us how you would go about checking for

2  Peyronie's?

3  A.  To exam for Peyronie's we will grab the head of the penis,

4  and then we will give it a stretch, and then we will run our

5  fingers in a pinching manner up and down the length of the

6  penis to feel for plaques that may be on the top half of the

7  penis, and then we will also feel for plaques on the

8  undersurface.  But we use a pinching manner to feel the full

9  length of the penis.  We will also see if there is any rigidity

10  to it or elasticity.

11  Q.  Again, this examination is conducted while the penis is in

12  the flaccid state, correct?

13  A.  Correct.

14  Q.  As you're conducting this physical exam, what is the

15  standard practice regarding glove wearing?

16  A.  For a sensitive exam -- we wear gloves for all sensitive

17  exams.

18  Q.  In addition to taking a medical history and a physical

19  exam, are there any other initial diagnostic steps that would

20  be taken?

21  A.  It depends on the severity of the patient's condition and

22  other associated findings.  In general, we will also assess a

23  testosterone level, which is a blood test.  We also may use

24  additional tests, such as an injection of the penis to

25  understand this there is a curvature condition and assess the

1   severity of the curvature condition.

2   Q.  Just now you mentioned that you may also test for a

3   testosterone level in a patient.  How is that test conducted?

4   A.  We will send a patient to the lab, and we will instruct

5   them to go to the lab and give a sample of blood before 10 a.m.

6   Q.  Based on your training and experience, as well as your

7   reading of the published literature in this area, is semen

8   analysis a medically valid way to test for a testosterone

9   level?

10  A.  No.

11  Q.  Now, based on your training and experience, are there any

12  diagnostic procedures for which a patient would need to obtain

13  an erect penis in the office?

14  A.  Yes.  So if they have the scar tissue condition called

15  Peyronie's Disease, we will want to quantify the angle

16  curvature and the degree of curvature, so we will administer an

17  injection of a medication to stimulate the erection so we can

18  objectively assess the curvature.

19       If the patients require more advanced treatment of

20  their erectile dysfunction, then we may also bring them in to

21  teach them how to either inject the penis or place a pellet in

22  their urethra to get an erection, but we will do that in the

23  office, and they will get an erection from that treatment.

24  Q.  If it become medically necessary for a patient to obtain an

25  erection for the purpose of diagnostic procedures, what are the

1   medically accepted ways for a patient to obtain an erection for

2   these procedures?

3   A.   The most common way is, we will inject a medication into

4   the side of the penis.  Those medications will work directly on

5   the blood vessels that are in the cylinders.  So on this model

6   we would inject into the sides of the penis with a very small

7   needle, a medication that would dilate the blood vessels to

8   allow the erections to occur.

9           If the patient did not want to use that method or they

10  were phobic of needles, then we can give them the option of

11  taking oral medication or self-stimulation to get to that

12  point.

13  Q.   When you say self-stimulation, what are you referring to?

14  A.   Masturbation.

15  Q.   Now, if a patient elects to self-stimulate, is there any

16  medical reason for a urologist to stay in the room while the

17  patient self-stimulates to obtain an erection?

18  A.   No.

19  Q.   Are there any medical reasons why a urologist should not

20  stay in the room while the patient self-stimulates?

21  A.   The process of getting an erection can be anxiety

22  provoking, and having a medical professional in the room can

23  add to that anxiety.

24  Q.   Have you heard of any urologist staying in the room while a

25  patient self-stimulates?

1    A.  I have not.

2    Q.  You also mentioned earlier that a common way to induce an

3    erection in the office is to provide an injection of

4    medication, correct?

5    A.  That's correct.

6    Q.  What is the injection intended to do?

7    A.  The injection introduces a medication that acts on the

8    blood vessels within the cylinders of the penis.  Those

9    medications will dilate the blood vessels, which will bring

10   more blood into the penis, expand the cylinders that are in the

11   penis, and allow an erection to occur.  By that expansion the

12   veins will also be compressed so the blood doesn't exit.

13   Q.  Was providing a patient with an injection a procedure for

14   which patient consent is required?

15   A.  Yes.

16   Q.  What typically happens after a patient is given this

17   injection?

18   A.  So after we administer the injection, we will tell the

19   patient to self-stimulate, and we will give them five to 10

20   minutes of privacy, and we will come back and reassess their

21   degree of curvature, if present, their erection, quality, and

22   characteristics.  And then also for doing an ultrasound, we

23   will do an ultrasound assessment at the baseline and at an

24   interval follow-up.

25   Q.  Are there any medical reasons for the doctor to remain in

1    the room with the patient while the injection is making its way

2    through?

3    A.   There wouldn't be a necessity for the physician to stay.

4    Q.   Now, you mentioned that the patient is often directed to

5    self-stimulate after the injection is given?

6    A.   Um-hum.

7    Q.   Are there any reasons for a doctor to manually masturbate a

8    patient, meaning stroking the patient's penis with a purpose of

9    obtaining an erection after the patient was given an injection?

10   A.   No, there would not be a necessity.

11   Q.   Are there any medical reasons why a doctor should not

12   masturbate a patient in that circumstance?

13   A.   The act of stimulating another patient's penis or genitalia

14   could be construed as a sexual act, and for that reason the

15   patient and the doctor should not engage in that type of

16   interaction or relationship.

17   Q.   Are there any medical reasons why a doctor should not

18   masturbate a patient?

19   A.   In addition to that, the urologist being in the room can

20   also add stress and anxiety for the patient, which can give

21   false positive results on the ultrasounds.

22   Q.   What does false positive mean in that context?

23   A.   If the patient has high anxiety and they don't respond to

24   the medication because their anxiety is suppressing their

25   erection, we may get to the point of diagnosing a patient as

1  having erectile dysfunction when the problem was never the

2  erectile dysfunction.  It was anxiety causing the erectile

3  dysfunction.

4  Q.  Now, what would happen if a patient cannot achieve an

5  erection after an initial injection?

6  A.  Our practice is to give another dose of the medication.

7  Q.  What if a patient is still unable to achieve an erection

8  after a second injection and after an opportunity to

9  self-stimulate?

10  A.  That would be meaningful and that would suggest that the

11  patient is incapable of achieving an erection, and that would

12  be the end of the exam.

13  Q.  Now, what may be the cause of the erectile dysfunction if a

14  patient cannot obtain an erection after two doses of injection?

15  A.  If they are unable to achieve an erection, it could be from

16  their anxiety or their having such strong negative input and

17  suppressing the erectile process.  It could also be due to

18  vascular reasons, either there is insufficient arterial flow

19  into the penis, or the veins that need to collapse to trap the

20  blood within the penis, veins are leaky and the blood is going

21  right back out.

22  Q.  Now, if a patient cannot obtain an erection, even after two

23  doses of injection and self-stimulation, would it then become

24  medically appropriate for a urologist to manually masturbate

25  the patient to assist that patient in obtaining an erection?

1    A.   No.

2    Q.   In the context of needing to induce an erection for the

3    purpose of diagnosis, are there any reasons why a doctor should

4    not masturbate a patient, even if injections fail?

5    A.   The medication is intended to stimulate the blood vessels

6    directly, and the medication is intended to work with minimal

7    stimulation.   So a patient is capable of self-stimulating to

8    the point of getting erection, and a urologist should not be

9    needed in that process.

10   Q.   Based on your training and experience, if the patient did

11   not respond to two doses of injection and self-stimulation, is

12   it likely that a doctor masturbating -- manually masturbating a

13   patient will be able to induce an erection in that patient?

14   A.   No.

15   Q.   Why not?

16   A.   If their condition is severe enough that they are not

17   responding to that medication, then it is typical beyond the

18   limits of what stimulation can achieve.

19   Q.   Would it be medically appropriate to manually stimulate a

20   patient's prostate to assist the patient in obtaining an

21   erection?

22   A.   No.

23   Q.   Again, in the context of needing to induce an erection for

24   diagnostic purposes, are there any reasons why a doctor should

25   not be stimulating a patient's prostate for the purpose of

 1   inducing an erection?

 2   A.  So the stimulation of the rectum or prostate is intended to

 3   potentially increase arousal.  But with the medication, that's

 4   bypassing the arousal step and it's going directly to the

 5   tissue of the penis.  So you are taking the arousal step out of

 6   the sexual response and stimulating the blood vessels directly.

 7   Q.  Just to clarify, where is the prostate located?

 8   A.  The prostate is located -- can I show you on this model?

 9   Q.  Absolutely.

10   A.  Behind the scrotum there is a patch of skin called the

11   perineum.  Behind the perineum is the rectum.

12   Q.  Where is the prostate?

13   A.  The prostate is located within the rectum.  So if we were

14   to use this model, it's really not a perfect model to show

15   that, but it would be within the rectal vault, on the -- it's

16   called the anterior surface or towards the front of the

17   patient.

18   Q.  How would a person stimulate the prostate?

19   A.  The prostate could be stimulated by putting a finger in the

20   rectal vault and pressing on the prostate.

21   Q.  If a patient is able to respond, meaning obtain an erection

22   due to a physician stimulating him, meaning masturbating him,

23   what is the likelihood of the patient being able to obtain an

24   erection either through self-stimulation or through the use of

25   an injection?

1    A.   The patient would likely be able to achieve that same

2    erection through self-stimulation or the injection.

