O4TVPAD1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        23 CR 181 (RA)

5    DARIUS A. PADUCH,

6              Defendant.                Trial

7    ------------------------------x

8                                        New York, N.Y.
                                         April 29, 2024
9                                        9:35 a.m.

10   Before:

11
                        HON. RONNIE ABRAMS,
12
                                         District Judge
13                                       —and a jury—
                             APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  MARGUERITE COLSON
          ELIZABETH A. ESPINOSA
17        JUN XIANG
          NI QIAN
18        Assistant United States Attorneys

19   BALDASSARE & MARA, LLC
          Attorneys for Defendant
20   BY:  MICHAEL BALDASSARE
          JEFFREY HAWRILUK
21

22   Also Present:  Grayson Glogoff, Paralegal—USAO
                    Mia Vuckovich, Paralegal—USAO
23

24

25

O4TVPAD1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.

3          So as I informed the lawyers last night — and Dr.

4     Paduch, you're going to hear this for the first time — Juror

5     No. 9 informed the Court last night that she would not be

6     reporting today due to a death in the family.

7          My deputy, Ms. Cavale, spoke with her further.  She

8     explained that she does not know when the services are yet;

9     that she'll be staying overnight in Long Island for services;

10    and that in addition to today, she'll likely be absent for two

11    more days as a result.  So accordingly, she will likely be

12    absent for at least three days.

13         I'll also note that she advised Ms. Cavale that she

14    lost her sister four weeks ago, and she sounded very upset.

15         So I don't know if you want to speak to Dr. Paduch for

16    a moment and see if you still have an objection to my replacing

17    her with an alternate.

18         MR. BALDASSARE:  Yes, Judge.  I just want to tell him

19    what went on last night.

20         THE COURT:  Exactly.  Take your time.

21         (Counsel conferred with defendant)

22         MR. BALDASSARE:  Judge, I spoke with my client about

23    where we were last night versus where we are with the

24    additional information this morning.

25         So we have no objection to excusing Juror 9 and

O4TVPAD1

1   seating Alternate Juror 1.

2              THE COURT:  Okay.  All right.  So that's what we'll

3   do.

4              I do also just want to note for the record that

5   reasonable -- that this constitutes reasonable cause for

6   replacing the juror with an alternate.  In *United States v.*

7   *Miller,* for example, the Second Circuit upheld the district

8   court's decision to dismiss a juror whose father died suddenly

9   during the trial.  That's 79 F.3d 338, 342.

10             So given the recent death in Juror 9's family and her

11  expected absence from the trial for several days, I do find

12  reasonable cause for her to be replaced.  But it sounds like

13  that's on consent anyway.

14             Are there any other issues that we need to discuss

15  this morning?

16             MS. QIAN:  Not from the government, your Honor.

17             MR. BALDASSARE:  No, your Honor.

18             THE COURT:  Okay.  So we will just let you know when

19  the jury is here, okay?  Thank you.

20             (Recess)

21             THE COURT:  Do you want to bring the witness back up.

22             By the way, we're still waiting for Juror No. 1 to get

23  back to us about his schedule for Friday.  We're seeing if it's

24  something he can get out of so he can still sit.

25             If anyone wants to sit while we're waiting, you're

O4TVPAD1                         Herati – Direct

1    free to do so.  But I know that they are almost ready.

2              (Jury present)

3              THE COURT:  I hope you had a nice weekend.

4              So sadly, Juror No. 9 had a death in her family; so

5    unfortunately she won't be able to sit going forward because

6    she won't be available.

7              So Ms. Marlatt, you are now Juror No. 9.  You can move

8    there now or you can sit where you're sitting and move there

9    later, it's up to you.  But going forward, you will be Juror

10   No. 9.

11             And we are ready to proceed.

12             And I'm going to remind the witness you're still under

13   oath.

14    AMIN HERATI,

15        called as a witness by the Government,

16        having been previously duly sworn, testified as follows:

17   DIRECT EXAMINATION (continued)

18   BY MS. QIAN:

19   Q.  Good morning.

20   A.  Good morning.

21   Q.  Before we broke for the weekend, we were discussing the

22   diagnosis and treatment for a condition called Klinefelter

23   syndrome.  Dr. Herati, can you remind the jury what kind of

24   condition is Klinefelter's?

25   A.  So Klinefelter's is a genetic condition.  It's an

O4TVPAD1                          Herati – Direct

1   abnormality of an extra chromosome on the 23rd pair.

2   Q.  And what are some typical symptoms of Klinefelter's?

3   A.  Klinefelter's affects the testes and it affects the

4   testosterone production and sperm production.

5       So men with Klinefelter's will classically have low

6   testosterone symptoms, they will potentially have enlarged

7   breast tissue.  But as a side effect of their fertility issues,

8   they will also have small testicles, and they are also known to

9   have very long arms and tall stature.

10  Q.  Are there any associated behavior issues connected with

11  Klinefelter's?

12  A.  Yes.  Some of the symptoms that may bring somebody with

13  Klinefelter's into a physician is delayed puberty and also

14  learning disorders as an adolescent.

15  Q.  I'm going to turn your attention now to the diagnosis and

16  treatment of infertility in Klinefelter patients.

17      Now, what is a typical issue encountered by

18  Klinefelter patients that may lead to infertility?

19  A.  The condition of Klinefelter's will cause the sperm cells

20  that would typically be there to not be present in ejaculate.

21  The reason for this is that the cells that are the mother cells

22  that will produce the sperm cells that we typically associate

23  with fertility, those go away due to a process called program

24  cell death, and that happens at puberty.  And because of the

25  loss of these cells, people with Klinefelter's will -- 93

O4TVPAD1                          Herati - Direct

1   percent of them will not have sperm in their ejaculate; or if

2   they do have sperm, they will be very rare in number.

3   Q.   Now, what is a diagnostic test for determining whether a

4   Klinefelter patient has or does not have sperm in their semen?

5   A.   We typically get two semen analyses.

6   Q.   In order to conduct a semen analysis, do you have to

7   collect anything from the patient himself?

8   A.   Yes.  So to get a semen analysis, we have to set the

9   patient up with an appointment with the andrology lab.  The lab

10  will give the patient a specimen cup with their name on the cap

11  and on the bottle.  And we give the patient an exam room and

12  appointment to go and collect.

13  Q.   And what are they seeking to obtain at the end of this

14  appointment?

15  A.   Information regarding whether or not they have sperm in

16  their ejaculate.

17  Q.   All right.  Just to be clear, what specific specimen are we

18  seeking to obtain from the patient?

19  A.   A semen sample.

20  Q.   Now, you discuss referring the patient to what's called an

21  andrology lab?

22  A.   Correct.

23  Q.   What is an andrology lob?

24  A.   So an andrology lab is a stand-alone lab within a health

25  organization where fertility work is done.  So the andrology

1  lab will do a number of things.  They will analyze a semen

2  analysis, so they'll tell you how many sperm are in the sample,

3  how fast they are swimming, how many are normally shaped, any

4  extra cells that may be in there, such as bacteria

5  contamination they can tell you about.  And then the lab will

6  also perform other functions, such as in-vitro fertilization or

7  intracytoplasmic sperm injection, which is part of the female

8  infertility treatments.

9  Q.  Now, you mentioned that at the andrology lab the patient

10 would be given a collection cup; correct?

11 A.  Correct.

12 Q.  Now, where is the patient located when they are actually

13 providing the semen sample?

14 A.  We offer exam rooms in the andrology lab.  If a patient

15 lives within an hour of the lab, we'll let them collect at home

16 and then bring the sample in within an hour of collection.  But

17 most patients want to collect on-site.

18 Q.  Now, when a patient does provide a semen sample on-site in

19 an exam room, are any medical staff in the exam room at the

20 time that they are providing the semen sample?

21 A.  No.

22 Q.  And what are the patients instructed to do once they're in

23 the exam room?

24 A.  So once they are in the exam room, they have instructions

25 to wash their hands.  And then they will collect the sample and

O4TVPAD1                        Herati – Direct

1    then close the lid up.  But they are instructed not to use

2    various things like lubricants or any sort of saliva for

3    lubrication; it's supposed to be a dry ejaculate.

4    Q.  What instructions, if any, are given to the patient on how

5    they are supposed to produce the semen sample?

6    A.  They are told that if they want to use their phone or any

7    magazines or videos, they are given an array of options that

8    they can look at.  But once they're done, they close the lid

9    and they leave it in a receptacle area in the exam room.

10   Q.  Just so I understand, are the patients allowed to

11   self-stimulate in the room?

12   A.  Yes.

13   Q.  And you mentioned that you typically instruct the patients

14   to not use lubricant; is that correct?

15   A.  That's correct.

16   Q.  Why is that?

17   A.  Lubricants can affect the sperm viability and motility.  So

18   it can give us false results.

19   Q.  Now, if an adult patient is able to produce a semen sample

20   on his own, is there any medical reason why a doctor would need

21   to be present to observe the patient ejaculate and produce a

22   semen sample?

23   A.  No reason.

24   Q.  Can you think of any reasons why it may be

25   counterproductive for a doctor to be present to observe a

O4TVPAD1                        Herati - Direct

1  patient produce a semen sample?

2  A.  The process of producing a semen sample is already

3  stressful.  And adding a physician or medical professional in

4  that setting can add more anxiety and it may inhibit the

5  process.

6  Q.  Now, if an adult patient is not able to ejaculate on his

7  own, would it ever be medically appropriate for a doctor in

8  that instance to manually masturbate a patient, meaning

9  stroking that patient's penis up and down with the purpose of

10  obtaining an erection and ejaculation in order to assist that

11  patient to provide a semen sample?

12  A.  No.

13  Q.  I'm sorry?

14  A.  No.

15  Q.  Are there any reasons why a doctor should not manually

16  stimulate a patient to assist that person to provide a semen

17  sample?

18  A.  We have other options to assist in those situations.  We

19  have vibratory stimulation, electro-ejaculation.  But we would

20  avoid manual stimulation because that would be considered a

21  sexual act.

22  Q.  You mentioned that there are other options; correct?

23  A.  Correct.

24  Q.  What are those other options?

25  A.  So the options in that setting would include vibratory

1    stimulation, electro-ejaculation.  That would be under

2    anesthesia, if the patient has sensation below the waist.  And

3    we can also perform what's called testicular sperm aspiration,

4    where we stick a needle into the testicle and withdraw some

5    tubules and/or sperm within it.

6    Q.  And how does the doctor decide which of these options to

7    take?

8    A.  In consultation with the patient.

9    Q.  Now, if it is decided that penile vibratory stimulation is

10   an appropriate course, can you describe for us the procedure

11   for obtaining a semen sample?

12   A.  Sure.  So the algorithm for penile vibratory stimulation

13   depends on the age.  For my practice, if a patient is a minor,

14   I'll take him to the operating room and we'll try the vibratory

15   stimulation under anesthesia.  If that doesn't work, then we

16   have the possibility of doing a testicular sperm extraction, if

17   we need the sample urgently for, for example, chemotherapy or

18   radiation purposes.  If the patient is an adult and they've

19   already had a sexual debut, then we will offer them penile

20   vibratory stimulation under no anesthesia.  And what that would

21   involve is we would put the vibratory stimulator on the head of

22   the penis or on the undersurface of the penis, under the head,

23   and then modulate the frequency of the amplitude until the

24   patient reaches climax.

25   Q.  Who's in the room during this procedure?

1    A.  Because of the nature of the procedure, you need a second

2    pair of hands to collect the sample.  So the staff member or

3    another professional is in the room to hold the cup.

4    Q.  Now, if an adult patient says that he is able to ejaculate

5    at home, but is unable to ejaculate in the office, would it

6    ever be medically appropriate for a doctor to manually

7    masturbate a patient to assist that person provide a semen

8    sample in the office?

9    A.  If they can collect at home and they live within an hour,

10   they can do that at home.

11   Q.  Now, if a patient ejaculates outside the collection cup, is

12   it medically appropriate to collect the semen from other

13   surfaces, like a chair or floor or other surface area?

14   A.  It would not be appropriate.

15   Q.  Why not?

16   A.  The ejaculate is assessed for presence of bacteria

17   contamination.  So you can get false positive results that

18   could potentially bring on unnecessary treatments.

19   Q.  Now, what is a medically appropriate procedure for

20   obtaining a semen sample from a minor patient?

21   A.  The discussion is had with them, patient and his or her --

22   his guardian or parent.  So we talk to the patient and parent

23   guardian and ask what their comfort left is and if they've had

24   that conversation with the minor, is the minor able to produce

25   a sample.

1         In many cases, especially with Klinefelter's, we see

2    patients that are younger than the age that we expect sperm to

3    be in the ejaculate.  So we let them have that conversation at

4    home between patient and parent or guardian.

5         So if they are capable of having that conversation or

6    the parent says that, Yes, so-and-so can go through with the

7    collection, then we'll have the parent or guardian arrange for

8    an appointment with the andrology lab to set up an appointment.

9    Q.  Now, if a minor has begun to masturbate or ejaculate on his

10   own, what is the medically appropriate procedure?

11   A.  If that is the case, then we let them set up an appointment

12   with the andrology lab, and then they will go through just like

13   an adult patient would.

14   Q.  And again, just to remind us, where do they go to provide a

15   semen sample?

16   A.  To the andrology lab.

17   Q.  And where within the andrology lab do they go?

18   A.  In an exam room.

19   Q.  And are they alone or with other medical staff present?

20   A.  Alone.

21   Q.  That doesn't change whether or not they are a minor or an

22   adult?

23   A.  That's correct.

24   Q.  Now, what if the minor has not yet begun masturbating or

25   ejaculating on their own, what is the medically appropriate

1    procedure for obtaining a semen sample from such a minor?

2    A.  If they haven't, then we will let the parents have that

3    conversation after the visit ends to see if they are

4    comfortable with the patient or minor learning the process of

5    that.  If they come back and they say that the patient is not

6    able to or we're not comfortable with the conversation, then we

7    can offer vibratory stimulation or testicular sperm aspiration

8    or extraction, assuming that they are of an age where we think

9    that sperm will be present.

10   Q.  Now, let's say that we have a minor patient who is not

11   masturbating on his own yet and is not comfortable learning.

12   You said one of the procedures could be using a vibratory

13   stimulation; correct?

14   A.  Correct.

15   Q.  Now, what is the procedure -- how is that procedure for a

16   minor different, if at all, from how you would use vibratory

17   stimulation to obtain a semen sample from an adult?

18   A.  Because of the sexual nature of it, we would give them

19   anesthesia so they don't have a recollection of the event.

20   Q.  Are you aware of any doctors who will elect to undertake a

21   vibratory stimulation procedure on a minor while the minor is

22   awake?

23   A.  I'm not aware.

24   Q.  I'm sorry?

25   A.  I'm not aware of any.

1    Q.  Now, let's say that the patient who has not previously

2    masturbated on his own, but after a conversation with their

3    parents, decides that they are willing and comfortable to learn

4    the process.  Is the doctor involved in the learning of that

5    process?

6    A.  No.

7    Q.  Now, going back to the use of a vibratory stimulation

8    procedure on a minor, is it necessary for a doctor to obtain

9    consent for such a procedure?

10   A.  Yes.

11   Q.  And from whom would the consent be obtained?

12   A.  The parent or guardian.

13   Q.  Would the patient be present during that conversation?

14   A.  Yes.

15   Q.  Would it ever be medically appropriate for a doctor to use

16   a vibratory device on a patient without their prior knowledge?

17   A.  No.

18   Q.  Now, would it ever be medically appropriate for a urologist

19   to manually masturbate a minor to obtain a semen sample?

20   A.  No.

21   Q.  Why not?

22   A.  It's a sexual act, and that's something that is not

23   recommended to do.

24   Q.  Any other reasons?

25   A.  That's the primary one.  The other reasons are that the

1    patient is capable of self-stimulation, so it's not necessary

2    that the doctor do that.

3    Q.  Is it ever medically appropriate for a urologist to teach a

4    minor how to masturbate so that they can provide a semen

5    sample?

6    A.  No.

7    Q.  Why not?

8    A.  That conversation is had between the patient and his

9    parents or guardian.  So if they want to have that conversation

10   to discuss what that process looks like, then that's the route

11   that we typically go.  If a parent or guardian is not

12   comfortable, then there are avenues that we can go to bypass

13   that, for example, the vibratory stimulation or sperm

14   extraction.

15   Q.  Now, earlier you mentioned that for an adult patient who

16   says that he is able to ejaculate at home, but is unable to do

17   so in the office, that they would be permitted to provide a

18   semen from home if they live within an hour of the lab;

19   correct?

20   A.  Correct.

21   Q.  Now, if the patient lives outside of an hour from the lab,

22   what is a medically appropriate procedure then?

23   A.  We sometimes have them check into a hotel, if they want to

24   be within an hour.  But they need to be somewhere where they

25   can be comfortable, but within the window where the sample

O4TVPAD1                          Herati - Direct

1    won't have degradation.

2    Q.  In that circumstance, is it ever medically appropriate for

3    a doctor to manually masturbate a patient to obtain a semen

4    sample?

5    A.  No.

6    Q.  Now, what is the treatment for infertility in a Klinefelter

7    patient?

8    A.  So patients with Klinefelter's have really high what are

9    called gonadotropins.  They are hormones that come from the

10   pituitary glands.  The elevated gonadotropin levels that

11   normally stimulate the testicles to produce sperm and/or

12   testosterone, have already tapped out their potential.  So a

13   lot of common treatments that we offer we can't give them.  The

14   only treatment that has been commonly used in the setting is a

15   hormone blocker.  It blocks the breakdown of testosterone in

16   its conversion into what's called estradiol.  And it's called

17   an aromatase inhibitor.  That's the most commonly used

18   treatment in preparation, assuming that their testosterone

19   level is low.

20   Q.  Earlier you also mentioned a surgical solution.

21   A.  Correct.

22   Q.  What is that surgical solution?

23   A.  Despite not having sperm in the ejaculate, there may be

24   sperm in the testicle.  And what we can do if we need to

25   undergo sperm freezing before treatment that may render them

O4TVPAD1                          Herati - Direct

1     completely infertile in the future, we can take the patient to
2     the operating room and make a small incision into the scrotum,
3     another incision into the testicle, and then identify dilated
4     tubules within the testicle that we can pluck and send to the
5     lab and let them look for sperm within the tubule.
6     Q.   Now, what is the standard of care for how many semen
7     samples a doctor should obtain before deciding on an
8     appropriate treatment course?
9     A.   Two.
10    Q.   Let's say that a doctor is able to successfully
11    cryopreserve sperm -- actually, first, can you define for us
12    what does it mean to cryopreserve sperm?
13    A.   Sure.  So cryopreservation means that the either sperm
14    cells or the issue that contains them is placed into liquid
15    nitrogen to freeze the sample.  And when kept in the liquid
16    nitrogen, the sample can be kept indefinitely as long as the
17    liquid nitrogen is kept.
18    Q.   And why would someone want to cryopreserve their sperm?
19    A.   When the sperm are cryopreserved, they can be thawed and
20    used at a later time.
21    Q.   Now, let's say that a doctor is able to cryopreserve sperm
22    for a Klinefelter patient, is there a medical reason why
23    urologists would continue to seek semen samples after that?
24    A.   It's possible that a patient may have sperm in their
25    ejaculate at some point down the road; and so they may want to

O4TVPAD1                         Herati - Direct

1    check at periodic time points, more at their own discretion,

2    not something that we typically recommend, but they may want to

3    continuously check to see if sperm has shown up.  Ejaculate

4    sperm will function better than frozen sperm, so we defer to

5    the ejaculate, if present.

6    Q.  At whose discretion is it to continue to obtain semen

7    samples and semen analysis?

8    A.  A patient.  But it's a shared decision, patient/physician.

9    Q.  Based on your training, experience, and review of the

10   published literature, is there a link between Klinefelter

11   syndrome and sexual dysfunction?

12   A.  Indirectly, yes.

13   Q.  Can you explain that for us, please.

14   A.  Because of the low testosterone that develops as a result

15   of the Klinefelter's, these guys may develop issues with sexual

16   dysfunction as a result of their low testosterone and

17   associated conditions that can arise from their low

18   testosterone state.

19   Q.  What is the standard of care for diagnosing sexual

20   dysfunction in a patient with Klinefelter's?

21   A.  Men with Klinefelter's will be given the same

22   questionnaire, the validity questionnaires that we give all of

23   our urology patients.  And within that questionnaire are

24   questions relevant to sexual function.  So patients may

25   initiate the conversation through the validate questionnaire,

or they may tell us that, By the way, I'm experiencing issues with difficulty maintaining erections or I'm having issues with delayed ejaculation.  They'll either self-initiate or they'll report it in the questionnaires.

Q.  Just to be clear, the initial diagnosis for sexual dysfunction comes from the patient?

A.  They will disclose if they have concerns.

Q.  I'm going to now move on to a different topic.

Now, if a patient were to come to you complaining of generalized pain in the abdomen and genitals area, how would you go about diagnosing what the issue is?

A.  I would take a history to understand when the pain started, what the nature of the pain is, what brings it on, what makes it better, if it radiates anywhere, any other associated signs or symptoms.  And then I'd also do an exam to see if I can localize where the pain is coming from.

Q.  What kind of exam?

A.  It would be a focused urologic exam; so it would be an exam -- depending on where the pain is.  If the pain is in the penis, then we'll do an exam of the penis.  If it's in the scrotum, then we'll look at the scrotum.

In some cases the pain can be diffuse because nerves that may be in that area can be impinged or affected.  So sometimes a rectal exam is also necessary to understand the location of the pain.

O4TVPAD1                          Herati – Direct

1   Q.  Now, is it ever medically appropriate to conduct any of the

2   physical exams that you just described without gloves?

3   A.  No.

4   Q.  And if you were to conduct a rectal exam under these

5   circumstances, approximately how long is that exam?

6   A.  About two minutes.

7   Q.  Is there any medical reason why a patient would need to be

8   erect during a rectal exam?

9   A.  No.

10  Q.  I'm going to take a step back from discussing specific

11  conditions.

12          Now, in your field of medicine, if a clinician has

13  come up with a novel way to treat a particular condition, how,

14  if at all, would that clinician communicate that to others?

15  A.  Through presentations at national, regional, or

16  international meetings.  That's typically in the form of

17  submitting the abstract with work, and then letting the

18  conference decide through publication.  And also just in

19  discussion with peers.  So in some cases we go to meetings that

20  are either national or international.  We have discussions at

21  these meetings to disseminate our work.

22  Q.  Now, have you recently reviewed published articles by Dr.

23  Paduch?

24  A.  Yes.

25  Q.  And did you find any articles where Dr. Paduch described

O4TVPAD1                        Herati – Cross

1  manual masturbation of a patient as a way to diagnose or treat

2  any urological condition?

3  A.  I was not able to find it.

4  Q.  Are you aware of any presentations given by Dr. Paduch

5  where he described manual masturbation of a patient as a way to

6  diagnose or treat any urological condition?

7  A.  I'm not aware.

8  Q.  So sum up, in your practice as a urologist in the field of

9  infertility in men's health, are you aware of any circumstances

10  where it would be medically appropriate for a urologist to

11  manually masturbate a patient?

12  A.  No.

13  Q.  Are you aware of any circumstances where it would be

14  medically appropriate for a urologist to manually masturbate a

15  minor patient?

16  A.  No.

17            MS. QIAN:  No further questions, your Honor.

18            THE COURT:  Cross-examination.

19  CROSS-EXAMINATION

20  BY MR. BALDASSARE:

21  Q.  Good morning, Dr. Herati.  Can you hear me okay?

22  A.  Yes.

23  Q.  My name is Mike Baldassare.  This is Jeffrey Hawriluk.  And

24  I know you're somewhat familiar with Dr. Paduch, who's seated

25  all the way on the left.

1            Can you see all three of us?

2    A.  Yes.

3    Q.  We've never met before; correct?

4    A.  That's correct.

5    Q.  Would you agree with me that even as we sit here today,

6    there are still debates within the field of urology regarding

7    diagnosis and treatment of various conditions?

8    A.  Yes.

9    Q.  And would you agree with me that as we sit here today,

10   there are even things that are considered controversies in the

11   field of urology related to Klinefelter syndrome?

12   A.  Yes.

13   Q.  And earlier, just a moment ago, when I asked about there

14   still being debates in the field of urology, that would also

15   extend to debates with respect to Klinefelter syndromes,

16   diagnosis and treatment, right?

17   A.  That's correct.

18   Q.  And with respect to the controversy -- some of the

19   controversies, there would be controversies over the need for

20   fertility preservation in these cases?

21   A.  That's correct.

22   Q.  And there would be controversy over the manner of treatment

23   in such cases, right?

24   A.  That's correct.

25   Q.  And there would be a controversy over the timing of the

O4TVPAD1                        Herati - Cross

1   fertility preservation in these cases; correct?

2   A.  Yes.

3   Q.  And there would be controversy over the timing of treatment

4   for these cases; correct?

5   A.  Yes.

6   Q.  And there is controversy over the approach to protecting

7   the fertility process; correct?

8   A.  I would say no.  In general, we say that the patients need

9   to have their fertility preserved or, if they are in the midst

10  of an infertility treatment, then they would need to have the

11  sperm extracted or identified for use.  I would say that that's

12  not controversial.

13  Q.  Do you agree that a controversy exists around the need for

14  timing of and the approach to fertility preservation and

15  treatment?

16  A.  There is controversy about the timing, yes.

17  Q.  And with respect to -- I mentioned earlier a debate.  Am I

18  right that there is a debate in the field of urology as to

19  whether -- as to when to extract sperm from a Klinefelter

20  patient?

21  A.  Yes, that's correct.

22  Q.  And the procedure known as -- is it T-S-E-E -- is it

23  pronounced TSEE?

24  A.  TSEE, yeah.

25  Q.  TSEE, for testicular sperm extraction.  Some say -- or some

1    physicians, urologists, say that that should occur at the time

2    of diagnosis, right?

3    A.  Some say that.

4    Q.  And the others say that the time for that is when the

5    patient is ready for fatherhood; correct?

6    A.  That's correct.

7    Q.  Is there a third school of thought on the timing for the

8    testicular sperm extraction?

9    A.  Another -- no those are generally the two.

10   Q.  And there are even experimental options to support and try

11   to protect for biological fatherhood; correct?

12   A.  Correct.

13   Q.  And would you agree with me that when treating Klinefelter

14   patients, it makes tense to proceed with caution because, in

15   some instances, there is a paucity of data regarding the sperm

16   extraction and fertility treatment?

17   A.  That's correct.

18   Q.  And would you agree with me that there is uncertainty

19   regarding sperm recovery under a number of instances related to

20   testosterone replacement?

21   A.  There is uncertainty about that.

22   Q.  And would you agree with me that for Klinefelter syndrome

23   patients, there are unique situations that come up in treating

24   those patients, right?

25   A.  That's correct.

1    Q.  And those unique considerations could stem from whether the

2    patient is prepubescent; correct?

3    A.  Correct.

4    Q.  Or peripubescent?

5    A.  Correct.

6    Q.  Which I recently learned in that setting "peri" just means

7    in the midst of?

8    A.  Correct.

9    Q.  All right.  Now, it's the standard of care for men seeking

10   fertility treatment to have -- for the physician to take a full

11   medical history; correct?

12   A.  Correct.

13   Q.  To conduct a physical exam?

14   A.  Correct.

15   Q.  To run lab work?

16   A.  Yes.

17   Q.  What kind of lab work?

18   A.  So the minimum requirement is a testosterone in an FSH or

19   follicle stimulating hormone.  And then as a reproductive

20   urologist will get an expanded panel to check for other markers

21   as well.

22   Q.  And as to the physical exam, does that involve looking at

23   muscular development?

24   A.  You can take a look at their development and see what their

25   general body habitus is.

1    Q.  Does it involve examining size and growth of the penis over

2    time?

3    A.  We will make assessments of their penile size and shape,

4    yeah.

5    Q.  Is there special attention paid to something called the

6    Tanner staging?

7    A.  Yes.

8    Q.  Can you explain — because you can do it better than me —

9    what is the Tanner staging?

10   A.  Tanner staging is a scale that we in the medical community

11   use, and it's on a one to five.  Five would be full adulthood,

12   where you would expect pubic hair and a full phallic

13   development.  And one would be somebody who hasn't gone through

14   puberty yet.

15   Q.  And is there any debate about the sections of the Tanner

16   scale or how they are graded or is that pretty solidly

17   accepted?

18   A.  Solidly accepted.

19   Q.  Okay.  And as part of the Tanner scale, you're measuring

20   pubic hair you said?

21   A.  You assess for the presence of pubic hair.

22   Q.  Okay.  And you're assessing the size of the testes?

23   A.  Not part of Tanner staging; but you do that as part of the

24   exam.

25   Q.  Is part of Tanner growth of the penis?

O4TVPAD1                         Herati - Cross

1   A.  It's not part of the Tanner staging, but it's part of the

2   physical exam that we perform on patients who come to see us.

3   Q.  And when treating Klinefelter syndrome patients, do you

4   consider labs for serum hormone profile?

5   A.  Yes.

6   Q.  And two semen samples with extended centrifuging?

7   A.  Yes.

8   Q.  And do you do something called microdeletion testing for Y

9   chromosomes?

10  A.  Yes.

11  Q.  Klinefelter syndrome patients present with low

12  testosterone?

13  A.  Not always.

14  Q.  And I'm not -- to the extent I'm asking, I'm going to try

15  to qualify not to be asking in an absolute fashion.

16          Do Klinefelter syndrome patients also present with low

17  sperm?

18  A.  Yes.

19  Q.  Do they present with small genitalia?

20  A.  The testes will be small, but the phallic size is variable.

21  Q.  The phallus what?

22  A.  Phallic size is variable.

23  Q.  Do they present with cognitive issues?

24  A.  They can.

25  Q.  Such as fatigue?

O4TVPAD1                          Herati - Cross

1    A.  Yes.

2    Q.  Attention deficit?

3    A.  It's possible.

4    Q.  Aloofness?

5    A.  It's possible.

6    Q.  How would you define aloofness presenting itself on a

7    Klinefelter syndrome patient?

8    A.  I would define that as an adolescent who is not engaged in

9    his school with his peers, and his parents are concerned that

10   he's not interacting, that he seems withdrawn.  So they'll

11   bring him into a pediatrician to have that looked at.

12   Q.  Could that aloofness manifest itself outside of school?

13   A.  It's possible.

14   Q.  Could that aloofness manifest itself in relation to

15   interactions with his own parents?

16   A.  It's possible.

17   Q.  And I think that maybe it was -- last time you were here,

18   you discussed measuring -- when the penis is measured, it is

19   done in a flaccid state?

20   A.  Correct.

21   Q.  For low testosterone, the first step is blood work?

22   A.  The first step is getting a history to understand what the

23   symptoms are.

24   Q.  Is part of the first step, second step, early step,

25   checking for cognitive issues?

1  A.  That's not in the scope of a urologist's practice.  So if

2  we have a patient that we think may have cognitive issues,

3  we'll either refer them back to their pediatrician or give them

4  a referral to a psychologist or behavioral health specialist.

5  Q.  And what would you see or hear or infer that would make you

6  think there's a cognitive issue that requires followup?

7  A.  If a patient or a parent endorses the symptoms, then we

8  will refer them over.  But we don't make that assessment.

9  Q.  What would the symptoms be?

10  A.  If they tell us that the patient is not engaged in school,

11  they are exhibiting signs of attention deficit, if they are

12  lethargic and they don't seem engaged in their work, then that

13  can be a sign.

14  Q.  And if the concern is infertility, there are semen samples

15  taken as you mentioned this morning?

16  A.  Correct.

17  Q.  And there may be hormone treatment to boost the sperm?

18  A.  Correct.

19  Q.  And are Klinefelter syndrome patients scheduled to come

20  back every certain amount of time in intervals?