3    Q.   Earlier you discussed that one of the procedures for which

4    a patient would need to obtain an erection is to assess the

5    curvature of a penis for the purpose of diagnosing a condition

6    called Peyronie's, correct?

7    A.   Correct.

8    Q.   Just to be clear on the record, what is Peyronie's?

9    A.   Peyronie's is a scar tissue condition of the two cylinders

10   that fill with blood during an erection.  If those cylinders

11   develop scar tissue, it can contract that cylinder and cause

12   curvature.

13   Q.   Earlier you had demonstrated for us the physical exam

14   conducted while the penis is in the flaccid state to assess

15   plaques, correct?

16   A.   Um-hum.

17   Q.   Approximately how long does that procedure take?

18   A.   The examination?

19   Q.   Approximately how long does the palpating of the penis

20   take, the touching of the penis take?

21   A.   A few seconds.

22   Q.   Now, once a penis has been induced to obtain an erection,

23   how do you go about examining the penis to diagnose Peyronie's?

24   A.   If the penis had a bend to it, then we have a retractor

25   that we can use to assess the angle of the curve when we will

 1   document the direction of the curve.  So we will assess the

 2   curve direction and degree of curvature.

 3   Q.  Does the diagnosis of Peyronie's at this stage require

 4   touching the penis?

 5   A.  There can be some palpation involved to determine how rigid

 6   the penis is.

 7   Q.  Can you demonstrate for us?

 8   A.  Sure.  If the penis has curvature or scar tissue, we may

 9   see if we can -- for example, if it's bending backwards, we may

10   see if we can continue to bend to see if there is a potential

11   weakness in that area, so we may palpate in that context.

12   Q.  Again, how long would this take?

13   A.  A few seconds.

14   Q.  Will the doctor's hand be gloved or ungloved during this

15   examination?

16   A.  Gloved.

17   Q.  Earlier you also mentioned a procedure called a penile

18   ultrasound.  Can you explain to us, what is a penile

19   ultrasound?

20   A.  Sure.  A penile ultrasound is a diagnostic procedure.  We

21   use an ultrasound wand to examine the penis at the baseline.

22   We will exam the tissue.  We will scan the penis, starting from

23   the base of the penis and go all the way to the tip, and we

24   will look at the consistency of the tissue and evaluate for any

25   scar tissue or plaque that would look white and have an echo

1   behind it, and also look at the blood vessels to see what the

2   blood vessels look like at a baseline.

3   Q.  Again, as you are taking that initial baseline scan of the

4   penis, what is the thing that is touching the penis?

5   A.  A probe.

6   Q.  Is the physician's hand touching the penis?

7   A.  In some cases we may rest a finger -- if the probe is here,

8   we may rest a finger on the lower abdomen to be able to

9   stabilize the probe.  But, in general, the only thing in

10  contact with the penis is the probe so that the probe can see

11  directly into the tissue.

12  Q.  Approximately how long does it take for the probe to scan

13  the penis for the baseline scan?

14  A.  The baseline scan was quick, within typically two to three

15  minutes.

16  Q.  Now, if the patient is able to obtain an erection, how

17  would a urologist then go back performing a penile ultrasound?

18  A.  Once we inject the medication, the patient has achieved an

19  erection, the first step is, we will assess the degree of

20  rigidity, which is a subjective assessment.  We will assess for

21  curvature.  And then we will scan the penis at different

22  phases, so this would be the base of the penis, this would be

23  the middle, and this would be what's called the distill tip or

24  the furthest point, and we will scan at one location to assess

25  the diameter of the blood vessels in the penis, and we will

1    assess the speed of blood flow through there as well.

2    Q.   What is the purpose of a penile ultrasound.  What is it

3    intended to study?

4    A.   The penile ultrasound can be used to identify structural

5    deformities, such as scar tissue.  It can also look at the

6    degree of stiffness of the tissue.  One of the main reasons

7    that we use it for is to study the blood vessels and the flow

8    of the blood vessels, especially with stimulation with the

9    medication that would dilate the blood vessels.

10   Q.   Earlier you said that one of the things that you would do

11   after a patient obtains an erection for the purpose of the

12   penile ultrasound is to assess the rigidity of the erection,

13   and that that would be a, quote, subjective assessment.

14            What does that mean?

15   A.   We will look at two things.  We will look at the degree of

16   rise, what's called tumescence, so we will be able to assess

17   how much of a rise there is with the erection.  Also, we can

18   see if the penis will buckle with the limited movement.  If the

19   penis is strong, it doesn't move, it has a fully rigid

20   erection.  If the penis bends, that may be a partial erection.

21   Q.   Can you demonstrate, again, the bend test?

22   A.   Yes.  I can inflate this to a full rigid erection.  Is that

23   OK?

24   Q.   Please do.

25   A.   This would be a partial erection.  So if this was, let's

1   say, a 30 percent tumescence, meaning it's only a third of the

2   way up, it can also have some bendability to it.  But if the

3   penis was fully rigid, then it would have 100 percent

4   tumescence and have a full rise, and it wouldn't be able to

5   buckle in that way.  A few more pumps will get it there.  It

6   doesn't bend when I put pressure on it.  We can use that as a

7   subjective assessment to understand how strong the erection is.

8   Q.  Approximately how long is a physician's hand in contact

9   with the penis in order to determine whether it bends?

10  A.  A few seconds.

11  Q.  Now, is there any medical reason why a doctor would need to

12  see the penis ejaculate for the purpose of a penile ultrasound?

13  A.  No.  That could actually disrupt the study because

14  ejaculation will end the sexual response cycle and it will

15  cause constriction of the blood vessels.  We want to study how

16  the blood vessels respond to the medication.  If they

17  ejaculate, that could cause false negative results.

18  Q.  We are moving off of penile ultrasounds now.

19       Is there any medical reasons why a urologist

20  diagnosing a patient with erectile dysfunction only, meaning no

21  other symptoms, any medical reason for that urologist to

22  perform a rectal exam on the patient?

23  Q.  Now, in what circumstances, if any, would it be medically

24  appropriate for a patient with erectile dysfunction to receive

25  a rectal exam?

1    A.  In many cases men presenting with erectile dysfunction are

2    of an age where they also have enlarged prostate or BPH.  In

3    those cases we will do that as part of the examination for

4    screening for prostate cancer.  If they have urinary symptoms,

5    where they have got burning with urination, weak stream,

6    incomplete emptying, frequency and urgency of urination, and we

7    think that they may have a condition called prostatitis, which

8    is inflammation of the prostate, then we can do a rectal exam

9    to see if the prostate is tender because that inflammation of

10   the prostate can also cause erectile dysfunction.

11   Q.  When you say that people of a certain age may have enlarged

12   prostates, so a rectal exam may be necessary, what is that age,

13   approximately?

14   A.  Large prostate or BPH increases per decade of life, but we

15   start seeing it by the fourth or fifth decade.

16   Q.  Meaning a person in their forties or fifties?

17   A.  Forties or fifties, yes.

18   Q.  If a rectal exam is necessary, how would that be conducted?

19   A.  So there are two ways we are taught in the medical field to

20   perform it.  Either the patient is in what's called the lateral

21   decubitus position, which means that they are on their side

22   with their knees tucked up to their chest.  That will allow the

23   urologist easy access to reach the rectum where they can then

24   feel the prostate, or we have the patient drop trouser, lean

25   over the table with the bend at the hip, and to keep their legs

1   underneath them, and then we will feel the prostate at that

2   point.

3   Q.   Approximately how fast is this exam?

4   A.   Two to three minutes.

5   Q.   Is there any medical need for the patient to be erect

6   during a rectal exam?

7   A.   No.

8   Q.   I am going to now ask you some questions regarding the

9   treatment of erectile dysfunction.

10          THE COURT:  Let me know whenever you think we should

11  take our afternoon break.  Just let me know.

12          MS. QIAN:  This might be a good time.

13          THE COURT:  Why don't we do that.

14          Remember, folks, keep an open mind and don't discuss

15  the case.

16          (Jury not present)

17          THE COURT:  Does 10 minutes work?

18          (Recess)

19          THE COURT:  Are we ready for the jury?

20          (Jury present)

21          THE COURT:  You may proceed.

22          MS. QIAN:  Thank you, your Honor.

23  Q.   Before the break, Dr. Herati, I was going to start asking

24  you some questions regarding the treatment for various types of

25  erectile dysfunction.

1          Now, if your diagnosis that the erectile dysfunction

2     is psychological in nature, what would be the medically

3     appropriate course of treatment?

4     A.   Part of the treatment is education, so we will educate the

5     patient on what psychogenic erectile dysfunction is.  We will

6     help them understand that a lot of their symptoms are related

7     to stress, anxiety, and it may not be anxiety that they may

8     think that -- it is typically anxiety, which is what people

9     always think is a racing heart or beads of sweat, but it can be

10    subconscious anxiety.

11         We can also offer them some therapies as a mental

12    crutch or placebo effect, but the most effective therapy is to

13    refer them to a sex therapist or psychologist.

14    Q.   You mentioned the word psychogenic erectile dysfunction.

15    What does the word psychogenic means?

16    A.   Psychogenic refers to inhibition of the arousal center of

17    the brain that is responsible for starting the process of

18    getting an erection.  When there is inhibition coming from

19    different parts of the brain, it can stop the nerves that are

20    responsible from signaling from the arousal center to the

21    spinal cord and then out to the genitalia.  What it would

22    present with would be a patient who has normal erections with

23    self-stimulation, but has abnormal erections for sexual

24    intercourse or sexual performance.