21  A.  Depends on what treatments they are getting.  If they are

22  on -- let's say they are not in the midst of fertility

23  surgeries and they are just coming in for hormone control and

24  hormone maintenance, then we have them come back every six

25  months if they're on testosterone therapy for screening for

O4TVPAD1                        Herati - Cross

1   complications, compliance, and renewal of their prescriptions.

2   Q.  Would it ever be shorter than six months?

3   A.  Unless they are having symptoms.

4   Q.  Would there be perhaps a tightly grouped series of

5   appointments:  Pre-op, op, and post-op?

6   A.  The pre-op, this is for my practice, occur with the

7   pediatrician, if they are a minor, or with their primary care

8   if they are an adult.  And then we'll see them post-op if

9   there's a complication or concern.  But these guys generally do

10  very well.

11  Q.  And what would be -- if someone is being treated for

12  Klinefelter's, for Klinefelter syndrome, and is doing well,

13  what would be the general outside parameter of how frequently

14  they might be scheduled to come back?

15  A.  Every six months we have them come back for serial blood

16  draws to make sure that they haven't developed too many red

17  blood cells, that their estrogen level hasn't gone too high,

18  and that they are no exhibiting any other signs or symptoms of

19  a complication from their therapy.

20  Q.  And is bringing the patient back at some interval part of

21  the standard of care?

22  A.  Yes.

23  Q.  Is bringing the patient back at some sort of interval

24  something that a urologist who is providing appropriate care

25  required to do?

O4TVPAD1                          Herati - Cross

1    A.  Yes.

2    Q.  In the diagnosis and treatment, whether it's sexual

3    dysfunction or infertility, the standard of care starts with a

4    detailed patient history; correct?

5    A.  Correct.

6    Q.  And I believe you testified that also could involve flaccid

7    examination of the penis size?

8    A.  Correct.

9    Q.  The size of the testes?

10   A.  Correct.

11   Q.  And the firmness of the testes?

12   A.  Correct.

13   Q.  Also checking for lesions in the genital region?

14   A.  Yes.

15   Q.  What exactly is that?

16   A.  So the lesions could be at the level of the skin or it

17   could be structural conditions within the penis such as scar

18   tissue, may feel like a nodule or plaque within the tissue that

19   would suggest a condition called Peyronie's disease.

20            THE COURT:  Can you spell that.

21            THE WITNESS:  P-E-Y-R-O-N-I-E.

22   Q.  And you might also check for urethral defects?

23   A.  Correct.

24   Q.  What would that be?

25   A.  So urethral defects, that normal opening is at the tip of

1    the penis.  But an abnormal position would be anywhere proximal

2    to that or closer to the body.  So it could be on the

3    undersurface, and that's called a hypospadias.  And that would

4    suggest that when the patient was in development, that they had

5    exposure to low testosterone in-utero.

6    Q.  And with respect to semen analysis, you're checking for

7    volume?

8    A.  Correct.

9    Q.  And is volume what a layperson -- just the amount --

10   A.  Correct.

11   Q.  -- of semen?

12   A.  That's right.

13   Q.  And are you checking for shape or mobility?

14   A.  We're looking at the shape of the sperm and how the sperm

15   move.  We look at are they moving or not, and are they moving

16   forward or not.  So we have different parameters that we're

17   checking for.

18   Q.  And so I get mobility going forward, right.

19            What about shape, what does that mean?

20   A.  We have something called the strict criteria for shape

21   assessment.  So the sperm, to be considered normal, have to

22   have perfect shape.  They have to have an oval head with what's

23   called an acrosomal cap, a mid piece, and then the tail with no

24   defects in the tail, no kinks in the tail, no blubs on the

25   tail, no double tails.

1   Q.  And I believe you testified this morning that even if sperm

2   is retrieved for a cryo bank and seems perfect, there still may

3   be reasons for periodic sperm checking; correct?

4   A.  That's correct.

5   Q.  And I think you said that that is a -- if that's going to

6   happen, it would be a decision between the patient and the

7   physician, right?

8   A.  Correct.

9   Q.  And if the patient was a minor, am I correct in assuming it

10  would be a decision that would also involve -- maybe the

11  patient too, but also the patient's -- the parents?

12  A.  That's correct.

13  Q.  Okay.  I want to talk to you a little bit about something

14  called the pelvic floor.

15          Can you tell me in as layperson terms as possible, on

16  a man, what is the pelvic floor and where is it?

17  A.  Sure.  So the way that I describe it to patients is I call

18  it the hammock in the pelvis.  The bladder sits on top of the

19  prostate and the prostate sits on top of the pelvic floor

20  muscles.  And then the urethra passes through the pelvic floor

21  muscles, the nerve fibers that go to the genitalia pass through

22  the pelvic floor muscles, and blood vessels will pass through

23  the pelvic floor muscles on their way to the genitalia.

24  Q.  All right.  So laypeople you know are smarter than me.

25          Is it sort of the set -- is the pelvic floor the set

1    of muscles that sort of run from the back to the front?

2    A.  Correct.  Into the sidewalls.

3    Q.  And to the side.  And that's sort of what holds everything

4    between our legs up?

5    A.  That's correct.

6    Q.  Okay.  And for an overly tight pelvic floor, there might be

7    a prescription of Xanax appropriate?

8    A.  In some cases.

9    Q.  Valium?

10   A.  That's possible.

11   Q.  Clonazepam?

12   A.  It's possible.

13   Q.  And an overly tight pelvic floor muscle might also present

14   with pain in the tip of the penis?

15   A.  That's possible.

16   Q.  And an overly tight pelvic floor could be the cause of ED

17   because of constricting flow -- arterial flow to the penis?

18   A.  That's right.

19   Q.  And in that instance, a rectal exam may be appropriate to

20   see if there's pressure on the pelvic floor muscles

21   contracting, right?

22   A.  Correct.

23   Q.  Am I right that a majority of urologists would do a rectal

24   exam for -- checking for pelvic floor muscles if the patient

25   presented with something else?

O4TVPAD1                        Herati - Cross

1    A.  If they have symptoms of pelvic floor dysfunction, such as

2    weak stream and complete emptying, burning with urination, pain

3    in the pelvis, then a rectal exam would be helpful in that

4    situation.

5    Q.  So if I come in with something that sounds like pelvic

6    floor muscle tightness and I have something else, pain during

7    sex?

8    A.  That's possible.

9    Q.  Go to a rectal exam?

10   A.  It's a consideration, yes.

11   Q.  But when you say "consideration," does that mean that it's

12   something some doctors might do and something some doctors

13   might not do?

14   A.  That's correct.

15   Q.  Pelvic floor and pain after sex?  I'm sorry.  Some doctors

16   might do a rectal exam, some doctors might not?

17   A.  That's correct.  Some may, some may not.

18   Q.  Pain in the pelvic floor and an inability to achieve

19   orgasm, would that, in some doctors, trigger the thought that a

20   rectal exam would be appropriate?

21   A.  It should.

22   Q.  It should or it shouldn't?

23   A.  It should.

24   Q.  It should.  Okay.

25              Would pain in the pelvic floor and pain in getting an

1    erection or pain during an orgasm also trigger a rectal exam in

2    the eyes of some doctors?

3    A.   No.

4    Q.   No.   Okay.   And why not?

5    A.   The pain during an erection could be something completely

6    separate from any pelvic floor issue.   It could be a scar

7    tissue condition called Peyronie's disease.   I'm sorry if I --

8    maybe I misunderstood your question.   But if you're asking if a

9    rectal exam is necessary for all patients with pain, then the

10   answer would be no.

11   Q.   No, no.   It was if you have -- if a patient presents with

12   what appears to be pain or tightness in the pelvic floor, and

13   you also have with that the presentation of pain during -- in

14   getting an erection or pain during an orgasm, if they

15   co-present as to that, would that trigger in the school of

16   thought of some doctors a rectal exam?

17   A.   Yes.

18   Q.   And in other doctors, no?

19   A.   In some doctors, no.

20   Q.   Okay.

21   A.   The reason for no is that some doctors are not familiar

22   with how to assess the pelvic floor tension.   So they may not

23   really understand what muscles to press to elicit the symptoms.

24   But classically we do it because we're checking for a condition

25   called prostatitis, which is inflammation of the prostate.   The

1  common teaching is that there could be a boggy prostate, which

2  means an inflamed or infected prostate.

3  Q.  And if you're checking for prostatitis, that would be a

4  rectal exam?

5  A.  That would be a rectal exam.

6  Q.  Am I right that, to your recollection, at Northwell a lot

7  of the old school physicians, quote/unquote, would conduct

8  rectal exams as a routine part of fertility check?

9  A.  I didn't spend as much time with the Northwell physicians

10  to understand their entire practice patterns but the one that I

11  did work with would want that checked, yes.

12  Q.  And there is some school of thought, literature and

13  otherwise, in the field of urology that a rectal exam checking

14  for prostatitis would be based on trying to diagnose or treat

15  premature ejaculation, right?

16  A.  If they have signs or symptoms, if there are coexisting

17  signs, then that can be part of the assessment.

18  Q.  And the other signs that would present that would warrant,

19  at least in some, right, because it seems like some doctors who

20  think a lot about one thing and some doctors who think the

21  exact opposite, right?

22  A.  No.  There are guideline statements that say that if a

23  patient has signs of prostatitis and premature ejaculation,

24  that they should do a pelvic exam.  So the doctors that are

25  not, are not following the guidelines.

O4TVPAD1                    Herati - Cross

1  Q.  And with respect to prostatitis and premature ejaculation,

2  before doing a rectal exam, you might also check for pain in

3  the region?

4  A.  Correct.

5  Q.  And burning sensation when urinating?

6  A.  Correct.

7  Q.  I want to talk to you about something that there is no

8  chance I will pronounce correctly.  Bulbo -- you know it,

9  right?  I'm just going to ask you to say it.

10  A.  So there is a reflex where we squeeze the head of the penis

11  and see what the rectal tone is.

12         THE COURT:  Can you spell that for the record.

13  A.  Bulbocavernous reflex, is that what you were going to ask?

14  Q.  Yup.

15  A.  B-U-L-B-O-C-A-V-E-R-N-O-U-S, and then reflex.

16  Q.  And would a rectal exam sometimes be appropriate if you're

17  checking for that?

18  A.  That exam is not present in 30 percent of normal patients

19  who have no issues, so it's not routinely performed.  But it is

20  a way of assessing the neurologic tone.

21  Q.  So it may be appropriate?

22  A.  It may be appropriate, but not recommended, because of the

23  fact that it can be falsely negative in 30 percent.

24  Q.  Are you familiar with a procedure called the UroLift

25  system?

1   A.  Yes.

2   Q.  What is the UroLift system?

3   A.  So UroLift system is a treatment for benign prostatic

4   hyperplasia.  So when the prostate gets enlarged and it becomes

5   obstructive, we put implants into the prostate to open up the

6   prostate so the urine can flow easier.

7   Q.  Is it a piece of hardware or -- that goes in, like, you

8   think of a hip replacement, this is something that goes in the

9   body?

10  A.  Yes.

11  Q.  And what exactly is it?

12  A.  So it's a three-part system.  There is an anchor that sits

13  outside the prostate, there is a suture, and another anchor on

14  the inside of the urethra that suspends everything open.

15  Q.  And how many of those have you done?

16  A.  Estimate 400 to 500.

17  Q.  Four to 500.

18          Okay.  That is made by, is it, the Teleflex?

19  A.  Correct.

20  Q.  And I noticed on your CV you're -- it's either adviser to

21  or an adviser to Teleflex?

22  A.  Consultant to them.

23  Q.  Consultant.

24          And what does being a consultant to Teleflex involve?

25  A.  Being a consultant involves me either proctoring or

1    preceptoring other physicians to teach them how to perform the

2    surgery; giving educational talks to them to help them

3    understand the reasons to perform or reasons not to perform the

4    surgery; and then what the education should be to the patient

5    so that when they are talking to patients about expectations.

6    So I will have sessions where I teach physicians on what to

7    manage and how to manage it.

8    Q.  And am I correct, ballpark, that during 2021 and 2022, you

9    received approximately $34,000 from Teleflex?

10   A.  I haven't reviewed to see how much, but that sounds

11   accurate.

12   Q.  Have you heard of a company called Dadi?

13   A.  Yes, Dadi, D-A-D-I.

14   Q.  D-A-D-I.

15          And that's a company that at the time was producing or

16   selling at-home sperm testing?

17   A.  Sperm collection for cryopreservation.

18   Q.  And you were adviser to Dadi?

19   A.  Correct.

20   Q.  Dadi was bought by Ro?

21   A.  Correct.

22   Q.  Do you receive any compensation from them?

23   A.  I received stock option from them.

24   Q.  And do you have any idea what the value of those stock

25   options currently are?

O4TVPAD1                          Herati – Cross

1   A.  I don't have a recent estimate, no.  The company is not

2   doing well.

3   Q.  LiNA Medical?

4   A.  Yes.

5   Q.  What is that company?

6   A.  LiNA Medical is a Danish company.  And they are primarily

7   the gynecologic space, but they are also expanding into urology

8   to make devices that urologists use.

9   Q.  Are you an adviser to LiNA?

10  A.  I'm an adviser to LiNA.

11  Q.  Do you receive any money from them?

12  A.  Correct.

13  Q.  For what services?

14  A.  I am part of an advisory board, and we're developing a new

15  disposal cystoscope.

16  Q.  And how are you compensated by LiNA?

17  A.  Hourly.

18  Q.  Hourly?  At what rate?

19  A.  400.

20  Q.  Do you have any idea how much you made total from LiNA for

21  that work?

22  A.  Under 20 would be my estimate per year.

23  Q.  You heard of NeoTract?

24  A.  NeoTract and Teleflex are the same.  They are part of the

25  same organization.

O4TVPAD1                         Herati – Cross

```
 1   Q.   NeoTract and?

 2   A.   Teleflex.

 3   Q.   Gotcha.  Okay.

 4        And Boston Scientific?

 5   A.   Yes.

 6   Q.   Do you do any services or perform any services for Boston

 7   Scientific?

 8   A.   No, no services for them.

 9   Q.   Speaking or anything?

10   A.   No.

11   Q.   Do you ever recall disclosing any income or -- in like or

12   in kind from Boston Scientific?

13   A.   No.  I work with Olympus, but not Boston Scientific.  Not

14   to my knowledge.

15   Q.   Okay.  Now, you have a contract to work with the U.S.

16   Attorney's Office on this case; correct?

17   A.   Correct.

18   Q.   And your rate is 500 an hour; correct?

19   A.   Correct.

20   Q.   And how much have you -- have you been paid yet at all?

21   A.   I have not submitted an invoice.

22   Q.   Okay.  If your engagement in this case ends today, what

23   would that invoice be about?

24   A.   I don't have a full sense for what the amount would be, but

25   I would estimate about 20 to 30.
```

1    Q.  20 to 30,000.  Correct?

2    A.  Correct.

3    Q.  And did the government pay for your travel here?

4    A.  They have told me they will reimburse the travel.

5    Q.  And how much was that, will that be about?

6    A.  I try to go economy on everything.  I took the train and

7    stayed in a very medium-scale hotel.  I would estimate maybe

8    500, $600 per trip up here.

9    Q.  Per trip.

10        How many times did you come down?

11    A.  Last week and then overnight last night.

12    Q.  Now, as far as when you came down, was that to meet with

13    the government?

14    A.  No, it was to come for this.

15    Q.  To meet with the prosecutors for this case?

16    A.  No, I have not met with them before, not in person.

17    Q.  Okay.  So you've had WebExes with the prosecutors?

18    A.  That's correct.

19    Q.  You've had telephone calls with the prosecutors?

20    A.  That's correct.

21    Q.  And you've emailed with the prosecutors?

22    A.  That's correct.

23    Q.  When was the first time you were in the same room with the

24    prosecutors?

25    A.  Friday.

1    Q.  Just this past Friday?

2    A.  Correct.

3    Q.  Okay.  Have you been with them since Friday?

4    A.  No.

5    Q.  Have you been in contact with them since Friday other than

6    for scheduling?

7    A.  No.

8    Q.  Okay.  Do you recall about how many times -- forget last

9    Friday.  Before then -- well, let me ask you this:  Does it

10   sound about right that you were first contacted by the

11   government to potentially be an expert in this case around

12   April of last year?

13   A.  That sounds about accurate.

14   Q.  And do you recall over time exchanging emails with the

15   prosecutors in this case?

16   A.  Yes.

17   Q.  Do you recall sending them articles that you thought were

18   relevant to your testimony?

19   A.  Yes.

20   Q.  And do you recall -- well, let me ask you this:  If I said

21   that between the calls, the WebExes, prior to last Friday, the

22   meetings with the government, excluding email exchanges, would

23   be maybe seven or eight times?

24   A.  Probably more.

25   Q.  How long would they last?

1    A.  Two hours.

2    Q.  And as far as who would be there, am I right that it would

3    sometimes be -- it would always be one of the prosecutors;

4    correct?

5    A.  That's correct.

6    Q.  And sometimes more; correct?

7    A.  That's correct.

8    Q.  And maybe sometimes all four of my colleagues; correct?

9    A.  I don't remember who all was on, but yes.  Sometimes I

10   would see four, five names on the WebEx, but I would never

11   write down or recall who was up there.

12   Q.  And there would be -- do you remember there would be other

13   people on there, perhaps an FBI agent?

14   A.  Yes.

15   Q.  Okay.  Like Agent Turansky?

16   A.  Yes.

17   Q.  Okay.  And possibly paralegals?

18   A.  I believe they were also part of the call.

19   Q.  And obviously nobody for Dr. Paduch was on any of those

20   calls, right?

21   A.  To my knowledge, no.

22   Q.  And to your knowledge, were any of your meetings with --

23   putting aside the emails, right, were any of your meetings with

24   the government recorded audio?

25   A.  I believe --

1             MS. QIAN:  Objection.

2             THE COURT:  The basis is knowledge or --

3             MS. QIAN:  Correct.  Knowledge.

4             MR. BALDASSARE:  I thought that was the question.

5             THE COURT:  You can just answer to the extent you

6    know.

7    A.  I believe they were, but I'm not sure.

8    Q.  What's the basis for believing they were?

9    A.  I may have heard at one point one of the prosecutors say

10   that this call is recorded, but I don't recall if it was.

11   Q.  Okay.  And I think I asked with respect to your knowledge,

12   were any of them audio-recorded, so I'm going to ask the same

13   question the same way with respect to your knowledge were any

14   of them video-recorded?

15   A.  I'm not sure.

16   Q.  Okay.  I guess you got in town for this trial, was it,

17   Thursday, April 25th?

18   A.  Came in Wednesday.

19   Q.  Wednesday?  Okay.

20             And do you recall asking the government if you could

21   meet with them on Thursday evening to practice?

22   A.  I did send that email, yes.

23   Q.  And would that be to practice the direct examination and go

24   through the direct examination that my colleague did this

25   morning?

1  A.  It was to have the questions directed at me so that I could

2  articulate my thoughts, yes.

3  Q.  And was it at all at any point -- did they practice what

4  your cross-examination would be like?

5  A.  They gave me an idea because I've never been in a courtroom

6  like this before, so they gave me some stylistic feedback to

7  say that this is what you may expect.

8  Q.  What you may expect on cross-examination?

9  A.  Correct.

10  Q.  How am I doing?

11  A.  Great.

12  Q.  All right.

13         I'm going to use a list of names of individuals that

14  are pseudonyms that are at work in this trial, people who are

15  testifying under alternate names based on the allegations,

16  okay?

17         Did you ever conduct a physical examination of anyone

18  with the last name Lenox connected to this case?

19  A.  No.

20  Q.  Did you ever meet anyone named Lenox?

21  A.  No.

22  Q.  Did you ever speak to him?

23  A.  No.

24  Q.  Did you ever even see him?

25  A.  No.

O4TVPAD1                          Herati - Cross

1   Q.  Did you ever ask for any testing to be done regarding that

2   individual?

3   A.  No.

4   Q.  With respect to an individual named Bevin -- and by the

5   way, if at any point you think you would want to see the real

6   name of the person, we can make that happen.  I just would want

7   to be careful that we do it in the right way.  So if you think,

8   Oh, I may have, but I don't remember that name, I remember

9   another name, just tell me.

10          Did you ever conduct an exam of anyone named Bevin?

11  A.  No.

12  Q.  Ever meet him?

13  A.  No.

14          THE COURT:  Sorry.  I don't know if this makes sense,

15  unless it's clear.  Were you given the names of the pseudonyms

16  and real names of certain people who testified in this trial?

17          THE WITNESS:  I was not.

18          THE COURT:  He's not going to know if you're just

19  giving him the pseudonyms and he has no idea.  I don't know if

20  you want to give a list of things.

21          MR. BALDASSARE:  I was wondering if we had the pink

22  one, I could put it up on the Elmo or the government could put

23  it up.

24          THE COURT:  Or we can just hand it to him, right?

25          MR. BALDASSARE:  Yeah, that's fine with me.

O4TVPAD1                        Herati - Cross

1                   THE COURT:  I don't know if you want to --

2                   MR. BALDASSARE:  I don't know if it's marked.

3                   THE COURT:  -- if you want to cross out the family

4       names and just have the patients.

5                   MR. BALDASSARE:  I think it will be clear from the

6       questioning.

7                   THE COURT:  Okay.

8                   MR. BALDASSARE:  We can just put on the record that

9       the document we're going to hand the witness is the pink sheet

10      that was used during jury selection, that has the true names of

11      the individuals, the former patients and some family members,

12      as well as the pseudonyms under which those individuals will be

13      testifying at trial.

14      BY MR. BALDASSARE:

15      Q.  Just back to Lenox, and I'm going to ask this — and I know

16      you know this, but please don't say the names that are the

17      actual names, okay?  Even the first names, okay.

18                  With respect to Mr. Lenox, now that you see that,

19      would your answers be the same?

20      A.  Same.

21      Q.  With respect to Mr. Bevin, would your answers be the same?

22      A.  Same.

23      Q.  Okay.  Look at Stewart.  And I'm just going to try to move

24      this along a bit.

25                  Do you see the name Stewart there?

O4TVPAD1                          Herati - Cross

1    A.  I do not.

2              THE COURT:  This only has the real names, so you're

3    not going to use those.  So if you want to -- this only has the

4    real names.

5    Q.  Let me ask you this:  The names on those lists, I think the

6    government will agree, are the former patients at issue in this

7    case.  So I'm going to ask you for any of the names on that

8    list, did you -- do you remember examining any of those people?

9    A.  None of these.

10   Q.  Okay.  Do you remember meeting any of them?

11   A.  No.

12   Q.  Do you remember speaking with any of them?

13   A.  No.

14   Q.  Do you remember seeing any of them?

15   A.  No.

16   Q.  Do you remember examining, meeting, speaking, seeing

17   anybody in connection with this case whose name might not be on

18   that list?

19   A.  I did see a news piece about the upcoming trial.  And I

20   think there are two people that I don't remember what their

21   names were, but just what had been presented on the news.

22   Q.  Now, let me ask you this:  Medical charts would contain lab

23   orders; correct?

24   A.  Correct.

25   Q.  Lab results; correct?

O4TVPAD1                          Herati – Cross

1   A.  Correct.

2   Q.  Blood samples; correct?

3   A.  Possibly.

4   Q.  Possibly saliva testing?

5   A.  Not typically.

6   Q.  In this type of case, semen testing?

7   A.  In a Klinefelter situation, yes, that's common.

8   Q.  Possibly, if done, the results of a biopsy?

9   A.  If they've gotten to that point in their care, yes.

10  Q.  Would it include notes from the patient interview

11  self-disclosure?

12  A.  An interview with the physician or the medical

13  professional.

14  Q.  Would it also include how the patient presents — in this

15  case it's all he's, I think — how the patient presents his

16  complaints?

17  A.  Yes.

18  Q.  Would it also contain the tests that were ordered by the

19  doctor?

20  A.  Yes.

21  Q.  Might contain pictures?

22  A.  Not typically, no.

23  Q.  Not even in a KS case?

24  A.  The times the pictures are incorporated into the chart are

25  if there's a lesion on the skin, we sometimes will take

O4TVPAD1                         Herati - Cross

1    pictures of that.  But otherwise, we don't take pictures of

2    patients.

3    Q.  Might it contain notes or reviews of prior -- medical

4    records from prior doctors?

5    A.  We will review those and, in some cases, put summaries of

6    those reviews into the chart.

7    Q.  Would it contain notes that were dictated by the physician

8    after the examination?

9    A.  Yes.

10   Q.  Would it contain a prescription history of the patient?

11   A.  In most cases, yes.

12   Q.  And would it contain the current history, current

13   prescription history of the patient?

14   A.  Yes.

15   Q.  Would it contain, if it had been made yet, a diagnosis?

16   A.  Yes.

17   Q.  Would it contain, if appropriate at the time, a prognosis?

18   A.  Not always.

19   Q.  Would it contain, if it was in place, a plan of care?

20   A.  Yes.

21            THE COURT:  Do any of the jurors think they need to

22   stand and stretch or is everyone doing okay?

23            All right.  Please proceed.  Thank you.

24   Q.  Dr. Herati, I'm going to do this quickly out of respect for

25   your time.

```
 1              I'm showing you what I'll represent are government
 2      exhibits -- sealed Government Exhibits 201 through 216, sealed
 3      201 through sealed 216.  I'm not going to come all the way up
 4      there.  I'm going to ask, you showing you -- these are
 5      double-sided medical records for one of the individuals on this
 6      list.  Did you ever look at these?
 7      A.  No.
 8      Q.  I'm showing you medical records for another individual on
 9      that list, double-sided.  Did you ever look at these?
10      A.  No.
11      Q.  Showing you medical exhibits for another person on that
12      list, again, double-sided.  Did you ever look at these?
13      A.  No.
14      Q.  I'm showing you medical records, double-sided, for one of
15      the individuals on that list.  Did you ever look at these?
16      A.  I did not.
17      Q.  I'm showing you medical records for another individual on
18      that list, they are double-sided.  Did you ever look at these?
19      A.  I have not.
20      Q.  These are two different individuals, double-sided, on that
21      list.  Did you ever look at these?
22      A.  No.
23      Q.  Same question?
24      A.  No.
25      Q.  This is one other individual, double-sided.  Did you ever
```

O4TVPAD1                         Herati - Redirect

1    look at these?

2    A.  No.

3    Q.  This is another individual, double-sided.  Did you ever

4    look at these?

5    A.  No.

6    Q.  Final individual, double-sided medical records.  Did you

7    ever look at these?

8    A.  No.

9            MR. BALDASSARE:  One moment please, Judge.

10           THE COURT:  Sure.

11           (Counsel conferred with defendant)

12           MR. BALDASSARE:  I have nothing further.  Thank you.

13           THE COURT:  All right.  Redirect.

14           MS. QIAN:  Yes.

15   REDIRECT EXAMINATION

16   BY MS. QIAN:

17   Q.  Dr. Herati, just a few questions here to wrap up.

18           Now, earlier do you recall being asked by my colleague

19   about debates regarding diagnosis and treatment?

20   A.  Yes.

21   Q.  Now, are you aware of any debate or controversy regarding

22   whether a doctor should manually masturbate a patient to obtain

23   and maintain an erection?

24   A.  No.

25   Q.  Do you recall also being asked by my colleague whether

O4TVPAD1                        Herati - Redirect

1   there are experimental options to help support and preserve

2   fertility in Klinefelter patients?

3   A.  Yes.

4   Q.  Now, are you aware of any experimental options to treat

5   fertility in Klinefelter patients that involves a physician

6   manually stimulating a patient?

7   A.  No.

8   Q.  You were also asked by my colleague whether there are

9   unique concerns when it comes to treating Klinefelter patients;

10  correct?

11  A.  Yes.

12  Q.  Are there any unique concerns that would make it medically

13  appropriate for a physician to manually stimulate a patient?

14  A.  No.

15  Q.  You were also asked by my colleague regarding follow-up

16  visits, correct, for Klinefelter patients?

17  A.  Yes.

18  Q.  And I believe you testified that typically you would want

19  to see your Klinefelter patients every six months?

20  A.  Correct.

21  Q.  What happens during those follow-up visits?

22  A.  So we go through a series of questions.  We ask about how

23  their symptoms are controlled, if they are having any problems

24  with the therapies that we've offered, we'll do an examination,

25  and then we'll also send them for blood work.

1  Q.  Is it typical in those six-month visits for a patient to be

2  manually masturbated by a doctor?

3  A.  No.

4  Q.  Is it ever medically necessary for a patient to be manually

5  masturbated by a doctor during one of these six-month follow-up

6  appointments?

7  A.  No.

8  Q.  I apologize.

9          Now, you were also asked on by my colleague regarding

10  physical exams to feel for lesions or plaques in the flaccid

11  penis; correct?

12  A.  Correct.

13  Q.  Can you just, using Government Exhibit 3, which is before

14  you, demonstrate for us how one would go about doing that?

15  A.  Sure.  Can you see this?

16  Q.  Yes.

17  A.  So we would typically run our fingers in a pinching manner

18  up and down the top half of the penis.  And then if we feel a

19  nodule or plaque, then we will assess the position of it, the

20  size of it.  And we'll also do the same thing on the

21  undersurface and just feel for plaques.  We use a pinching

22  motion to work our way up and down.

23  Q.  Approximately how long does this examination last?

24  A.  One to two minutes.

25  Q.  Now, you were also asked some questions by my colleague

O4TVPAD1                          Herati - Redirect

1    regarding patients who might present with pelvic floor issues;

2    correct?

3    A.   Yes.

4    Q.   Now, are you aware of any -- is it ever medically

5    appropriate to treat a patient with pelvic floor issues with

6    manual masturbation?

7    A.   Just to clarify, is it their own masturbation or a

8    physician?

9    Q.   A physician to masturbate the patient.

10   A.   That would not be necessary.

11   Q.   Now, you were also asked by my colleague regarding whether

12   you reviewed any of these medical records; correct?

13   A.   Correct.

14   Q.   And I believe you said the answer was no, right?

15   A.   Correct.

16   Q.   You also did not examine any of the patients on that list;

17   correct?

18   A.   Correct.

19   Q.   Now, does your opinion that it is never medically

20   appropriate for a physician to manually masturbate a patient

21   depend on whether or not you've personally reviewed the medical

22   records of those patients, where you've personally examined

23   those patients?

24   A.   No.

25   Q.   You were also asked questions regarding -- by my colleague

1    regarding what's contained in these sets of medical records,

2    right?

3    A.  Correct.

4    Q.  And one of the things that you said would be contained

5    would be notes involving interviews with patients?

6    A.  Correct.

7    Q.  Now, whose notes are those?

8    A.  Whoever is discussing with the patient, it could be a

9    nurse, it could be a medical assistant, it could be even a

10   pharmacist.

11   Q.  Is it ever the patient himself writing the notes into the

12   medical record?

13   A.  They will submit questions through a patient portal, and

14   that gets archived into the medical records.

15   Q.  But if it's just an in-person conversation, who's writing

16   those notes?

17   A.  It's the physician or whoever is on the medical provider

18   end.

19   Q.  And do the physicians typically show their notes to the

20   patient thereafter?

21   A.  The notes are visible in our system to the patient.  They

22   can log in and see every note that was written and go through

23   their entire chart.  Not every piece of it, but the office

24   visit notes, labs, exams, things of that nature.

25   Q.  I'm sorry, you said what kind of notes were available?

O4TVPAD1                          Herati - Recross

1   A.   Progress notes from our visits are visible to the patients,

2   labs and any pathology reports and imaging exams, like a CT

3   scan, ultrasound report, things like that would be visible to

4   the patient.

5   Q.   Now, again, you were being -- you were shown short of the

6   binders with these medical records; correct?

7   A.   Correct.

8   Q.   Now, do you need to look at any of these medical records to

9   rendering your opinions as to whether it is medically

10  appropriate for a physician to stimulate -- excuse me,

11  masturbate a patient?

12  A.   No.

13  Q.   Why not?

14  A.   What I base my testimony was off of my clinical experience,

15  my training, and the guidelines.