25    Q.   When you say that a urologist may prescribe some therapy as

1   a, quote, mental clutch, what are you referring to with the

2   words therapy in that?

3   A.   What I'm referring to in that is Viagra or Cialis.

4   Patients often get the prescription, they will leave the pill

5   bottle by their bedstand, and they won't turn to it.  But as

6   long as they know that they have it, they have confidence that

7   they can have intercourse.

8   Q.   Just briefly, what is Viagra or Cialis?

9   A.   So those drugs belong to a family of drugs that are called

10  Phosphodiesterase 5 Inhibitors.  And what that enzyme does is

11  it breaks down one of the substrates that's responsible for

12  creating dilation of the blood vessels.  By inhibiting that,

13  breakdown of that compound, you keep the your blood vessels

14  dilated longer.

15  Q.   What is the purpose of someone taking Viagra or Cialis?

16  A.   People who take Viagra and Cialis are benefiting from the

17  fact that the blood vessels will stay dilated longer when the

18  erection is dissipating due to the supply what's called nitric

19  oxide.  If they are low on nitric oxide, that could potentiate

20  or increase the activity of nitric oxide.

21  Q.   You mentioned towards the end of your answer that there

22  might be a different type of therapy that would be more

23  beneficial, correct.  What is that therapy?

24  A.   For psychogenic erectile dysfunction, a sex therapist or

25  sex psychologist has been shown in studies to achieve a better

1    response than medication alone.

2    Q.  Now, what is the difference in training between a sex

3    therapist or a sex psychologist and a urologist?

4    A.  So a sex therapist or sex psychologist has psychology

5    training.  They can work with patients on their depression,

6    their anxiety, and their behavioral approaches to sexual

7    dysfunction.  A urologist is trained on the medical and

8    surgical aspects of its management.

9    Q.  Are urologists trained in psychology or sufficiently

10   trained in psychology to be able to manage psychogenic erectile

11   dysfunction on their own?

12   A.  We have very basic training.

13   Q.  Now, based on your training and experience, would practice

14   obtaining an erection help a patient suffering from psychogenic

15   erectile dysfunction?

16   A.  If obtaining erections on a more regular basis can help

17   them overcome their anxiety, it's possible.  However, the

18   patients that have psychogenic erectile dysfunction often have

19   situational erectile dysfunction, and the practice would need

20   to be in the area that they are having problems.

21   Q.  So, typically, if practice is warranted at all, where

22   should it be done?

23   A.  In the privacy of the patient's home.

24   Q.  Would it ever be medically appropriate for a urologist to

25   masturbate a patient to help that patient practice obtaining an

1    erection?

2    A.   No.

3    Q.   Are there any reasons why a urologist should not be part of

4    a patient's erection practice?

5    A.   Two reasons.  One, the introduction of a urologist or

6    medical professional in that process can introduce anxiety, and

7    that can suppress the erection, and the second is that would be

8    considered a sexual act on a patient.

9    Q.   Earlier you had mentioned prescribing Cialis or Viagra to

10   treat psychogenic erectile dysfunction, correct?

11   A.   Correct.

12   Q.   Are you also familiar with the term psychotropic drugs?

13   A.   Yes.

14   Q.   Is that term defined?

15   A.   Psychotropic drug refers to a medication that alters the

16   chemistry of the mind.

17   Q.   Is clonazapem a type of psychotropic drug?

18   A.   Yes.

19   Q.   What does clonazapem do?

20   A.   It belongs to the family of medications called

21   benzodiazepines, and it has an inhibitory effect.

22   Q.   Inhibiting what?

23   A.   Inhibiting stress, anxiety.

24   Q.   Is Valium a type of psychotropic drug?

25   A.   Yes.

1    Q.  Again, what does Valium do?

2    A.  It's also a member of the benzodiazepine family.

3    Q.  How does it alter a brain's chemistry?

4    A.  So the medications that are benzodiazepines have what's

5    called a GABAergic effect, and GABAergic has an inhibitory

6    effect on the nerves that they are working on.

7    Q.  In practice what does that mean?

8    A.  It inhibits nerve excitation or nerve signal.

9    Q.  Would it be medically appropriate for a urologist to

10   prescribe clonazepam to treat psychogenic erectile dysfunction?

11   A.  That is not my practice nor the practice of urologists that

12   I know.

13   Q.  Would it be medically appropriate for a urologist to

14   prescribe Valium to treat psychogenic erectile dysfunction?

15   A.  Also not my practice or any urologist that I know.

16   Q.  Are there any reasons why you do not prescribe clonazepam

17   or Valium to treat psychogenic erectile dysfunction?

18   A.  I don't have sufficient training in psychology or

19   psychiatry to manage the adverse effects and drug interactions

20   that can potentially come with long-term use of those drugs.

21   Q.  Who would have sufficient training to be able to prescribe

22   psychotropic medication to treat psychogenic erectile

23   dysfunction?

24   A.  Psychiatrists and psychologists have the adequate training.

25   Q.  Do doctors have additional due-diligence requirements that

1    they must conduct or meet on an ongoing basis before they can

2    prescribe psychotropic medication?

3    A.  Yes.  As part of that process, when we are discussing

4    treatment options with patients an option like that is

5    discussed or offered.  We will review a list of all the

6    medications that a patient is taking to make sure that they are

7    not getting a similar medication or a medication that may

8    potentially conflict.

9    Q.  What must a doctor do as the patient is taking psychotropic

10   medication?

11   A.  So members of the benzodiazepine family are controlled

12   substances, so we need to see the patient every six months and

13   assess their treatment response before we can continue the

14   medication.

15   Q.  Now, based on your training and experience, can erectile

16   dysfunction be caused by incorrect masturbation technique by

17   the patient?

18   A.  In rare circumstances it can.

19   Q.  Can you describe for us those rare circumstances.

20   A.  Sure.  If a patient breaks their penis, that would be a

21   surgical emergency and that can lead to long-term erectile

22   dysfunction.  And in some cases a blood vessel can also be

23   ruptured between the cylinders of the penis and the top half of

24   the penis.  If that happens, that can introduce scarring that

25   would then become what is called Peyronie's Disease.

1   Q.  If a patient says that they are generally stroking their

2   penis in an up-and-down fashion, is there such a thing as a

3   correct angle or incorrect angle?

4   A.  Not to my knowledge.

5   Q.  Is there such a thing as correct hand or finger placement

6   versus incorrect hand or finger placement?

7   A.  Not to my knowledge.

8   Q.  Is there such a thing as correct frequency versus incorrect

9   frequency?

10  A.  We have frequencies that we use for vibratory stimulation

11  if we are trying to stimulate ejaculation, but for the purposes

12  of masturbation, no.

13  Q.  For the purposes of masturbation?

14  A.  No.

15  Q.  Based on your training and experience, would it be

16  medically appropriate for a urologist to observe how a patient

17  masturbates to make sure that they are doing it correctly?

18  A.  No.

19  Q.  So then how would a urologist be able to diagnose a patient

20  who may be incorrectly masturbating?

21  A.  We can elicit that information through a history.

22  Q.  If a urologist believes that a patient's erectile

23  dysfunction is a result of incorrect masturbation, what would

24  be the medically appropriate treatment?

25  A.  If we think that their problem is from incorrect

1  masturbation, that would be a behavioral problem, and we can

2  refer them to a sex therapist or psychologist to review the

3  behavioral aspects.

4  Q.  Would it ever be appropriate for a urologist to manually

5  masturbate a patient to teach the patient proper masturbation

6  skills?

7  A.  No.

8  Q.  Are there any reasons why a doctor should not be

9  demonstrating masturbation on a patient?

10  A.  The primary reason why a urologist should not be doing that

11  is because that would be a sexual act on a patient.

12  Q.  You said that was the primary reason.  Are there other

13  reasons?

14  A.  Another reason is, the introduction of a physician or

15  urologist can introduce anxiety for the patient, and that can

16  make that whole process uninterpretable.

17  Q.  Would it be ever appropriate for a urologist to masturbate

18  himself to demonstrate proper masturbation skills to a patient?

19  A.  No.

20  Q.  Are there any reasons why a urologist should not be

21  demonstrating masturbation on himself?

22  A.  That would be inappropriate exposure, and a urologist or

23  physician should never expose themself to a patient.

24  Q.  Are you familiar with the term Fleshlight?

25  A.  Yes.

1    Q.   What is it?

2    A.   A Fleshlight is a cylindrical device that men use for

3    masturbation.

4    Q.   Have you ever seen one?

5    A.   No.

6    Q.   Based on your training and experience, could it ever be

7    medically appropriate for a urologist to prescribe or recommend

8    the use of Fleshlight to treat psychogenic erectile

9    dysfunction?

10   A.   There are potential benefits to that if a patient uses that

11   at home.

12   Q.   Are you aware of any urologist who actually prescribes or

13   recommends the use of a Fleshlight to patients with psychogenic

14   erectile dysfunction?

15   A.   No.

16   Q.   If a patient's erectile dysfunction is structural, would

17   masturbation help -- would more frequent masturbation help to

18   treat those structural issues?