16  Q.   Is there anything in these medical records that can

17  persuade you to think that a physician manually stimulating a

18  patient is medically appropriate?

19  A.   I highly doubt that I'll find anything in there.

20           MS. QIAN:  No further questions, your Honor.

21           THE COURT:  Any recross?

22           MR. BALDASSARE:  Briefly.

23  RECROSS EXAMINATION

24  BY MR. BALDASSARE:

25  Q.   Mr. Herati, I'm not going to do them one at a time.  I just

O4TVPAD1                         K. Bevin - Direct

1    want to ask you, do you think having seen any of these medical

2    records would have aided your testimony in any way?

3    A.  No.

4           MR. BALDASSARE:  Nothing further.

5           THE COURT:  All right.  You can step down.  Thank you.

6           (Witness excused)

7           THE COURT:  Government can all its next witness.

8           MS. COLSON:  The government calls Krista Bevin.

9    KRISTA BEVIN,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MS. COLSON:

14   Q.  Good morning, Mrs. Bevin.

15          Are you testifying under a pseudonym today?

16   A.  Yes.

17   Q.  Before we go any further, Mrs. Bevin, I'm going to ask

18   Ms. Vuckovich to please pull up sealed Government Exhibit 317

19   for the witness, the parties, and the Court.

20          Mrs. Bevin, do you recognize this document?

21   A.  Yes, I do.

22   Q.  What is this?

23   A.  My driver's license.

24   Q.  Focusing on the driver's name, do you recognize it?

25   A.  Yes.

O4TVPAD1                         K. Bevin - Direct

1   Q.  Is that your true and accurate name?

2   A.  Yes.

3            MS. COLSON:  At this time I offer sealed Government

4   Exhibit 317, and I ask that Ms. Vuckovich please publish it to

5   the jury.

6            THE COURT:  Any objection?

7            MR. BALDASSARE:  No objection.

8            THE COURT:  All right.  It will be admitted as sealed.

9            (Government's Exhibit 317 received in evidence)

10  Q.  Are you familiar with Luke Bevin?

11  A.  Yes, I am.

12  Q.  How are you familiar with Luke Bevin?

13  A.  He's my son.

14  Q.  Where does Luke live?

15  A.  In Maryland.

16  Q.  Does he live with you?

17  A.  Yes.

18  Q.  Where does he live?

19  A.  In Maryland with me.

20  Q.  In your home?

21  A.  Yes, in our family home.

22  Q.  How many children do you have, Mrs. Bevin?

23  A.  I have six children.

24  Q.  And where does Luke fall among that six?

25  A.  He's the youngest.

O4TVPAD1                          K. Bevin - Direct

1   Q.   Is Luke Bevin your son's true name?

2   A.   No.

3        MS. COLSON:  Ms. Vuckovich, would you please pull up

4   Government Exhibit 305 for the witness, the parties, and the

5   Court.

6   Q.  Mrs. Bevin, do you recognize this?

7   A.   Yes, I do.

8   Q.   What is this?

9   A.   My son's driver's license.

10  Q.   Do you recognize the driver's name?

11  A.   Yes.

12  Q.   Is it your son's true and accurate name?

13  A.   Yes.

14  Q.   And do you see where it says date of birth?

15  A.   Yes.

16  Q.   Is that your son's true and accurate date of birth?

17  A.   Yes, it is.

18       MS. COLSON:  At this time I offer sealed Government

19  Exhibit 305, and ask that Ms. Vuckovich please publish it to

20  the jury.

21       MR. BALDASSARE:  No objection.

22       THE COURT:  Admitted as sealed.

23       (Government's Exhibit 305 received in evidence)

24  Q.  Mrs. Bevin, I believe you said you live in Maryland; is

25  that correct?

1   A.  Yes, it is.

2   Q.  And Luke lives with you in Maryland you said?

3   A.  Yes.

4   Q.  Have you ever lived in New York City?

5   A.  Never.

6   Q.  Has Luke ever lived in New York City?

7   A.  Never.

8   Q.  Have either of you ever lived in New York state?

9   A.  Never.

10  Q.  Are you familiar with the genetic condition known as XXY?

11  A.  Yes, I am.

12  Q.  Does that condition go by another name?

13  A.  It goes by Klinefelter syndrome.

14  Q.  How are you familiar with XXY?

15  A.  My son was diagnosed with that.

16  Q.  Who was Luke's primary caretaker during his childhood and

17  teenage years?

18  A.  I was.

19  Q.  Who was responsible for Luke's medical care as he was

20  growing up?

21  A.  I was.

22  Q.  Who was responsible for Luke's education?

23  A.  I was.

24  Q.  Mrs. Bevin, how would you describe Luke's affect growing

25  up?

1  A.  He was very sweet and soft-spoken.  Loved to play outside.

2  I think as the youngest of six siblings, he was -- his feet

3  never really touched the ground and he was really and is very

4  beloved and very kind.  And very tall.

5  Q.  What, if any, speech delays did Luke experience growing up?

6  A.  He had extensive speech delays.  The kids always said I was

7  the only one who could understand what he was saying.  So he

8  did a lot of speech therapy, a lot of intervention from a

9  young, young age.

10  Q.  Mrs. Bevin, what, if any, reading delays did Luke

11  experience?

12  A.  He had significant reading delays recognizing letters, and

13  really stood out because of the older siblings.  So we did a

14  lot of reading intervention programs from the time he was

15  probably four, I guess.  He had an IEP at school.

16  Q.  Approximately when did you first learn that Luke had XXY?

17  A.  When he was in middle school.  He was 14 years old.

18  Q.  And what grade was he in?

19  A.  He was in seventh grade.

20  Q.  How did you learn that Luke had XXY?

21  A.  His pediatrician, who had been his pediatrician since

22  birth, recognized certain characteristics, like the height was

23  one thing, and there were some other things.

24          So they referred us to an endocrinologist, who saw him

25  and did blood work and looked at his chromosome panel, and

O4TVPAD1                         K. Bevin - Direct

1    that's when we got the diagnosis.

2    Q.  After receiving that diagnosis, what did you do next?

3    A.  I discussed it with the pediatrician, what to do, because

4    I'm actively involved in all of my kids' and my parents'

5    healthcare, and wanted -- always wanting to do whatever I could

6    to get ahead of everything, because he was so young and there's

7    a lot of long-term issues.

8            And my pediatrician and their whole practice had never

9    had a patient with this.  So I did a lot of research and I

10   tried to educate myself, and it was a lot.  Trying to find the

11   best care for him in the immediate, but more so for his

12   long-term health and well-being.

13   Q.  Mrs. Bevin, are you familiar with Darius Paduch?

14   A.  Yes, I am.

15   Q.  How are you familiar with him?

16   A.  He treated my son.

17   Q.  What type of doctor is Darius Paduch?

18   A.  He's a urologist.

19   Q.  Mrs. Bevin, looking around the courtroom, do you see Darius

20   Paduch here?

21   A.  I do.

22   Q.  Would you please identify himself.

23           MR. BALDASSARE:  Judge, happy to stipulate that the

24   Darius Paduch she's testifying is here seated to my left.

25           THE COURT:  All right.  Is that correct?

O4TVPAD1                        K. Bevin - Direct

1            THE WITNESS:  That is correct.

2            THE COURT:  Okay.  Thank you.

3    BY MS. COLSON:

4    Q.  Mrs. Bevin, approximately when did you first learn of the

5    defendant?

6    A.  I learned of him at a genetic conference in Baltimore,

7    Maryland.  It was about a month after my son's diagnosis.

8    Q.  And what was the topic of that conference?

9    A.  It was a big annual or semiannual conference for kids and

10   adults who had genetic differences of all kinds, XXX, XXY, just

11   different things for the people who have it, but also for the

12   families.  So there was a lot of information for not just

13   treatment, but also support.  And it was national, so different

14   providers or -- it was just a big two-day conference

15   specifically for people and families who were dealing with

16   this.

17   Q.  And Mrs. Bevin, when you say a big conference, how large

18   are you talking?

19   A.  They took over a big hotel with a conference -- with lots

20   of breakout rooms.  Hundreds of people.

21   Q.  Who, if anyone, did you attend that conference with?

22   A.  I attended with my husband, my son's father; and my mother,

23   my son's grandmother.

24   Q.  Why did you attend as a party of three?

25   A.  Because I like to be thorough and I didn't want to miss any

O4TVPAD1                          K. Bevin - Direct

1  information from any of the presenters.  Just needed all the

2  information that I could have.  So my mother, you know, we

3  broke out on the two days who would attend which, and we all

4  took notes.  And then at the end of the day, we got together

5  and we shared what breakout sessions we had sat in.

6  Q.  What was the defendant's role at the conference?

7  A.  He was a presenter.

8  Q.  On what topic did he present?

9  A.  He presented on the condition that my son had.  Has.

10 Q.  What do you recall him saying during the presentation?

11 A.  I remember him saying that he specialized in this and was

12 doing groundbreaking work; and was actually treating the

13 adolescents very successfully who had this condition with --

14 you know, he talked about stem cells and manipulating the gene

15 to edit out some of the symptoms eventually in the future,

16 like -- so it was the research, but also to be able to treat my

17 son, to mitigate some of the other things that come along with

18 it, like heart condition or cancer or all the other things.

19         And, you know, it was -- it was convincing.  It was a

20 lot of information regarding, you know, this diagnosis.

21 Q.  Mrs. Bevin, did you personally interact with the defendant

22 at the conference?

23 A.  Yes, I did.

24 Q.  When was that?

25 A.  After the presentation, I spoke with him.

O4TVPAD1                          K. Bevin - Direct

1   Q.  And what did you discuss with him?

2   A.  I discussed my son.

3          Part of the presentation, he had said, was that, you

4   know, for his treatment, he's got to get the kids in early

5   before they're through puberty; otherwise, preserving their

6   fertility, which is a big issue, infertility is a major issue,

7   that to get them in early, there was more chance that he would

8   be able to have a child.  And my son at the time was 14.  So I

9   felt, you know, if he could help him, there was definitely an

10  urgency.

11  Q.  Did you discuss whether the defendant might be willing to

12  treat your son?

13  A.  Yes.

14  Q.  What did he say?

15  A.  He said yes, absolutely.  But he said he had a waiting

16  list.

17  Q.  Mrs. Bevin, how did you feel when the defendant offered to

18  treat your son?

19  A.  I was grateful.  I was concerned that it was, you know, far

20  away in Manhattan; but we would do anything for our children.

21  All of our medical care for our kids, it never mattered if

22  they -- most of our other kids who've all had medical issues,

23  nothing like this, money was never an issue, insurance didn't

24  matter.  We would do anything for them.

25  Q.  During your discussion with the defendant -- just take your

O4TVPAD1                                K. Bevin - Direct

1   time.

2                THE COURT:  Do you want to maybe break now?

3                MS. COLSON:  Sure.  It's a good time.

4                THE COURT:  Take a break.

5                Just remember, don't discuss the case.  Keep an open

6    mind.

7                (Jury not present)

8                THE COURT:  If you ever need to take a break, just let

9    me know, okay?  We can go as slowly as you want to.

10                Why don't we break for ten minutes and we can come

11   back.  All right.  Thank you.

12                (Recess)

13                (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O43TPAD2                         K. Bevin - Direct

1          THE COURT:  Are we ready for the jury?

2          MS. COLSON:  Yes, your Honor.

3          (Jury present)

4          THE COURT:  Why don't you ask your last question

5     again.

6          MS. COLSON:  Sure.

7     BY MS. COLSON:

8     Q.  Mrs. Bevin, I believe you were talking about your

9     interaction with the defendant at the genetic conference,

10    specifically after his breakout presentation.  I asked you how

11    did you feel when the defendant offered to treat your son?

12    A.  I felt relieved and hopeful.

13    Q.  During the discussion with the defendant, did the topic of

14    where you lived come up?

15    A.  Yes.

16    Q.  Did you tell him where you lived?

17    A.  Yes, I said we were local, because the conference was in

18    Maryland, and we lived closer to Washington, D.C., but you

19    know.

20    Q.  What, if anything, did the defendant say in response?

21    A.  He said he had lots of patients from Maryland and other

22    parts of the country.

23    Q.  Did you eventually set up an appointment with the defendant

24    for your son?

25    A.  Yes.

O43TPAD2                          K. Bevin - Direct

1   Q.  How did you set that up?

2   A.  He had given me his card and the -- his e-mail, and his I

3   think nurse assistant scheduler's e-mail address and phone

4   number.  So I reached out via e-mail and I think I also called.

5   Q.  What were you hoping to achieve by sending Luke to the

6   defendant?

7           MR. BALDASSARE:  Objection.  Can we go to sidebar.

8           THE COURT:  Sure.  We'll have a quick sidebar.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43TPAD2                         K. Bevin - Direct

1          (At the sidebar)

2          MR. BALDASSARE:  So, I let the first question go about

3     how it made Ms. Bevin feel.  This is sort of a second question

4     as to what's in her head and what's going on.  I'm just not

5     sure the depth of the relevance of what's happening in her

6     head.  The government may be able to proffer something.  Even

7     if the Court thinks it's appropriate for some level, I don't

8     know how far down the rabbit hole we can go as to her mental

9     state.

10         MS. COLSON:  Your Honor, I think the question is what

11    are you hoping to achieve as a treatment goal.  And first, it

12    is the last of these types of questions.  But second, it is

13    relevant to the extent she was adamant her son keep going back.

14    To the extent of, well, if this is happening to you, why did

15    you keep going back.  It explains why she, the caretaker of her

16    minor son, would have been compelling him to go back.

17         THE COURT:  I'll let it go but then move on.

18         (Continued on next page)

19

20

21

22

23

24

25

O43TPAD2                         K. Bevin - Direct

 1                  (In open court)

 2     BY MS. COLSON:

 3     Q.  Mrs. Bevin, what were you hoping to achieve by sending Luke

 4     to the defendant?

 5     A.  I was hoping that my son would be able to receive treatment

 6     for his -- I guess not just the genetic condition, you can't

 7     change.  He has that forever.  But for the symptoms that come

 8     along with it.  To really mitigate those, and especially for

 9     him to be able to have a child if he chose in the future.

10     Q.  To be clear, did your son Luke become a patient of the

11     defendant?

12     A.  Yes.

13                  MS. COLSON:  Ms. Vuckovich, can you please show for

14     the witness, the parties, and the Court what has been

15     admitted -- and the jury as well -- what's been admitted as

16     sealed Exhibit 205A, a Weill Cornell visit list.

17     Q.  Starting on page 1, Mrs. Bevin, do you recognize the

18     patient name at the top right?

19     A.  Yes, I do.

20     Q.  Whose name is that?

21     A.  That's my son.

22                  MS. COLSON:  Ms. Vuckovich, if you'd please scroll to

23     page 4 and the bottom most entry.  Thank you.

24     Q.  Mrs. Bevin, what is the date of that entry?

25     A.  August 20, 2015.

O43TPAD2                          K. Bevin - Direct

1   Q.  How old would Luke have been on that date?

2   A.  He was 14.  14.

3   Q.  Does that correspond to Luke's first appointment with the

4   defendant?

5   A.  Yes, it does.

6   Q.  At 14, what did Luke look like physically?

7   A.  He looked like a middle schooler.  He was super tall.  He

8   was I think like 6 feet tall in the fourth grade.  But he was a

9   little boy.  He looked like a baby face, and you know, he just

10  looked like a sweet tall middle schooler.  Very, very skinny.

11  Q.  Did you attend that first appointment with Luke when he was

12  14?

13  A.  Yes, his dad and I were there with him.

14  Q.  How did you get to that appointment?

15  A.  We drove together from Maryland.

16  Q.  Where was the defendant's office?

17  A.  In New York Presbyterian Hospital.

18  Q.  Is New York Presbyterian synonymous with you for Weill

19  Cornell?

20  A.  Yes.

21  Q.  What was the quality of care you expected from that

22  hospital?

23  A.  Well, I'd heard of it, so I assumed it was a top-tier

24  hospital, maybe not only in the city, but in New York and

25  beyond.

O43TPAD2                          K. Bevin - Direct

1  Q.  Focusing on that first appointment, Mrs. Bevin, what

2  happened?

3  A.  In terms of what?

4  Q.  Walk us through how you arrived and what happened after you

5  arrived, please.

6  A.  We went to the office, which was I think on one of the

7  higher floors.  It's a huge hospital.  We waited in the main

8  reception.  Then we went with my son when he was taken back to

9  have his height checked, his blood pressure, his temperature,

10  his weight.  And then I think he might have had blood work at

11  that time or maybe later.  And then we were taken into a small

12  exam room where we waited in there for a while for the doctor

13  to come in.

14  Q.  What happened after the doctor entered?

15  A.  And then, so, I had a lot of questions, and for all my kids

16  and for my parents, I always keep a notebook of medical stuff

17  so I never miss anything.  I record the height, the weight of

18  every visit for every kid, because I can't keep up with all of

19  them, and also for the next visit or whatever, I always can

20  have it in one place.

21      So I had written questions that I had and asked them.

22  And my son was there and my husband was there, and we talked,

23  and then he said we could leave the room.  He was going to

24  examine my son.  So, we left the room.

25  Q.  And at that first appointment, did the defendant prescribe

O43TPAD2                        K. Bevin - Direct

1   any medications?

2   A.  Yes.  He did.

3   Q.  Which medications?

4   A.  If I recall correctly, he prescribed a topical testosterone

5   gel, because part of the diagnosis is his body doesn't make

6   enough testosterone, which affects everything, like your brain,

7   your muscle tone, your heart.  It's just a fundamental thing.

8   So that gel would help give him the testosterone he needed to

9   function.

10           He prescribed a chemotherapy drug in a pill form,

11  which was to, if I understand it correctly, reduce -- one of

12  the conditions is called gynecomastia, which is increased

13  breast tissue.  So, that chemotherapy drug, I think women who

14  have had breast cancer take it, and it is to reduce that.

15           And then he prescribed I think an acne medication.  I

16  think that was it at the time.

17  Q.  Did that testosterone need to be refilled?

18  A.  Yes, it is a controlled substance.  So it needed to be

19  refilled, like called in every three months.

20  Q.  Mrs. Bevin, did Luke ever undergo a surgery with the

21  defendant?

22  A.  Yes.

23  Q.  What was that surgery?

24  A.  That was, that was -- it's called a testicular extraction.

25  TESE, micro testicular surgery, which the doctor had started

O43TPAD2                         K. Bevin - Direct

1  talking about, like, within I think at the first or second

2  visit that he needed to have that.

3  Q.  When did Luke have that surgery?

4  A.  He had that almost a year to the date of the first

5  appointment that we had.  So a year later.

6  Q.  What, if anything, did the defendant say was the reason for

7  that surgery?

8  A.  He said he needed to open up his testicles to find if there

9  was any sperm.  And that he needed to take some tissue in order

10  to possibly grow sperm from the lining of the cells in the

11  testicles at a future date, and that would be possible.  So

12  that could be preserved until a time when technology would

13  catch up.

14  Q.  Where was that surgery performed?

15  A.  At New York Presbyterian Hospital.

16  Q.  Who performed that surgery?

17  A.  The doctor.  The defendant.

18  Q.  Did you travel with Luke to New York for that surgery?

19  A.  Yes, we did, my husband and I.

20  Q.  Did you learn whether the surgery was successful?

21  A.  Well, we waited.  It was many, many hours in the waiting

22  room.  On one hand, it was not successful, because he came out

23  and said there were no sperm.  But he gave us a little vial of

24  tissue which my husband took to a cryobank in Manhattan

25  somewhere that day, immediately.

O43TPAD2                        K. Bevin - Direct

1    Q.   Following the surgery, Mrs. Bevin, did Luke continue to see

2    the defendant as a patient?

3    A.   Yes, he did.

4    Q.   Throughout the time Luke continued as a patient of the

5    defendant, did you communicate directly with the defendant

6    regarding Luke's care?

7    A.   Yes, I did.

8    Q.   How would you communicate with him?

9    A.   Via e-mail or I would call the office or try to ask for him

10   to call me back.

11   Q.   What would you discuss during those communications?

12   A.   I would discuss his medication and any side effects of it.

13   I would discuss if I had learned of any new possible treatments

14   or, you know, better.  For instance, a patch, they developed a

15   testosterone patch which came out, which was so much better for

16   him because the gel is messy and has to dry and it's every

17   single day of his life for the rest of his life.  Things like

18   that.  And his, you know, his height or his weight or his acne.

19   Q.   Did you discuss scheduling?

20   A.   Discussed scheduling, yes.

21   Q.   Did Luke communicate directly with the defendant?

22   A.   Yes.

23   Q.   How did Luke and defendant communicate?

24   A.   At our first visit, after the -- after the exam room, my

25   husband and I would be shown to a different smaller waiting

O43TPAD2                          K. Bevin - Direct

1    room, and then we would all meet back in the doctor's personal

2    office with his big desk, and we would sit across and then we

3    would kind of talk about the next steps.  And on the first

4    visit, he gave my son his cell phone number and his -- I guess

5    his personal e-mail and said, you know, all my boys text me and

6    call me any time, you know.  So he texted him, called him.

7    Q.  Mrs. Bevin, you said you have six children, is that

8    correct?

9    A.  Yes, I do.

10   Q.  Have those children seen doctors?

11   A.  Many, many doctors.

12   Q.  To your knowledge, did any of your children routinely text

13   with their doctors?

14   A.  Never.

15   Q.  Did they text socially with their doctors?

16   A.  Never.

17           MS. COLSON:  Your Honor, at this time, pursuant to a

18   certification under Rule 902(11) in which we understand the

19   defense does not object, the government offers Government

20   Exhibits 806 and 807, as well as sealed Exhibits 801, 802, and

21   803.

22           THE COURT:  They'll be admitted.

23           MR. BALDASSARE:  I'm sorry.

24           THE COURT:  It sounded like it was on consent, so I

25   didn't ask your view.

O43TPAD2                          K. Bevin - Direct

1          MR. BALDASSARE:  Absolutely, Judge.

2          (Government's Exhibit 806, 807 received in evidence)

3          (Government's Exhibit Sealed 801, 802, 803 received in

4     evidence)

5          MS. COLSON:  Ms. Vuckovich, can we please pull up

6     what's been admitted as Government Exhibit 806, and I'll note

7     that's not sealed, and specifically page 217.

8  Q.  Mrs. Bevin, would you please read the name of the Verizon

9     subscriber at the top of this record?

10  A.  Darius Paduch.

11  Q.  And the phone number belonging to that subscriber, please.

12  A.  917-658-4945.

13  Q.  What is the billing record for this -- excuse me.  What is

14     the billing period for this record?

15  A.  September 2, 2018, to October 1st, 2018.

16  Q.  How old would Luke have been during this period?

17  A.  17.

18          MS. COLSON:  Ms. Vuckovich, can we please highlight

19     the entry on September 11 at 7:15 a.m.

20  Q.  Mrs. Bevin, directing your attention to that entry,

21     September 11 at 7:15 a.m., do you recognize the telephone

22     number?

23  A.  Yes.

24  Q.  Who does it belong to?

25  A.  My son's cell phone.

1          MS. COLSON:  You can take that down.  And

2    Ms. Vuckovich, can we please pull up what's been entered as

3    sealed Government Exhibit 801.

4          THE COURT:  Just when we show the sealed exhibits,

5    just to be clear, we're turning off the screen in the gallery.

6    But I want to make sure the lawyers' screens can't be seen from

7    behind.

8          MS. COLSON:  I believe we have privacy screens on

9    these.

10          MR. BALDASSARE:  We're happy to just use one for all

11    three of us.

12          THE COURT:  Just tilt them in a way.

13          MR. BALDASSARE:  If we do it this way, Judge.  Nobody

14    behind us.

15          THE COURT:  Thank you.

16    Q.  Mrs. Bevin, do you recognize the name at the top of that

17    record?

18    A.  That's my name.

19    Q.  Do you recognize the telephone number associated with the

20    Verizon account holder?

21    A.  That's my cell phone.

22    Q.  What's the date at the top under the heading "date due"?

23    A.  July 16, 2016.

24    Q.  How old would Luke have been at that time?

25    A.  15.

O43TPAD2                        K. Bevin - Direct

1          MS. COLSON:  Ms. Vuckovich, if you can please

2   highlight the entry from June 1st at 8:17 p.m.

3   Q.  Mrs. Bevin, would you please read the highlighted telephone

4   number.

5   A.  917-658-4945.

6          MS. COLSON:  Thanks.  You can take that down.  And now

7   Ms. Vuckovich, can we please pull up what's been marked and

8   entered as sealed Government Exhibit 802.

9   Q.  Mrs. Bevin, do you recognize the subscriber's name?

10  A.  Yes, I do.

11  Q.  Who does it belong to?

12  A.  My son's father.

13  Q.  Do you recognize the phone number associated with that

14  subscriber?

15  A.  Yes, I do.

16  Q.  Who does it belong to?

17  A.  My husband's cell phone number.

18  Q.  What is the billing period for this record?

19  A.  July 22, 2019 to August 21, 2019.

20  Q.  How old would Luke have been?

21  A.  18.

22  Q.  Directing your attention to the entry on July 30 at

23  2:02 p.m.  Would you please read the cell phone number

24  associated.

25  A.  917-658-4945.

1          MS. COLSON:  You can take that down, Ms. Vuckovich.

2     If you can please pull up what's already been marked and

3     entered as sealed Government Exhibit 803.

4     Q.  Mrs. Bevin, do you recognize the phone number at the top of

5     this record?

6     A.  Yes.

7     Q.  Who does it belong to?

8     A.  It belongs to my son's father.

9     Q.  Again, what is the billing period for this record?

10    A.  July 22, 2019 to August 21, 2019.

11    Q.  Directing your attention to the entry on August 6 at

12    4:11 p.m.  Would you please read the telephone number.

13    A.  917-658-4945.

14          MS. COLSON:  Thanks, Ms. Vuckovich.  You can take that

15    down.

16    Q.  Apart from calls, I believe you said you also e-mailed with

17    the defendant, is that correct?

18    A.  Yes.

19    Q.  Did you also communicate with members of the defendant's

20    staff?

21    A.  Yes.

22    Q.  Who did you communicate with?

23    A.  The nurses and schedulers, assistants I guess.

24          MS. COLSON:  Ms. Vuckovich, would you please pull up

25    sealed Government Exhibit 205 at page 362 and scroll to the

O43TPAD2                        K. Bevin - Direct

1    bottom.

2    Q.  Mrs. Bevin, do you recognize the name Jessica Collazos?

3    A.  Yes, I do.

4    Q.  Who is that?

5    A.  She worked in the office as a nurse and a point of contact.

6    Q.  Do you recall corresponding with Ms. Collazos about Luke's

7    care?

8    A.  Yes.

9    Q.  When you corresponded with Ms. Collazos about Luke's care,

10   did you understand her to be communicating her own

11   recommendations or those of the defendant?

12   A.  Those of the defendant.

13   Q.  Focusing on the entry.  It begins:  Patient's mom sent

14   e-mail regarding PT's results.  Sent PT's mom e-mail with

15   Dr. Paduch's recommendation.  Hope you are well.  This is

16   Jessica, Dr. Paduch's nurse, and I received your message

17   regarding about the results for redacted.  Per Dr. Paduch's

18   recommendation, testosterone level okay, redacted to take

19   Arimidex and Axiron medications as ordered by Dr. Paduch.  Y

20   chromosome test normal.  Tunel test no sperm on tunel test, per

21   Dr. Paduch.  Consider testicular biopsy with cryopreservation.

22   PT's mom verbalized understanding.

23          And Mrs. Bevin, when I say "redacted," was that your

24   son's true and accurate name?

25   A.  Yes.

O43TPAD2                          K. Bevin - Direct

1    Q.  What is the date of this entry?

2    A.  Well, there are two dates.  I guess the October 2, 2015.

3    There is also a September 25, 2015.

4    Q.  On either of those dates, how old would Luke have been?

5    A.  14.

6    Q.  Did Luke attend follow-up visits after his surgery?

7    A.  Yes.

8    Q.  How often did they occur?

9    A.  They occurred about every six months.

10   Q.  Starting how soon after surgery?

11   A.  Probably a week or two.

12   Q.  Who determined the schedule of follow-up visits?

13   A.  The defendant.

14   Q.  Did you follow the defendant's instructions as to when to

15   follow up?

16   A.  Yes.

17   Q.  Why did you follow those instructions?

18   A.  Because I generally follow my children's doctor's

19   instructions.  And the pattern of every six months, I guess I

20   just, that's what we were told to do, so that's what we did.

21   Q.  Did you attend follow-up visits with Luke?

22   A.  Yes, we attended every visit.

23   Q.  Did you travel to New York for these visits?

24   A.  Yes.

25   Q.  How did you travel there?

O43TPAD2                        K. Bevin - Direct

1   A.  We traveled by car or by private airplane.

2   Q.  Where were you traveling from?

3   A.  From Maryland.

4   Q.  Did you have any other purpose visiting New York, other

5   than to see the defendant when you made those trips?

6   A.  No, we would get in and out as fast as we could in one day.

7   Q.  How would Luke behave before these visits?

8   A.  He wouldn't want to come.  He would say please don't make

9   me go.  And we would say, you know, we're really sorry, but

10  with your condition, you know, this is really necessary for

11  your longterm health, and I'm really sorry.

12          Like when they don't want to go to the dentist.

13  You're like, I'm really sorry, but as your mom, I have to take

14  you.

15          He would not talk the whole way or sleep and say let's

16  leave as fast as we can.

17  Q.  Did Luke refer to New York Presbyterian by a particular

18  name?

19  A.  He called it the zombie hospital.

20  Q.  You said Luke would sleep after the visits, is that

21  correct?

22  A.  Yeah, we would get to the car as fast as we could, and he

23  would have a -- his blanket that he always took, and he would

24  get in the back seat and not say a word for the drive, which is

25  about like a four-hour drive.

O43TPAD2                          K. Bevin - Direct

1   Q.  Did you notice an overall change in Luke's demeanor over

2   the course of his time as a patient of the defendant?

3   A.  He stopped smiling, and he had a really beautiful smile.

4   And he, he was just different.  And you know, I've raised -- I

5   had raised five other teenagers and middle schoolers before

6   him.  And you know, I know his diagnosis was a lot for him.  I

7   know what he went through was a lot for him.  But he just -- it

8   was a lot.

9   Q.  During the follow-up visits, were you present with Luke for

10  the entire appointment?

11  A.  At the office, yes.  With my son, no.

12  Q.  When would you separate from your son?

13  A.  We would separate after we would go wait for the defendant

14  in the exam room.  And we would talk for a few minutes, and

15  then we would leave and go wait in another waiting room.

16  Q.  Did the defendant explain what he would do during

17  examinations of Luke?

18  A.  He said he was basically just wanting to, you know, like a

19  checkup.  And I know like he would check, we talked about

20  scoliosis, I know he would check for gynecomastia, the breast

21  tissue.  And I know that part of what the condition is, is

22  testicular atrophy, so possibly just monitoring that.  But it's

23  a given.  So...

24  Q.  Did you understand that the defendant was collecting semen

25  samples during follow-up appointments?

1    A.  Yes.

2    Q.  What's that understanding based on?

3    A.  What do you mean?

4    Q.  Why did you think that the defendant was doing that?

5    A.  He said he had to know if there were -- was sperm present

6    in the semen.

7    Q.  How did you think that semen samples were being collected?

8    A.  I thought my son was in a private room with some magazines

9    or a video, and I thought he would pass the sample through a

10   little window or a little slot.

11   Q.  After the examination portion of Luke's appointments, how

12   did the appointments conclude?

13   A.  We would meet back in his office in like an office, office,

14   desk.

15   Q.  During those meetings, did the defendant ever describe to

16   you how he had obtained a semen sample?

17   A.  Never.

18   Q.  Did the defendant ever seek your consent to participate in

19   producing a semen sample with your son?

20   A.  What do you mean?

21   Q.  Did the defendant ever seek consent to manually masturbate

22   your son?