19   A.   No.

20   Q.   Why not?

21   A.   If the problem is structural, then it's a scar tissue

22   condition and that is the reason for their erectile

23   dysfunction.  More frequent stimulation would not reverse or

24   correct that.

25   Q.   So would a doctor manually masturbating a patient who has

1    structural erectile dysfunction be helpful to that patient?

2    A.   There should not be any benefit.

3         Can I expand on that point?

4    Q.   Absolutely.

5    A.   There are stretches that we do for the treatment of

6    structural conditions.  There is something called penile

7    modeling, where we will bend the penis in the opposite

8    direction in an erect state or recommend that a patient do

9    that.  And that's an exercise a patient will then do at home to

10   correct the structural condition, but it's not masturbation.

11   It's just a bend.

12   Q.   Using Government Exhibit 3, can you demonstrate what that

13   bending technique is.

14   A.   Sure.  We will tell patients who have the structural

15   abnormality called Peyronie's, it is three times a day we want

16   their penis to be on maximum stretch and held there for 30

17   seconds.  So they will grab the head of the penis and give it a

18   full stretch and hold it in that stretched position for 30

19   seconds.  When they have an erection, if their penis was curved

20   upwards, we will tell them to bend it the opposite direction as

21   much as they can tolerate, hold it in that position for 30

22   seconds.

23   Q.   Thank you.

24        Earlier you mentioned one of the common causes of

25   erectile dysfunction is neurologic?

1    A.  Correct.

2    Q.  What does that mean?

3    A.  Neurologic erectile dysfunction refers to abnormal nerve

4    signals going to the penis through what are called the

5    parasympathetic nerves.  Those are the nerves that initiate the

6    erection.

7    Q.  Would manually stimulating or masturbating a patient who

8    has neurologic erectile dysfunction be helpful to that patient?

9    A.  The data would not support that.

10    Q.  Why is that?

11    A.  If the problem is neurologic, the problem is oftentimes

12    further beyond the penis.  It is at the level of the prostate.

13    In men who have had their prostate removed as part of a

14    prostatectomy, prostate removal surgery as part of their

15    bladder removal surgery, or if they have had any injury to

16    their spinal cord and stimulation of the genitalia will not

17    affect or benefit that.

18    Q.  Now, you also mentioned earlier that another cause, common

19    cause of erectile dysfunction is vascular, correct?

20    A.  Correct.

21    Q.  What does vascular erectile dysfunction mean?

22    A.  So vascular erectile dysfunction means one of two things or

23    a combination.  It's insufficient arterial flow, meaning the

24    arteries that feed the genitalia have plaques with them called

25    atherosclerosis and that limits the blood flow to the penis, or

1    the veins that are in the penis are not collapsing with an

2    erection the way that they should collapse, and the blood will

3    exit out those veins.

4    Q.  Would manually masturbating a patient who has vascular

5    erectile dysfunction be helpful to that patient?

6    A.  No.  For the same reasons that would not help a patient

7    with neurologic erectile dysfunction.  The problem is a

8    systemic problem, and their blood vessels are blocked further

9    back than their penis.

10   Q.  Earlier you also mentioned metabolic erectile dysfunction.

11   What is metabolic erectile dysfunction?

12   A.  So metabolic erectile dysfunction refers to, most commonly,

13   diabetes.  So when people have elevated blood sugar levels, the

14   blood sugar would not allow the cells that are in the lining of

15   the blood vessels to continue to release nitric oxide that is

16   needed to keep the blood vessels dilated, to keep the erection

17   going, so it can suppress the initiation and the maintenance of

18   the erection.

19   Q.  Now, would manually masturbating a patient with metabolic

20   erectile dysfunction be helpful to that patient?

21   A.  No.

22   Q.  And why is that?

23   A.  The problem intrinsic to metabolic is not going to be

24   overcome by masturbation.

25   Q.  Based on your training and experience, are the diagnostic

1    tests for erectile dysfunction any different for minor patients

2    who have erectile dysfunction?

3    A.   Similar diagnostic procedures can be done to minors.

4    Q.   Based on your training and experience, are the treatments

5    for erectile dysfunction any different for minor patients who

6    have erectile dysfunctions?

7    A.   Similar options can be offered to minors.

8    Q.   Are there any special precautions when it comes to

9    diagnosing or treating minors with erectile dysfunction?

10   A.   The special precautions that one would need to be mindful

11   of, the parent or guardian needs to be present during that

12   conversation, and the nature of the condition also needs to be

13   considered.  The patients often have psychogenic erectile

14   dysfunction, but they may have organic erectile dysfunction as

15   well due to structural, metabolic, or hormone deficiencies.

16   Q.   Earlier you had mentioned some procedures for a diagnosis

17   of erectile dysfunction that requires a patient to obtain an

18   erection, correct?

19   A.   Correct.

20   Q.   Now, how, if at all, different are those procedures done on

21   a minor patient?

22   A.   They are done in a similar way.  Because we don't expect

23   them to have plaques within blood vessels due to

24   atherosclerosis, they often need less medication.  If we do any

25   sort of diagnostic procedure, it is done with a parent or

1    guardian in the room or an observer -- a chaperone, rather.

2    Q.  As I understand it just now, you are saying that the

3    difference is that you need to have a parent or a guardian or

4    some other chaperone in the room for the procedure, is that

5    correct?

6    A.  Correct.

7    Q.  Now, for how long has the need for a parent, guardian, or

8    other chaperone been required during the time that you've been

9    practicing medicine?

10   A.  As long as I've been in practice.

11   Q.  How long has that been?

12   A.  Since 2010.

13   Q.  Now, if a minor patient does not want their own parent or

14   guardian in the room for privacy reasons, what is the standard

15   of care for how to proceed in that circumstance?

16   A.  We will bring in a chaperone into the room.

17   Q.  Can a minor opt out of having any chaperone at all?

18   A.  No.

19   Q.  Now, would it be medically appropriate for a urologist to

20   be more involved in a minor's masturbatory practices?

21   A.  I'm sorry.  Can you repeat the question.

22   Q.  Sure.  Would it be medically appropriate for a urologist to

23   be more involved in a minor's masturbatory practices?

24   A.  No.

25   Q.  Why not?

1  A.  That would be behavioral intervention, and that would be

2  something that the sex therapist or psychologist can discuss

3  with the patient.

4  Q.  Are there any reasons why a urologist should not

5  demonstrate masturbation on a minor patient?

6  A.  That would be considered a sexual act on a patient.

7  Q.  Any other reasons why?

8  A.  It can also introduce anxiety in the patient.

9  Q.  I am going to now turn our focus to a different disorder.

10        Are you familiar with the term ejaculatory

11  dysfunction?

12  A.  Yes.

13  Q.  What is ejaculatory dysfunction?

14  A.  So, ejaculatory dysfunction is a range of conditions.  It

15  can encompass either no ejaculation, premature ejaculation, or

16  delayed ejaculation.

17        MS. QIAN:  Mr. Glogoff, can you please pull up for the

18  witness, the parties, and the Court only what's been marked for

19  identification as Government Exhibit 902.

20  Q.  Dr. Herati, do you recognize this document?

21  A.  Yes.

22  Q.  What is it?

23  A.  It's the American Urological Association guidelines on

24  disorders of ejaculation.

25  Q.  Is this an authority that a urologist relies on to

1  determine their reasonable standard of care for the treatment

2  and diagnosis of ejaculative dysfunctions?

3  A.  Yes, it is.

4  Q.  Is it a widely accepted authority in the urological

5  community?

6  A.  Yes.

7  Q.  Did you rely in part on these guidelines in reaching your

8  opinions today?

9  A.  Yes.

10         MS. QIAN:  The government offers to admit, but not to

11  publish, Government Exhibit 902.

12         THE COURT:  Any objection?

13         MR. BALDASSARE:  No objection.

14         THE COURT:  You may proceed.

15  Q.  Dr. Herati, I am going to direct your attention to the list

16  of authors here.

17         Do you see Darius Paduch listed as an author?

18  A.  Yes.

19  Q.  I will turn your attention to page 2 of this document.

20  Under guidelines statement number 1 it reads:  Lifelong

21  premature ejaculation is defined as poor ejaculatory control

22  associated bother, and ejaculation within about two minutes of

23  initiation of penetrative sex that has been present since

24  sexual debut.

25         Did I read that correctly?

1    A.   Yes.

2    Q.   I am now also going to read guidelines statement 2, which

3    says:  Acquired premature ejaculation is defined as

4    consistently poor ejaculatory control, associative bother, and

5    ejaculation latency that is markedly reduced from prior sexual

6    experience during penetrative sex.

7             Did I read that correctly?

8    A.   Yes.

9             MS. QIAN:  You can take this down, Mr. Glogoff.

10   Q.   The condition of premature ejaculation is concerned with

11   the length of time to ejaculate in what types of settings?

12   A.   Sexual performance.

13   Q.   Is the conditions of premature ejaculation concerned with

14   the length of time to ejaculate in a medical setting?

15   A.   No.

16   Q.   Why not?

17   A.   The definition relies on sexual performance, sexual

18   intercourse, masturbation, any sexual act, but not in the

19   office setting.

20   Q.   Based on your training and experience, as well as the AUA

21   guideline on the diagnosis and treatment of ejaculatory

22   dysfunction, how would a urologist go about diagnosing

23   premature ejaculation?