23   A.  Absolutely not.

24   Q.  What type of doctor did you understand the defendant to be?

25   A.  A urologist.

O43TPAD2                        K. Bevin - Direct

1    Q.  Did he describe himself to you as any other type of doctor?

2    A.  No.

3    Q.  To your knowledge, did Luke experience any sexual

4    dysfunction?

5    A.  No.

6    Q.  Ejaculatory dysfunction?

7    A.  No.

8    Q.  Did the defendant prescribe psychotropic medications to

9    Luke?

10   A.  He recommended medications, you know, at the appointments.

11   But I'm not a big fan of a lot of medications, and I worry

12   about them interacting with each other.  So I would say no if

13   they were offered.

14   Q.  Did the defendant ever refer you out to a psychiatrist or a

15   psychologist?

16   A.  No.

17   Q.  Switching gears a bit.  Did the defendant ever bring up

18   Luke working for him as a summer intern?

19   A.  Yes.

20   Q.  What did he say?

21   A.  He said that he had chosen my son for a highly selective

22   internship program working with him at New York Presbyterian

23   Hospital as his summer intern.

24   Q.  Did he propose where Luke might live during that

25   internship?

O43TPAD2                              K. Bevin - Direct

1    A.  Yes, he said he could live with him.

2    Q.  How old would Luke have been?

3    A.  I think he was probably 16 at the time.  Because he said

4    it -- or 17.  He said it would look really good on his college

5    résumé.

6    Q.  Mrs. Bevin, what was your response to the defendant's

7    proposal?

8             MR. BALDASSARE:  Objection.

9    A.  I was shocked --

10            THE COURT:  Do you have an objection?

11            MR. BALDASSARE:  Yeah, I think that this is hearsay.

12   I let it go for a bit.

13            THE COURT:  Why don't you move on to the next

14   question.

15            MS. COLSON:  Sure.

16   Q.  Mrs. Bevin, have you ever tried to send the defendant

17   flowers?

18   A.  Yes.

19   Q.  Around when was that?

20   A.  That was in January a year ago, so 2023.

21   Q.  Why did you try to do that?

22   A.  Because in September of 2022, my son's daily medication of

23   the testosterone, he was on the patch at that time, was denied

24   by our insurance company.  So, I had been fighting to have it

25   covered, and he had taken it for years, so it was just --

O43TPAD2                         K. Bevin - Direct

1    sometimes insurance companies do strange things.  So, I spent

2    several months trying to get the same medicine he had been

3    taking for years approved.  And I was working with the Maryland

4    Insurance Association, and they had asked for the prescribing

5    doctor to provide information as to the necessity of my son

6    needing testosterone.  Because his condition hadn't changed and

7    that's why they denied it.  With the genetic condition, it

8    wasn't going to change.

9         So, I had been reaching out I think, you know, through

10   the office or through e-mail or phone for the defendant to call

11   me, because we needed him to get the medicine approved.  And I

12   kept getting referred to like a physician assistant within the

13   office.  And I had said to my son, like, if you can get

14   ahold --

15        MR. BALDASSARE:  Objection.  Sounds like this answer

16   is going to be hearsay.

17        (Counsel conferring)

18        MR. BALDASSARE:  Judge, withdrawn.

19        THE COURT:  Okay.

20   A.  Anyway.  He had texted the doctor who had said I can't help

21   your mom, I can't be your doctor anymore, I'm very ill in the

22   hospital with a heart condition.  And I can't help -- I

23   can't -- no longer your doctor, I can't help your mom.

24        So I was devastated.  Literally.  Shocked.

25   Devastated.  You know, the medicine aside, like, this had been

O43TPAD2                          K. Bevin - Direct

1    my son's doctor, so I wanted to send flowers or do something
2    that I would do for anyone else who had cared for my children.
3    And I just went on the internet to find his address where I
4    could send the flowers, and I saw that he had been accused of
5    crimes.
6    Q.  Mrs. Bevin, has your son taken any legal action against the
7    defendant and Weill Cornell?
8    A.  My son is part of a civil suit.  Not -- the defendant in
9    this is not the defendant in that case.
10   Q.  Did you assist your son in finding an attorney to represent
11   him in that lawsuit?
12   A.  Well, I didn't assist him.  I had called when I read the
13   article, I was so shocked.  My first call was to my
14   pediatrician to say, like, what is this, and praying my son had
15   not been a victim of it.  And then my husband and I had a call
16   with the attorney for that case who was representing a person
17   who had been a victim.  And I said, I don't know if my son, you
18   know, I'm just horrified.

19           And so, I talked to several of the pediatric group
20   about how to approach my son, and so we could -- because he was
21   at college in Arizona at the time, and I didn't want to scare
22   him, and I want in person with him.  So, my husband and I had a
23   call with him saying this is what's happening.  We don't know
24   if you, you know, have been a victim.  But if you would like to
25   speak with the attorney, here's the number.  And we had the

O43TPAD2                         K. Bevin - Cross

1   pediatricians on standby, we had psychologists, we had whatever

2   he needed.  And then he took the ball from there.  And he's

3   over 21, so I can't legally be part of that process.  So he had

4   a call with them.

5   Q.  What are you hoping for your son to get out of that action?

6   A.  Justice.

7          MR. BALDASSARE:  Objection, Judge, as to what's in her

8   head about this.

9          THE COURT:  Okay.  I am going to sustain that.

10         Do you have any more questions?

11         MS. COLSON:  No further questions.

12         THE COURT:  Cross-examination.

13         MR. BALDASSARE:  Would the witness like a break or

14  should we start?

15         THE COURT:  Are you okay?  You can go ahead.

16  CROSS-EXAMINATION

17  BY MR. BALDASSARE:

18  Q.  Good afternoon, Ms. Bevin.  My name is Mike Baldassare, and

19  Jeffrey Hawriluk and I represent Dr. Paduch who is at the end

20  of that table.  Obviously, if you want a break at any point,

21  just say break and we'll stop.

22         Am I correct that Luke was a patient of Dr. Paduch

23  from about 2015 to about 2022?

24  A.  Yes.  Yeah, 2022.

25  Q.  And he was a patient of his first at Weill Cornell, right?

O43TPAD2                              K. Bevin - Cross

 1   A.  Yes.

 2   Q.  And then afterward, when Dr. Paduch was at Northwell, he

 3   was a patient of his at Northwell, correct?

 4   A.  Correct.

 5   Q.  I think you said that the entire time that Luke was a

 6   patient of Dr. Paduch's, you lived in Maryland, correct?

 7   A.  Correct.

 8   Q.  And you would frequently drive to the appointments up to

 9   Dr. Paduch and then drive home the same day?

10   A.  Except for the surgery, where we stayed for several days at

11   a hotel here.

12   Q.  So, the surgery stay when you drive up, what kind of a day

13   is that?  Is it leave at 6 a.m., get home at 6 p.m.?

14   A.  The surgery day?

15   Q.  No.  I'm sorry.  Put aside the surgery day for a second.

16   A.  Okay.

17   Q.  A regular visit day.  What is that day like travel-wise

18   driving?

19   A.  Of a drive?  Four hours or whatever, and then --

20   Q.  How long a ride was it up?

21   A.  Well, it depends with traffic here can be really bad.  So,

22   you know, we would leave plenty of time so we wouldn't be late.

23   So, I would say an average of -- depends if we were coming from

24   our bay house, which is an hour closer, or from Potomac.  I

25   would say an average of four or five hours, depending on

O43TPAD2                         K. Bevin - Cross

1   traffic on 95 or the tunnels.

2   Q.  How much closer is the bay house than the Potomac house?

3   A.  An hour closer.

4   Q.  And then back would be to the same house.  So is it safe to

5   say that, absent a surgery day, a driving day to see Dr. Paduch

6   and go back was basically the day was shot?

7   A.  Yeah.  It was exhausting.

8   Q.  And would the day get shorter if you took the plane up?

9   A.  Yes.

10  Q.  And you usually came with your son to the appointments?

11  A.  We both always came.

12  Q.  Did he drive himself to a few of them later on at Northwell

13  by himself?

14  A.  He came for I think one appointment by himself, which I

15  think was the last.

16  Q.  Did his father come on any, some, or all --

17  A.  Yes.

18  Q.  Any, some, or all?

19  A.  Well, I think except for the last appointment, I would say

20  all.  We always came together.

21  Q.  You said that Luke is part of a lawsuit against Weill

22  Cornell, correct?

23  A.  Correct.

24  Q.  And am I right that Dr. Paduch was originally part of that

25  lawsuit filed?

O43TPAD2                          K. Bevin - Cross

1    A.  Yes, I believe so.  I'm not part of that lawsuit, so you'd

2    have to speak to them about that.

3    Q.  Do you have any recollection that at some point, the

4    lawsuit stayed only against Weill Cornell, and Dr. Paduch was

5    dropped out of the lawsuit as a defendant?

6    A.  Presently, it's only against the two hospitals systems,

7    Weill Cornell and New York Presbyterian, and Northwell Health

8    Hospital System.

9    Q.  And is that lawsuit based on the allegations that we're

10   discussing here today?

11   A.  That lawsuit is based on their -- their involvement in, you

12   know, the abuse of patients that happened at their hospitals.

13   Q.  Right.  It's not -- I don't mean to be disrespectful, it is

14   not some unrelated slip or fall or car accident or something.

15   It is based on the allegations made against Dr. Paduch with

16   respect to your son at least --

17   A.  It's based on allegations against the hospital systems'

18   lack of oversight of a physician working for them, and people

19   who were abused within their hospital system.

20   Q.  As far as the allegations in the lawsuit with respect to

21   Luke, those are the allegations that are based on your

22   observations and the allegations regarding your son, correct?

23   A.  I'm not following.  What's the question?

24   Q.  To the extent that that lawsuit has to do with any other

25   allegations as to any other former patients, that's not

O43TPAD2                        K. Bevin - Cross

1    something that you have any first-hand knowledge of, correct?

2    A.  That I know those people?  Is that what you're saying?

3    Q.  For starters, yeah.

4    A.  I know they're going back years and years, many patients of

5    different, you know, patients, and also people working in the

6    hospital system as well who are involved.  But it's not my

7    case.  So I'm here for my son for this.

8    Q.  Okay.  And is the law firm representing your son in that

9    shorthand known as PCVA?

10   A.  I believe so, yes.

11   Q.  Did any PCVA lawyers accompany you to any of your meetings

12   with the prosecutors in this case?

13   A.  No.

14   Q.  Do you have any lawsuits against any of the hospitals?

15   A.  Absolutely not.

16   Q.  Would I be right that the conference where you first met

17   Dr. Paduch was on a Saturday in, say, July of 2015?

18   A.  I don't remember exactly, but I have the all of the

19   brochure and paperwork and scheduling notes which would confirm

20   if that was the date.

21   Q.  And if I told you that you had e-mailed Dr. Paduch on

22   Monday, the 27th saying I met you at the conference on

23   Saturday, would that sound --

24   A.  Yes.

25              MS. COLSON:  Objection.

O43TPAD2                        K. Bevin - Cross

1          THE COURT:  Does that date sound right to you?

2          THE WITNESS:  It sounds right.  Because it was in a

3   few months of his diagnosis.  And yes, I followed up after the

4   conference, after speaking to him, which I said earlier that I

5   e-mailed and probably called, so, yes.

6   Q.  And to your recollection, is it correct that this happened

7   about a month after the diagnosis that your son got from the

8   endocrinologist?

9   A.  I can't be exact on the time.  But it was in that time

10  frame of a few months, which I think his diagnosis might have

11  been before school ended in -- and this was --

12         THE COURT:  If anyone wants to try and refresh

13  Ms. Bevin's recollection, they can try to do it with documents.

14  Q.  Do you remember communicating with Dr. Paduch early on,

15  giving him an overview of your son's diagnoses up to that

16  point?

17  A.  I'm sure that I communicated all the information I had

18  regarding my son.  If it would help in his care, absolutely.

19  Q.  Did Dr. Paduch agree to see your son?

20  A.  Yes, he was at the conference soliciting patients for what

21  he said he specialized in.  So, yes, and he said he had a big

22  waiting list, so, you know, yes.

23  Q.  And do you remember calling to make your son's initial

24  appointment with Dr. Paduch?

25  A.  I either e-mailed or called.  I think I probably did both.

O43TPAD2                    K. Bevin - Cross

1   I think I initially probably e-mailed and then, you know, I
2   would have followed up with a call probably to whatever number
3   the assistant -- I think her name was maybe Crystal or
4   something.
5   Q.  Am I right that when you called to make this initial
6   appointment in around July of 2015, the initial appointment
7   they gave you was out like six months into January of '16?  Do
8   you remember that?
9   A.  I don't remember that specifically.  But I remember being
10  very worried that what he had presented at the conference
11  was -- if you miss this window, his chance of -- the chance of,
12  you know, his fertility is going down on a daily basis.  So
13  unless he's in treatment and we're treating him, if you miss
14  that window, you know, and I wanted to give my son every
15  chance, I didn't want him to look back one day and say, mom,
16  why didn't you, you know, help me, because now I can't have a
17  kid.  I wanted to just do whatever I could in that window, I
18  felt was like we needed to, you know, I needed to do what I
19  could, if there was any chance for my son's fertility to be
20  preserved, and also his health and well being.
21  Q.  So, given the timing concerns that you just described, do
22  you remember being concerned that the initial appointment that
23  they tried to give you was outside the window of where you
24  thought it could be helpful?
25  A.  I would assume, yes, that I would.  And given he said he

O43TPAD2                          K. Bevin - Cross

1   had a waiting list, so that also scared me that my son

2   wouldn't -- would miss the window.

3   Q.  Do you recall contacting Dr. Paduch directly to say I

4   called to get an appointment, and --

5           MS. COLSON:  Objection.

6           THE COURT:  Just without saying exactly what she said.

7   But just ask the question.

8           MR. BALDASSARE:  I thought -- okay.

9   Q.  Do you recall inquiring to see if you could get an earlier

10  appointment that would assuage your concerns about the window

11  of time?

12  A.  I mean, I don't recall specifically, but I would assume,

13  and there would be a record of it if I did, so...

14  Q.  Do you recall that the first appointment with Dr. Paduch

15  was in fact during that following August, right after the

16  conference?

17  A.  Yeah, we have the medical thing I think that was shown, so

18  yes, that would be the exact date.  I wouldn't have been able

19  to remember it off the top of my head, but yes, the notes from

20  the hospital show an August appointment.  I think it was the

21  20th of 2015.

22  Q.  Who's Dr. Dana Kornfeld?

23  A.  That is my son's primary pediatrician, and also Dr. James

24  Matty.  They work in a practice in Bethesda called The

25  Pediatric Care Center.

O43TPAD2                      K. Bevin - Cross

1   Q.  As of 2015, had Dr. Kornfeld been your son's pediatrician

2   for his whole life?

3   A.  Yeah, I think most of his life in the practice.  There was

4   Dr. Matty, Dr. Kornfeld, and there was one more doctor who

5   retired in that time.  I can't remember his name.

6   Q.  Was Dr. Kornfeld involved in Luke's medical care during the

7   time that Luke was under the care of Dr. Paduch?

8   A.  She was kind of peripherally, you know, and I would try to

9   loop her in because I've always, like with my other children,

10  it's really important when they have major issues -- which my

11  kids have had some major issues -- that there is a team

12  supporting my child, but there is one person who can kind of

13  oversee all of the specialists I guess treating for whatever

14  we're dealing with.

15          However, she had said to me, ███, I defer to you on

16  this.  I don't know.  So, you know, she wasn't actively

17  involved in that.  And because he had his height, his weight,

18  his blood work done every six months, you know, I didn't want

19  to put him through extra doctor visits if he didn't need it.

20  Q.  Do you recall attempting to get Dr. Paduch and Dr. Kornfeld

21  to talk --

22  A.  I'm sure I did because that's, like, I've done with my

23  other children, whether it's cancer or stroke or whatever, I

24  like to have -- I like to have a team.

25  Q.  Is it Dr. Rosebaum or Rosenbaum who was also, you have

O43TPAD2                          K. Bevin - Cross

1    no --

2    A.  Is that from Children's National?

3    Q.  I believe so.  Do you remember a Dr. Rosenbaum or Rosebaum?

4    A.  I had six kids and 100 doctors.  So I vaguely remember the

5    name, if he's the head of genetics at Children's National

6    Medical Center in Washington, D.C.  I could be wrong, but could

7    you verify that?

8    Q.  Do you remember that doctor referring you to a doctor named

9    Dr. Spruce?

10   A.  You'd have to -- can you tell me where Dr. Rosenbaum works

11   or what his title is?

12   Q.  Rosenbaum was at Children's.

13   A.  So my memory serves.  So I think that was initially my son

14   had -- I called Children's National Medical Center, because it

15   is close to where we live and it is a national children's

16   hospital.  And my son was seen by the head of genetics there

17   who did wrote a full report, looked at his body.  So I don't

18   remember a Dr. Spruce, I don't know what kind of doctor

19   Dr. Spruce is or have any recollection of that.  But if it's in

20   the report, then maybe he did.

21   Q.  Do you remember a Dr. Grossman being involved in your son's

22   medical care at any point?

23   A.  There is a Grossman who is a -- like a sports medicine

24   doctor.  Is that who you're talking about?  For a broken bone

25   or orthopedic surgeon?

O43TPAD2                        K. Bevin - Cross

1            I got a Rolodex with 100 doctors in it literally.  So

2   I think there is a Grossman in Chevy Chase who is an orthopedic

3   surgery.

4   Q.  Do you remember Luke ever seeing an orthopedic surgeon?

5   A.  Yes.  He's broken his shoulder, he's broken his elbow, he's

6   broken, you know, he plays sports.  So...

7   Q.  Were you at least as of say 2015, were you grateful for

8   Dr. Paduch's participation in your son's healthcare?

9   A.  At the time for what I thought that healthcare was, yes.

10  Q.  Did you have full confidence in him?

11  A.  I trusted what he was telling me was the truth, as I have

12  trusted all of the physicians who have treated my children

13  until I've known otherwise.

14  Q.  Did at some point Dr. Paduch prescribe -- is it

15  doxycycline?

16  A.  If -- is that an antibiotic?

17  Q.  I have no idea.

18  A.  I think that's an antibiotic, so possibly.  We're going

19  back many years.  So if it's in the record, then yes.  I think

20  that's an antibiotic.

21  Q.  Do you recall him prescribing Artistem?

22  A.  Artistem?  What is that?  What kind of medicine is that?  I

23  might not know it by its medical or brand name.

24  Q.  I believe it has to do with --

25            MS. COLSON:  Objection, your Honor.  He's testifying.

O43TPAD2                       K. Bevin - Cross

1            MR. BALDASSARE:  And she's asking me if I know.

2            THE COURT:  Just phrase it as a question.

3  Q.  Do you know if Artistem has to do with cultured sertoli

4  cells?  Does that ring a bell?

5  A.  No.

6  Q.  Do you remember discussing anything like that with

7  Dr. Paduch in e-mails?

8  A.  I have a vague recollection that I listened in on a call

9  through actually the Access Foundation who put on the

10 conference.  So they would send e-mails about like cutting edge

11 medications or new updates in the field of treating what my son

12 has.  So I would always try to follow up and read the articles,

13 and I think this company were promoting a new testosterone --

14 like, it wasn't the patch, but I think it was something else

15 that I remember sitting in on a call with.  Because you can do

16 it, like, they can put pellets under your skin, you can take it

17 orally.  There's so many methods of doing testosterone

18 supplement.  So I was always looking for what was easiest, you

19 know, for like a middle schooler or a high schooler, because

20 compliance is the number one thing.  If you don't do it

21 regularly every day, you're, like, you know, the hormone levels

22 are all over the place and that's very unhealthy.

23            That's what I'm assuming it is.  But I'm assuming

24 that's what that was.  My son never took it.  We never pursued

25 it.  But I would want the advice of his -- you know, person

O43TPAD2                         K. Bevin - Cross

1  treating him for this condition to weigh in as a physician.

2  Q.  I may have asked this, but do you know if Dr. Kornfeld ever

3  had a discussion with Dr. Paduch about your son's care?

4            MS. COLSON:  Objection, your Honor.

5            THE COURT:  Sustained.

6            MR. BALDASSARE:  I don't understand the basis, Judge,

7  other than asked and answered.  I'm not asking if she has

8  knowledge of what was said.  Does she know if Dr. Kornfeld ever

9  had a conversation with Dr. Paduch.  And there has been --

10            THE COURT:  I'll allow that but I don't want the

11  substance.

12            MR. BALDASSARE:  No.

13 A.  I do not, I don't know that for sure.

14 Q.  Do you know if any of the other doctors who were treating

15 your son during the time he was treating -- he was being

16 treated by Dr. Paduch, not the substance, do you know if they

17 ever had any conversations with Dr. Paduch?

18 A.  Which doctors are you referring to?

19 Q.  Any of the doctors we spoke about, Dr. Kornfeld, if you

20 remember, any other doctors.

21 A.  Outside of that -- no.  I don't remember her speaking

22 specifically to him.

23 Q.  Am I correct that your son's lawsuit to your recollection

24 was filed on February -- about February 3, 2023?

25 A.  I couldn't say to be sure.  But I think around the time of

O43TPAD2                        K. Bevin - Cross

1   February, yeah, or March 2023.

2   Q.  Do you remember meeting with the prosecutors in this case?

3   A.  Do I remember meeting with them?  Yes.

4   Q.  Does it sound about right that you met with them six times?

5   A.  That sounds about right.

6   Q.  During the course of 2024, from February until about March

7   of this year?

8   A.  That sounds about right.

9   Q.  When was the last time you met with them?

10  A.  The last time I met with them was yesterday.

11  Q.  Were all of those meetings in person?

12  A.  I think so.  There might have been -- no, I think there was

13  probably like a Zoom call or something.

14  Q.  Am I correct that at those meetings, one or more of my

15  colleagues sitting to my right would have been at those

16  meetings?

17  A.  Yes.

18  Q.  And perhaps there would be other individuals there, like

19  Agent Turansky?

20  A.  Yes.

21  Q.  And possibly other individuals, like paralegals?

22  A.  I couldn't say.

23  Q.  Certainly I wasn't at any of those meetings, right?

24  A.  No.

25  Q.  And Mr. Hawriluk wasn't at any of those meetings, correct?

O43TPAD2                          K. Bevin - Cross

1    A.  Correct.

2    Q.  To your knowledge, were any of those meetings audio

3    recorded?

4    A.  I have no idea.

5    Q.  To your knowledge, were any of those meetings video

6    recorded?

7    A.  I don't know.

8    Q.  To your knowledge, do you know if the government ever

9    interviewed Dr. Kornfeld?

10   A.  I don't know.

11   Q.  To your knowledge, do you know if the government ever

12   requested your son's medical records from Dr. Kornfeld?

13   A.  I do not know.

14   Q.  Did the government ever request Dr. Kornfeld's medical

15   records from you?

16   A.  I'm sorry?  Could you repeat that?

17   Q.  Did the government ever request your son's medical records

18   from Dr. Kornfeld's treatment from you?

19   A.  I don't really understand the question.  But, I kept

20   copious records of all of my children's medical stuff.  So I

21   don't remember specifically if they requested it.

22   Q.  Do you ever remember signing a release for the government

23   to obtain your medical -- the medical records of your son from

24   Dr. Kornfeld?

25   A.  I don't remember, but I would have absolutely volunteered

O43TPAD2                    K. Bevin - Cross

1    to sign that.

2    Q.  Do you remember if you did?

3    A.  I don't remember if I did, but I would have obligingly

4    given them all of the information.

5    Q.  Do you remember searching some cell phones for text

6    messages at the government's request?

7    A.  Searching some cell phones?  What do you mean?

8    Q.  Looking for -- I am going to give you not the full number.

9    See if this rings a bell.  A phone number that ends in 5394.

10   Is that a phone number you remember?

11   A.  No.

12   Q.  Do you remember a number 746-5394?

13   A.  No.

14   Q.  Do you remember searching any phones for text messages at

15   the request of the government?

16   A.  I'm sorry, I'm not following.

17   Q.  Do you remember the government ever asking you to look for

18   text messages with Dr. Paduch in any of the cell phones that

19   may have been in use back in 2015?

20   A.  Cell phones with correspondence from the doctor and the

21   doctor's staff?  I don't remember them ever asking, but I would

22   have volunteered anything that I have just to volunteer what I

23   have.

24   Q.  Do you remember ever searching a phone number 4945, that

25   ended in 4945, for text messages at the request of the

O43TPAD2                         K. Bevin - Cross

1    government?

2    A.   If it belonged to the defendant, or the hospital, or then I

3    would have definitely looked at my communication record to be

4    sure to verify what I am saying here is accurate, because I

5    don't want to give misinformation.  So I do my homework.

6    Q.   Do you remember ever turning over any text messages to the

7    government?

8    A.   I would have turned over any e-mails, text messages,

9    medical records for my son, the conference records.

10   Absolutely.

11   Q.   I'm asking just a slightly different question.  I

12   understand you would have.

13           I'm asking do you remember specifically ever giving

14   text messages to the government related to this case?

15   A.   I'm sure I would have given them, even if they hadn't

16   asked, anything related just to get it off of -- away from me,

17   frankly.

18   Q.   Again, do you remember doing it?

19   A.   I remember giving them records, you know, I have all these

20   folders with each kid's name and each kid's diagnosis.  So

21   saying here's what I have.  Here's what I have.

22   Q.   Did you set up the meeting for your son with the PCVA

23   lawyers?

24   A.   No, I did not.

25   Q.   Did you ever tell the FBI that you set up the meeting?

O43TPAD2                         K. Bevin - Cross

1    A.  No.

2    Q.  Did you attend -- did you accompany your son to the offices

3    of PCVA?

4    A.  Never.

5    Q.  Do you remember your son going in and having a meeting

6    privately with one of the lawyers at PCVA that you didn't

7    attend?

8    A.  Going to their office and having a meeting with them?  No.

9    Q.  Do you remember your son ever meeting with a PCVA lawyer

10   outside of your presence?

11           MS. COLSON:  Objection, your Honor.  How would she

12   know?

13           THE COURT:  Just if you know.

14   A.  No.  I would say no.

15   Q.  Do you remember ever telling the FBI that your son went

16   into a meeting with the PCVA lawyer and you stayed outside?

17   A.  As far as I know, they are -- their law office is in Oregon

18   or California or somewhere far away.  So, no.  I would say --

19   Q.  Do you remember telling the FBI that he had a meeting with

20   them, you were there, and then you left when they had the

21   meeting?

22           MS. COLSON:  Objection.

23   A.  I'm sorry?

24           THE COURT:  Overruled.  You can answer.  Do you have

25   any memory of that?

O43TPAD2

1          THE WITNESS:  I don't.

2    Q.  Am I correct that it's your belief that you didn't know

3    about the allegations specifically what happened to your son

4    until a few weeks ago?

5    A.  You are correct that -- the actual -- the actual specifics

6    of the abuse to my son's body, my son was embarrassed for me to

7    know.  Didn't want me to know.  I didn't want to invade his

8    privacy.  And learning of what happened on those visits has

9    nearly killed me.

10          So, yes, I happened to see specific -- what I had seen

11   was redacted always.  And by a fluke, I happened to read

12   recently what happened to my son on those visits.  And it's

13   worse than I could have ever imagined.

14          MR. BALDASSARE:  One moment.

15          THE COURT:  Sure.

16          MR. BALDASSARE:  I have nothing further.  Thank you.

17          MS. COLSON:  No redirect, your Honor.

18          THE COURT:  You can step down.  Thank you.

19          (Witness excused)

20          THE COURT:  I'm going to note that the witness I

21   believe mentioned her real name, so let's redact that from the

22   transcript.

23          You can call your next witness.

24          MS. COLSON:  Your Honor, I am going to briefly read a

25   portion of our next witness's medical record, and then if your

O43TPAD2

1    Honor would prefer, we could break for the lunch break or I

2    could begin with that witness.

3            THE COURT:  That's fine.  It's up to you.

4            MS. COLSON:  I think I'll read the portion and it

5    might be a good time for a break.

6            THE COURT:  Okay.

7            MS. COLSON:  Ms. Vuckovich, can we please pull up

8    sealed Government Exhibit 205 and navigate to page 399.

9            I'll note the patient's name is at the upper right.

10   Assessment and plan.

11           "This is a 14-year-old boy who was recently diagnosed

12   with Klinefelter syndrome.  He has not been treated yet.  He

13   has some speech delay, has private tutor to help with dyslexia,

14   and goes to private school.  Mostly has issues with expressive

15   language.  Good grades otherwise.  He has no issues with math."

16           Thank you.  If we could also scroll to page 400.

17           "Because many genes which are expressed in brain and

18   testis are X-linked, thus it is not surprising that the men

19   with KS have mild impairment of cognitive function, especially

20   language and auditory processing as well as spermatogenic

21   failure.  The exact mechanisms of negative effects on X

22   chromosome disomy on brain and testicular development are not

23   clear."

24           These pertain to the witness we will see after lunch.

25           THE COURT:  So we are going to take our lunch break

O43TPAD2

1    now for an hour.  Don't discuss the case and keep an open mind.

2    Thank you.

3              (Jury excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43TPAD2

1              (At the sidebar)

2              THE COURT:  I want to raise one question with respect

3      to the civil case, because there was a lot of questions on

4      cross-examination about the civil case and when Dr. Paduch was

5      or was not in that civil case.  And I completely understand

6      that from the defendant's perspective, this goes to bias.  But

7      should I be instructing the jury anything about the civil case

8      and what may have happened in the civil case is not relevant to

9      their deliberations or something to that effect?

10             MR. BALDASSARE:  Here's what I would say, Judge.  I

11     think respectfully I think it depends on my question.  I think

12     it goes to bias.  And I'm not asking why -- I'm not asking why

13     did PCVA add, drop, or do something.  I'm asking factual

14     questions about the civil lawsuits.  And if we go down the

15     road, respectfully, about what we're going to instruct about

16     the civil lawsuit, I just can't imagine there is ever going to

17     be -- you could do whatever you want, obviously, you are the

18     judge.  It is going to open up a quagmire of, well, do we tell

19     them it doesn't have it?  Because the truth is that's not true.

20     It does have something to do with it, and we all know it has

21     something to do with Dr. Paduch.  It has plenty to do with what

22     happens to Weill Cornell.

23             This witness I let her go out of respect about other

24     people and all this other stuff.  She said more about the civil

25     case than I asked, and they didn't object.  And they could

1    have, but they didn't because they liked, I think, probably

2    what her answer was.

3        I think if my questions are as narrowly tailored as

4    they are, the civil suits are what they are.

5        MR. XIANG: So, your Honor, I think the government's

6    view is that there could be a kind of uncontroversial and

7    relatively short limiting instruction as to the civil suit, and

8    we can think over the break or in the coming days about what

9    that can be and confer with the defense.

10        But look, I think it's undisputed that the civil suit

11    and the suit here are under different standards of proof.

12    There has been no evidence put before this jury of what those

13    causes of action are, why causes of action have been added or

14    dropped, etc.  I think if we stick to those relatively

15    undisputed propositions, we can craft something that is

16    accurate and does not impair defense counsel's ability to

17    develop a theme that, insofar as specific victim witnesses are

18    also plaintiffs in that suit, and obviously he can inquire of

19    them what their subjective understanding is of any linkage

20    between the outcome here and that suit, we're not objecting to

21    those types of questions.

22        But I don't think it would be improper for the Court

23    just to point out that the jury should not be deferring or

24    caveating their own fact finding function in light of the

25    existence of that suit.

O43TPAD2

1          THE COURT:  I'm not going to do anything.  Just think

2     about it.  If there is language you think that I should say,

3     run it by opposing counsel.  It sounds like there won't be

4     agreement, I understand, and I am not doing anything now.  I

5     wanted to raise the issue and hear you out, and you'll come

6     back to me and let me know what your thinking is.