24   A.   The diagnosis is made similar to erectile dysfunction.  We

25   obtain a history, and we use validated questionnaires to assess

1    how long it takes a patient to reach climax.

2    Q.   Any other diagnostic tools?

3    A.   There are some additional diagnostic tools that we can use

4    if a patient has delayed or absent ejaculation.

5    Q.   Focusing right now just on premature ejaculation, would an

6    initial diagnostic step include a physical exam at all?

7    A.   Yes.

8    Q.   What would that physical exam consist of?

9    A.   We would evaluate the sensitivity -- we will do a focused

10   exam on the genitalia.  We will again look at the structure of

11   the penis to determine if there are any abnormalities with scar

12   tissue or anything that could indicate a coexisting diagnosis

13   of erectile dysfunction.  We would also look at the scrotum to

14   assess for consistency of the testicles, the blood vessels.

15   Q.   Are there any differences in the way you conduct a physical

16   exam to diagnose a patient with erectile dysfunction versus

17   ejaculatory dysfunction?

18   A.   It would be similar.

19   Q.   Now, do the guidelines suggest anywhere that to diagnose

20   premature ejaculation a urologist should observe in the office

21   how long it takes for a patient to ejaculate?

22   A.   No.

23   Q.   Why should a urologist not do that?

24   A.   The diagnosis is made based on how long it takes for a

25   patient to reach ejaculation and their performance of sexual

1    activity with a partner or during self-stimulation at home.

2    Q.  Are there any scientific reasons or medical reasons why it

3    would not be helpful for a doctor to observe a patient's

4    ejaculatory process in the office to diagnose premature

5    ejaculation?

6    A.   Introduction of anxiety or stress on the patient can alter

7    the results and make the history taking more difficult to

8    discern.

9    Q.  Would it be medically appropriate to diagnose premature

10   ejaculation by calculating the length of time a patient takes

11   to ejaculate while being stimulated by a penile vibrator?

12   A.   No.

13   Q.  Why not?

14   A.  The diagnosis depends on the sexual performance.  It would

15   not be tied to the vibrator.

16   Q.  I will ask you some more questions about penile vibrators

17   at a later point.

18            For now, focusing just on premature ejaculation, what

19   are some causes for premature ejaculation?

20   A.  The causes can include neurologic reasons.  So if a patient

21   has an imbalance in terms of how much, what's called dopamine,

22   which is a nerve transmitter, or oxytocin, those imbalances can

23   lead to premature.  If the nerves that are going to the

24   genitalia are hypersensitive, that can also lead to premature

25   ejaculation.  Then in a subset of guys, when they have

1    coexisting erectile dysfunction, they may try to speed up the

2    process of reaching climax so they can complete ejaculation

3    before their erection is lost.

4    Q.   Now, you mentioned just now one of the causes for premature

5    ejaculation is potentially hypersensitivity of the penis,

6    correct?

7    A.   Correct.

8    Q.   How would a urologist go about measuring whether a person

9    suffers from hypersensitivity?

10   A.   We have a test that can assess vibratory sensation.  It's

11   called a biothesiometer.  And using this device we can assess

12   when a patient feels the vibration of a device that looks like

13   a pencil placed on the penis.  So we will increase the

14   frequency of vibration until the patient feels the vibration.

15   If they feel it earlier than expected, that can determine the

16   hypersensitivity.

17   Q.   While a urologist uses a biothesiometer on a patient, is

18   the patient awake, is the patient -- are their eyes opened?

19   Are their eyes closed?  What is the state of the patient?

20   A.   The patient has to be awake to report when they feel the

21   vibration, and we will increase the amplitude or increase the

22   dial of our biothesiometer until a patient reports that they

23   can feel the vibration, but they typically cannot see what the

24   gauge is.

25   Q.   They cannot see the gauge.

1    A.   They cannot see the gauge.

2    Q.   How perceptible is the amount of vibration on a

3    biothesiometer?

4    A.   We increase the dial until the vibration is barely

5    perceptible.

6    Q.   You said barely perceptible?

7    A.   Correct.

8    Q.   Is it possible for a patient to mistake a biothesiometer

9    probe with a penile vibrator?

10   A.   No.

11   Q.   Why not?

12   A.   A biothesiometer probes looks like a pencil and the

13   vibration that comes through it is minute.  A penile vibrator

14   has a handle that will hit the penis at a set frequency and

15   amplitude.

16   Q.   Is it possible for a person to ejaculate from the use of a

17   biothesiometer?

18   A.   Not to my knowledge.

19   Q.   Can premature ejaculation be caused in part by

20   psychological factors?

21   A.   Yes.

22   Q.   If the patient's premature ejaculation is psychological in

23   part, what would be appropriate treatments?

24   A.   One option is to refer them to a psychologist or a sex

25   therapist to practice behavioral interventions to try to stop

1    the ejaculatory process.

2    Q.   Now, would practice masturbating and ejaculating be

3    medically appropriate treatment for a premature ejaculation?

4    A.   It could in a subset of patients.

5    Q.   What is that subset?

6    A.   There are some patients who at the beginning of their

7    sexual debut, they do not know how to inhibit the sexual

8    response.  With more practice and more stimulation, they could

9    potentially learn to inhibit the process more.

10   Q.   In that subset of patients who are suffering from

11   psychological premature ejaculation, where should the practice

12   occur?

13   A.   At home.

14   Q.   Is there any medically appropriate reason for the practice

15   of masturbating and ejaculating occur in the office?

16   A.   No.

17   Q.   Any medical reason for a urologist to be present while the

18   patient is practicing masturbating and ejaculating?

19   A.   No.

20   Q.   Any reasons why they should not be in the room?

21   A.   It can introduce anxiety and stress for the patient.

22   Q.   Any medical reasons why a urologist should be assisting the

23   patient in masturbating or ejaculating for the purpose of

24   practicing for a patient who is suffering from psychological

25   ejaculatory dysfunction?

1  A.  A urologist assisting in that process could be construed as

2  sexual misconduct or a sexual act on a patient.

3  Q.  Any other reasons why it would be inappropriate?

4  A.  The ultimate goal of seeing the physician is to get help so

5  the patient can have more independence and freedom from their

6  condition at home.  So what we want to do is to get the patient

7  be able to have the ability to reach ejaculation in a desirable

8  way on their own.

9  Q.  Now, if the premature ejaculation is neurologic in nature,

10 would practice masturbating and ejaculating help in that

11 circumstance?

12 A.  It would not.

13 Q.  And if the premature ejaculation is due to hypersensitivity

14 in the penis, would practice masturbating and ejaculating help?

15 A.  I would not expect it to help.

16 Q.  I am going to direct your attention now to delayed

17 ejaculation.

18        MS. QIAN:  Mr. Glogoff, if we can please pull up for

19 the witness, the parties, and the Court only what's been marked

20 for identification as Government Exhibit 902.  You can go to

21 page 5 of that exhibit.

22 Q.  Dr. Herati, I am going to direct your attention to

23 statement 16 and 17.

24        I will read guidelines statement number 16:  Lifelong

25 delayed ejaculation is defined as lifelong, consistent,

1   bothersome inability to achieve ejaculation or excessive

2   latency of ejaculation despite adequate sexual stimulation and

3   the desire to ejaculate.

4           Statement number 17 reads:  Acquired delayed

5   ejaculation is defined as an acquired consistent, bothersome

6   inability to achieve ejaculation or an increased latency of

7   ejaculation, despite adequate sexual stimulation and the desire

8   to ejaculate.

9           Did I read those two statements correctly?

10  A.  You did.

11  Q.  Now, the condition of delayed ejaculation is concerned with

12  the length of time to ejaculate in what types of settings?

13  A.  This would be during sexual activity or sexual performance.

14          MS. QIAN:  Mr. Glogoff, you can take down Government

15  Exhibit 902.

16  Q.  Do the guidelines suggest anywhere that to diagnose delayed

17  ejaculation a urologist should observe in the office how long

18  it takes for a patient to ejaculate?

19  A.  They do not mention that.

20  Q.  Are there any scientific reasons why it would not be

21  helpful for a doctor to observe a patient's ejaculatory process

22  in the office for the purpose of diagnosing delayed

23  ejaculation?

24  A.  Introducing the urologist or a physician could add stress

25  and anxiety, and that can be a cause of delayed ejaculation, so

1    it could give you a false positive test.

2    Q.   What are some causes for delayed ejaculation?

3    A.   There are many causes.  Some of the causes are neurologic.

4    So in the same way that premature is caused by an abundance of

5    dopamine oxytocin, the abundance of serotonin or GABAergic

6    neurotransmitters can lead to suppression and that can

7    sometimes be caused by medications that patients are taking.

8         Other reasons that one can have delayed ejaculation,

9    if there is a spinal cord injury, then that can lead to a

10   delay.  Or if the nerves that are responsible for sensing the

11   sensation of touch to the penis are affected through a scar

12   tissue condition called Peyronie's or from a surgery that would

13   affect their transmission, then the signal will not go from the

14   penis to the spinal cord to stimulate the ejaculatory reflex.

15   Q.   Now, would practice masturbating and ejaculating be

16   medically appropriate treatment for delayed ejaculation?

17   A.   If their delay is due to anxiety and stress and performance

18   anxiety specifically, then more frequent practice could

19   potentially help.