7          MR. BALDASSARE:  Talking about the quagmire.  If the

8     government wants to talk about a different standard of proof,

9     that's fine.  But I am going to close and say this is a higher

10    one, and if they win here, they win the civil suit.  That's the

11    problem.  We're not going to lie to them.  If this jury

12    convicts my client, he's cooked in the civil suit.  And as long

13    as I can say that, that's the problem.

14         We work well together, but this is an area that goes

15    to bias.  And if we are going to start talking about the civil

16    suits, I just think we are going to open a door that is just

17    going to have everybody objecting, and that's fine, but then I

18    get to tell this jury, if you convict him here, it is a higher

19    standard of proof.  It is the reverse of OJ.  Lost at the

20    higher one, won at the lower one.  But that's what I'm going to

21    tell the jury if we start to go down that road, absent you

22    telling me I can't say it.

23         THE COURT:  I don't think it has come out nor do I

24    think you asked a question about specifically what happened,

25    meaning as opposed to a settlement or as opposed to a judge

1    dismissing.  I don't think it is clear to the jury exactly

2    what's happening in the civil case, nor should it be.  I'm just

3    asking the question if there is any instruction that would be

4    appropriate.  Maybe the answer is no.  Maybe the answer is yes.

5    I wanted you to be thinking about it and then get back to me.

6    And as I said, I'll always hear you out before doing anything.

7         MR. BALDASSARE:  It could be a limiting instruction

8    after an answer.  Because this witness and, again, obviously

9    she's upset.  But this witness opened the door to a lot about

10   Weill Cornell, it's not him, and now it's Weill Cornell for all

11   the other things.  We may agree on some sort of limiting

12   instruction.

13        THE COURT:  I thought you specifically asked a

14   question about whether Paduch was still in the lawsuit at a

15   particular period of time.  That's my recollection.  I'm not

16   sure.  But I thought you had.

17        MR. BALDASSARE:  I asked something like that.  I think

18   the answer I got was far afield.  I wasn't going to tell her to

19   stop.  Government didn't object.  There may be times we agree

20   that something comes out that the jury should disregard.  I

21   think she was getting close to saying, you know, he did this to

22   hundreds and hundreds of people.  I don't think either side

23   would want that on the record.

24        THE COURT:  So think about that.  Think about what

25   scenarios there are where a witness may answer in a certain way

O43TPAD2

1   or certain questions that one side may object to, and let's be

2   prepared for this.  Because I don't want to give an instruction

3   on this issue without hearing you out or call more attention to

4   it than is necessary.  But I do want to be prepared.  So think

5   about it, talk to each other, and get back to me.

6           MS. COLSON:  One small point which we do agree on,

7   your Honor, I want to flag.  In case this next witness needs

8   his recollection refreshed with a piece of writing, defense

9   counsel has agreed, rather than make that witness read it, we

10  would sort of collect those instances, and then outside the

11  presence of the jury, either defense counsel or I could read to

12  the witness what defense counsel seeks to refresh him with.

13          THE COURT:  Okay.  Does the witness have trouble

14  reading?

15          MS. COLSON:  Yes.  He has severe dyslexia and it is

16  too difficult for him to do it on the spot.  So we could

17  collect the instances, if there is a situation --

18          THE COURT:  That's fine.

19          MR. BALDASSARE:  Send the jury out and do them all at

20  once.  We don't want to do a sidebar for everyone.

21          MS. COLSON:  No.  This is the only witness, maybe one

22  more for whom this would be an issue.  Just these two.

23          THE COURT:  Keep me posted on how you want to deal

24  with it.  I will see you back at 10 of 2.  Thank you.

25          (Recess)

1                    A F T E R N O O N   S E S S I O N

2                              1:55 P.M.

3              THE COURT:  Are we all ready for the jury?

4              MS. COLSON:  Yes, your Honor.

5              THE COURT:  Great.

6              (Jury present)

7              THE COURT:  The government can call its next witness.

8              MS. COLSON:  Thank you, your Honor.

9              The government calls Luke Bevin.

10    LUKE BEVIN,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MS. COLSON:

15    Q.  Good afternoon, Mr. Bevin.

16              Are you testifying under a pseudonym today?

17    A.  Yes.

18    Q.  Before we go any further, I'm going to ask Ms. Vuckovich to

19    please pull up sealed Government Exhibit 305 for you, for the

20    parties, the Court, and the jury.

21              Do you recognize this document, Mr. Bevin?

22    A.  Yes.

23    Q.  What is it?

24    A.  My driver's license.

25    Q.  Do you recognize the driver's name?

O4TVPAD3                          L. Bevin - Direct

1    A.  I do.

2    Q.  Is that your true and accurate name?

3    A.  It is.

4    Q.  Do you see where it says date of birth?

5    A.  Yes.

6    Q.  Is that your true and accurate date of birth?

7    A.  Yes.

8           MS. COLSON:  You can take that down, Ms. Vuckovich.

9    Thank you.

10          Ms. Vuckovich, would you please pull up Government

11   Exhibit 105.  And I'll note this is not sealed.  Just give it a

12   minute for the gallery to see it.

13   Q.  Do you recognize the person in this photograph?

14   A.  I do.

15   Q.  Who is it?

16   A.  Myself.

17          MS. COLSON:  At this time, the government offers

18   Government Exhibit 105.

19          THE COURT:  Any objection?  Admitted.

20          (Government's Exhibit 105 received in evidence)

21          MS. COLSON:  You can publish that to the jury,

22   please -- excuse me, the gallery, please.

23   Q.  How old are you today?

24   A.  23.

25   Q.  In what month and year were you born?

O4TVPAD3                              L. Bevin - Direct

```
 1   A.  March 2001.

 2   Q.  Mr. Bevin, where do you live now?

 3   A.  Maryland.

 4   Q.  Have you ever lived in New York?

 5   A.  No.

 6   Q.  How are you spending your time now?

 7   A.  I'm on Cross Coach and I do some filming for sports.

 8   Q.  Mr. Bevin, have you heard of a genetic condition known as

 9   XXY?

10   A.  Yes.

11   Q.  Were you diagnosed with XXY?

12   A.  Yes.

13   Q.  Who diagnosed you?

14   A.  My primary care doctor.

15   Q.  Where was that doctor located?

16   A.  In Maryland.

17   Q.  Does XXY go by any other name?

18   A.  Yes.

19   Q.  Do you know the name?

20   A.  Klinefelter's.

21   Q.  Were you still in school when you learned that you had XXY?

22   A.  Yes.

23   Q.  About what grade?

24   A.  It was about ninth grade.

25   Q.  Did there come a time when you saw a special doctor for
```

O4TVPAD3                           L. Bevin - Direct

1    XXY?

2    A.  Yes.

3    Q.  Who was that special doctor?

4    A.  Dr. Paduch.

5         MS. COLSON:  Ms. Vuckovich, would you please pull up

6    for the witness and the parties alone Government Exhibit 100.

7    Q.  Mr. Bevin, do you recognize the person in this photograph?

8    A.  Yes.

9    Q.  Who do you recognize it to be?

10   A.  Dr. Paduch.

11        MS. COLSON:  The record will reflect, please, that the

12   witness has identified the defendant in Government Exhibit 100.

13        THE COURT:  It will so reflect.

14        MS. COLSON:  Thanks.

15        Ms. Vuckovich, would you please pull up for the

16   witness the parties and the jury what's been admitted as sealed

17   Government Exhibit 205-A.

18   Q.  Now, focusing on the name at the top of the first page of

19   this visit list, Mr. Bevin, do you recognize that name?

20   A.  Yes.

21   Q.  Whose is it?  Is that your name?

22   A.  At the top?

23   Q.  We'll blow that up for you, Mr. Bevin.

24        Do you see the name at the top right?

25   A.  Yes.

O4TVPAD3                    L. Bevin - Direct

1   Q.  Whose name is that?

2   A.  Myself.

3   Q.  And is that your true and accurate date of birth?

4   A.  Yes.

5           MS. COLSON:  Ms. Vuckovich, would you please go to

6   page 4 of that exhibit and highlight the bottom-most entry.

7           Thank you.

8   Q.  Mr. Bevin, do you see the date of this entry?

9   A.  Yes.

10  Q.  What is the date?

11  A.  August 20th, 2015.

12  Q.  How old would you have been on that date?

13  A.  14.

14          MS. COLSON:  And Ms. Vuckovich, would you please

15  highlight the provider for this office visit.

16  Q.  Mr. Bevin, who was your provider for this first office

17  visit?

18  A.  Paduch.

19  Q.  At the time of this first visit in August of 2015, where

20  were you living?

21  A.  In Maryland.

22  Q.  So how did you get to your appointment?

23  A.  Me and my parents drove up.

24  Q.  Where was Paduch's office?

25  A.  Downtown New York.

O4TVPAD3                          L. Bevin - Direct

1   Q.  Was that office located in a hospital?

2   A.  Yes.

3   Q.  Which hospital?

4   A.  Zombie hospital.

5   Q.  Let's focus on that first appointment, Mr. Bevin.

6           Did Paduch collect any blood samples?

7   A.  Yes.

8   Q.  Semen samples?

9   A.  Yes.

10          MS. COLSON:  Ms. Vuckovich, would you please return to

11  sealed Exhibit 205-A.  And would you please highlight the entry

12  on the bottom of page 2, surgery encounter.

13  Q.  Do you see that, Mr. Bevin?

14  A.  Yes.

15  Q.  What is the date of that entry?

16  A.  August 4th, 2016.

17  Q.  So would that have been about a year after your first

18  visit?

19  A.  Yes.

20  Q.  And about -- withdrawn.

21          Did you, in fact, have a surgery with Paduch in August

22  of 2016?

23  A.  Yes.

24  Q.  Where was that surgery?

25  A.  It was at that hospital.

1    Q.  Generally speaking, what did you understand was the goal of

2    that surgery?

3    A.  It was to go in and take sperm samples and freeze them and

4    store them.

5    Q.  Who told you that?

6    A.  Paduch.

7    Q.  Do you know whether the surgery was successful?

8    A.  He said it was.

9    Q.  So now, Mr. Bevin, I want to focus after the surgery.

10           Did you keep seeing Paduch as a patient?

11   A.  Yes.

12   Q.  Starting how soon after the surgery?

13   A.  It was three to six months.

14   Q.  And that's how often you would see him?

15   A.  Yes.

16   Q.  Who decided how often you would see Paduch?

17   A.  Paduch did.

18   Q.  Did you follow his instructions for follow-ups?

19   A.  Yes.

20   Q.  Why?

21   A.  Because he was a doctor, so we just followed what he said.

22   Q.  When you attended these visits with Paduch, did you travel

23   to New York?

24   A.  Yes.

25   Q.  From where?

1    A.  Maryland.

2    Q.  How did you get there?

3    A.  Me and my parents drove up.

4    Q.  Was the reason you went to New York to see the defendant?

5    A.  Yes.

6    Q.  What would you do after the visit was over?

7    A.  Drive home.

8    Q.  I want to stick with the visits after the surgery, okay?

9             During these visits, who was in the examination room?

10   A.  Just me and Paduch.

11   Q.  Was your mom or dad with you?

12   A.  No.

13   Q.  Why not?

14   A.  I didn't want them in the room.

15   Q.  During these visits, was there a physical examination,

16   meaning did the doctor check your body?

17   A.  Yes.

18   Q.  For the physical examination, what were you wearing?

19   A.  I was wearing a gown with nothing underneath.

20   Q.  During the physical examination, did Paduch inspect your

21   penis?

22   A.  Yes.

23   Q.  With his hands?

24   A.  Yes.

25   Q.  Your testicles?

O4TVPAD3                         L. Bevin - Direct

1    A.  Yes.

2    Q.  During the physical examination, did Paduch inspect your

3    rectal area?

4    A.  Yes.

5    Q.  With his hands?

6    A.  Yes.

7    Q.  What did he do?

8    A.  He just touched it.

9    Q.  And when you say he touched it, what do you mean?

10   A.  He would just, like, poke his hand around it.

11   Q.  Did he explain why he was examining your rectal area?

12   A.  No.

13   Q.  Do you remember, Mr. Bevin, complaining of any pain in your

14   rectal area?

15   A.  No.

16   Q.  Pressure?

17   A.  No.

18   Q.  During these follow-up appointments after your surgery,

19   apart from the physical examination, did Paduch touch your

20   penis?

21   A.  Yes.

22   Q.  What did he do?

23   A.  He masturbated me.

24   Q.  When you say "masturbate," what do you mean?

25   A.  I mean his hand was on my privates and it was going up and

O4TVPAD3                      L. Bevin - Direct

1    down.

2    Q.  Did Paduch masturbate you on some appointments, about half,

3    or more than half?

4    A.  It was more than half.

5    Q.  Did Paduch say why he needed to masturbate you?

6    A.  No.

7    Q.  At the time Paduch masturbated you during those

8    appointments, were you capable of masturbating yourself?

9    A.  Yes.

10   Q.  Did you tell the doctor that you could masturbate yourself?

11   A.  Yes.

12   Q.  When Paduch masturbated you, how close would he be to you?

13   A.  He would be at my right hip.

14   Q.  And how would you be positioned?  Would you be lying down,

15   sitting up, standing up?

16   A.  I would be lying down.

17   Q.  Would any part of Paduch's body be touching you as he

18   masturbated you?

19   A.  No.

20   Q.  Just to be clear, apart from his hand?

21   A.  Yes.

22   Q.  Did Paduch wear gloves when he masturbated you?

23   A.  Yes.

24   Q.  Did Paduch ever display pornography for you?

25   A.  No.

O4TVPAD3                         L. Bevin - Direct

1   Q.  Did Paduch ever expose his own penis for you?

2   A.  No.

3   Q.  Did Paduch ever ask you to masturbate him?

4   A.  No.

5   Q.  When Paduch masturbated you, did you ever ejaculate?

6   A.  Yes.

7   Q.  Mr. Bevin, where did your ejaculate land?

8   A.  Either on his hands, clothes, or a cup when he provided it.

9   Q.  Did Paduch masturbate you in the same room where he

10  conducted the physical exam or somewhere else?

11  A.  Same room.

12  Q.  Now, Mr. Bevin, if you learned that it was not for medical

13  treatment, would you have let Paduch masturbate you?

14  A.  No.

15  Q.  Did you ever tell Paduch that you were having trouble

16  masturbating on your own?

17  A.  No.

18  Q.  Getting erections?

19  A.  No.

20  Q.  Ejaculating?

21  A.  No.

22  Q.  To your knowledge, did Paduch ever tell your parents that

23  he was masturbating you?

24  A.  No.

25  Q.  At the time you were a patient of Paduch, did you ever tell

1  your parents that Paduch was masturbating you?

2  A.  No.

3  Q.  Now, Mr. Bevin, after the New York City hospital, the

4  zombie hospital, did you see Paduch at any other hospital?

5  A.  Yes.

6  Q.  Where was it?

7  A.  In Long Island.

8  Q.  Why did you keep seeing Paduch at that new hospital?

9  A.  Because he was my doctor.

10  Q.  And what would happen during your visits with Paduch at the

11  Long Island hospital?

12  A.  He would do the same exact thing as we would as the one in

13  the hospital in the city.

14  Q.  Mr. Bevin, did you communicate with Paduch by phone?

15  A.  Yes.

16  Q.  How?

17  A.  Text message.

18  Q.  How did you get Paduch's number?

19  A.  He gave it to me on the first appointment.

20  Q.  Did he say anything to you when he gave you that number?

21  A.  He just said, Text me if you have any questions.

22          MS. COLSON:  Ms. Vuckovich, can we please pull up for

23  the witness and the parties what's been marked as Government

24  Exhibit 404.  And I'll note that this is not sealed.

25  Q.  Mr. Bevin, do you recognize this?

1    A.  Yes.

2    Q.  What is this?

3    A.  That is Paduch's contact information in my phone.

4    Q.  And you said it's from your phone; is that correct?

5    A.  Yes.

6    Q.  So who does "New York doctor" refer to?

7    A.  Paduch.

8    Q.  And I'll read the number aloud.  That's 917-658-4945.

9          MS. COLSON:  At this time, the government offers

10   Government Exhibit 404, again, noting it is not sealed.

11         THE COURT:  Any objection?  Admitted.

12         (Government's Exhibit 404 received in evidence)

13         MS. COLSON:  Ms. Vuckovich, we can take that down,

14   please.  And if you'd please pull up for the witness and the

15   parties what's been marked as Government Exhibit 414.

16   Q.  Mr. Bevin, do you recognize these messages?

17   A.  Yes.

18   Q.  What are they?

19   A.  My text message with Paduch.

20   Q.  Where did they come from?

21   A.  My phone.

22   Q.  Who sent the messages in green?

23   A.  I did.

24   Q.  And who is "New York doctor"?

25   A.  Paduch.

1          MS. COLSON:  At this time, the government offers

2     Exhibit 414, again, noting it's not sealed.

3          THE COURT:  Objection?

4          MR. BALDASSARE:  No objection.

5          THE COURT:  414 is admitted.

6          (Government's Exhibit 414 received in evidence)

7     Q.  Sticking with the first page, Mr. Bevin, do you see the

8     date at the top of this message, September 11, 2018?

9     A.  Yes.

10    Q.  And based on your birthday, would you have been 17?

11    A.  Yes.

12    Q.  Focusing on the second message, the defendant writes:  Jock

13    itch.  Better yet, I will send script for a cream to your

14    pharmacy.  Which pharmacy you want me to send it to?  If it get

15    worse, send me a picture to this phone.

16          You write back:  Send it to Giant in Potomac.

17          Mr. Bevin, where is Potomac?

18    A.  It is a small town in Maryland.

19    Q.  What is Giant?

20    A.  Like a grocery store.

21          MS. COLSON:  Ms. Vuckovich, can we please go to page

22    4.

23    Q.  Do you recognize this, Mr. Bevin?

24    A.  Yes.

25    Q.  And again, who sent the messages in green?

1    A.  I did.

2    Q.  Who is "New York doctor"?

3    A.  Paduch.

4    Q.  Focusing on the bottom message, I'll read that aloud:

5    Good.  BTW, I forgot to ask you my normal questions.  One, you

6    are straight, gay, or in between?  Either is fine with me, of

7    course.  Anybody bullying you or are you bullying anybody?

8    Sorry, bud, I need to ask all kids the same questions, which

9    are important to me.  No good or bad answer.  Let me know how —

10   if we could please go to page 5 — your birthday party goes.

11           Mr. Bevin, did Paduch often ask you about your

12   sexuality?

13   A.  Yes.

14   Q.  Did he say why he needed to know about your sexuality over

15   text?

16   A.  No.

17   Q.  Sticking with page 5, who's the individual in that

18   photograph?

19   A.  I am.

20   Q.  I'll read the message below:  Hi, Doctor P.  It's redacted.

21   Just heard you left NY, so I thought if you have time now we

22   can go fishing on the Chesapeake Bay.  Rock fish are biting.

23   Also, can you still be my DR, doctor, or can you help me find a

24   new one like you.

25           Mr. Bevin, why did you invite the defendant to your

O4TVPAD3                           L. Bevin – Direct

1   home?

2   A.  Because it was going to be a good gesture.

3   Q.  Who wrote this text?

4   A.  My mom.

5   Q.  Did your mother tell you what to write in other texts to

6   Paduch?

7   A.  Yes.

8          MS. COLSON:  Ms. Vuckovich, can we please go to page

9   6.

10  Q.  I'll read the reply:  Like the pic.  What is the depth of

11  the dock?  I need three to four feet.  There is not other

12  doctor like me.  I can still be your doctor.  See drpaduch.com

13  and my Twitter, Dr. Paduch.  I like your goatee.  Redacted.

14  Call me Paduch, Doc, Darius, but not Doctor P.  Smiley face.

15         MS. COLSON:  Thanks, Ms. Vuckovich.

16         If you could please go to page 14.

17  Q.  And beginning about halfway down, you write:

18         Why do I have to be 25 when I can start coming by

19  myself?  Pausing there, Mr. Bevin, who told you you had to be

20  25 years old to visit Paduch by yourself?

21  A.  He did.

22         THE COURT:  Just repeat the objection, please.

23         MR. BALDASSARE:  Withdrawn.

24         THE COURT:  Okay.

25  Q.  I'll repeat that, Mr. Bevin.

O4TVPAD3                        L. Bevin - Direct

1        Who told you that you had to be 25 years old to visit
2   Paduch by yourself?
3   A.   He did.
4   Q.   When did he tell you that?
5   A.   On the first appointment.
6   Q.   Who was that in front of?
7   A.   My parents.
8   Q.   All right.  I'll keep going.
9        So now the defendant writes:  18.  So July 2021, which
10  is the date of this, you're 20 years old; is that correct?
11  A.   Correct.
12  Q.   You write:  So I could come see you this time with no
13  parents.  The defendant wrote:  Up to you and your parents.
14  Whatever you want to do.  I don't mind seeing you without your
15  parents.
16       MS. COLSON:  You can take that down, Ms. Vuckovich.
17       Thank you.
18  Q.   Mr. Bevin, in your life have you seen other doctors besides
19  Paduch?
20  A.   Yes.
21  Q.   How often do you text with other doctors?
22  A.   Never.
23  Q.   Do other doctors ask for pictures of your genitals?
24  A.   No.
25  Q.   Has any doctor ever texted you to ask about your sexuality?

O4TVPAD3                          L. Bevin - Direct

1   A.  No.

2          MS. COLSON:  Now, Ms. Vuckovich, would you please go

3   to page 23.

4   Q.  I'll read the message in the green about halfway down the

5   page:  January 2nd.  Hi, Dr. Paduch.  Tomorrow morning my mom

6   has the first call with the judge and opposing lawyer for

7   scheduling the preliminary hearing about getting BC/BS to pay

8   for my patches.  Would you please give her a call when you have

9   time?  She would like to talk to you about any info you can

10  help add to the case, and if you would be a witness and — if

11  you could go to the next please — give her a call when you have

12  time.  She would like to talk to you about any info you can

13  help add to the case and if you would be a witness and whatever

14  else you can recommend.  Thanks.  Redacted.  Her number is

15  redacted.  And email is redacted.

16         MS. COLSON:  Thanks, Ms. Vuckovich.

17  Q.  Mr. Bevin, who wrote the message in green asking for the

18  help from Paduch?

19  A.  My mom.

20  Q.  And after this message, excuse me, did there come a time

21  when you joined a lawsuit against Paduch?

22  A.  Yes.

23  Q.  Do you have a lawyer for that case?

24  A.  Yes.

25  Q.  Did your mother help you find the lawyers?

O4TVPAD3                          L. Bevin - Cross

1    A.  Yes.

2    Q.  Luke, do you want to be here?

3    A.  No.

4    Q.  Finishing up that text message, the defendant writes:

5    Unfortunately, my heart is failing badly and I am in and out of

6    atrial fibrillation and not seeing patients right now.  I hope

7    all will go well, but I am not able to help at this point.

8              MS. COLSON:  No further questions.

9              THE COURT:  Cross-examination.

10   CROSS-EXAMINATION

11   BY MR. BALDASSARE:

12   Q.  Good morning, Mr. Bevin.  My name is Mike Baldassare.  This

13   is Jeff Hawriluk.  And we represent Dr. Paduch, who I know you

14   know is at the end of the table.

15             Can you hear me okay?

16   A.  Yes.

17   Q.  We've never met before; correct?

18   A.  Nope.

19   Q.  Okay.  If at any point you can't hear me or you want to

20   take a break, just let me know, okay?

21   A.  All right.

22   Q.  You testified just a few minutes ago that some of the texts

23   that the prosecutor read your mom had written for you, right?

24   A.  Yes.

25   Q.  Did you dictate what your mom typed or did she come up with

O4TVPAD3                        L. Bevin - Cross

1    the message herself?

2    A.  She came up with the typed message.

3    Q.  Do you know why she didn't just text message Dr. Paduch

4    directly?

5    A.  Well, she didn't have his phone number.

6    Q.  Do you know why she didn't just get the phone number from

7    you and text him directly?

8    A.  No.

9    Q.  Is there any reason you can think of why your mom would be

10   texting Dr. Paduch as you?

11   A.  It was so that, like, more information as a text message,

12   in-depth.

13   Q.  Did your mother ever -- to your recollection, ever text Dr.

14   Paduch from your number after you were 18?

15   A.  No.

16   Q.  You started seeing Dr. Paduch at around August of 2015,

17   right?

18   A.  Yes.

19   Q.  And saw him at Weill Cornell till about January 2019;

20   correct?

21   A.  Yes.

22   Q.  And then saw him at Northwell until about end of 2022,

23   right?

24   A.  Yes.

25   Q.  So overall you were his patient for seven years; correct?

O4TVPAD3                         L. Bevin - Cross

1   A.  Yes.

2           MR. BALDASSARE:  I'm just going to ask the government

3   to bring it up so we're sure we're using the correct copy.

4           THE COURT:  That's fine.

5   Q.  Mr. Bevin, I'm showing you what is Government Exhibit 414,

6   page 24 of that document.  Do you see that?

7   A.  Yes.

8   Q.  Can you see that okay, sir?

9   A.  Yes.

10  Q.  You see the bottom bubble on the right in green?

11  A.  Yes.

12  Q.  Okay.  Where it says:  Please hang in there.  You are the

13  best doc in the world and I really need you.  I hope you get

14  better soon.  Can you keep me posted.  I'm saying prayers.  And

15  then the, I guess, hands praying emoji.  Did I read that right?

16  A.  Yes.

17  Q.  Did you write that message?

18  A.  No.

19  Q.  Who wrote that message?

20  A.  My mom.

21  Q.  To your knowledge, did she -- why did she write that

22  message?

23  A.  Because she generally helped me with most of the, like,

24  more important text messages.

25  Q.  At that time did you think he was the best doc in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O4TVPAD3                          L. Bevin – Cross

1   world?

2   A.  Yes.

3   Q.  At that time did you want him on your team?

4   A.  Yes.

5   Q.  Now, this text, if we go back to the prior page, looks like

6   it was from January 2nd of 2023.  You see that?

7   A.  Yes.

8   Q.  And so then if we go back to the message we were just

9   looking at, so that was sent on January 2nd, 2023.  Would you

10  agree with me that your lawsuit was filed about a month later

11  on February 3rd, 2023?

12  A.  I honestly don't know what day it was filed.

13  Q.  Do you remember it being filed within about a month of that

14  message we just looked at?

15  A.  Yes.

16  Q.  And you're represented in that lawsuit by a law firm

17  shorthand PCVA?

18  A.  Yes.

19  Q.  And at that law firm a woman named Mallory Allen?

20  A.  Yes.

21  Q.  And I think you said that your mom had set up that meeting

22  for you?

23  A.  Yes.

24  Q.  And that you didn't want to go?

25  A.  To what?

O4TVPAD3                          L. Bevin - Cross

1    Q.  To the meeting.

2    A.  Which meeting?

3              MS. COLSON:  I don't believe the witness testified to

4    that.

5              THE COURT:  Why don't you rephrase the question.

6              MR. BALDASSARE:  Yeah.

7              THE COURT:  Thanks.

8    Q.  Am I correct that your first meeting with the U.S.

9    Attorney's Office was about three weeks after the filing of the

10   lawsuit?

11   A.  I don't remember.

12   Q.  Do you remember meeting with the prosecutors seated to my

13   right about this case?

14   A.  Yes.

15   Q.  Do you remember meeting with them in February of 2023?

16   A.  Yes.

17   Q.  Do you remember meeting with them throughout 2024?

18   A.  Yes.

19   Q.  Would nine meetings with them throughout 2024 sound about

20   right?

21   A.  I'm not sure.

22   Q.  Do you remember how long the meetings lasted in general?

23   A.  Which ones?

24   Q.  Any of the ones you remember.

25   A.  About an hour.

O4TVPAD3                        L. Bevin - Cross

1    Q.   At each meeting, was one or more of the prosecutors seated

2    to my right there?

3    A.   More.  Like one or more, yeah.

4    Q.   And were there any FBI agents there that you know of?

5    A.   Yes.

6    Q.   Was one of them Agent Stacy Turansky?

7    A.   Yes.

8    Q.   Were there any other individuals there who you might see in

9    the courtroom, paralegals or otherwise?

10   A.   Yes.

11   Q.   I wasn't at any of those meetings, right?

12   A.   No.

13   Q.   Mr. Hawriluk wasn't at any of those meetings?

14   A.   No.

15   Q.   To your knowledge, were those meetings recorded in any

16   audio fashion?

17   A.   I'm unsure.

18   Q.   To your knowledge, were those meetings recorded in any

19   video fashion?

20   A.   Unsure.

21   Q.   Did Mallory Allen attend your first meeting with the U.S.

22   Attorney's Office in February 2024 -- strike that.

23        Did Ms. Allen from PCVA attend the first meeting you

24   had with the government in February of 2023?

25   A.   Yes.

O4TVPAD3                        L. Bevin - Cross

1   Q.  Did Mallory Allen of PCVA attend the meeting you had with

2   the government on March 27, 2024?

3   A.  Yes.

4   Q.  Did Mr. Pfau of PCVA attend the meeting you had with the

5   government on April 4th, 2024?

6   A.  Who?

7   Q.  Mr. Pfau?

8   A.  I'm not sure.

9   Q.  Was there a lawyer from PCVA at your meeting with the

10  government on April 4th, 2024?

11  A.  Yes.

12  Q.  Do you know an attorney from PCVA, last name Surface?

13  A.  No.

14  Q.  Was an attorney from PCVA at your meeting with the

15  government on April 10th, 2024?

16  A.  I don't know.  Unsure.

17  Q.  When you came up for these meetings with the government,

18  were you occasionally accompanied by your mother?

19  A.  Yes.

20  Q.  Do you know, to your knowledge, if your mother was

21  separately interviewed by the government on those days?

22  A.  She was.

23  Q.  You testified a moment ago that you would -- when you would

24  come to meet Dr. Paduch, sometimes you would drive from

25  Bethesda; is that correct?

O4TVPAD3                          L. Bevin - Cross

1    A.  Maryland, yes.

2    Q.  Would you drive also from Potomac?

3    A.  Yes.

4    Q.  And were those both homes that your family had in Bethesda

5    or Potomac?

6    A.  Yes.

7    Q.  Did you drive from any other homes to see Dr. Paduch?

8    A.  Yes.

9    Q.  What other homes?

10   A.  The house I live in now.

11   Q.  Where is that?

12   A.  In Queenstown.

13   Q.  And where is that, what state?

14   A.  Maryland.

15   Q.  Would you always drive?

16   A.  Yes.

17   Q.  Do you ever remember taking a private plane?

18   A.  Yes, there was one time.

19   Q.  In August 2016, am I correct that you certainly trusted Dr.

20   Paduch enough to let him operate on you; correct?

21   A.  Yes.

22   Q.  And would it be your impression that your mom also trusted

23   him enough to --

24            MS. COLSON:  Calls for speculation.

25            THE COURT:  Sustained.

O4TVPAD3                        L. Bevin - Cross

1    Q.  During the visit, you stated you didn't want your parents

2    in the room; correct?

3    A.  Yes.

4    Q.  And during that visit, Dr. Paduch examined your penis;

5    correct?

6    A.  Yes.

7    Q.  And your testicles; correct?

8    A.  Yes.

9    Q.  And you said that he touched or poked around your rectal

10   area; correct?

11   A.  Yes.

12   Q.  Did the government ever ask you to have any independent

13   evaluations in advance of this trial?

14   A.  What's that?

15   Q.  Ever ask you to go to a doctor for an evaluation hired by

16   the government?

17   A.  No.

18   Q.  To your knowledge, did the government ever interview your

19   pediatrician, Dr. Kornfeld?

20   A.  Unsure.

21   Q.  To your knowledge, did the government ever ask your

22   pediatrician, Dr. Kornfeld, for any of your medical records?

23   A.  Unsure.

24   Q.  Can you explain to me the setup of the exam room and what

25   was right outside of it?

O4TVPAD3                           L. Bevin - Cross

1   A.  You want the inside or the outside?

2   Q.  Both.

3   A.  Which one first?

4   Q.  Inside.

5   A.  Yeah, so you walk in and you have the table that you lie

6   down on to your left.  And then you have the desk, computer as

7   soon as you walk in.  There's a little chair.