20   Q.   Where should that practice be conducted?

21   A.   At home.

22   Q.   Would there be a medical reason to conduct that practice in

23   the office?

24   A.   No.

25   Q.   I'm sorry.  In the medical office, to be clear.

1  A.  No.

2  Q.  Is it ever medically appropriate for a urologist to assist

3  the patient in practicing masturbating and ejaculating for the

4  purpose of treating of delayed ejaculation?

5  A.  Not for that purpose.

6  Q.  Is it ever medically appropriate for a urologist to use a

7  device such as a penile vibrator to help a patient with delayed

8  ejaculation to achieve ejaculation?

9  A.  Yes.

10  Q.  What are those circumstances?

11  A.  In some cases, men who have diminished nerve sensation, by

12  using the penile vibrator, they can have increased signal.

13  They can stimulate more of the nerves and get a stronger signal

14  to go back to the spinal cord, so we can teach the patients how

15  to use that so they can do that at home.

16         MS. QIAN:  Mr. Glogoff, can you please pull up on the

17  screen for the parties, the witness, and the Court only what's

18  been marked for identification as Government Exhibit 501 and

19  502 side by side.

20  Q.  Dr. Herati, do you recognize the items depicted in these

21  images?

22  A.  Yes.

23  Q.  What are they?

24  A.  So on the left hand, that's the Ferticare 2.0.  That's a

25  single-paddle penile vibrator.  Then on the right side, that's

1    the Viberect, also a penile vibrator, with two paddles.

2            MS. QIAN:  The government offers Government Exhibits

3    501 and 502.

4            THE COURT:  Any objection?

5            MR. BALDASSARE:  No objection.

6            THE COURT:  Admitted.

7            (Government Exhibits 501 and 502 received in evidence)

8            MS. QIAN:  May we publish?

9            THE COURT:  Yes.

10   Q.  Dr. Herati, can you explain the scientific basis for how

11   these devices work.

12   A.  Sure.  The paddle -- if we look at the left picture, the

13   white circle on that is the vibrating paddle.  On the ends of

14   the device we can adjust the amplitude and the frequency that

15   that paddle vibrates.  We would put the paddle on either the

16   head of the penis or under the head of the penis where the

17   nerves are most dense, and we would dial the device until the

18   patient is capable of reaching climax.

19   Q.  Using Government Exhibit 502, how would that device work?

20   A.  This is a sandwich model where the two vibrating paddles

21   are placed on the top and bottom of the head of the penis.  It

22   stimulates both sets of nerves at the top and bottom surface.

23   Q.  Earlier you said that one of the medically appropriate ways

24   for a urologist, reasons for a urologist to use a penile

25   vibrator is to help a patient with diminished nerve sensation,

1    correct?

2    A.   Correct.

3    Q.   Now, are the patients typically told to use these devices

4    at home by themselves or with the assistance of a doctor?

5    A.   What we typically do is, we bring the patient in.  If they

6    are not sure how to use the device, where to put the paddle, we

7    will do a teaching.  So we will have them come in, show them

8    where the paddle is placed, and then they will continue that

9    practice at home.

10   Q.   Can you just explain, what does it mean for a patient to

11   have diminished nerve sensation?

12   A.   Diminished nerve sensation can be diagnosed through the

13   biothesiometer.  The probe will be placed on the penis, and we

14   would have to increase the signal of vibration to higher

15   amplitudes and higher frequency than what a normal patient

16   would be able to sense.

17        I'm sorry.  Let me rephrase that.  We would increase

18   the frequency of vibration to a higher level than other parts

19   of their body can assess.  If they can assess the frequency at

20   a lower level in their thigh or in their finger, in their penis

21   that would confirm diminished nerve signal.

22   Q.   Typically, what population of patients would suffer from

23   diminished nerve sensation?

24   A.   Most commonly, patients with Peyronie's Disease.

25   Q.   Now, when a doctor is teaching a patient how to use one of

1   these vibrators in the office, is the goal of that particular

2   session to bring the patient to ejaculation?

3   A.  No.

4   Q.  Are there other circumstances where a doctor may need to

5   use a penile vibrator such as these on a patient in the office

6   in order to bring them to ejaculation?

7   A.  Yes.

8   Q.  What are those circumstances?

9   A.  The circumstances that that would be necessary is for

10  procurement of sperm.  So the patient needs to have sperm

11  collected for what's called an assisted reproductive technology

12  where the sperm is transferred to the female partner.  Then we

13  will collect the sample on site and then pass it to the lab.

14  Q.  Would you use a penile vibrator on anybody who needs to

15  provide a semen sample for the purpose of assisted fertility?

16  A.  No.  If they can achieve erection and ejaculation on their

17  own without it, then the vibrator will not be necessary.

18  Q.  Typically speaking, what types of patients are doctors

19  using the penile vibrators in order to procure a semen sample?

20  A.  Most classically, patients with spinal cord injury.  They

21  are the group that benefits the most from it.  There are some

22  patients who have such strong anxiety and inhibition of the

23  process that the vibrator is necessary to help them overcome

24  the psychological input.

25  Q.  For those individuals for whom they have such a strong

1  psychological reasons why they can't bring themselves to

2  ejaculate, is the use of a vibrator in the office still in

3  order to procure a semen sample or for other reasons?

4  A.   In those cases it's for semen sample collection.

5  Q.   Is the use of a vibratory device, such as one of the

6  vibrators depicted on Government Exhibit 501 and 502, a

7  procedure for which patient consent is necessary?

8  A.   Yes.

9  Q.   Can you explain how you would go about obtaining consent

10  for such a procedure.

11  A.   Sure.  So we would explain to them that they are having a

12  penile vibratory stimulation.  We would discuss the benefits,

13  which are for the purposes of fertility to procure sperm.

14         There are risks of the procedure that I would describe

15  to a patient.  If the paddle has been placed on the skin for

16  too long, it can cause skin breakdown.  And also in patients

17  who have spinal cord injury, they can also have what's called

18  autonomic dysreflexia, which is where the nerves that control

19  the tone of the blood vessel and the heart rate can begin to

20  act abnormally, so they can have abnormal heart rates and

21  abnormal blood pressures as a result and side effect of this

22  treatment.

23  Q.   You mentioned as one of the risks of the use of a penile

24  vibrator that if used for too long it can cause breakdown of

25  the penile skin?

1    A.   Yes.

2    Q.   How long is too long, approximately?

3    A.   I will limit the use of this to 30 minutes.

4              MS. QIAN:   Mr. Glogoff, we take down Government

5    Exhibits 501 and 502.  Thank you.

6    Q.   Moving away from the use of penile vibrators, could being

7    too tense while masturbating be a cause for delayed

8    ejaculation?

9    A.   Yes.

10   Q.   Now, is there a medical need to observe how a patient

11   ejaculates in order to determine whether they are too tense to

12   ejaculate?

13   A.   No.  That is something that is behavioral and something

14   that psychologists or therapists can help work through.

15   Q.   Is someone being too tense to ejaculate something that can

16   be observed?

17   A.   No.

18   Q.   In that event, how would a urologist be able to make a

19   diagnosis of the cause that a patient is being too tense?

20   A.   What would suggest anxiety, stress, or being too tense

21   would be if they have abnormal sensation, and they have

22   overwhelming thoughts.  If they have pervasive thoughts that

23   are preventing them from being able to reach ejaculation, that

24   would be a patient that would be quote/unquote too tense, and

25   that would be a really good patient to send to sex therapy, to

1    help them center back on the erectile function and the sexual

2    activity so they can reach climax easier.

3    Q.   Would it be medically appropriate for a urologist to

4    prescribe psychotropic medication such as Valium or clonazepam

5    to a patient suffering from ejaculatory dysfunction due to

6    psychological reasons?

7    A.   We do prescribe some psychotropic medications, but the

8    benzodiazepines to assist, that would not be something a

9    urologist would do.

10   Q.   Who would be the appropriate party to do that then?

11   A.   We give the patient referral to a sex therapist or a

12   psychologist and let them seek the therapy through them or a

13   psychiatrist.

14   Q.   Now, earlier you mentioned that one of the causes for

15   delayed ejaculation can be neurologic in nature?

16   A.   Um-hum.

17   Q.   Now, would more frequent masturbation practice assist a

18   patient who has neurologic ejaculatory dysfunction?

19   A.   No.

20   Q.   You also mentioned that another cause for delayed

21   ejaculation could be the presence of scar tissue?

22   A.   Correct.

23   Q.   Now, would manually masturbating a patient who has

24   scar-tissue-caused delayed ejaculation assist that patient?

25   A.   No.

 1   Q.  I would like to now shift to a third condition.  Are you

 2   familiar with a condition called Kleinfelter Syndrome?

 3   A.  Yes.

 4   Q.  Briefly, what is Kleinfelter Syndrome?

 5   A.  Kleinfelter's refers to an abnormal number of chromosomes.

 6   So there are 23 pairs of chromosomes in everybody.  The 23rd

 7   pair is what's called the sex chromosome pair.  And in a male,

 8   a biologic male, they should have one X and one Y chromosome,

 9   but with Kleinfelter's they have an extra X.  They have 47 XXY,

10   or in the 23rd pair they have got two Xs in that pair, so they

11   had a triad of chromosomes.