8   Q.  And outside the exam room, was it a hallway, a walkway,

9   another office, what was that?

10  A.  Hallway.

11  Q.  And would -- was that hallway accessed -- accessible to

12  other people besides you and Dr. Paduch?

13  A.  Yes.

14  Q.  Did you ever see any other people walking up and down that

15  hallway when you were going in or coming out of the exam room?

16  A.  Yes.

17  Q.  Would you see people who appeared to be nurses?

18  A.  Yes.

19  Q.  People who appeared to be doctors?

20  A.  Yes.

21  Q.  People who appeared to be patients?

22  A.  Sometimes, not really.

23  Q.  Okay.  You never said to your mother anything about your

24  treatment from Dr. Paduch that he was masturbating you;

25  correct?

1    A.  No, I did not.

2    Q.  Did you ever say anything to that effect to your dad?

3    A.  No.

4    Q.  Did you ever say anything to your mom or dad about him

5    watching you masturbate?

6    A.  No.

7    Q.  Did you ever say anything to your mom or dad about him

8    touching your rectal area?

9    A.  No.

10   Q.  Did you ever say anything to any of your siblings?

11   A.  No.

12   Q.  After you stopped seeing Dr. Paduch, have you sought any

13   therapy?

14   A.  Yes.

15   Q.  Can you just tell me the year you started.

16   A.  It was 2023.

17   Q.  Does that continue?

18   A.  Yes.

19   Q.  Would you agree that your mom was very involved in your

20   healthcare?

21   A.  Yes.

22   Q.  Did the research for doctors?

23   A.  Yes.

24   Q.  Did she collect articles on the latest potential

25   treatments?

O4TVPAD3                        L. Bevin - Cross

1    A.  Yes.

2    Q.  Did your mother ever ask you about what was happening

3    during your treatment with Dr. Paduch?

4    A.  No.

5    Q.  Did your dad ever ask you?

6    A.  No.

7    Q.  Would you say your mom was more, less, or the same involved

8    in your healthcare treatment with Dr. Paduch than she was with

9    any other doctor?

10   A.  What do you mean by that?

11   Q.  Well, did your mother talk to you about what care you were

12   receiving from Dr. Kornfeld?

13   A.  No.

14   Q.  Your mom didn't know what was happening when you met with

15   Dr. Kornfeld?

16   A.  Oh, she did, yeah.

17   Q.  She didn't with Dr. Paduch?

18   A.  No.

19   Q.  Did the government ever ask you to search for text messages

20   on any of your phones that you may have had with Dr. Paduch?

21   A.  Yes.

22   Q.  And did you conduct that search?

23   A.  Yes.

24   Q.  And did you find any text messages?

25   A.  Yes.

1    Q.  And did you give them to the government?

2    A.  Yes.

3    Q.  Did the government ever take possession of your phone?

4    A.  No.

5    Q.  Did you keep any record of how you conducted that search?

6    A.  What type of search do you mean?

7    Q.  You said you searched your phones for texts related to Dr.

8    Paduch for this case at the government's request, right?

9    A.  Like how did I give it to them?

10   Q.  Did you keep any record of how you conducted the search?

11   A.  No.

12   Q.  Would you review the text messages that your mom would type

13   on your phone as you -- before she sent them?

14   A.  Yes.

15   Q.  And did you approve them?

16   A.  Most of the time, yes.

17   Q.  And on the times when you didn't, why wouldn't you?

18   A.  I would just change them a little bit.

19   Q.  In what way?

20   A.  If I wanted to or not.

21   Q.  Did you change them substantively or was it just a little

22   word here or there?

23   A.  Little word.

24   Q.  Did you ever ask your mom to let you just type your own

25   text messages to Dr. Paduch?

O4TVPAD3                        L. Bevin - Redirect

1    A.  It would depend on what information was being said.

2    Q.  But did you ever do that?

3    A.  Can you reask the question?

4    Q.  Yeah.  Did you ever ask your mom to let you type your own

5    messages to Dr. Paduch?

6    A.  I could text if I wanted to.  She did not have to be there.

7    Q.  Did you ever write your own text messages to Dr. Paduch

8    without any involvement from your mother?

9    A.  Yes.

10             MR. BALDASSARE:  Nothing further.  Thank you.

11             THE COURT:  Any redirect?

12             MS. COLSON:  Very briefly, your Honor.

13   REDIRECT EXAMINATION

14   BY MS. COLSON:

15   Q.  Mr. Bevin, when the defendant masturbated you, was the exam

16   room door closed or was it open?

17   A.  It was closed.

18   Q.  Now, you testified that you didn't tell your family, your

19   parents, your siblings, that the defendant was masturbating

20   you; is that correct?

21   A.  Correct.

22   Q.  Why not?

23   A.  That was too personal for me to tell them.

24             MS. COLSON:  No further questions.

25             THE COURT:  Anything else?

O4TVPAD3                          Alvarez – Direct

1           All right.  Thank you.  You can step down.

2               (Witness excused)

3           THE COURT:  The government can call its next witness.

4           MS. QIAN:  Your Honor, might I just have a moment to

5    confer with defense counsel?

6           THE COURT:  Sure.

7               (Counsel conferred)

8           MS. QIAN:  Your Honor, we're ready to call our next

9    witness.

10          THE COURT:  All right.  Whenever you're ready.

11          MS. QIAN:  The government calls Ms. Jasminda Alvarez.

12   JASMINDA ALVAREZ,

13       called as a witness by the Government,

14       having been duly sworn, testified as follows:

15          THE COURT:  Good afternoon.  You may proceed.

16          MS. QIAN:  Thank you, your Honor.

17   DIRECT EXAMINATION

18   BY MS. QIAN:

19   Q.  Good afternoon, Ms. Alvarez.

20          Are you currently employed?

21   A.  Yes.

22   Q.  Where are you employed?

23   A.  Weill Cornell.

24   Q.  And what is your title there?

25   A.  Senior medical secretary.

1  Q.  Do you work in any particular department within Weill

2  Cornell?

3  A.  The department of urology.

4  Q.  Now, how long have you been a medical secretary at Weill

5  Cornell Urology?

6  A.  For about 11 to 12 years.

7  Q.  When you first started at Weill Cornell urology, did you

8  work for any particular doctor?

9  A.  Yes.

10  Q.  Who?

11  A.  Darius Paduch.

12  Q.  Ms. Alvarez, can you please take a look around the

13  courtroom to see if you see Dr. Darius Paduch anywhere in the

14  courtroom?

15  A.  Yes.

16  Q.  Can you identify him by where he is sitting and an article

17  of clothing that he is wearing?

18          MR. BALDASSARE:  Judge, we'll stipulate Darius Paduch,

19  the defendant, is two to my left.

20          THE COURT:  Is that correct?

21          THE WITNESS:  Yes.

22          THE COURT:  All right.  Thank you.

23  Q.  Now, from approximately which year to which year did you

24  work for Dr. Paduch?

25  A.  My official date of hire was March 25th of 2013, but I

1    first started with him the Columbus Day the year before that.

2    Q.   Approximately 2012?

3    A.   Yes.

4    Q.   And when did you stop working for Dr. Paduch?

5    A.   Around mid to late 2015.

6    Q.   Now, who, if anyone else, did you work for after?

7    A.   James Kashanian.

8    Q.   And who is James Kashanian?

9    A.   He's now the director of male sexual health medicine.

10   Q.   Is he a urologist?

11   A.   Yes, he is.

12   Q.   At Weill Cornell?

13   A.   Yes.

14   Q.   Now, during the time that you worked for Dr. Paduch, were

15   you responsible at all for scheduling patients?

16   A.   Yes.

17   Q.   Who's the person who determines whether a patient needs to

18   return for another medical visit?

19   A.   The doctor.

20   Q.   And who is the person who determines approximately how soon

21   after the patient should return?

22   A.   The doctor.

23   Q.   And who is the person who actually schedules the

24   appointments?

25   A.   That would have been me.

O4TVPAD3                        Alvarez - Direct

1  Q.  Now, if the patient is in the office, how do you schedule
2  them?
3  A.  If they are in the office, with having an appointment with
4  him, then he would bring me over to the patient and tell me
5  what was the next plan.  So he would say two-month follow-up,
6  three-month follow-up, and that's the way I would book him.
7  Q.  Now, if the patient is not in the office, how would you
8  schedule them?
9  A.  If they are on the phone or if it's via email, then I would
10  have to pull up the patient's chart and review the assessment
11  and the plan to see when they needed to be scheduled next.
12  Q.  Well, you said if it's by phone or by email.  What do you
13  mean by that?
14  A.  If they called for an appointment or if they emailed me
15  regarding a follow-up appointment, then I would have to look up
16  their chart.
17  Q.  And how is the schedule ultimately communicated to the
18  patient?
19  A.  I would pull up what's the next availability and give it to
20  them.
21  Q.  Would you do it in person, by phone, by email?
22  A.  Whichever way.  If the patient was physically in the
23  office, then I would tell them what was the next availability
24  that I had for that time frame.  If the patient was on the
25  phone, then I'll tell them the answer over the phone.  Or if

O4TVPAD3                        Alvarez - Direct

1    not, I'll send it to them in an email.

2    Q.  Now, prior to the scheduled appointment, do you do anything

3    to remind the patient of upcoming appointments?

4    A.  I used to confirm their appointments.

5    Q.  And how would you do that?

6    A.  Phone or email.

7    Q.  Was this something that you did sometimes or always?

8    A.  All the time.

9    Q.  Now, during the time that you worked for Dr. Paduch, from

10   when did you become responsible for communicating with patients

11   to schedule them for visits or to remind them of visits?

12   A.  My first date of hire.

13   Q.  Are you aware of anyone else on Dr. Paduch's staff who was

14   responsible for communicating with patients?

15   A.  Yes.

16   Q.  Who else?

17   A.  There was at the time Joseph, Joe Kipper, and Jordan

18   Bizarnick.

19   Q.  Anybody else who you're aware would also communicate with

20   Dr. Paduch's patients?

21   A.  After Joe Kipper left the department, then it became

22   Jessica.  So that was the next person.

23   Q.  I'm sorry, did you say Jessica?

24   A.  Yes.

25   Q.  Do you know her last name?

1  A.  Collazo.

2  Q.  Now, during the time that you worked for Dr. Paduch, did

3  you ever hear Dr. Paduch refer to himself as a sex therapist?

4  A.  No.

5  Q.  Did you ever hear him refer to himself as a sex surrogate?

6  A.  No.

7  Q.  During the time that you worked for Dr. Paduch, did you

8  ever hear any patient refer to Dr. Paduch as a sex therapist?

9          MR. BALDASSARE:  Objection, Judge.

10          THE COURT:  Sustained.

11  Q.  Are you aware of what a sex therapist does?

12  A.  Yes.

13  Q.  And how are you aware?

14  A.  Because it's therapy, so it's more so that I'm speaking

15  with the patient and, I guess, trying to help them with

16  whatever their issues were, especially if it was psychological.

17  Q.  In your work while you're working for Dr. Paduch, did you

18  ever come into contact with any sex therapists?

19  A.  No.

20  Q.  Did you ever have to speak to any sex therapists?

21  A.  No.

22  Q.  Did any conversation regarding sex therapists come up?

23  A.  There would be conversations of a sex therapist coming up.

24  Q.  What would Dr. Paduch say, if anything, about sex

25  therapists?

O4TVPAD3                          Alvarez - Direct

1   A.   If he wanted to refer the patient out to a sex therapist,

2   we had one that he would recommend.

3   Q.   I'm going to now shift gears and ask you some questions

4   regarding the layout of the office.

5   A.   Yes.

6   Q.   In which city is Weill Cornell Urology Department located?

7   A.   New York, New York, Manhattan.

8   Q.   And Ms. Alvarez, do you see in front of you a binder that

9   contains what's been labeled Government Exhibits 512, 514, 525,

10  526, 528, 531, 533, 535, 537 to 539, 541 and 546?

11  A.   There's no 546 in the back, there's 541.

12  Q.   I'm sorry?

13  A.   There's not a 546 in the back, there's a 541.

14  Q.   Okay.  546 is the very first one, I think.

15  A.   Oh, yes.

16          MS. QIAN:  Government offers Government Exhibits 512,

17  514, 525, 526, 528, 531, 533, 535, 537 to 539, 541 and 546.

18          THE COURT:  Hearing no objection, they'll be admitted.

19          (Government's Exhibits 512, 514, 525, 526, 528, 531,

20  533, 535, 537 to 539, 541, 546 received in evidence)

21          MS. QIAN:  Ms. Vuckovich, can you please pull up

22  what's been admitted as 546.

23  Q.   Ms. Alvarez, what is depicted in this photo?

24  A.   The entrance of the college of Weill Cornell.

25  Q.   And is Weill Cornell Urology located within these doors?

1   A.  You can get to it from these doors, but it's not in this

2   actual building.

3         MS. QIAN:  Ms. Vuckovich, can you now please publish

4   Government Exhibit 512.

5   Q.  Ms. Alvarez, what is depicted in this photo?

6   A.  The entrance of Brady Urology.

7   Q.  And from here can you access -- from here, whose office can

8   you access?

9   A.  You can access all the offices there for the doctors that

10   are stationed in that wing.

11         MS. QIAN:  Now, Ms. Vuckovich, can you please pull up

12   what's been admitted as Government Exhibit 525.

13   Q.  Ms. Alvarez, what is depicted in this photo?

14   A.  That's the waiting area for Brady Urology.

15   Q.  Now, did Dr. Paduch have an office for himself?

16   A.  Yes.

17   Q.  Using Government Exhibit 525, which is in front of you, how

18   would you navigate from what's in front of you to Dr. Paduch's

19   office?

20   A.  You would go straight through the open entrance that's to

21   the left.

22   Q.  I believe the screen in front of you is actually a touch

23   screen.

24   A.  So you can go this way.

25   Q.  Never mind.  It's not a touch screen.

O4TVPAD3                        Alvarez - Direct

1              Are you referring to what appears to be an open

2    doorway?

3    A.  Yes.

4    Q.  On the left side of the photo?

5    A.  Yes.

6              MS. QIAN:  Now, Ms. Vuckovich, can you please pull up

7    what's been admitted as Government Exhibit 514.

8    Q.  Ms. Alvarez, what is depicted in this photo?

9    A.  Darius's old office.

10   Q.  And is this what Dr. Paduch's office looked like at the

11   time that you worked for him?

12   A.  Well, the layout is pretty much the same.

13   Q.  Is there anything that's different?

14   A.  His -- his plaques, artwork, and his personal items aren't

15   in there.

16   Q.  Now, where did Dr. Paduch sit?

17   A.  The same location where the chair is located at.

18   Q.  Where the chair is located where?

19   A.  Where the chair is located at, right in front of the

20   computer monitor.

21   Q.  Dr. Paduch would sit in the chair in front of the computer?

22   A.  Yes.

23   Q.  Okay.  Now, were you aware if any patients ever went into

24   Dr. Paduch's office?

25   A.  Sometimes they did.

1   Q.  And where would they sit?

2   A.  They would sit on the opposite side of the desk where the

3   chairs are to the right.

4   Q.  Was Dr. Paduch the only doctor in the practice or were

5   there other urologists?

6   A.  There's other urologists.

7   Q.  Approximately how many other urologists?

8   A.  On our side there's about ten.

9   Q.  And what do you mean by "on our side"?

10  A.  Well, our department for adult urology, that would be on

11  our side.  So it would be between Brady and LeFrak Urology.

12  Q.  In total, how many urologists were there?

13  A.  On our side would be the ten doctors approximately.

14  Q.  Are there any other type of doctors that practiced from

15  within Brady Urology?

16          THE COURT:  I'm sorry, can you clarify what that word

17  is before "urology"?

18          MS. QIAN:  Brady.

19          THE COURT:  Okay.  Thank you.

20  A.  I'm sorry, can you repeat the question?

21  Q.  Sure.  Earlier you referred to the two wings as Brady

22  Urology and LeFrak; correct?

23  A.  Yes.

24  Q.  Are you aware of any other type of doctor other than

25  urologists who practice within Brady and LeFrak?

1    A.  No.

2    Q.  Are there any psychologists who work there?

3    A.  No.

4    Q.  Now, were there any exam rooms in the -- within the urology

5    department?

6    A.  Yes.

7    Q.  Approximately how many?

8    A.  Seventeen, 18 exam rooms.

9             MS. QIAN:  Ms. Vuckovich, can you please publish

10   what's been admitted as Government Exhibit 526.

11   Q.  Ms. Alvarez, what is depicted in this photo?

12   A.  Pod 2.

13   Q.  And what happens at Pod 2?

14   A.  Once the patients pass the front, do their vitals, they

15   come in, they place them there until we have an available room

16   for them to go into.

17   Q.  Now, of the 17 or 18 exam rooms, were there any particular

18   exam rooms that were assigned specifically to Dr. Paduch?

19   A.  Yes.

20   Q.  Which ones?

21   A.  Seven, 8, and 9.

22            MS. QIAN:  Ms. Vuckovich, can you please pull up

23   what's been admitted as Government Exhibit 528.

24   Q.  Ms. Alvarez, what is depicted in this photo?

25   A.  That's exam room 8.

O4TVPAD3                          Alvarez - Direct

1   Q.  Do you see the yellow curtain on the left-hand side of the

2   photo?

3   A.  Yes.

4   Q.  What is that?

5   A.  That's the cover curtain.  Because to the side of it is the

6   door.  So when patients are undressing, we pull the curtain so

7   that they can have their privacy.

8   Q.  Is there a privacy curtain in every exam room in Weill?

9   A.  Yes.

10          MS. QIAN:  Ms. Vuckovich, can you please publish

11  what's been admitted as Government Exhibit 521.  I'm sorry,

12  531.

13  Q.  Ms. Alvarez, what is depicted in this photo?

14  A.  Exam room 7.

15  Q.  And again, do you see a little bit of something yellow to

16  the right?

17  A.  That's the curtain for that exam room.

18          MS. QIAN:  Ms. Vuckovich, can you please now publish

19  what has been admitted as Government Exhibit 533.

20  Q.  And Ms. Alvarez, what is depicted in this photo?

21  A.  Exam room 9.

22  Q.  During the time that you worked at Weill Cornell Urology,

23  are you aware whether any medical staff other than Dr. Paduch

24  would be in the room -- in the exam room with the patient on a

25  routine basis?

O4TVPAD3                          Alvarez - Direct

1    A.   Not on a routine basis.

2    Q.   Other than Dr. Paduch -- on a routine basis, other than Dr.

3    Paduch, who else would be in the -- what other medical staff

4    would be in the exam room?

5              MR. BALDASSARE:  Objection.  Asked and answered.

6              THE COURT:  Overruled.  You can answer.

7    A.   None.

8    Q.   Now, is there a way for you to log in and see a particular

9    patient's medical file?

10   A.   Yes.

11   Q.   How do you do that?

12   A.   We'll go into the hospital system, which is Epic.

13   Q.   And when you log into Epic, and if you're looking up a

14   particular patient's name, how do you do that?

15   A.   You type up the last name, first name.  And just you can

16   also enter the doctor, and it will pull up all the patients

17   within that name underneath that doctor's name.

18   Q.   And what do you see on the screen once you enter a

19   particular patient's name?

20   A.   You would see the last name, first name, date of birth,

21   age, and the beginning of the home address.

22   Q.   Other than the exam rooms that we just looked at, are there

23   any rooms for particular procedures?

24   A.   Yes.

25   Q.   What kind of rooms?

O4TVPAD3                         Alvarez - Direct

1   A.  We have a special procedure room.

2   Q.  And what is a special procedure room?

3   A.  It's where patients who had to produce a sample who will go

4   in there privately to produce a sample.

5   Q.  What kind of sample?

6   A.  Semen.

7          MS. QIAN:  Ms. Vuckovich, can you please pull up

8   what's been admitted as Government Exhibit 535.

9   Q.  Ms. Alvarez, what is depicted in this photo?

10  A.  That's the special procedures room.

11  Q.  How long would it take to walk from one of the exam rooms

12  we just looked at to this special procedure room?

13  A.  Less than a minute.

14  Q.  I'm sorry?

15  A.  Less than a minute.

16         MS. QIAN:  Ms. Vuckovich, can you please now publish

17  what's been admitted as Government Exhibit 537.

18  Q.  And Ms. Alvarez, what is depicted in this photo?

19  A.  That's one of the special procedure rooms.

20         MS. QIAN:  Ms. Vuckovich, can you please now publish

21  what's been admitted as Government Exhibit 538.

22  Q.  Ms. Alvarez, what is depicted in this photo?

23  A.  That's the recliner and the sink.

24  Q.  I'm sorry?

25  A.  The recliner and the sink.

O4TVPAD3                    Alvarez - Direct

```
1   Q.  Where?

2   A.  In those special procedure room.

3   Q.  Now, earlier you said that the special procedure room is a

4   private place for patients to provide semen samples; correct?

5   A.  Yes.

6   Q.  What do you mean by that, "private place"?

7   A.  It's a more secluded area where they would be able to watch

8   a movie if they needed to, watch a movie and masturbate.

9   Q.  Are you aware of anyone, any medical staff would be in the

10  special procedure room with the patient?

11  A.  No, not inside the special procedure room.

12  Q.  I'm sorry?

13  A.  Not inside the special procedure room with the patient.

14          MS. QIAN:  Ms. Vuckovich, can you please pull up

15  what's been admitted as Government Exhibit 539.

16  Q.  Ms. Alvarez, what is depicted in this photo?

17  A.  The TV with the DVD player, the storage box, and I guess

18  the art.

19  Q.  And when you say "the storage box," what are you referring

20  to?

21  A.  When they were done producing their sample, they were

22  advised to put the cup in that little silver box.

23  Q.  And where is the silver box located in this photo?

24  A.  Underneath the TV.

25          MS. QIAN:  Ms. Vuckovich, can you please pull up
```

1    what's been admitted as Government Exhibit 541.

2    Q.  Ms. Alvarez, what is depicted in this photo?

3    A.  That's the picture of the box.

4    Q.  Now, how do medical staff collect semen samples from this

5    room?

6    A.  On the other side you can open up the door and just grab

7    the cup.

8    Q.  The medical staff have to go into the special procedure

9    room in order to collect the semen sample?

10   A.  No.

11           MS. QIAN:  Ms. Vuckovich, we can take this down.

12   Q.  Now, during the time that you worked for Dr. Paduch, where

13   did Dr. Paduch tell his patients to go to provide semen

14   samples?

15   A.  The exam room the majority of the time.  Or if not, to the

16   special procedure room.

17   Q.  Now, earlier you testified that after Dr. Paduch, you also

18   worked for Dr. Kashanian; correct?

19   A.  Yes.

20   Q.  He's another urologist?

21   A.  Yes.

22   Q.  Are you aware of whether any of Dr. Kashanian's patients

23   needed to provide semen samples?

24   A.  Yes.

25   Q.  And where did Dr. Kashanian tell his patients to go to

```
 1    provide semen samples?

 2              MR. BALDASSARE:  Objection, Judge.

 3              THE COURT:  Sustained.

 4              Don't say what he told you, just say what you did,

 5    okay?

 6              THE WITNESS:  Okay.

 7    A.  I would always put them inside the special procedure room.

 8    Q.  During the last 11 or 12 years that you worked at Cornell

 9    Urology, do you have an understanding of where patients are

10    supposed to go to deliver semen samples?

11    A.  Yes.

12    Q.  Where?

13    A.  The special procedure room.

14    Q.  I'm going to now change topics to discuss ultrasounds.

15    A.  Yes.

16    Q.  Are you familiar with ultrasounds?

17    A.  Yes, I am.

18    Q.  Now, did Dr. Paduch during the time that you worked for him

19    perform any ultrasounds?

20    A.  Yes, he did.

21    Q.  Now, were you ever involved in any part of preparing for

22    the ultrasounds?

23    A.  Sometimes I would have to clean out the machine if I'm

24    changing out the rooms to place the patient and enter the

25    patient's information into his ultrasound machine.  And I would
```

O4TVPAD3                        Alvarez - Direct

1    also consent the patients.

2    Q.  What do you mean that you would also consent to the

3    patients?

4    A.  I will go inside the exam room with them, explain to them

5    what we were about to do or what the doctor had ordered.  I

6    would get their consent for the penile ultrasound Doppler with

7    an injection.  They'll sign.  And I'll walk out and have them

8    undress.

9    Q.  Now, you mentioned that you would obtain consents for

10   patients for a penile Doppler ultrasound; correct?

11   A.  Yes.

12   Q.  Now, when you're seeking a patient's consent for an

13   ultrasound, for this particular ultrasound, the penile Doppler

14   ultrasound, how do you go about describing how the doctor would

15   induce an erection in the patient's penis?

16          MR. BALDASSARE:  Objection, Judge.  I think it's

17   hearsay.

18          THE COURT:  Give me one second.  I'm just looking.  I

19   have a transcript here, which is why I look at it sometimes.

20          I don't think so.  I don't think it's -- it's just

21   something that she is witnessing, so --

22          MR. BALDASSARE:  I thought the question was what would

23   she tell them.

24          MS. QIAN:  Your Honor, we're not offering it for the

25   truth, we're just asking what she would tell other patients.

O4TVPAD3                          Alvarez - Direct

1              MR. BALDASSARE:  If they are not offering it for the

2    truth, I think the Court could give the jury a couple of

3    sentences about what it means to not offer a statement for the

4    truth, but for a different reason.

5              THE COURT:  Okay.  So for what purpose are you seeking

6    to elicit it?

7              MS. QIAN:  What is being told to the patients.

8              THE COURT:  All right.  I'm going to allow the

9    testimony.

10             Sometimes you'll hear an objection, you'll hear the

11   word "hearsay."  And the idea is that hearsay is a statement

12   that's being admitted for its truth, an out-of-court statement,

13   I should say.  Something that someone else said or even the

14   witness said, but out of court, that's being admitted for its

15   truth is hearsay and is often not admissible unless a certain

16   exception applies.

17             But that's different if you're just admitting it to

18   say this is what people were told as opposed to this is true.

19             Does that make sense?  I hope so.

20             Thank you.  All right.  You can answer the question.

21             Maybe ask the question again.  It's a while back now.

22   BY MS. QIAN:

23   Q.  Ms. Alvarez, what would you tell the patients about how a

24   doctor would be able to induce an erection?

25   A.  I would tell them that they are here to have a penile

1    ultrasound Doppler with an injection of a compounded drug that

2    would help them sustain a full erection throughout the

3    procedure.

4    Q.  Did you ever explain a different procedure for how Dr.

5    Paduch would induce an erection?

6    A.  No.

7    Q.  Now, towards the beginning of your employment with Dr.

8    Paduch, did Dr. Paduch ever say anything to you regarding his

9    marital status?

10   A.  Yes.

11   Q.  What did he say?

12   A.  That he was married to a female and he had children.

13   Q.  And did Dr. Paduch ever say anything to you regarding

14   whether he told any of his patients that he was married?

15   A.  Yes.

16   Q.  What did he say?

17   A.  He had told me that he -- he does tell them that he was

18   married to a female because he didn't want them to feel, I

19   would say -- you know, to feel bad or to not want to be seen by

20   a gay physician.

21   Q.  What, if anything, did Dr. Paduch say about the

22   truthfulness of the statement that he was married to a woman?

23           MR. BALDASSARE:  I'm sorry, I just -- I'm going to

24   move over here because I'm having trouble hearing.

25           Can I hear that question again?

O4TVPAD3                    Alvarez - Cross

1          THE COURT:  Yeah.  Do you want to repeat the question.

2   Q.  What, if anything, did Dr. Paduch say about the

3   truthfulness of the statement that he was married to a woman?

4   A.  He wasn't married to a woman.

5          MS. QIAN:  No further questions, your Honor.

6          THE COURT:  All right.  Cross-examination.

7          MR. BALDASSARE:  Yes.  Thank you.

8   CROSS-EXAMINATION

9   BY MR. BALDASSARE:

10  Q.  Good afternoon, Ms. Alvarez.

11         THE COURT:  Whenever you're ready.

12         MR. BALDASSARE:  Oh, okay.

13         THE COURT:  We're just getting some water.

14  Q.  Good afternoon, Ms. Alvarez.  My name -- can you hear me

15  okay?

16  A.  Yeah.

17  Q.  Okay.  So my name is Mike Baldassare.  Jeffrey Hawriluk and

18  I represent Dr. Paduch, who I imagine you can see at the far

19  end of that left table.

20  A.  Yes.

21  Q.  If you can't hear me at any point, let me know.  And

22  obviously if we need a break, I guess just say so.

23         Regarding Dr. Paduch's statements regarding his

24  marital status, to your understanding, was it a lie because he

25  was married to a man and not a woman?

O4TVPAD3                          Alvarez – Cross

1    A.  Yes.

2    Q.  Okay.  And to your understanding, what was the lie about

3    him having children?

4    A.  Well, at the time I ended up finding out later that he

5    didn't have children.

6            Go ahead.

7    Q.  Do you know if he ever had children?

8            MS. QIAN:  Objection.

9    A.  No.

10           THE COURT:  Overruled.

11   Q.  I'm sorry, did you ever become aware that he -- whether he

12   did have a child or children?

13   A.  No, not at that time.  Not in the beginning.

14   Q.  What about later?

15   A.  Later on he did adopt a boy.

16   Q.  Okay.  Dr. Paduch saw, would you agree with me, about 40

17   patients a day?

18   A.  Yes.

19   Q.  And that would be over a two to three-day period during the

20   week?

21   A.  Yes.

22   Q.  And the other days were -- one of them was reserved for

23   surgery?

24   A.  Yes.

25   Q.  And the other one would be reserved for office work or

O4TVPAD3                        Alvarez - Cross

1   administrative work?

2   A.  Either that or another day of surgery.

3   Q.  Another day of surgery.  Okay.

4           During your time working with Dr. Paduch, did he ever

5   seem overwhelmed by his workload?

6   A.  Yes.

7   Q.  Your job -- was one of your roles there to get exam rooms

8   ready?

9   A.  It wasn't my role; but to keep the office hours going in a

10  timely fashion, I would flip the room.

11  Q.  And was your assistance in keeping it going in a timely

12  fashion because on days when he was seeing patients, things

13  would move quickly?

14  A.  They would move quicker unless, you know -- so we wouldn't

15  have to wait for a technician to come and do it.

16  Q.  And would Dr. Paduch ever have a patient in room 7, a

17  patient in room 8, and a patient in room 9, and make his rounds

18  through those three rooms?

19  A.  Yes.

20  Q.  And after patient 7 -- let's just assume it goes in order.

21  I know maybe it doesn't.  But after patient 7 is done, would

22  you then go in that room and prep it for the next patient to go

23  into 7?

24  A.  Sometimes I would.

25  Q.  Okay.  And same thing with 8 and 9?

O4TVPAD3                          Alvarez – Cross

1    A.  Yes.

2    Q.  With respect to the special procedure room, am I right that

3    Dr. Paduch, you said, sometimes would use the special procedure

4    room for gathering semen samples but sometimes he wouldn't,

5    right?

6    A.  Yes.  He would do the exam rooms the majority of the time,

7    and a few patients in the procedure room, the special procedure

8    room.

9    Q.  Okay.  Okay.  But that wasn't any secret, as far as you

10   knew, in the urology department; correct?

11   A.  No.

12   Q.  Okay.  And I'm not asking you what's in everybody's head,

13   but as far as it appeared to you, people knew that, right?

14   A.  Yes.

15   Q.  During the time when Dr. Paduch was seeing patients,

16   whether in 7, 8, 9 or elsewhere, was there activity outside the

17   hallway outside those rooms?

18   A.  Always.

19   Q.  Patients walking by?

20   A.  Yes.

21   Q.  Doctors?

22   A.  Yes.

23   Q.  Nurses?

24   A.  Yes.

25   Q.  Technicians?

1    A.  Yes.

2    Q.  Any other group of people?

3    A.  Patients, staff, everybody that's physically within that

4    department would walk around.