12   Q.  When can Kleinfelter Syndrome be diagnosed?

13   A.  The diagnosis can be made at any time point in life.  It

14   can be picked up when a person is in utero inside their mom's

15   uterus through what's called amniocentesis.  It can be picked

16   up early after birth, it can be diagnosed in adolescence, or in

17   early adulthood or later on.

18   Q.  What are some typical symptoms of Kleinfelter Syndrome?

19   A.  When patients are not going through puberty at the expected

20   time or if they are having behavioral disorders, such as

21   attention deficit or inability to concentrate, or they are

22   abnormally lethargic, or they are seemingly disinterested, then

23   that may prompt them to seek evaluation with the pediatrician.

24   That is one avenue that patients can be picked up with

25   Kleinfelter's Syndrome.

1          Another avenue is, when patients are older, if they

2   are seeking fertility, if they have an abnormal semen analysis,

3   they will often be examined.  If the exam has suggested that

4   they may have Kleinfelter's, or if they have complete absence

5   of sperm in their ejaculate, then a test can be run on the

6   blood to see if they have Kleinfelter's.

7   Q.  Now, are there any physical symptoms that are typically

8   associated with Kleinfelter Syndrome?

9   A.  The classic description of a person with Kleinfelter's is

10  that they have really long arms or what's called a long wing

11  span.  They are tall in stature.  They will have increased

12  amount of breast tissue called gynecomastia.  And on the exam

13  of the genitalia they will have very small testicles.

14  Q.  Now, setting aside fertility issues for now, what are some

15  ways a urologist can help Kleinfelter patients to manage some

16  of the symptoms that you just described?

17  A.  Education and referral.

18  Q.  Can you explain.

19  A.  Yup.  One of the hallmark features of Kleinfelter's is that

20  there can be cognitive disorders and behavioral disorders.

21  Helping patients and their families understand what the

22  patients may be at risk for can help motivate them to seek out

23  the appropriate referrals that would help get them in the right

24  path.

25  Q.  What are the appropriate treatments for, for example, what

1    you had described as being long arm spans, particularly tall,

2    and large breast tissues, small testes?

3    A.   The treatment -- the disorder of Kleinfelter affects the

4    man's testicles and specifically their testosterone production.

5    There is no treatment for the long arm span.  But if they are

6    low in their testosterone, they can potentially be a candidate

7    for testosterone replacement therapy.

8    Q.   How would a urologist test for a patient's testosterone

9    production levels?

10   A.   We would send them to the lab and have them get a

11   blood-draw test before 10 a.m.

12   Q.   What are some treatments for low testosterone?

13   A.   It depends on what the patient's circumstances are.  If

14   they are not looking to have kids in the next six to 12 months,

15   then they can undergo testosterone replacement therapy.

16   Q.   Now, if a urologist does prescribe testosterone replacement

17   therapy, are there any ongoing obligations when it comes to

18   refills of the testosterone treatment?

19   A.   Yes.

20   Q.   What are those ongoing obligations?

21   A.   So testosterone replacement is a controlled class 3

22   controlled substance.  Because of the controlled nature, we

23   have to see the patient every six months, assess them for signs

24   and symptoms and side effects, and also review their benefits

25   from the therapy as well as part of that visit.

1  Q.  Typically, what occurs during these follow-up appointments?

2  A.  We will assess signs and symptoms of low testosterone

3  levels.  So, classically, patients with low testosterone will

4  have low energy, low libido, difficulty maintaining erections,

5  body composition issues, difficulty concentrating.  Not always

6  do they have all those, but we will assess for their degree of

7  improvement as a measure of the treatment efficacy.

8  Q.  How do you go about assessing the degree of improvement, if

9  any?

10  A.  Symptom assessment through history taking, but also we have

11  a validated questionnaire.

12  Q.  Are physical exams required as part of the routine

13  follow-up appointments for patients on testosterone therapy?

14  A.  Yes.

15  Q.  What kind of physical exams?

16  A.  One of the side effects of testosterone therapy is they can

17  have elevated blood pressure, so we need to do a vital exam

18  check.

19         One of the other side effect is that the patient can

20  develop acne on their face or their neck or their back, so we

21  will do an examination to see if they have any signs of acne.

22  Gynecomastia can also develop as a reason from the testosterone

23  therapy.  So if they have gynecomastia, if we need to examine

24  them, we can examine them in the office.

25         And also if they are over the age of 40, we will also

1    do a rectal exam to assess for the prostate cancer risk.

2    Q.  Can you define what gynecomastia means?

3    A.  Gynecomastia means abnormal breast tissue tenderness

4    enlargement, but classically enlargement of the breast tissue.

5    Q.  Other than the rectal exam that you discussed for patients

6    after the age of 40, are there any other physical exams of the

7    genital region that is routine during these follow-up visits?

8    A.  Rarely do we assess the size of the testicles.  The

9    testicles will lose size with testosterone therapy, and we will

10   just examine to make sure there are no changes.  But the

11   patient will bring forth complaints or concerns that would

12   prompt that exam.  But, otherwise, we don't typically do a

13   genitalia exam.

14   Q.  Now, would a urologist need to see the patient obtain an

15   erection in order to determine whether the testosterone

16   medication is working?

17   A.  No.

18   Q.  Are there any scientific reasons why seeing a patient

19   obtain an erection would not help the urologist to determine

20   whether the testosterone medication is working?

21   A.  The information that would be relevant to that, the patient

22   will tell us in the history, and everything that we would need

23   would come from the history and validated questionnaires.

24   Q.  Would a urologist need to see a patient ejaculate in order

25   to determine whether the testosterone medication is working?

1    A.  No.

2    Q.  Again, why not?

3    A.  Testosterone level has been linked to ejaculatory

4    dysfunction for men who have delayed ejaculation, but the

5    report of the patient being able to ejaculate with the normal

6    latency time would be sufficient for the history taking.

7    Q.  Are semen samples required during routine follow-up

8    appointments?

9    A.  No.

10   Q.  I'm sorry.  Did you say no?

11   A.  No.

12   Q.  Now, earlier we discussed appropriate care for the

13   cognitive symptoms related to Kleinfelter Syndrome.

14        What is the standard of care for a urologist as to

15   whether they should be making any cognitive diagnoses that may

16   stem from Kleinfelter's?

17   A.  We, as urologists, do not have the background and cognitive

18   assessment or cognitive therapy, so the standard would be to

19   refer the patient to a psychologist for that care.  At Hopkins

20   we have a psychologist as part of our Kleinfelter center who

21   would manage that part.

22   Q.  Now, you refer to the Kleinfelter center at Johns Hopkins.

23   Are you part of the Kleinfelter center?

24   A.  I am.

25   Q.  Approximately how many Kleinfelter patients do you see?

1   A.  Approximately one a week.

2   Q.  Now, are you aware of any neurologists who may prescribe

3   medications to address patients' cognitive issues on their own?

4   A.  I'm not.

5   Q.  Can you just repeat that answer?

6   A.  No, I'm not aware.

7   Q.  Turning your attention now to treating infertility in

8   Kleinfelter patients, what is a typical issue encountered by

9   Kleinfelter patients that lead to infertility?

10  A.  So with Kleinfelter Syndrome, the presence of the extra

11  chromosome causes the cells that produce sperm cells to hit a

12  kill switch.  So when patients go through puberty, the cells

13  that are the mother cells, called spermatogonia, will go

14  through apoptosis or cell death.  And once a patient reaches

15  puberty and the spermatogonia receive the extra signal from the

16  brain to stimulate puberty, the spermatogonia wake up.  And

17  when they wake up, they sense the extra chromosome, and gene

18  expression changes will occur that will initiate the program's

19  cell death.

20          MS. QIAN:  Your Honor, I notice that it is

21  approximately 5:00 now.

22          THE COURT:  Yes.  Is this a good time to adjourn?

23          MS. QIAN:  I think so, your Honor.

24          MR. BALDASSARE:  Judge, one minute before we end for

25  day, if we can go to sidebar.

 1          THE COURT:  OK.

 2          (At sidebar)

 3          MR. BALDASSARE:  Judge, I normally wouldn't ask this

 4   if it wasn't the end of the day on a Friday, but I would ask

 5   that you give that instruction, because they are going to be

 6   left with this for two days.  If I was going to be able to get

 7   up and cross him now, I wouldn't ask.  If it was the end of his

 8   testimony, I probably wouldn't even ask, if it was a regular

 9   day, but I think that they have heard a lot of, should he do

10   this, should he not do this, should he do this, should he not

11   do this.  It is Friday.  We are not coming back until Monday --

12          THE COURT:  You just want me to read the same

13   instruction?

14          MR. BALDASSARE:  Yes.

15          THE COURT:  That's fine.

16          MR. BALDASSARE:  Thank you, Judge.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Folks, I am going to send you home

3   momentarily, but I did just want to remind you before you go

4   that you are not required to find what the standard of care is

5   in a urology setting.  If you do make such a conclusion, I

6   instruct you that a finding by you that Dr. Paduch deviated

7   from the standard of care is not, standing alone or in and of

8   itself, sufficient to establish any element of the charged

9   offense.  If you find that the government has provided

10  sufficient evidence of a standard of care and that Dr. Paduch

11  deviated from it, you may consider that evidence as relevant to

12  the defendant's intent or other elements of the charged

13  offenses.