5    Q.  And I think you said there were ten doctors in this general

6    area?

7    A.  There's approximately ten doctors in that area.

8    Q.  And approximately ten doctors.  Did each of them have a

9    certain number of rooms assigned to them?

10   A.  Yes.

11   Q.  And did they each have about -- well, let me ask you this:

12   Were there three per doctor or two or four?

13   A.  I can't answer that.  I don't work for those offices.

14   Q.  Okay.  Do you know how many exam rooms there were in those

15   offices?

16   A.  They are not -- they are not enclosed offices.  All the

17   exam rooms, the whole layout is different.  The back offices

18   are for the physicians.  We sit up in the front cubicles, and

19   then come all the exam rooms throughout the whole department.

20   Q.  Okay.  Would other doctors also have -- strike that.

21          Would other doctors be seeing patients on the same

22   days that Dr. Paduch was seeing patients?

23   A.  Yes.

24   Q.  And is that why there was, say, constant traffic in these

25   hallways outside these exam rooms?

O4TVPAD3                        Alvarez - Cross

1    A.  Yes.  And also there's a lot of staff.  So there's always

2    going to be -- in a large department there's always going to be

3    traffic.

4    Q.  Do you remember, Ms. Alvarez, meeting with the prosecutors

5    seated to my right?

6    A.  Yes.

7    Q.  Do you remember meeting with them maybe two times?

8    A.  Yes.

9    Q.  Were there any other individuals in the room, an FBI agent,

10   paralegal, anything like that?

11   A.  Yes.

12   Q.  To your knowledge, was -- let me ask you this:  Were both

13   of those meetings in person?

14   A.  Yes.

15   Q.  To your knowledge, were either of those meetings

16   audio-recorded?

17   A.  Not to my knowledge.

18   Q.  To your knowledge, were they video-recorded?

19   A.  Not to my knowledge.

20   Q.  And I wasn't there; correct?

21   A.  No.

22   Q.  And Mr. Hawriluk wasn't there; correct?

23   A.  No.

24   Q.  And obviously Dr. Paduch wasn't there; correct?

25   A.  No.

O4TVPAD3                          Alvarez - Cross

1    Q.  Okay.  Am I correct that Weill Cornell did not issue work

2    phones to the physicians?

3    A.  I don't know about that.

4    Q.  Do you know if when the physicians gave out their phone

5    numbers, they had any other option?

6            MS. QIAN:  Objection.

7            THE COURT:  Sustained.

8    A.  Do you want to repeat that?

9            THE COURT:  He's going to rephrase it actually.

10   Q.  To your knowledge, if a doctor was going to give out a

11   text, a number to a patient for a text, did they have any other

12   option but their personal phone?

13   A.  I can't speak for any other doctor.

14   Q.  Did you say any other doctor, meaning --

15   A.  Yeah, any other doctor that was in that department, I can't

16   speak for them.  I didn't work for them.

17           MR. BALDASSARE:  One moment, please.

18           THE COURT:  Sure.

19           (Counsel conferred with defendant)

20   Q.  Ms. Alvarez, thank you very much for your time.  I have

21   nothing further at this time.

22           THE COURT:  Any redirect?

23           MS. QIAN:  No, thank you, your Honor.

24           THE COURT:  All right.  You can step down.  Thank you.

25           (Witness excused)

O4TVPAD3

| 1 | THE COURT: Government can call its next witness.
| 2 | MS. ESPINOSA: The government calls Dr. Lisa Rocchio.
| 3 | THE DEPUTY CLERK: Judge, can we take a break?
| 4 | THE COURT: Sure. Why don't we actually take our --
| 5 | since we broke for lunch a little early, we'll take our
| 6 | afternoon break a little early, okay?
| 7 | So just remember, don't discuss the case. Keep an
| 8 | open mind.
| 9 | MR. BALDASSARE: Judge, can we speak with you not on
| 10 | the record about a scheduling issue?
| 11 | THE COURT: Yes. Wait for the jury, please.
| 12 | (Jury not present)
| 13 | THE COURT: This is off the record or on the record?
| 14 | MR. BALDASSARE: Just a scheduling issue. I don't
| 15 | think it needs to be --
| 16 | THE COURT: Let's just put it on the record, if it's
| 17 | okay. Thank you. Go ahead.
| 18 | MR. BALDASSARE: So, Judge, the government has been
| 19 | admirable in giving me the witness list and even in sticking to
| 20 | it. I don't know how long they are going to go with Dr.
| 21 | Rocchio today. But if we get to any point, if they end at any
| 22 | point where the government would be okay adjourning a little
| 23 | early, I could use tonight to finish to start my cross. If
| 24 | they go 15 minutes, I'll get up and start it, but if it gets to
| 25 | be some sort of a time later in the day and the Court is

O4TVPAD3

1    inclined, that would be my request.  We're going as fast as we

2    can.  I think we're moving pretty fast, too.

3              THE COURT:  Why don't we just see what time it is.

4              MR. BALDASSARE:  I just didn't want to spring that on

5    you when they finish and then say can we stop.

6              THE COURT:  I appreciate that.

7              Does the government have a sense of how long this

8    witness will be on direct?

9              MS. ESPINOSA:  I expect it will be between an hour and

10   an hour and a half.

11             THE COURT:  Okay.  We'll probably be close.  If it's

12   close, I'll let us adjourn early; but if it's a significant

13   period of time, then I'm going to ask you to start your cross.

14             Two things:  So tomorrow I do think that we are going

15   to adjourn early at, I think, at 3:15.  So let's talk about

16   what makes the most sense in terms of breaks so that we don't

17   lose much time.

18             I mean, we could either, number one, ask the jury if

19   they could start earlier, or we could just start at 10 and have

20   fewer breaks and end at 3:15.  I mean, we could sort of do the

21   model where we just take one lunch break and then not have the

22   morning and afternoon breaks, unless, you know, we're sitting

23   here and someone wants to run to the rest room, they can do it.

24   And then I don't think we'll lose much time; a little bit, but

25   not much.

O4TVPAD3

1          Do you have a preference?  I don't want to -- I don't

2    know what's happening with your witnesses tomorrow, so --

3          MS. ESPINOSA:  Your Honor, that would be fine for us.

4    Either one.  I think that we are -- we have our witnesses lined

5    up for tomorrow, so we can work with either.

6          THE COURT:  Okay.  Okay.  All right.  Fine.  Okay.  So

7    we'll figure it out.

8          And then the second thing is that one of the jurors

9    asked my deputy how many more witnesses there are.  She said

10   she didn't know.

11         Do you have a suggestion on -- I mean, I can either

12   tell her to say she doesn't know, which would be true, or I can

13   give them a sense of things if you think that's better, just so

14   that they can, you know, adjust their expectations.

15         MS. ESPINOSA:  Your Honor, I think that we would

16   suggest that we say something along the lines that the

17   government expects or hopes to wrap its case up this week.  The

18   exact number of witnesses can always change, so we would prefer

19   not to --

20         THE COURT:  All right.  Any problem with my deputy

21   saying that?

22         MR. BALDASSARE:  No, Judge, because I think what the

23   government and I are both thinking is that the raw number might

24   sound a little scary, even though the time --

25         THE COURT:  Right.  No, I get it for sure.

O4TVPAD3

1              Okay.  So I'll have her say that.

2              All right.  And I will see you in ten minutes.

3              Thank you.

4              (Recess)

5              (Continued on next page)

O4T3PAD4                    Rocchio - Direct

1           THE COURT:  Are we ready for the jury?

2           MR. BALDASSARE:  Yes.

3           THE COURT:  Great.

4           (Jury present)

5           MS. ESPINOSA:  The government calls Lisa Rocchio.

6           THE COURT:  Good afternoon.

7           THE WITNESS:  Good afternoon.

8    LISA ROCCHIO,

9         called as a witness by the Government,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MS. ESPINOSA:

13   Q.  Good afternoon, Dr. Rocchio.

14   A.  Good afternoon.

15   Q.  What is your profession?

16   A.  I'm a clinical and forensic psychologist.

17   Q.  What is a clinical psychologist?

18   A.  A clinical psychologist is a psychologist who studies

19   behavior.  I am trained in the assessment and treatment of

20   psychopathology as well as human resilience and healthy

21   behavior.

22   Q.  You mentioned you are also a forensic psychologist.  What

23   is forensic psychology?

24   A.  Forensic psychology is the application of psychology to

25   some legal matter.  So, I'm called upon to offer information

1    about psychology and my expertise when there is some

2    psychological issue as it relates to the law.

3    Q.  Could you please describe your educational background.

4    A.  I have a bachelor of arts degree from Emory University in

5    English and psychology.  I have a master's degree and a

6    doctoral degree from the University of Rhode Island in clinical

7    psychology.

8    Q.  Dr. Rocchio, can you please describe your coursework and

9    training in connection with your master's and PhD degrees.

10    A.  As a clinical psychologist, I'm trained in the basics of

11    psychology.  So, cognition, perception, physiology, brain

12    behavior.

13            I'm trained in the assessment of psychopathology and

14    clinical diagnoses.  I'm trained in a variety of treatment

15    methodologies.  And because I attended a doctoral program, I'm

16    also trained in statistics and the analysis of and conducting

17    of scientific research.

18    Q.  Where did you get your PhD?

19    A.  From the University of Rhode Island.

20    Q.  During the course of your graduate studies at the

21    University of Rhode Island what, if any, topics did you focus

22    on?

23    A.  I focused specifically on clinical psychology and also on

24    the areas of eating disorders and traumatic stress and

25    interpersonal violence as well as coursework in forensic

O4T3PAD4                          Rocchio - Direct

1  psychology.

2  Q.  What is traumatic stress?

3  A.  Traumatic stress refers to the response to an extreme or

4  traumatic stressor where an individual's coping mechanisms are

5  overwhelmed.  And the degree of stress can vary from an extreme

6  stressor all the way up to a trauma.  And at the more extreme

7  end, in the Diagnostic and Statistical Manual, it refers to an

8  individual having been exposed to extreme or threatened death,

9  severe physical injury, or sexual violence.

10  Q.  What do you mean by the term sexual violence?

11  A.  Sexual violence is a term, it is an umbrella term used in

12  the field of psychology to refer to any form of sexual abuse or

13  abuse of sexual interaction.  The term sexual violence refers

14  specifically to rape, sexual assault, childhood sexual abuse,

15  intimate partner violence, and also sexual harassment.

16  Q.  In connection with your master's and PhD degrees, did you

17  perform clinical work with patients?

18  A.  Yes.

19  Q.  Approximately how many supervised hours of clinical work

20  did you have to complete to get your degree?

21  A.  Thousands.  So I needed a minimum of I think about 500 to

22  1,000 hours before going on a year-long fellowship.  So that

23  would be another 2,000 hours during fellowship, and another

24  2,000 after that before becoming licensed.  So approaching

25  5,000 supervised hours.

O4T3PAD4                          Rocchio - Direct

1   Q.  In connection with your degrees, did you have to perform

2   any research in addition to your clinical work?

3   A.  I did.  In order to earn my doctoral degree I had to

4   conduct independent research, both in the form of a master's

5   thesis and in the form of a doctoral dissertation.

6   Q.  You mentioned before that you also received training in

7   statistics, is that right?

8   A.  Yes, that's correct.

9   Q.  How, if at all, does this research and statistics training

10  impact your clinical work?

11  A.  So, because I am trained in both how to conduct research

12  and research methodology, I'm trained in how to analyze the

13  psychological and scientific literature.  My clinical work in

14  turn allows me to learn from my patients.  I learn their

15  experiences, their struggles, their healing, their pain.  And

16  than information in turn allows me to be a better consumer of

17  the scientific literature in terms of discerning what's

18  applicable, how to apply the literature that I read, and how

19  relevant it is to my clinical practice.

20  Q.  You mentioned a fellowship you performed?

21  A.  Yes.

22  Q.  Where did you do that fellowship?

23  A.  The Yale University School of Medicine.

24  Q.  Was that before or after you earned your PhD?

25  A.  That was before.

O4T3PAD4                        Rocchio - Direct

1    Q.  What kind of work did you do?

2    A.  I worked for six months at an adolescent psychiatric

3    hospital with teenagers, both inpatient and they would come for

4    the day and do groups and individual and family therapy and

5    then go home in the evening.

6            And then I did six months working at an adult day

7    program, which was another psychiatric hospital for adults with

8    significant mental health issues who needed daily day-long

9    treatment, but not so severe that they required inpatient

10   hospitalization.

11   Q.  After you received your PhD, what did you do next?

12   A.  I had to do the equivalent of a full year of additional

13   supervised clinical practice before I could sit for my

14   licensing exam.  During that year, I worked in a psychiatric

15   hospital with chronically suicidal and self-injurious women,

16   the majority of whom had experienced some form of childhood

17   and/or adult sexual abuse.

18           I taught classes at Providence College and I worked in

19   a private practice setting providing outpatient psychotherapy

20   to teenagers an adults, again, the majority of whom had

21   experienced some form of interpersonal violence, either in

22   childhood or adulthood or both.

23   Q.  You mentioned your licensing exam.  Did you obtain a

24   license?

25   A.  Yes.

1    Q.  What specifically is the license that you have?

2    A.  I'm licensed to practice psychology in the states of Rhode

3    Island, Connecticut, Massachusetts, Maine, and New York.

4    Q.  What year did you obtain your license?

5    A.  My initial licensure was in Rhode Island and that was in

6    1997.

7    Q.  After you completed your postdoctoral fellowship, what did

8    you do next?

9    A.  I opened an independent psychotherapy practice where I have

10   employees who also provide psychotherapy, I provide

11   psychotherapy and training to my employees.  And also that was

12   when I began to work independently also as a forensic

13   psychologist.

14   Q.  When did you open your practice?

15   A.  January of '98.

16   Q.  Where is your practice located?

17   A.  Johnston, Rhode Island.

18   Q.  Is your practice still open?

19   A.  Yes.

20   Q.  What's your role there?

21   A.  So I'm the owner.  I'm also the clinical manager.  So I

22   provide psychotherapy, I treat patients myself, I supervise all

23   the administrative and clinical staff, I provide supervision,

24   both in the form of a group supervision meeting and individual

25   supervision, and training to my employees, some of whom are

1    also trainees working to become licensed.

2    Q.  In your clinical practice, what do you focus on?

3    A.  Primarily the majority of the patients I work with have

4    experienced some form of traumatic stress.  So, largely

5    interpersonal violence, but I also do a fair amount of work

6    with first responders and individuals who have experienced

7    traumatic grief.

8    Q.  You've mentioned that you are a forensic psychologist.  Do

9    you practice in that area as well?

10   A.  Yes, I do.

11   Q.  What sort of work do you do in your forensic practice?

12   A.  I work in both clinical -- I'm sorry.  Both in criminal and

13   civil settings.  So, I can be called upon to conduct an

14   evaluation of someone to determine some particular issue

15   pertaining, for example, to their state of mind at the time of

16   a crime or at the time of sentencing to determine whether or

17   not they've been harmed by a specific event, and if so, to what

18   degree.  I also provide consultation to attorneys around issues

19   pertaining to psychology, or at other times I can come as a

20   pure subject matter expert as I am today, providing information

21   for the Court and the jury about issues pertaining to the

22   matter at hand.

23   Q.  How many, in the course of your career, how many forensic

24   evaluations of individuals have you conducted approximately?

25   A.  So I've been involved in over 100 cases, forensic matters.

1    As far as evaluations, probably 80 or so.

2    Q.  Who typically hires you for forensic work?

3    A.  Typically the attorneys will hire me, either prosecutors or

4    defense attorneys.  And then I've also done work for the state,

5    evaluating teenagers who have been involved with the criminal

6    justice system.

7    Q.  Have you done work on behalf of both prosecutors and

8    defense attorneys?

9    A.  Yes, I have.

10   Q.  In connection with your forensic work have, you testified

11   at trials before?

12   A.  Yes, I have.

13   Q.  Approximately how many times have you testified at trial?

14   A.  At trial, probably about 12 times.

15   Q.  In your career, for approximately how many years have you

16   treated and assessed patients?

17   A.  So independently over 25.  I actually started seeing

18   patient back in '91 during graduate school.  But as a licensed

19   psychologist, over 25 years.

20   Q.  For what portion of your career have you focused on

21   traumatic stress and interpersonal violence?

22   A.  The entirety of my career.

23   Q.  Over the course of your career, have you treated and

24   evaluated individuals who have reported or experienced sexual

25   abuse?

1    A.  Yes, I have.

2    Q.  Approximately how many?

3    A.  Close to 1,000 or more at this point.  Hundreds upon

4    hundreds.

5    Q.  Broadly speaking, has your experience with evaluating

6    individuals in your clinical and forensic practice contributed

7    to your understanding of the issues you discuss in cases like

8    this one?

9    A.  Absolutely, yes.

10   Q.  In addition to running your practice, do you work anywhere

11   else?

12   A.  I do.

13   Q.  Where else do you work?

14   A.  I'm on the faculty at the Brown University School of

15   Medicine where I provide supervision and training to psychiatry

16   fellows.

17   Q.  What's your title there?

18   A.  Clinical assistant professor in the Department of

19   Psychiatry.

20   Q.  How long have you been a clinical assistant professor at

21   Brown?

22   A.  About four years.

23   Q.  What are your current responsibilities there?

24   A.  So I provide supervision to the residents who they've

25   completed medical school, and they're now studying to become

O4T3PAD4                          Rocchio - Direct

psychiatrists. And Brown University has also specialized

training in giving psychotherapy. So I provide the supervision

to help them learn how to do psychotherapy, and specifically

how to do psychotherapy with individuals who have experienced

trauma, traumatic stress, and interpersonal violence. In

addition to the one-on-one supervision, I come in and give

lectures as part of their coursework on trauma psychology and

ways it pertains to psychotherapy.

Q. Turning to academic publications, have you published

articles in any types of publications?

A. I have.

Q. What are some of the topics you've focused on in your

published articles?

A. Generally when I've published or presented at national

conferences, it is in the area of traumatic stress. I've done

work on clinical assessment, forensic assessment, I've done a

fair amount of work on ethics and ethical issues. I've

presented on issues pertaining to professional misconduct. But

generally, interpersonal violence and traumatic stress has been

the bulk of what I've presented or written.

Q. What types of publications have your articles appeared in?

A. Most recently, there was a special issue of the Journal

Psychological Injury and the Law. I was a co-editor of a

special selection that focused specifically on assessment and

treatment issues in forensic application of individuals who had

1    experienced childhood sexual abuse.

2    Q.  Do you have any other types of involvement in professional

3    publications?

4    A.  So, I'm on the editorial board where I am involved as

5    what's called an ad hoc reviewer.  So I review articles that

6    pertain to my areas of expertise and provide commentary,

7    feedback as to changes that may need to be made and as to

8    recommendations as to whether they should or shouldn't be

9    published.

10   Q.  Are you familiar with the term "peer reviewed" in the

11   context of publications?

12   A.  I am.

13   Q.  What does that mean?

14   A.  So that's the process I just described.  When you're

15   talking about a publication in a peer reviewed journal, what

16   happens is people will submit an article to the editor of the

17   journal, and then that editor will identify experts in the

18   field and send out copies of the article, usually without the

19   author's name attached so it can be reviewed without bias.  And

20   then as a reviewer, we make recommendations about these things

21   need to be elaborated on or the statistics seem solid or they

22   don't.  Then make a recommendation as to whether or not we

23   would recommend the article be published.

24   Q.  You mentioned presentations, is that right?

25   A.  Yes.

O4T3PAD4                        Rocchio - Direct

Q.  What are some of the topics you've given presentations on?

A.  So earlier in my career I did a number of presentations in
the area of eating disorders, but then moving into areas
pertaining to traumatic stress.  So, I've done a number of
presentations for general practice psychotherapists, who want
and need to understand more about how to assess and treat
traumatic stress clinically.

        I've similarly done presentations for forensic
psychologists around specific training that's necessary for
trauma psychology as it applies in the area of traumatic
stress.  And I've done a number of presentations on
professional practice issues standards of care and ethics,
again, within clinical and forensic psychology and traumatic
stress and interpersonal violence.

Q.  How do you come to give those presentations?

A.  So, through a variety of ways.  Some of the conferences
that I've presented at also go through a similar peer review
process.  So I might submit a description of a presentation I'd
like to give, and it is sent out for peer review, and if I'm
selected, then I will go and present at that conference.

        I've also given invited addresses at conferences where
I've been asked to present on a topic relevant to my expertise.
Then I've also conducted professional trainings where I have
been hired to conduct trainings, again, in my areas of
expertise for continuing education, or ongoing education of

O4T3PAD4                         Rocchio - Direct

1    professionals in the field.

2    Q.   Have you held any leadership positions in any professional

3    organizations?

4    A.   Yes, I have.

5    Q.   What leadership positions?

6    A.   I've served as the president of the Rhode Island

7    Psychological Association.  I've served as the president and

8    the treasurer of the Division of Trauma Psychology within the

9    American Psychological Association.  I've served on the ethics

10   committee for the American Psychology Association at the

11   national level, and also for the Rhode Island Psychological

12   Association.  Those are some of them.

13   Q.   What is the American Psychological Association?

14   A.   It is the premier professional organization for

15   psychologists within the United States.

16   Q.   How, if at all, do you keep up to date on the subjects in

17   which you specialize?

18   A.   Certainly through providing ongoing treatment and

19   assessment, I'm constantly looking at the literature to be sure

20   that the treatment I'm providing to my patients is evidence

21   based and supported in the literature.  I keep up with the

22   journals in my field.  I consult regularly with colleagues.  As

23   part of maintaining my licensure, I maintain regular continuing

24   education and attend programming on an annual basis.  And then

25   I also, as I said, consult with my peers and also mentors in

O4T3PAD4                          Rocchio - Direct

1   the areas of psychology.

2              MS. ESPINOSA:  At this time the government moves to

3   qualify Dr. Rocchio as an expert in the field of psychology

4   with a specialized expertise in traumatic stress and

5   interpersonal violence.

6              THE COURT:  She'll be so qualified.

7   Q.  Dr. Rocchio, have you interviewed any witnesses in this

8   case?

9   A.  I have not.

10  Q.  Do you know who the witnesses in this case are?

11  A.  I do not.

12  Q.  Have you reviewed any patient medical records in this case?

13  A.  No.

14  Q.  Has the government provided you with any specific details

15  witnesses in this case have alleged occurred?

16  A.  No, they have not.

17  Q.  Are you aware of press and news reporting related to

18  allegations in this case?

19  A.  I'm generally aware, but I was advised to avoid reading

20  articles, and so I have not read any specific articles about

21  the case.

22  Q.  Do you have any personal knowledge of the facts of this

23  case?

24  A.  No, I do not.

25  Q.  So to be clear, when you're testifying here today, what

O4T3PAD4                          Rocchio - Direct

1    will your testimony be based on?

2    A.  The science of psychology and my education, background,

3    training, and skills as an expert in the area of traumatic

4    stress and interpersonal violence.

5    Q.  What, if any, type of compensation are you receiving for

6    testifying here today?

7    A.  I'm compensated for the time I've spent reviewing

8    literature, to prepare for my testimony today, and the time I

9    spend testifying.

10   Q.  How is the rate of compensation determined?

11   A.  It's my standard rate.  At this point it's $500 per hour.

12   Q.  Does the amount you get paid depend in any way on the

13   outcome of the trial?

14   A.  Absolutely not.  That's actually ethically prohibited in my

15   field.

16   Q.  I'd like to turn first to some questions regarding sexual

17   abuse and common responses to sexual abuse.

18            So we're all clear, what does the term sexual abuse

19   include?

20   A.  Sexual abuse refers to a set of behaviors, processes, that

21   involve abuse of a sexual nature of an individual without their

22   consent.  And it can be because an individual declines to

23   provide consent, or they're not capable of consent because of

24   their state of mind, because of their age, because they have

25   been incapacitated in some way.  But it's abuse of a sexual

O4T3PAD4                          Rocchio - Direct

1    nature.

2    Q.  Among instances of sexual abuse, how common is it for the

3    abuse to be committed through extreme physical force, rather

4    than non-violent means?

5    A.  Most sexual abuses are committed through the use of

6    coercion, intimidation and threats.  A small number,

7    percentage-wise, of rape and sexual assault involve extreme use

8    of force that would result in additional physical injury.

9    Generally, it's not involving extreme force.

10   Q.  In the case first of adult victims.  How common is it for

11   sexual assault or abuse to be committed by someone known to the

12   victim rather than a stranger?

13   A.  Only about 12 percent of rape and sexual assault is

14   perpetrated by a stranger.  So, a significant majority is

15   perpetrated by someone known to the victim.

16   Q.  What about with child victims?

17   A.  Similar.  The vast majority of sexual abuse is perpetrated

18   by somebody known to the victim, whether you're talking about a

19   child, an adolescent, or an adult.

20   Q.  Where does the information that makes up those statistics

21   come from?

22   A.  It comes from a variety of places.  So certainly the CDC

23   conducts national surveys of representative samples.  The

24   Bureau of Justice, the FBI, all calculate and conduct surveys

25   of households.  They can look at crimes that have been reported

O4T3PAD4                         Rocchio - Direct

1    through the police departments that gets reported up at the

2    national level.  So there are federal and national statistics.

3           But then also looking at the psychological literature,

4    there are a number of researchers who have done grants and done

5    research with community samples, naturally representative

6    samples or subsamples of specific populations.  So they might

7    be looking at rates and incidence of childhood sexual abuse in

8    college campuses or in hospitals or community mental health

9    centers or in prisons.

10          So, there are lots and lots of research, and you can

11   look across studies for commonalities in terms of what these

12   statistics demonstrate.

13   Q.  You mentioned that most sexual assaults are committed by

14   people known to the victim.  In such cases, what are some of

15   the ways in which victims commonly respond during the sexual

16   assault?

17   A.  So, sexual assault is an incredibly fearful experience.

18   And we know that when an individual is being sexually

19   assaulted, the fear circuitry in the brain takes over.  So, the

20   thinking and logical rational parts of our brain often kind of

21   go off line, and we will fall back on our habitual responses to

22   power.

23          So most often individuals will experience some form of

24   a freeze response.  80 percent or so will report some form of

25   immobility at some point during the sexual assault.  But then

1    also in terms of attempting to protect themselves, they will

2    fall back on kind of their habitual responses to power, which

3    will typically involve things such as pleading or trying to

4    rationalize or trying to placate so as to avoid further injury.

5            If an individual does fight back physically, the types

6    of physical force that are used for resistance are typically

7    those things that are not likely to result in injury to either

8    the perpetrator or the victim.  So, for example, things like

9    hitting and kicking and biting are used fewer than 10 percent

10   of the time.

11   Q.  Based on your education, research, training, and

12   experience, how common is it for victims of sexual abuse by

13   people known to them to recognize it as sexual abuse at the

14   time it happens?

15   A.  So, there's a lot of research that's been done looking at

16   individuals' recognition of whether or not they've been

17   sexually assaulted or raped, and also their labeling of that

18   experience as a sexual assault or rape.  And what they found is

19   that in about 60 percent of women, about 75 percent of men, if

20   they're asked, they will -- with a behaviorally broad question

21   that -- I'm sorry, a behaviorally specific question that asks

22   something specific such as have you ever been forced to have a

23   sexual encounter against your will or forced to have

24   intercourse against your will, even if they answer "yes" to

25   that question, if they're asked later have you ever been raped,

1  have you ever been sexually assaulted, they will say "no" to

2  that.

3            So, that's what's referred to in the literature as

4  unacknowledged rape.  Meaning that individuals either don't

5  recognize that what's happened to them is rape or they don't

6  use that language or those words when they talk about their own

7  experiences.

8  Q.  What are some of the reasons an individual might not use

9  those words when talking about their own experiences?

10 A.  So, we know that they're less likely to label an experience

11 as a rape or a sexual assault the closer the relationship they

12 have with the perpetrator.  But also, we know that there can be

13 myths or misconceptions about what rape is.  So to the degree

14 that someone believes in their mind that rape is, you know,

15 something that a stranger does when they jump out of the woods

16 and violently attack you, to the extent that their own

17 experience doesn't reflect that rape script, then they're less

18 likely to label their own experience as a rape or sexual

19 assault.

20           There are other reasons.  They may have trust or faith

21 in a close relationship with the perpetrator, so they may

22 experience what's referred to as cognitive dissonance.  This is

23 a good person, this person has done good things to me, it must

24 have been a misunderstanding, it couldn't have been that.

25           And then also shame, self-blame, confusion about

O4T3PAD4                        Rocchio - Direct

1   what's happened.

2                  Those could be some of the reasons that individuals

3   might not label the experience as a rape or a sexual assault.

4   Q.  You've mentioned it is specifically called unacknowledged

5   rape.  But does this phenomenon exist in scenarios outside of

6   forcible intercourse or penetrative sex?

7   A.  Yes, it does.  It's why using behavioral descriptors when

8   inquiring about any form of abuse, physical, sexual assault,

9   how people were disciplined as children, it's become the gold

10  standard, whether you're talking about medical care,

11  psychological care, or research studies.  Because people, we

12  don't know how people categorize their own experience.  So to

13  get accurate data, we need to use behavioral descriptors.

14  Q.  Based on your education, research, training, and

15  experience, are there some reasons internal to an individual

16  that they may not want to label their experience as rape or

17  sexual assault?

18  A.  Yes.

19  Q.  What are some of those reasons?

20  A.  So from a psychological coping perspective, we know that

21  when individuals have a traumatic experience, one of the ways

22  that we can protect ourselves from the overwhelming and

23  horrifying feelings that go along with that can be to kind of

24  minimize that experience to ourselves.  So, it is a

25  psychological process of, if I don't acknowledge to myself that

1    that was really bad, then maybe I don't have to deal with the

2    overwhelming feelings.

3              So, another reason psychologically could be an

4    individual feels a lot of shame, so they blame themselves.  And

5    therefore, they're going to minimize as they talk about it how

6    they describe that experience.

7    Q.  You mentioned in particular that 75 percent I believe of

8    male victims do not label their experiences as rape or sexual

9    assault.  Are there any particular reasons why male victims are

10   less likely to apply those labels than female victims?

11   A.  We know that, although individuals of any gender can

12   certainly be sexually assaulted, there are also cultural norms

13   and expectations associated with masculinity in our culture

14   that can make it difficult for men to be willing to recognize

15   themselves as victims of assault or particularly sexual assault

16   or to be willing to share that with others.

17   Q.  What are some examples of those types of norms or beliefs?

18   A.  So, when anybody is sexually assaulted, it involves

19   experiencing a sense of powerlessness and overwhelming feelings

20   of emotional distress.  And culturally, there is a lot of

21   expectation and myth that men can't be raped.  That a real man

22   would fight back.  That if you really don't want the

23   experience, there are expectations that part of being a

24   masculine man is fighting back.  And a lot of additional

25   pressure not to communicate and express painful distressing

1    emotions.  So those can be some of the factors.

2           In addition, there are still a lot of stereotypes and

3    stigma associated with male-on-male sexual contact.  So for

4    boys or men, for example, who are sexually abused by other men,

5    there can be real concerns about what does this mean about me,

6    why was I the one that this person abused, what does it say

7    about me.

8           And then finally, men -- all bodies can respond

9    physiologically to stimulation.  And for men, it's not

10   necessarily unusual for a man to experience an erection or even

11   ejaculation during an experience of sexual abuse, and that can

12   also add to the confusion and shame, guilt, self-blame, all of

13   which will affect both the labeling of the experience as abuse,

14   and the willingness to talk about it with anyone else.

15   Q.  What, if any, types of relationship make the victim of

16   sexual abuse less likely to recognize what happened to them as

17   abuse?