14         With that, I am going to send you home.  I am just

15  going to remind you not to do any research at all, not to talk

16  about the case with anyone, and keep an open mind and enjoy the

17  weekend.  Thank you.

18         We will be starting again at 10:00 on Monday, so

19  please be here at 9:45.  Thank so much, and be well.

20         (Jury not present)

21         THE COURT:  Just a couple quick things.

22         Number one, on the *Touhy* issue, if the government is

23  going to have an objection to calling Special Agent Turansky, I

24  would like a letter in response, and in particular I would like

25  you to address -- there is a case, *United States v. Bahamonde*.

1   It is 445 F.3d 1225.  It's from the Ninth Circuit.  But I just

2   want you to address the Court's conclusion therein.

3          MS. QIAN:  Your Honor, I can just talk about it now.

4   We can resolve this short of a letter.

5          THE COURT:  Perfect.  Even better.  Thank you.

6          MS. QIAN:  Thank you, your Honor.

7          As I recall, the way this came up yesterday was that

8   at the end of the day I think defense counsel expressed some

9   confusion as to whether or not there was any expectation that

10  the government would call FBI agent Stacy Turansky.  I think we

11  made clear that, given the state of how we produced 3500 in

12  this case, that there was no reasonable expectation that we

13  would have called Agent Turansky.

14         Later that evening, we did receive from defense

15  counsel a *Touhy* notice, as well as several Rule 17(c)

16  subpoenas.  Even though we were, I think, improperly served, we

17  are not the agents of the FBI who can properly receive service,

18  nonetheless, we received the *Touhy* notice and the subpoenas.

19  We did forward them to the FBI agents in question.

20         And my understanding, from speaking to the case

21  agents, is that the FBI will not be objecting to calling -- not

22  be objecting under *Touhy* grounds to calling the case agents or

23  FA agents as witnesses in this case.

24         THE COURT:  Great.

25         MS. QIAN:  That is correct, your Honor.

1          I will note just a couple of things just to put on the

2     record, given the record that was established yesterday.

3          I understand that defense counsel had made a

4     representation that he thought that the government had done

5     something, quote, unwise and that he was able to pull out 10

6     examples of circumstances where the government had meetings

7     with witnesses without the presence of any FBI agent or

8     paralegal to act as a witness.

9          We have now gone through all of our 3500.  We have

10    noticed two instances of notes that were produced to defense

11    counsel as 3500 where there was no one other than lawyers

12    present during those conversations.

13         One of them was a pair of notes for one of the

14    government's witnesses, Dr. Rocchio, but those notes were taken

15    for a different case.  Those were not notes that are prepared

16    for their presentation of this trial, for the preparation of

17    this trial.  It was for a different trial years ago.  We

18    produced it out of abundance of caution just because we have

19    possession of it.

20         The second notes were a conversation between

21    government attorneys and, I think, other attorneys.  It's

22    attorney-only notes.  So there were no witnesses because it was

23    in fact not an interview --

24         THE COURT:  Was the other attorney representing what

25    his or her client had said?

1              MS. QIAN:  It was not.  It was regarding logistics,

2    your Honor.

3              THE COURT:  You're on notice.

4              MR. BALDASSARE:  Yes.

5              Judge, there was one -- I didn't have a complaint

6    about this.  There was, I think, one where after an interview

7    with one of the former patients, I think one of the civil

8    attorneys did call the government, and I got that.

9              One of the things I was referring to yesterday that is

10   more than the two -- I think I have one or two more than

11   that -- was, it was news to me that the Southern District

12   thinks I can, and they have said that I can, that I could call

13   a paralegal.

14             So I was not counting those as -- I was counting those

15   as only government people.  I would never think that I could

16   call a paralegal who didn't author notes and say, do you

17   remember being there?  Was this said?  Frankly, at this point I

18   am not sure it is going to be an issue.

19             Yet again, wise or unwise, I wasn't ever saying that I

20   thought they were lying or not putting names on.  It's just a

21   completely different way.  I never in a million years would

22   think to call a paralegal specialist to talk about what

23   happened during an interview and to have notes that they didn't

24   take.

25             It sounds at this point, Judge, I think the issue is

1    resolved.

2            I have one thing to put on when the government is

3    done.

4            THE COURT:  It sounds like it, and I am glad that you

5    are working together to avoid unnecessary issues, so I

6    appreciate that.

7            MS. QIAN:  Thank you, your Honor.

8            THE COURT:  I wanted to say one quick thing just about

9    scheduling, which is that there are a few days where we need to

10   either start a little late or end a little early.

11           Let me see if I can get my calendar up.

12           On Monday, we are going to have the standard day.

13           On Tuesday, I may have to adjourn early, about an hour

14   and a half early, like at 3:30.  I'll let you know that by

15   Monday.

16           If we do, what I plan to do, so we don't lose time, is

17   have a truncated day where we don't have as many breaks.  We

18   will have a shorter lunch, and we won't lose too much time.  I

19   just wanted to give you a heads-up that I'll let you know on

20   Monday if we are going to end early on Tuesday.

21           Then, on Friday, the 3rd, I need to start at 11.  You

22   may recall juror number 1 may have a potential conflict on

23   Friday, but we are going to find out about that.  Ms. Cavale

24   has asked him to keep her posted.  I'll keep you posted about

25   that.  We will decide what to do with juror 1.

1          But with respect to starting an hour late, then we

2     wouldn't take the morning break, and, again, I'll try to take a

3     shorter lunch, so we won't lose much time.

4          On Monday, the 6th, I'll need to start at 10:30.  If

5     there are any issues, let me know, and hopefully we can discuss

6     them in the lunch break so we don't lose any more time.  But I

7     think that, again, we will try and take shorter breaks and the

8     like.

9          Then, on May 9, we will need to start at 11, and I

10    know you need to end at 3.  So I thought with that time we

11    would just take one half-an-hour break in the middle of the day

12    and no other breaks.

13          Then I think we need to see what's going to happen on

14    the 10th.  I think I had already told you that -- I just have a

15    lot of different sentencings.  There are some things that are

16    harder to move than others.  So unless the jury is

17    deliberating, or there are other real scheduling issues, I

18    would prefer not to sit on Friday just because I have so many

19    things scheduled that I have to adjourn.  That being said, if

20    we need to sit on Friday, the 10th, I will.  We just may need

21    to start a little bit late, around 10:30 or 10:45 or something,

22    but I'll work with you.

23          I just wanted to give you a heads-up.  That's just

24    some scheduling issues I wanted to let you know.

25          MR. BALDASSARE:  I just have one thing, Judge.

1          It's not particularly directed at the government, and

2   I let it go at the time because the witness was here and I

3   wanted to keep the case moving along.

4          The government, I understand, put on the record PCVA's

5   standing objection.

6          Here is what I am going to say about that.

7          Number one, I don't accept it.  PCVA has no standing

8   there.  This isn't a civil case.  They don't intervene.  They

9   don't get to tell the government to try to say things about my

10  cross-examination.  I think I have been extraordinarily

11  courteous to these former patients, even in filings, where I

12  could have named people, because they are not using aliases.  I

13  think that I was very careful when I did that.  I was the one

14  who stopped the first former patient from testifying.

15          I think if your Honor thinks I'm running afoul -- I

16  don't want to stand here and set a precedent where the

17  government can put any objections by the civil law firms on the

18  record.  If they want to send something in, send something in.

19          The jury is not here, Judge, so I can say this,

20  respectfully, and I don't mean to sound upset, but I am, and

21  I'm certainly not upset at you, and I'm certainly upset at the

22  government.

23          You know what's at stake.  PCVA should stay in its

24  lane.  I can defend my client.  I know how to cross-examine

25  someone.  I don't ever, respectfully, want to hear again

1   anything about PCVA.  I know what I'm doing, I've been doing

2   it, and I think it is inappropriate, and I don't think the

3   government should be standing up and saying, I want a note.

4   And I don't fault Ms. Qian, but I don't want to keep hearing,

5   I'm putting PCVA's standing objection on.

6         The Court, I think, knows, I know what I'm doing, and

7   I've been careful.

8         THE COURT:  It didn't affect anything.  They rightly

9   mentioned it outside the hearing of the jury.  As you know, it

10  hasn't affected any of my rulings.  I don't fault the

11  government at all for mentioning it, and we will just leave it

12  at that.  I don't think we need to talk about it further.

13        MR. BALDASSARE:  Thank you, Judge.

14        THE COURT:  Have a good weekend, all.

15        (Adjourned to April 29, 2024 at 9:45 a.m.)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

SAM LENOX

Direct By Mr. Xiang  . . . . . . . . . . . . 155
Cross By Mr. Baldassare  . . . . . . . . . . 198
Redirect By Mr. Xiang  . . . . . . . . . . . 259

 MICHAEL BUSCEMI

Direct By Ms. Espinosa . . . . . . . . . . . 262
Cross By Mr. Baldassare  . . . . . . . . . . 269
 AMIN HERATI

Direct By Ms. Qian . . . . . . . . . . . . . 272

GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 401   . . . . . . . . . . . . . . . . . . . 161

 GX 503-511 . . . . . . . . . . . . . . . . 266

 3   . . . . . . . . . . . . . . . . . . . . 297

 501 and 502  . . . . . . . . . . . . . . . 339

DEFENDANT EXHIBITS

Exhibit No.                                  Received

 301   . . . . . . . . . . . . . . . . . . . 208