18   A.  So, the more an individual trusts and has a positive

19   relationship in some way with someone who has also abused them,

20   the less likely they are to both label that experience as abuse

21   and to disclose that experience to others.  They're more likely

22   to be confused.  And then certainly, when a relationship of

23   trust is present and the perpetrator has also engaged in lies

24   and deception in order to perpetrate abuse, if someone you

25   trust is lying to you, you're more likely to believe them,

1   you're more vulnerable and more susceptible to those lies and

2   deceptions.

3   Q.  You used the term "relationship of trust."  What does that

4   mean?

5   A.  It means a relationship between two people where one

6   individual has reason to trust another, either by virtue of the

7   relationship, or by virtue of the individual's positions.

8   Q.  What are some examples of situations where a relationship

9   of trust can develop?

10  A.  Parent child, adult child, teacher student, doctor patient,

11  Boy Scout leader and student.  Any sort of relationship where

12  there can be a reasonable expectations that, by virtue of the

13  individual's position to the person that they're abusing, there

14  would normally be an expectation that that person has a duty of

15  care.  Or in the context of an ongoing relationship, so dating

16  partners, marital partners, family members, that sort of thing.

17  Q.  How, if at all, does a relationship of trust impact

18  someone's vulnerability to sexual abuse?

19  A.  It would increase their vulnerability to sexual abuse.  We

20  know vulnerability is increased the closer the relationship,

21  and the closer the relationship, the more you have elements of

22  trust in that relationship.

23  Q.  You mentioned before that victims in a relationship of

24  trust are less likely to recognize what happened to them as

25  sexual abuse.  Is that right?

O4T3PAD4                              Rocchio - Direct

A.  They're more susceptible to believe in the deception, and

they're less likely to describe what's happened to them as

sexual abuse, yes.

Q.  What are some of the reasons for that?

A.  So, if you trust someone, and they're telling you that what

they're doing is out of care or concern, or even telling you

that, frankly, what they're doing is for your benefit or not

abusive, then we kind of have to choose, are we going to

believe this person and who we have faith and we trust, or do

we trust our own gut that feels like maybe something is not

quite right.

         And when our connection and attachment with someone we

care about and trust is at stake, we are far more likely to

believe that person.

         Also, there can also be situations where, if you're

talking about children or you're talking about someone who has

a lot of power, individuals may not realize that what's

happening is actually abusive in nature.

Q.  In the context of sexual abuse occurring in a relationship

of trust with someone in a position of power, how common is it

for there to be ongoing contact between the victim and the

perpetrator?

A.  So we know that sexual abuse that occurs in the context of

a relationship, especially if you're talking about a

relationship where there is a significant power differential,

1    is often ongoing.  People who cultivate a relationship with
2    someone for the purpose of sexually abusing them will continue
3    to sexual abuse them for essentially as long as they can get
4    away with it.
5    Q.  I would like to talk about psychological defenses and
6    coping strategies that victims use.  What are some common
7    psychological defenses and coping strategies of sexual abuse?
8    A.  As I had mentioned earlier, minimizing the gravity of what
9    has occurred or minimizing the impact.  So, telling yourself
10   that it was no big deal, telling others it was no big deal.
11   Using words that are less scary, so, this was something
12   uncomfortable that happened.  He did something I didn't like or
13   it made me feel weird or queasy.  As opposed to using words
14   like he raped me or he sexually assaulted me.
15           Certainly for all of us when we experience a painful
16   difficult experience of any kind, but particularly sexual
17   assault, there is something called compartmentalization where
18   we lock it can away in a part of our minds and deliberately
19   attempt not to think about it.  We can say, oh, I don't want to
20   think about that.  Some may turn to substances in an effort to
21   help not to think about it.  Other people just may try to avoid
22   thoughts and reminders every time it comes up and just put it
23   out of their minds.
24           Those would be some of the common ones.
25   Q.  Based on your clinical experience in particular, what are

1   some of the feelings that sexual abuse can trigger in victims?

2   A.  Intense shame, intense self-blame, guilt, feelings of

3   confusion, wondering what it was about them that made them a

4   target, feelings of not wanting to be labeled a victim,

5   feelings of self-disgust, fear.

6   Q.  I want to shift focus a bit.  Dr. Rocchio, are you familiar

7   with the term childhood sexual abuse?

8   A.  Yes.

9   Q.  What does that mean?

10   A.  It means the -- it refers to the dynamics and processes of

11   an individual abusing someone under the age of 18 for purposes

12   of their own sexual gratification.  And it can involve contact

13   sexual abuse, in other words, touching someone in a sexual

14   manner.  Or what's referred to as non-contact sexual abuse, for

15   example, showing a child pornographic material or exposing

16   oneself to the child or having the child expose themselves to

17   you.

18   Q.  You mentioned before that the vast majority of sexual abuse

19   of a child is committed through non-violent means.  How are the

20   majority of sexual abuse of children carried out?  What means

21   are used?

22   A.  Coercion, intimidation, manipulation, lies, deception.

23   Q.  Are you familiar with the term "grooming" in the context of

24   childhood sexual abuse?

25   A.  Yes, I am.

O4T3PAD4                              Rocchio - Direct

1    Q.   What is grooming?

2    A.   Grooming refers to the set of tactics, modus operandi,

3    techniques, strategies, deceptions that a perpetrator of sexual

4    abuse will use to isolate a victim and build typically some

5    form of relationship of trust with that individual,

6    specifically for the purpose of sexually abusing them.

7    Q.   In the literature on grooming, is it divided into a series

8    of stages?

9    A.   Yes.  So, the term "grooming" and looking at the tactics

10   that are used by perpetrators have been used in the literature

11   for a very long time.  What they've tried to do now is identify

12   what are some of the common processes that are used.  So,

13   there's a model that has been supported by the research.  It is

14   a five stage model.

15   Q.   I'd like to walk through each of the five stages.

16        What's involved in the first stage of grooming?

17   A.   The first stage is where the perpetrator identifies the

18   individual that they intend to sexually abuse.

19   Q.   And the second stage?

20   A.   Finding ways to isolate that individual and developing

21   opportunities to be alone with that person for the purposes of

22   sexually abusing them.

23   Q.   What's the third stage of grooming?

24   A.   The third stage is continuing to cultivate through lies,

25   deception, and manipulation some form of relationship of trust.

 1  It can involve giving the child special attention, special

 2  care.  Sometimes it can also involve gift giving or providing

 3  access to things that the child might ordinarily not have

 4  access to.  But positioning one's self in what the child comes

 5  often to believe and characterize as a special relationship.

 6  It makes the child feel that they're special in the eyes of the

 7  perpetrator.  In adolescents it can also commonly involve

 8  things like providing substances, or sometimes teenagers are

 9  misled to believe that it's a boyfriend/girlfriend kind of

10  relationship, when in fact it is an adult abusing a child.

11  Q.  What's the fourth stage?

12  A.  The fourth stage involves some form of desensitization to

13  both physical touch and sexualized materials.  So, the

14  perpetrator has some reason why they are touching the child's

15  body.  There might be reasons for that to occur in the context

16  of a relationship.  Doctor-patient relationship, for example.

17  Or it could start through tickling, joking around, playing,

18  back rubs, let me massage your shoulders.  There is a gradual

19  build up of increasing levels of physical contact.  Then also

20  there may be discussion of sexualized topics.  So introduction

21  of pornography or specific questions about matters of a sexual

22  nature.

23  Q.  What's the fifth and final stage?

24  A.  The final stage is referred to as the maintenance stage,

25  whereby the perpetrator continues to behave in deceptive and

1   manipulative ways to keep the relationship going, which allows

2   them to continue abusing the child and prevents disclosure of

3   what's happening.

4   Q.  Based on your education, research, training, and

5   experience, does each perpetrator of childhood sexual abuse

6   always use all five stages of grooming?

7   A.  No, they don't.  These are commonly utilized types of

8   things but not -- there are some perpetrator who will simply

9   abuse right away.  You don't haven't to go through each and

10  every stage, no.

11  Q.  Is abuse -- is grooming always gradual?

12  A.  I'm sorry?

13  Q.  Is grooming always a gradual process?

14  A.  Not always, no.

15  Q.  Are there factors that can make a child more vulnerable to

16  sexual abuse?

17  A.  Yes.

18  Q.  What are some of those factors?

19  A.  So again, as I mentioned, anybody can be sexually abused,

20  but we also know that there are certain subgroups of

21  individuals who are at higher risk.  There can be individual

22  factors.

23          So for example, a child who is more socially awkward

24  or tends to be more socially isolated can be at higher risk.

25  Individuals who are more vulnerable by virtue of having a

significant health issue or mental health problem.  Kids who
have already been abused at home or who come from homes where
there's violence between parents, for example.  Individuals who
are already part of a marginalized group, so kids who are
sexual or ethnic minority kids can also be at higher risk.

Q.  We spoke before about psychological responses and coping
mechanisms to deal with sexual abuse.  How do those manifest in
child victims?

A.  Very similarly.  A lot of times with kids they don't
necessarily recognize that what's happening is abuse.  So, if
they're told that this is something that just has to happen or
is for your own good, they're more inclined to believe that.
So they're less likely to necessarily recognize that what's
happening is sexual abuse.

But also apart from the dynamics between the
relationship between the perpetrator and the child, kids can be
afraid that they're going to get in trouble or they're afraid
that the perpetrator, who perhaps in some ways has been a
positive figure in their lives, could get in trouble.  They can
be afraid they won't be believed.  And so they can often either
decide to kind of believe what they're being told, or it's
sometimes not a conscious decision.  Or they, again, just kind
of put it out of their minds, then will focus on the positive
aspects of the relationship and try not to think about the more
terrifying, scary, or painful parts.

1    Q.  Do these defenses and coping mechanisms manifest in

2    adolescents in any particular ways?

3    A.  So we know that adolescents are among the least likely

4    group of individuals as far as sexual assault victims to tell

5    what's happening to them.  They're more easily and readily

6    manipulated.  And they often are afraid of getting themselves

7    in trouble or of having their freedom curtailed.  So if they

8    are afraid that someone's not going to believe them or they're

9    going to get in trouble and not be able to do the things they

10   like to do.  Also teenagers as a group generally don't like to

11   talk much about anything they think is of a sexual nature with

12   other adults.  Even if they do talk with anyone, they're likely

13   to talk about it with friends, rather than an adult or

14   certainly not an authority figure.

15   Q.  We started talking a bit about disclosure of sexual abuse.

16   I'd like to focus on that topic more generally.  How typical is

17   it of victims sexual abuse to disclose the abuse at or close to

18   the time it occurred?

19   A.  We know only about 55 to 60 percent of victims of sexual

20   assault will tell someone else what's happened to them within

21   say a week of the abuse itself occurring.  So we're looking at

22   a significant number, 40 percent anyway, who don't tell within

23   a week of it occurring.  And although the figures have varied

24   depending on the studies, 20 to 25 percent of adults who

25   acknowledge that they were sexually abused as children will say

O4T3PAD4                              Rocchio - Direct

1    that they've never told anyone.

2    Q.  Are you familiar with the term "delayed disclosure" in the

3    context of sexual abuse?

4    A.  Yes, I am.

5    Q.  What does that mean?

6    A.  Delayed disclosure simply means not telling someone about

7    the abuse at the time that it's occurring.

8    Q.  Based on your education, research, training, and

9    experience, what are some of the reasons a person may delay

10   talking about the sexual abuse they experienced?

11   A.  So, it's important when thinking about disclosure to

12   recognize it is a process that occurs over time.  And also when

13   we're talking about disclosure, part of it depends on who

14   they're disclosing to.  So, very, very few individuals will

15   disclose, for example, to police or law enforcement.

16          But even when talking to someone else, it can have to

17   do with first whether they believe that what's happened to them

18   was abusive or wrong.  If they've been manipulated in believing

19   this was part and parcel of their relationship with the person,

20   in their minds there's nothing to tell.  So, if they don't

21   acknowledge it is abusive, if they don't recognize it's

22   abusive, that's definitely going to decrease rates of

23   disclosure.

24          We know that the closer the relationship between the

25   child, the victim and the perpetrator, the less likely it is to

1    be disclosed.  We know that the degree to which an individual

2    blames themselves or has questions about their degree of

3    complicity or culpability in whatever it is that occurred or

4    the degree to which they've been made to feel that they're

5    complicit or culpable, those things will also negatively impact

6    the individual and delay disclosure.

7    Q.  Who do victims of sexual abuse commonly first talk about

8    their experiences to?

9    A.  A friend.

10   Q.  Does that vary by the age of the person who experienced the

11   abuse?

12   A.  Well, teenagers are definitely most likely to talk to

13   friends.  But not really.  Adults also are most likely to talk

14   to another trusted peer.

15           The least likely anyone is to talk to is going to be

16   law enforcement.

17   Q.  Now, you mentioned that disclosure is typically a process.

18   Can you talk a little more about why that is.

19   A.  If you think about talking about something that's painful

20   and upsetting or confusing, I think it makes sense.  We all

21   recognize we talk about that in varying detail with varying

22   emotions and in varying ways, depending on the situation we're

23   in, who we're talking to, and the circumstances.  So,

24   disclosure often is something that, when people talk, they may

25   give varying levels of detail, for example, depending on who

O4T3PAD4                              Rocchio - Direct

1    they're talking to.

2              Over time, how they come to feel about what's happened

3    to them can change.  So, their level of self-blame or their

4    level of ability to understand and recognize that what happened

5    was harmful can vary over time.  So the way that someone comes

6    to think about their experiences certainly does influence how

7    they talk about those experiences.

8              And then also, the responses that they get when they

9    talk about it.  So we know that when individuals disclose and

10   they're met with disbelief or shame or blame, that will

11   absolutely shut down how -- how willing they are to continue

12   talking.  Not only to that person, but even to others.

13   Q.  We may have talked about this a bit before, but I want to

14   focus on how, if at all, the relationship between the victim

15   and the perpetrator, and particularly where there is a power

16   differential, how that can impact the likelihood that someone

17   will start talking about this sexual abuse.

18   A.  To the degree that someone is in an authority figure,

19   individuals are more likely to comply with what it is that's

20   been asked of them in the context of the sexual abuse.  And

21   that can really add to the sense of confusion about was this

22   abuse, was this is something I so voluntarily participated in,

23   am I to blame.  And all of that can exacerbate an individual's

24   vulnerability.

25              Also when someone is an authority figure, just in

1    general, we as human beings tend to be less likely to question

2    what it is that we're being asked to do.

3    Q.  We spoke a bit about gender differences in recognizing and

4    labeling abuse.  Are there any -- can there be an impact -- can

5    gender impact whether a victim discloses or starts talking

6    about the sexual abuse they suffered?

7    A.  Yes.

8    Q.  How can gender impact whether or not someone discloses

9    their sexual abuse?

10   A.  So it can have a direct effect, because we know, for

11   example, boys and men tend to experience higher levels of

12   self-blame and shame, and in some studies, less ability to

13   recognize or at least label what's happened as abusive.  So in

14   those two sets of circumstances, gender is going to play a role

15   in whether or not they're talking about their experiences with

16   other people.

17   Q.  Based on your education and research, training, and

18   experience, and in particular your clinical experience, when

19   people are talking about sexual abuse they have experienced,

20   are there particular emotions they typically express?

21   A.  The short answer to that would be all of them.  People --

22   there's not any one way that people talk about their

23   experiences of having been sexually abused.  And any variety of

24   responses from anger to tears to intense fear to giggling,

25   because they're anxious and uncomfortable, to completely flat

1    affect because they're trying -- flat emotion because they're

2    trying to push all of those feelings aside.  All of those can

3    be very, very common when people are talking about sexual

4    abuse.

5              And how people talk about it, again, can vary.  So,

6    they may, in the privacy of a therapy setting, come to trust

7    me, and over time, talk about the pieces that are most painful,

8    most shameful, along with the ability to express the feelings

9    that go along with it.  But in other settings, they may just

10   talk about it as very matter of factly or angrily.

11   Q.  I want to shift our focus to talking about sexual abuse in

12   the context of a healthcare provider and a patient.

13             Are you familiar with situations in which patients are

14   abused during the course of medical treatment by a healthcare

15   provider?

16   A.  Yes, I am.

17   Q.  How are you familiar with those situations?

18   A.  In a variety of ways.  In my work on the ethics committee

19   for the American Psychological Association, we certainly dealt

20   with responding to reports of psychotherapists' sexual

21   misconduct.

22             In my clinical practice, I treat patients who have

23   been sexually abused by a healthcare provider, either a medical

24   provider or a previous mental health provider.

25             And I've conducted forensic evaluations and been

O4T3PAD4                          Rocchio - Direct

involved in forensic cases where there has been sexual abuse

alleged or found to have occurred by a healthcare professional.

Q.  How, if at all, is the concept of a relationship of trust

relevant to sexual abuse in a doctor-patient context?

A.  It's very relevant.

Q.  Can you explain why it's relevant.

A.  When people go to a doctor, a doctor generally, we

understand, most people understand that a physician has an

ethical obligation to help us.  We're going to that individual

for help and care, and we're putting our health and well-being

in that person's hands.

       So it's going to increase our vulnerability to tell

the doctor about our experiences.  The doctor is in a position

of power where generally they can ask quite intimate and

personal questions, and have access through either questioning

or through review of our medical records to a lot of intimate

private details.

       So, the power imbalance in terms of education and

training, but then also in terms of information, the patients

typically don't have access to a lot of personal information

about the physician's lives.

       And then to the degree that the individual is

unfamiliar with methods or what the doctor says that they need

to do, in the context of providing health care, those things

can all increase an individual's vulnerability to sexual abuse

1    by a healthcare professional.

2    Q.  How, if at all, does a doctor's institutional affiliation

3    impact this power imbalance between a doctor and a patient?

4    A.  It can exacerbate the power differential.  So people will

5    tend to assume, often, that degrees from fancy institutions or

6    affiliation with well-known, well-established, well-respected

7    institutions are associated with greater skill, greater ability

8    to provide care.  And that can, again, both increase the power

9    differential, increase the individual's likelihood to trust and

10   put faith in the professional, and also cause individuals to

11   question themselves if something's going on that doesn't quite

12   feel right.  Many, many people will say but they've treated,

13   you know, hundreds of patients.  How do they have such great

14   reputation.  I must be the one who is mistaken here.

15   Q.  Are you familiar with the term "institutional grooming"?

16   A.  I am.

17   Q.  What does that mean?

18   A.  It means when, as part of the grooming process, what a

19   perpetrator of sexual abuse will do is they will use their role

20   within a given institution as part of the authority that they

21   then manipulate and misuse for the purpose of sexually abusing

22   someone.  So, it could be in the case of -- as we were just

23   talking, a physician using their role as a doctor, it could be

24   a teacher finding ways to be alone with students, it might be a

25   priest with a parishioner or with a child.

1          But it's when you're using the institution and your

2     role as part of your abuse.

3     Q.  Does this power differential disappear if the individual

4     has a choice of going to see a different doctor?

5     A.  No, not at all.

6     Q.  Based on your education, training, experience, and

7     research, is it ever the case that sexual behaviors are

8     presented to the patient as part of their medical care?

9     A.  Yes.

10    Q.  What are some examples of that?

11    A.  I mean, I've seen it in a variety of ways.  I've seen

12    situations where individuals have reported that their

13    gynecologist has conducted genital exams that weren't

14    necessary.  Psychiatrists or mental health professionals have

15    told patients that, you know, part of their treatment would be

16    improved if they had some sort of sexual contact with the

17    psychotherapist.  I was involved in a case where an individual

18    was given multiple exams and called back to the physician's

19    office like several times a week for unnecessary physical

20    exams.  Things of that nature.

21    Q.  How, if at all, can this impact a patient's ability to

22    recognize what's happening to them as sexual abuse?

23    A.  So, to the degree that they're being led to believe that

24    what is being done is a necessary part of their medical care,

25    then that can absolutely contribute to -- increase their

O4T3PAD4                          Rocchio - Direct

1  likelihood to believe in the deception.

2  Q.  Focusing in particular on children.  How does the power

3  dynamic play out in the context of a doctor treating a child?

4  A.  So again, it's really with kids about the authority that

5  the doctor has.  But then you also have, there is a concept

6  that's also referred to as grooming the environment, which

7  means that when you're in the context of childhood sexual abuse

8  of children, the grooming is not just convincing the child that

9  you are a good person and someone to be trusted, but you're

10  also -- you've also convinced individuals in the child's

11  environment that you are a good person to be trusted.

12          So to the degree that a child trusts someone but also

13  their parents are telling the child, you know, do what the

14  doctor said, or this is a good person, he is going to help you

15  to feel better, there are all of these additional added

16  pressures on children to believe that what's being done is

17  something they're supposed to comply with or listen to.

18          And also, for kids with chronic medical problems,

19  often uncomfortable or painful medical procedures can be part

20  of their care.  So if they're saying this hurt or I don't like

21  this, sometimes the adults in their lives can assume that

22  they're talking about appropriate care, and may not realize

23  that the child's actually talking about something inappropriate

24  or abusive that's being done to them.

25  Q.  Does the fact that someone is being sexually abused by a

1    doctor mean the doctor is not otherwise providing some medical

2    treatment or care?

3    A.  No, not at all.  With health professionals, often the

4    cultivation that I talked about of an appropriate relationship

5    of trust means that physicians can be in many ways doing some

6    good things as part of their relationship with the individual.

7    And that's part of what makes it so confusing.

8              MS. ESPINOSA:  One moment, your Honor.

9              THE COURT:  Sure.

10             MS. ESPINOSA:  No further questions.

11             THE COURT:  Mr. Baldassare, are you ready?

12             MR. BALDASSARE:  Whichever you'd like, Judge.

13             THE COURT:  If you can do a little bit of cross.  We

14   can end a little bit early.  I know it's been a long day.  But

15   go for a little bit.  Thank you.

16   CROSS-EXAMINATION

17   BY MR. BALDASSARE:

18   Q.  Dr. Rocchio, my name is Mike Baldassare.  Jeff Hawriluk and

19   I represent Dr. Paduch.  Can you hear me okay?

20   A.  Yes, I can.  Thank you.

21   Q.  If at any point you can't, let me know.

22             We've never met before, correct?

23   A.  That's correct.

24   Q.  And you are being paid by the government -- is it 500 an

25   hour?

O4T3PAD4                    Rocchio - Cross

1   A.  Yes, that's correct.

2   Q.  And how much have you billed to this matter as of appearing

3   here today?

4   A.  I haven't billed anything yet.

5   Q.  If your testimony were to end some time tomorrow, how much

6   do you think the final bill would be?

7   A.  I haven't looked at the billing yet.  But I would say

8   somewhere in the vicinity of 50 hours.

9   Q.  So about -- I don't do math.

10  A.  Approximately $25,000.

11  Q.  25,000.  Okay.

12         How much would you say you make a year testifying as

13  an expert, civil, criminal, defense, prosecution, just total?

14  A.  I don't actually testify -- testifying is the smallest

15  portion of what I do.  So on an annual basis, it can depend.

16  Just testifying, less than $50,000 a year.

17  Q.  And as far as putting aside the actual testimony, you have

18  your clinical practice where you actually see patients,

19  correct?

20  A.  Yes, that's true.

21  Q.  And then you have your forensic practice, and that's where

22  you consult with could be defense, could be prosecution, could

23  be plaintiff, could be defendant, correct?

24  A.  Yes, that's correct.

25  Q.  And in the consulting role, in your forensic practice, how

1  much would you say you make in that portion?

2  A.  So I spend about 40 percent of my time doing forensic work

3  and about the other 60 percent doing clinical work.  And that

4  clinical work can include the supervision and the conducting of

5  the practice.  So, I don't know, maybe roughly equal amounts.

6  Maybe I make about 50 percent doing the forensic work.

7  Q.  In your role as a clinician, that's where, for a layperson

8  like me, that's where you just see patients, correct?

9  A.  I provide psychotherapy and treatment and assessment to

10  patients, yes.

11  Q.  Right.  So people who come in for weekly therapy?

12  A.  Yes, generally.

13  Q.  And in that role, am I correct that your role with that

14  person is to accept as true what that person says happened?

15  A.  No, that's not necessarily correct.

16  Q.  Do you do any external or independent investigation into

17  whether what that person says happened to them, to him or her,

18  is true?

19  A.  So, no.  If someone tells me they're depressed and, I don't

20  know, not sleeping, I don't investigate whether or not they're

21  actually sleeping.  My role is not an investigator.  But I do

22  take what they say and look at it within -- in light of the

23  scientific literature, and try to understand what's happening

24  and how much sense it makes.

25          But no, I'm not investigating.  I'm generally treating

O4T3PAD4                    Rocchio - Cross

1  them based on what they're saying.

2  Q.  And just to take it out of -- I understand if someone says

3  he or she is depressed.  But what if someone -- if someone

4  comes to you and says I was sexually assaulted 20 years ago by

5  a priest.  Do you take any steps to determine if they ever went

6  to school where there were priests or if they're even of a

7  religion where there are priests?

8  A.  No.  I don't conduct any sort of independent investigation

9  on my patients, no.

10  Q.  So, 40 to 50 percent of your practice is dealing with

11  people who -- and I'm not saying this is incorrect from a

12  professional standpoint, I'm just trying to understand -- 40 to

13  50 percent of your practice is dealing with individuals who are

14  describing events or feelings that it would be inappropriate

15  for you to even take an independent investigation of, right?

16  A.  Well, my clinical practice is more like 60 percent.  But,

17  yes, about 60 percent of people I'm not doing any sort of

18  external investigation.  That's correct.

19  Q.  Which would mean you may not talk to family members,

20  correct?

21  A.  I may not.

22  Q.  You may or may not look at medical records, correct?

23  A.  May or may not, depending on the medical record or the

24  situation.

25  Q.  Would you agree with me that the concept of grooming is

O4T3PAD4                    Rocchio - Cross

something that is retrospective or backward looking to try to
find the signs of?

A.  I would say that the literature is predominantly
retrospective.  There has been some research attempting to
identify what are called red flag behaviors that are more
closely linked to the sexual abuse.  So some of the behaviors
that go along with grooming are retrospective in nature, and
others are in and of themselves sexually abusive behaviors.

Q.  What I'm talking about retrospective, what I'm wondering
is, there could be some of the hallmarks that you've said of
grooming, but they're not grooming in and of themselves.
Taking an interest, let's just say, a doctor taking an interest
in a patient, mentoring that patient.

        That in and of itself is not a grooming activity until
it is converted to a grooming activity by an allegation of
sexual assault, right?

A.  So, the definition of grooming involves engaging in these
types of behaviors for the purpose of sexual assault.  So you
can groom someone for the purpose of sexual assault, even if
that sexual assault doesn't happen.  But it would be for the
purpose of sexual assault.

Q.  But it could also be just because you're interested in
someone's career, right?

A.  Well, that's why you wouldn't define grooming by any one
behavior.  It would be looked at -- you would look at a pattern

O4T3PAD4                        Rocchio – Cross

1    of behavior.

2    Q.  But would you agree with me that there are markers of

3    grooming or whatever you would call each of them, singling

4    somebody out, taking special interest in somebody, helping

5    somebody with something that he or she may not have.  There are

6    a bunch of those that could simply have absolutely innocuous or

7    possibly even laudable goals, right?

8    A.  Sure.  People can develop a relationship of trust and care

9    with another person for lots of reasons.  Absolutely.

10   Q.  So my point is, until there is an allegation of sexual

11   assault, those things that in and of themselves could be good

12   personality traits, trying to help someone, are not necessarily

13   just, oh, there is a marker of grooming, correct?

14   A.  It is not so much they are markers.  These are tactics.  So

15   the research has been done by asking offenders what kind of

16   things do you do in the course of abusing ing, how do you get

17   to do it.  So it is not just retrospective, because the

18   research is not only with victims.  It is also with

19   perpetrators.

20   Q.  Right.  But you are talking to people who you know have

21   done it, right?

22   A.  Or who have admitted they've done it, sure.

23   Q.  So, if I take a young legal intern, and I give that young

24   legal intern experiences that that individual might not

25   otherwise have, it's not grooming unless that individual says I

O4T3PAD4                          Rocchio - Cross

1  sexually assaulted her, right?  Otherwise it's just me being a
2  good legal mentor.
3  A.  It's not grooming unless you sexually assaulted them or
4  there's other patterns of behavior of a sexually abusive
5  nature.
6  Q.  Of course.  Right.  If I physically assault her or
7  physically -- the rarer kind that you're talking about -- rape
8  that individual, of course.
9          But, if all you were to know is that I took an
10  interest in a law clerk, a law student, of age, and said I
11  think you're a genius, and you would do great at our law firm,
12  and come to us because you want to do criminal defense, and I
13  think I'm the best and you can work with me.  Whether that's
14  true or not that I'm any good.
15          My question is that in and of itself could be grooming
16  if somebody says I did something wrong.  It also could be
17  something that you would want in a lawyer, correct?
18  A.  No.  In and of itself it wouldn't be grooming.
19  Q.  Right.
20  A.  But as I said, of course, you can be mentoring
21  relationships, close relationships, and good doctors and good
22  teachers and priests, of course.
23  Q.  Right.  And my point is, is that those factors, all of the
24  factor -- not all of them.  Take aside the things that involve
25  physical harm.

O4T3PAD4                        Rocchio - Cross

1          My point is, is that the behaviors, there are many of
2     those behaviors that, even if you have multiple ones, could
3     just be somebody being a good person and they don't convert to
4     nefarious purposes until there is an allegation, right?
5     A.  So, yes.  Some of the behaviors that can be part of the
6     grooming process can also be part of a normal healthy
7     relationship, yes.
8          MR. BALDASSARE:  Judge.
9          THE COURT:  Sure.  We are going to end a little early
10    today.  Just remember don't discuss the case, don't research
11    the case, keep an open mind, and I will see you tomorrow
12    morning regular time.
13          (Jury excused)
14          (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

O4T3PAD4

1          THE COURT:  You can step down.  We start tomorrow

2    promptly at 10.

3          THE WITNESS:  Thank you, your Honor.

4          (Witness temporarily excused)

5          THE COURT:  Any issues we need to discuss today?

6          MS. ESPINOSA:  Not from the government.

7          MR. BALDASSARE:  9:30 for us?

8          MS. ESPINOSA:  10 tomorrow with the jury.

9          MR. BALDASSARE:  We've been coming at 9:30.

10         THE COURT:  Just in case there are any issues you'll

11   let me know, and I'll come down early.  Thanks.

12         (Adjourned until April 30, 2024, at 10 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

O4T3PAD4

 1   AMIN HERATI

 2   Direct By Ms. Qian . . . . . . . . . . . . . . 367

 3   Cross By Mr. Baldassare  . . . . . . . . . . 384

 4   Redirect By Ms. Qian . . . . . . . . . . . . 417

 5   Recross By Mr. Baldassare  . . . . . . . . . 422

 6   KRISTA BEVIN

 7   Direct By Ms. Colson . . . . . . . . . . . . 423

 8   Cross By Mr. Baldassare  . . . . . . . . . . 456

 9   LUKE BEVIN

10   Direct By Ms. Colson . . . . . . . . . . . . 482

11   Cross By Mr. Baldassare  . . . . . . . . . . 500

12   Redirect By Ms. Colson . . . . . . . . . . . 513

13   JASMINDA ALVAREZ

14   Direct By Ms. Qian . . . . . . . . . . . . . 514

15   Cross By Mr. Baldassare  . . . . . . . . . . 534

16   LISA ROCCHIO

17   Direct By Ms. Espinosa . . . . . . . . . . . 545

18   Cross By Mr. Baldassare  . . . . . . . . . . 585

19   317   . . . . . . . . . . . . . . . . . . . 424

20   305   . . . . . . . . . . . . . . . . . . . 425

21   806, 807   . . . . . . . . . . . . . . . . 443

22   Sealed 801, 802, 803   . . . . . . . . . . 443

23   105   . . . . . . . . . . . . . . . . . . . 483

24   404   . . . . . . . . . . . . . . . . . . . 494

25   414   . . . . . . . . . . . . . . . . . . . 495

O4T3PAD4

1      512, 514, 525, 526, 528, 531, 533, 535, . . . 520

2              537 to 539, 541, 546