**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |
|---|
| UNITED STATES |
| v. |
| DARIUS A. PADUCH, |
| *Defendant.* |

Crim. No. 1:23-cr-181 (RA)

---

**DEFENDANT DR. DARIUS PADUCH'S SENTENCING MEMORANDUM**

---

**BALDASSARE & MARA, LLC**

75 Livingston Avenue, Suite 101
Roseland, NJ 07068
T: (973) 200-4066
F: (973) 556-1071
E: mbaldassare@mabalaw.com

*On the Brief*:

Michael Baldassare, Esq.
Jeffrey Hawriluk, Esq.

*Attorneys for Defendant*
*Dr. Darius Paduch*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... ii

TABLE OF EXHIBITS ..................................................................................................... iv

I.      PRELIMINARY STATEMENT ............................................................................. 1

II.     PROCEDURAL HISTORY ..................................................................................... 1

III.    PERSONAL INFORMATION AND BACKGROUND ......................................... 2

      A.      Introduction ................................................................................................. 2

      B.      Childhood and Family ................................................................................. 2

      C.      Education and Work History ....................................................................... 3

      D.      Dr. Paduch's dedication to his patients is unique and well-established. ..... 7

      E.      Medical History ......................................................................................... 11

      F.      Dr. Paduch's Military Service to the United States ................................... 11

IV.     THE APPLICABLE LEGAL STANDARD ........................................................... 12

V.      THE GUIDELINES CALCULATION ................................................................... 12

      A.      The Probation Office and The Government ............................................... 12

      B.      The Defense Calculation ........................................................................... 13

VI.     THE STATUTORY FACTORS (18 U.S.C. § 3553) ............................................. 16

      A.      The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)) ............ 16

      B.      The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)) ...... 16

            1.      Dr. Paduch is precisely the opposite person portrayed by the media and plaintiff lawyers. ........................................................................... 16

            2.      Dr. Paduch's efforts and successes during his time at MDC demonstrates a character is warrants a reduction in his sentence. .......... 17

            3.      The Probation Office agrees that Dr. Paduch's personal history presents mitigating factors. ..................................................................... 19

            4.      The Conditions at MDC warrant a reduced sentence. ............................ 19

      C.      Promoting Respect for the Law (18 U.S.C. § 3553(a)(2)(A)) .............................. 26

      D.      Deterrence (18 U.S.C. § 3553(a)(2)(B)) ............................................................. 27

      E.      Rehabilitation (18 U.S.C. § 3553(a)(2)(D)) ....................................................... 27

      F.      Sentencing Disparity (18 U.S.C. § 3553(a)(6)) ................................................... 27

      G.      Restitution (18 U.S.C. § 3553(a)(7)) .................................................................. 28

VII.    A FINAL REQUEST FOR LENIENCY ................................................................ 29

VIII.   CONCLUSION ....................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Gall v. United States*, 128 S. Ct. 586 (2007)............................................................................... 26, 27

*United States v. Arbaugh,* 951 F.3d 167 (4th Cir. 2020) .............................................................. 13

*United States v. Booker*, 543 U.S. 220 (2005) .............................................................................. 12

*United States v. Carter*, 960 F.3d 1007 (8th Cir. 2020)................................................................ 13

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008)................................................................... 12

*United States v. Cernik*, No. 07-20215, 2008 U.S. Dist. LEXIS 56462 (E.D. Mich.
    July 25, 2008) .......................................................................................................................... 26

*United States v. Chavez*, No. 22-CR-303 (JMF), 2024 U.S. Dist. LEXIS 1525
    (S.D.N.Y. Jan. 4, 2024)...................................................................................................... 20, 24

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .................................................................... 12

*United States v. Nucci*, 364 F.3d 419 (2d Cir. 2004) .................................................................... 29

*United States v. Ontiveros*, No. 07-333, 2008 U.S. Dist. LEXIS 58774 (E.D. Wis.
    July 24, 2008) .......................................................................................................................... 26

*United States v. Ray Parish*, 2024 U.S. Dist. LEXIS 151228 (S.D.N.Y. Aug. 22,
    2024) ........................................................................................................................................ 20

*United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014)............................................................ 12

*United States v. Watkins*, 667 F.3d 254 (2d Cir. 2012) ................................................................ 14

*United States v. Whyte*, 928 F.3d 1317 (11th Cir. 2019) ............................................................. 13

## STATUTES

18 U.S.C. § 3553.............................................................................................................................. 16

18 U.S.C. § 3553(a) ......................................................................................................................... 12

18 U.S.C. § 3553(a)(1)..................................................................................................................... 16

18 U.S.C. § 3553(a)(2)(A) ............................................................................................................... 26

18 U.S.C. § 3553(a)(2)(B) ............................................................................................................... 27

18 U.S.C. § 3553(a)(2)(D) ............................................................................................................... 27

18 U.S.C. § 3553(a)(6) .................................................................................................... 27

18 U.S.C. § 3553(a)(7) .................................................................................................... 28

18 U.S.C. § 3664(d)(5) .................................................................................................... 28

18 U.S.C. § 3664(j)(2) ............................................................................................... 28, 29

18 U.S.C. §§ 3553(a)(2) .................................................................................................. 19

N.Y. Educ. Law § 6524(2) .............................................................................................. 15

## **OTHER AUTHORITIES**

8 NYCRR 60.3(a), (b) ..................................................................................................... 13

BOP Policy 5100.08, Ch. 4, § 16; Ch. 5 ......................................................................... 24

U.S.S.G. § 2G1.3(a)(3) .................................................................................................... 11

U.S.S.G. § 2G1.3(b)(2)(B) ............................................................................................... 11

U.S.S.G. § 2G1.3(b)(4)(A)(i) ........................................................................................... 12

U.S.S.G. § 3B1.3 .............................................................................................................. 12

U.S.S.G. § 4B1.5(b)(1) .................................................................................................... 13

U.S.S.G. § 5G1.2(c) ......................................................................................................... 14

## <u>TABLE OF EXHIBITS</u>

Dr. Paduch's Letter to the Court ................................................................. A1-6

Dr. Paduch's *Curriculum Vitae* ................................................................. B1-37

Dr. Paduch's Scholarly Articles ................................................................. C1-386

Dr. Paduch's MDC Documentation ............................................................. D1-31

Medical Studies and Documents ................................................................. E1-38

## I.  PRELIMINARY STATEMENT

Dr. Paduch submits this memorandum in support of his request for a sound, measured, merciful and appropriate sentence.  A sentence at or near 10 years is "sufficient, but not greater than necessary" under the circumstances of this case and this defendant.  18 U.S.C. § 3553(a). The Probation Office (and likely the government when it files its sentencing submission) recommends a 30-year sentence.  A sentence at or near three decades is inappropriate and unthinkable.  As explained herein, any such sentence is tantamount to life and will ensure that Darius Paduch dies in federal prison.  The law requires a more measured and thoughtful approach, one that considers Dr. Paduch's life and the effects of incarceration, among many other mitigating factors.  Darius' letter to the Court warrants such an approach.  A1-6.

While a *de facto* life sentence may seem nearly appropriate under a mechanical, mathematic and rote application of the Guidelines, a 30-year sentence is untethered to Dr. Paduch's long history as a loving father and a brilliant physician who has given so much to his patients and his field of specialty.  A sentence at or near 10 years will incarcerate Darius well into his 60's, place him on an extended period of supervised release and require sex offender registration.  He will never practice medicine again and, while incarcerated, will face the literally dozens of lawsuits against him.  Based on all this, a sentence at or near 10 years is borne out by a reasonable approach, rather than an automatic reaction to the conviction, the Guidelines and the public vilification of this Defendant.

## II.  PROCEDURAL HISTORY

Dr. Paduch was charged by Indictment 23-cr-181 which was unsealed on April 11, 2023. A Superseding Indictment was filed on October 23, 2023.  A Second Superseding Indictment was filed on January 16, 2024.  PSR ¶ 1.  On May 8, 2024, Dr. Paduch was found guilty on Counts 1, 2, 3, 4, 5, 7, 8, 9, 10, 12, and 13.  The government elected not to proceed with Counts 6 and 11 and those Counts were dismissed with prejudice.  PSR ¶ 16.

### III.    PERSONAL INFORMATION AND BACKGROUND

#### A.    Introduction

Darius Paduch was born on May 23, 1967, in Kolobrzeg, Poland.  PSR ¶ 143.  He was the only child of Adam Paduch and Elizabeth Aleksandrowicz.  *Id*.  Darius was raised alongside Tomasz Paduch.[1]  *Id*.  Darius entered the United States in 1993 and became a naturalized citizen in 2001.  PSR ¶ 148.  Dr. Paduch has no criminal history, and this case is his first brush with the law.  PSR ¶¶ 136-137.

#### B.    Childhood and Family

Darius grew up in the seaside town of Kolobrzeg, Poland.  PSR ¶ 143, 146.  Darius' mother Elizabeth was a professor and his father Adam was an electrician.  *Id*.  Darius was raised in a Catholic household.  PSR ¶ 145, 147.  In his early years, Darius was and altar boy and later took part in his church's outreach programs.  PSR ¶ 147.

As Darius describes his early life for the Court:

> I learned altruism and justice from my family in Poland and in the USA. My great-grandmother Justyna risked her life hiding a Jewish family in the basement of her home during World War II. She risked hers and her family lives to save people whom she used to work for prior to the War. Her heroism and humanism were recognized by the Israel government with an award of the medal of "Just Among the Nations".
>
> My parents were always ready to help others and our home was full of kids of who needed company and often something to eat. We were not rich, rather a struggling middle class family, but there was always a room for additional person at our family table during meals and holidays.  My mom and my great-grandma had huge hearts; they shaped my zeal to help people.  My mom was a sought-after educator and she often volunteered to help the student who had issues due to prolonged illness by teaching them at home after hours.

---

[1] The PSR reflects that Darius Paduch "is unsure if Tomasz is his biological brother."  PSR ¶ 145.  The defense's objections to the draft PSR more accurately reflect that "Tomasz was raised with Darius Paduch in Poland. Darius does not believe they are biologically related, but considers Tomasz a brother."

A1.

At the age of 17, Darius' parents separated.  PSR ¶ 143.  Despite the separation, Darius'

family remained close.  Darius' father moved a few blocks away and maintained regular contact.

PSR ¶ 146.  Darius' father passed away from congestive heart failure in his late 40's.  PSR ¶

143.

Darius' mother later married Broneck Aleksandrowicz, who was a Corporal in the Polish

Air Force.  PSR ¶ 144.  Mr. Aleksandrowicz died in 2009 at the age of 65.  *Id*.  Darius remains

close with his mother, emailing her weekly and calling her biweekly.  PSR ¶ 145.  Unfortunately,

Darius' mother has not visited him due to financial constraints associated with travel.  *Id*.

Darius met his husband Robert in 2013 at a medical conference in San Diego.  PSR ¶

150.  They married in New York on September 23, 2014.  *Id*.  Robert describes Darius as

"ambitious, intelligent, caring, and a person who always wants the best for others."  PSR ¶ 153.

Robert and Darius adopted their son ███ in 2017.  PSR ¶ 152.  ███ is currently 15

years-old and is heavily involved in wrestling.  *Id*.

On June 12, 2024, Robert filed for divorce seeking sole custody of their son, child

support, a division of their marital assets, and attorney's fees.  PSR ¶ 151.  Robert describes the

divorce as "an amicable mutual decision due to the uncertainty of sentencing."  PSR ¶ 153.

C.    **Education and Work History**

Darius describes his early decision to be a physician:

> At the age of twelve I decided that I want to become a doctor
> seeing how my best-friend father, also a pediatrician, was never
> counting the money the parents paid him to treat their children at
> home. I admired this man's altruism and generosity; he treated
> even the poorest of the kids. His name was Dr. Maj and he was
> known and loved in our city.
>
> I studied hard through my schools and I was on the top of the
> national Medical Entrance Exam and I entered into the Medical
> School in Lodz, Poland. I had to leave my family and moved far
> away to study medicine but I was following my calling. These

> were tough times as Poland was under the Communism regime
> with shortages of food, gas and basic supplies. I often ate stale
> bread and cottage cheese for dinner to stretch my stipend.

A1-2.

Darius attended the Nicolaus Copernicus Gymnasium in Kolobrzeg, Poland, from 1982 through 1986 and obtained the equivalent of a B.S. in Biochemistry. PSR ¶ 164. He then attended the Medical Academy of Lodz in Lodz, Poland, from 1986 through 1993. He completed an M.D. degree in 1993, and a Ph.D. degree in applied medical sciences with a specialization in molecular microbiology in 2002. PSR ¶ 165.

Dr. Pauch's *curriculum vitae* provides the following information. B1-37. Between 1993 to 1995, Dr. Paduch worked as a Staff Physician in Preventive Adolescent Industrial Medicine with the Engineering and Builders Vocational School and College No. 1 in Lodz, Poland. During that time, Dr. Paduch also served as an Instructor in Pediatric Surgery and Urology, as well as Co-Director for Adolescent Andrology and as Staff Scientist, with the Polish Mother's Memorial Hospital pediatric surgery department.

Dr. Paduch completed his residency in Urology at Oregon Health and Science University between July 1996 and June 2003. PSR ¶ 174. For the year that followed, Dr. Paduch served as an Assistant Professor Surgery in the University's urology division. PSR ¶ 174. From there, Dr. Paduch continued for approximately seven years between July 2005 and June 2012 as an Assistant Professor of Urology and Reproductive Medicine with Cornell Institute's Brady Urologic Health Center. PSR ¶ 173. During his tenure, Dr. Paduch worked his way up from Assistant Professor to Associate Professor and eventually to Director of Sexual Health and Medicine at Weill Cornell Medical College. PSR ¶ 172. Dr. Paduch also served as Director and Student Advisor of Mimi Suico Students Summer Research Program while at Weill Cornell. He was also Herbert Fisk Johnson Endowed Associate Professor of Urology and Reproductive Medicine between 2012 and 2019, and served as Chair of the LGBT Curriculum Committee from 2015 to 2018.

Dr. Paduch held multiple positions at Weill Cornell. He was an assistant professor urology and reproductive medicine at the Brady Urologic Health Center at Cornell Institute for Reproductive Medicine between July 2005 and June 2012. PSR ¶ 173. Further, from 2009 to 2020, Dr. Paduch was employed by Weill Cornell Medical College as assistant professor, associate professor, and director of sexual health and medicine. PSR ¶ 172. In March 2020, Paduch began work at the Smith Institute for Urology, Northwell Health, Northshore University Hospital in Great Neck, N.Y. PSR ¶ 171. He was employed by Northwell until April 2023. *Id.*

In addition to his institutional positions, Dr. Paduch simultaneously worked as Staff Scientist with Population Council's Center for Biomedical Research since 2005, as well as a President and Chief Scientist of Consulting Research Services, Inc. since 2009. By the time Dr. Paduch left Weill Cornell in 2020, he was the Director of their Penile Transplantation program. Once he left Weill Cornell, Dr. Paduch began working for Northwell Health's Smith Institute of Urology in Great Neck, New York. PSR ¶ 171. At Northwell Health, Dr. Paduch served as Associate Professor Urology and Director of Male Infertility and Microsurgery. PSR ¶ 171. As part of that role, Dr. Paduch practiced pediatric and adult reproductive health, through which he treated patients, performed surgeries, and trained medical students. PSR ¶ 171.

███████████ has provided the Court with a moving, first-hand and powerful overview of Darius' intellect and skill as a physician. V1.

> I interviewed Dr. Darius Paduch in the mid 1990's when he applied for six years of post-graduate training with our very competitive sub specialty program in urology. He was obviously very bright, MD PHD, graduate of a Polish Medical school but in my opinion had already written a seminal article on testicular atrophy which is small testicles in adolescent boys and he demonstrated that if this were diagnosed and the testes has started to shrink and the varicose veins were taken care of that the testicles would grow back to normal size and presumably function normally and I thought this was amazing that he was have done this properly at his age.

I thought Darius was brilliant and I thought that he should be ranked number one in our competitive residency match program and we did.

Dr Paduch made several contributions to our profession most especially with the young men who had Klinefelter syndrome which is a chromosome abnormality and this means that they will have breast start to grow they'll have wide hips, they'll have difficulty with sexual function. In other words getting erections. They'll have abnormalities with their testicles and not make testosterone properly or make sperm properly. He developed and pioneered some techniques for finding sperm in these young men.

He also is a talented physician and I think he could be a credit to whatever incarceration assignment he has if he's allowed to have some way of practicing medicine while he's there, he has talent and it'd be a shame to waste it.

Dr. Paduch has been published in over 100 scholarly works regarding a wide variety of topics in urology, reproductive health and medicine throughout his career. B11-26. He has co-authored approximately 88 studies between 1995 and 2019, exclusive of his 125 peer-reviewed abstracts and 14 book chapters. *Id.* Those publications included, but are not limited to, the often-overlapping subjects of Klinefelter Syndrome, andrology and male infertility, treatment of varicocele, sexual dysfunction and reproductive medicine.

Darius has written to the Court regarding his medical studies and career in a highly specialized area:

After legally immigrating to the USA in 1993 I chose urology as it is a surgical specialty where the doctors care for the patients of different ages over many years. After graduating from urology residency I ran the urogynecology practice within urological Department at Oregon Health Science University, Portland, OR.

Upon advice of my mentor Dr. Eugene Fuchs I did an additional two years of fellowship training in male infertility and sexual medicine at Weill Cornell Medical College in NYC. As a clinician-researcher with MD and PhD degrees I was offered a clinical and research position as an assistant professor of urology and reproductive medicine at Weill Cornell/New York Presbyterian Hospital in 2005. I then was promoted to associate professor, Director of Sexual Health and Medicine, fellowship research

director, and finally Herbert Johnson endowed associate professor of reproductive medicine.

In my clinical career I focused on preservation of fertility in teenagers and young men with genetic conditions and cancer as well as uncovering reasons for anorgasmia and un-ejaculation in men. The areas poorly understood twenty years ago.

For most of us the ability to have children seem inherited right like justice, freedom etc. But one in ten couples in the USA suffer from infertility. Men are called sterile when no sperm can be found in their semen. Klinefelter syndrome (KS); presence of additional X chromosome; is a the most common chromosomal (genetic) abnormality among the men with 1:500 to 1:800 men affected in general population. It is a leading cause of genetic sterility in men. However, the research performed at Weill Cornell and few other centers in the world showed that the sperm may be found in 25 to 30 % of adult men with KS if treated early. I and my fellows showed that all boys with KS are capable to produce sperm but they lose its capacity early during puberty. I published my data that showed if we operate on adolescents and young men with KS early we can find sperm in 70% of patients. We then can preserve the sperm so it can be used for future fertility.

Despite initial doubts from the medical community I saw more and more patients with KS every week. Most of them were teenagers brought by their parents to preserve their fertility but also to manage their testosterone and help them with physical development. I saw their potential. I also saw the pain in their families being misunderstood by medical community and often marginalized. I treated my patients and their families like my own family. I gave my cell phone number to every patient I operated on so they or their families had a way to contact me any time.

A3-4. Darius' letter has far more detail on this portion of his career. *Id.*

As set forth regarding the § 3553(a) factors, Dr. Paduch's medical career establishes "history and characteristics" that warrant a reduced sentence.

### D.    Dr. Paduch's dedication to his patients is unique and well-established.

Notwithstanding the conviction, even after the jury's highly publicized verdict, patients and family have provided their support.  V1.  Former patient E.Z. summarizes Dr. Paduch's care and treatment of him as follows:

I just went in for a fertility test. I went specifically for one thing. And I told him that. Another kind of a doctor easily would have said, "fine you want this one thing, I'll give it to you." But Dr. Paduch really made sure that he was thorough with me, and in my case, it was a life and death decision. He did a standard thing which I guess is called a PSA, a Prostate Specific Antigen test. And, in healthy men that is supposed to be like a 0. And mine came back with a 25, 27, which is really, really high. That then started us on this sort of path where he said, "it's probably nothing. You probably have some kind of infection. We'll run another test." Until finally, we realized I had stage-four cancer.

I think that as an older adult, you have a different kind of take on these things where you understand that certain things are going to happen in an exam that you're maybe not comfortable with but are necessary. And I'm sure that if I were a younger person, if I was ten, fifteen, maybe in my twenties, I probably would have had a different reaction. I'm sure I would've had a different reaction and more discomfort around some of those exams.

And I also do remember, yes, seeing these commercials on television that were very enticing of like, you should call us if you know this terrible Dr. Paduch. And I thought this can't be the same person. But then, there's only one Dr. Paduch, I guess. But the way they were painting him, I did not recognize that character.

When your life is on the line, what you really want is an advocate. And what you really want is for somebody who will make time for you. So, I was lucky that he was one of those people. And it could be a simple thing like you just have a question if this hurts and that doesn't hurt, and maybe I'm too tired, or I can't get the appointment I need. And you make a call, or you send a text, and you get an answer and it just makes you feel better.

I feel very strongly that Dr. Paduch is somebody who makes a big difference in people's lives. And he's somebody who saves lives. And he belongs in a hospital, and he belongs in the field doing what he can do to help people.

Those sentiments are echoed by former patient A.S., who has come to support Dr. Paduch with a very personal story:

When any man goes through any problem downstairs, it's a complete mess. Not only physically but emotionally. And Dr. Paduch made sure I was okay. One of the nurses actually recommended him to me because, again, his trajectory of being a good doctor and fixing problems. And that is actually how I met

Darius. People need to understand that he worked not only worked at the best hospital in New York City, but that he was one of the best in his field. I came over there with a problem and I came out with the issue resolved.

The man cared for his patients, truly cared for his patients. And I experienced that 100%. And I also had experienced the bad side in that hospital with horrible doctors, and this is why I'm speaking up. And every time that he was doing an examination of me, he always explained to me why he was doing it and the reason why. Because, again, it's my first time going through urology and yeah, it is kind of weird for me, as a man another man touching your penis, but again, that's his job.

I never, ever felt any type of way. And something that I'm going to put out there, that is kind of hard for me, I was molested when I was a kid growing up, by a family member. And to this day now, I am still trying to figure that out because I remember pretty much everything but I can't do faces. And because of that experience that I experienced when I was six to nine, I have developed some kind of a sense for predators you can say. And, never, never felt any way. The main priority of Paduch, not only to me, but also to patients, is always their well-being. Not only physically but emotionally.

C.R., the mother of a patient, did not hesitate to stand here for Dr. Paduch, giving heartfelt support for his treatment of her minor son:

He really was the "it" guy in the fertility world for Klinefelter men. And, you know, our son being so young, you know people think we're crazy talking about fertility, but it's a huge issue in the Klinefelter community. And, you know, its an area that he was studying. And he had a lot of compassion for some of the questions that we had, and for some of the ways that they were working with the community and giving us insights into some of the work that he was doing and I think that was very appealing to us. We weren't looked at as a bunch of, you know. And this happens. I was in a fertility clinic with my son at sixteen and they thought I was crazy. And then you're with Dr. Paduch, and he's like, "No, I get this. He's not married, he doesn't have kids, let's talk about what that future looks like." And we really appreciated him understanding some of those deep cares that parents have when their kids have conditions.

This window that we have for finding fertility is a very awkward time in a young man's life. It's puberty. We all hate puberty. We all look gross in puberty. We all hate ourselves. And now we're

9

asking a doctor to come in and do an ultrasound of your testicles and feel your penis to see if you have viable sperm. This is not fun. It wouldn't be fun for anybody. And it's particularly not fun for teenage boys. My son went through it. He did not think of Dr. Paduch as a weirdo. He thought of him as someone who was giving him an opportunity to have a future.

After we heard about what was happening with Dr. Paduch, the first question I had is, "Okay [A.], what happened? Is there anything we need to know about?" Because we saw somebody that was a helper and I recommended a lot of people to Dr. Paduch in our community, because he had helped us so much. And, my son's reaction was very like, "he's a urologist, he's supposed to touch your penis. It was medical. I didn't think anything of it." He didn't feel any weird or unusual vibes. He felt that Dr. Paduch was there for him. He gave us a card and it was to both of us, to my son and us. And he said, "if you have any questions you don't want to talk to your parents about, we are here for you." And I was grateful for that because kids don't want to talk to their parents about this stuff.

And Tom Del Giorno has witnessed Darius' commitment to his patients even when not working at the hospital:

If the patient needed something he'd be there for the patient. He gave his phone number out, he said call me anytime and strange enough he'd answer the phone. When we were at dinner one night, "ah i gotta take this it's a patient" ya know this is on a Sunday night.

Mr. Del Giorno's statement is particularly relevant because it rebuts the government's attempt to cast Dr. Paduch providing his cell phone to patients as nefarious. He did it because he cared about his patients, plain and simple.

Even Darius's husband Robert has witnessed his dedication to his patients and their gratitude:

You know with his work he was the only person in his field that was actually trying to do something about helping kids with Klinefelter Syndrome and Mary at Northwell has even told me a few times that patients are still asking when he's coming back or we hope he comes back. You walk into his office at his work and he had a lot of cards and pictures from former patients actually on his cabinets in his office and a lot of them were patients that weren't able to have kids but once they came to see him he'd help

them be able to have kids so a lot of them were sending pictures of
them with their children thanking him for helping them have a kid.

As set forth, *infra*, yet again Dr. Paduch's personal and professional characteristics
warrant a reduced sentence under § 3553(a).

**E.    Medical History**

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

        ███████████████████████████████████

        ███████████████████████████████████

        ███████████████████████████████████

        ██████████████████████

██

██████████████████████████████████████████████████ ██

████████████████████████████████████████████████ ██

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████ █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

**F.    Dr. Paduch's Military Service to the United States**

Dr. Paduch served in the United States Army Reserves Medical Corps. between 2001 and
2004. PSR ¶ 169.  He was assigned to Joint Base Lewis-McChord in Washington as a medical

doctor and attained the rank of Captain.  *Id*.  Dr. Paduch was honorably discharged on October

23, 2004.  *Id*.

## IV.    THE APPLICABLE LEGAL STANDARD

The applicable legal standard by which the Court should fashion Dr. Paduch's sentence is

clear:

> District courts are to use the Guidelines as a "starting point," and
> then make an independent sentencing determination, taking into
> account the "nature and circumstances of the offense and the
> history and characteristics of the defendant," and all of the
> statutory factors.

*United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (citing and quoting *United States v.*

*Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc) & 18 U.S.C. § 3553(a)).  The Supreme Court

has held that the Sentencing Guidelines are "effectively advisory."  *United States v. Booker*, 543

U.S. 220, 245 (2005), and has empowered district judges with "considerable discretion" in

determining whether a non-guideline sentence is justified. *United States v. Jones*, 531 F.3d 163,

171 (2d Cir. 2008). Indeed, *Booker* instructs district courts to consider all of the statutory factors

listed under 18 U.S.C. § 3553(a) in order to tailor an appropriate sentence based on the

defendant's specific situation and particular circumstances.

## V.    THE GUIDELINES CALCULATION

### A.    The Probation Office and The Government

The Probation Office concluded that Dr. Paduch's Total Offense Level is 45, which is

reduced to 43 pursuant to U.S.S.G. Ch. 5, Pt. A, comment. (n.2); PSR ¶ 134.  It is undisputed

that Dr. Paduch is in Criminal History Category I.  PSR ¶ 138.  The suggested sentencing range

for Level 43/CHC I is life.  U.S.S.G. Ch. 5, Pt. A (Sentencing Table).  The defense does not yet

have the benefit of the government's sentencing submission; however, based upon the

government's objections to the draft-PSR, it appears the government will agree with the

Probation Office's calculation.

### B.    The Defense Calculation

Base Offense Level.    The defense agrees with the Probation Office that Dr. Paduch's Base Offense Level is 28 pursuant to U.S.S.G. § 2G1.3(a)(3).

"Undue Influence" Enhancement (§ 2G1.3(b)(2)(B)).[2]    The defense objects to the application of the two-level enhancement under § 2G1.3(b)(2)(B), which applies if a defendant "unduly influenced a minor to engage in prohibited sexual conduct …."  When, as here, there is a 10-year or greater age gap between the minor and the defendant, there is a rebuttable presumption that this enhancement applies.  *Id.*, comment. (n.3(B)).

However, that rebuttable presumption does not shift the burden of proof from the government to the defendant.  *United States v. Arbaugh,* 951 F.3d 167, 174 (4th Cir. 2020) (stating that under § 2G1.3(b)(2)(B), the government always bears "the burden of proving, by a preponderance of the evidence, any facts supporting the district court's finding that 'undue influence' over a minor").

This enhancement should not apply because in the setting of a physician who treats minors it would apply in every case give that the 10-year age difference given that physicians are basically all over 27 by the time they are treating patients.  Further, the individuals in this case sought out Dr. Paduch for medical care.  Their return appointments were necessary for medical care.  This is not a case in which the enhancement under § 2G1.3(b)(2)(B) was warranted because of, for example, violence or the like.  *See, e.g.*, *United States v. Carter*, 960 F.3d 1007 (8th Cir. 2020) (defendant hit the victim leaving her with a black eye and a bloody nose); *United States v. Whyte*, 928 F.3d 1317 (11th Cir. 2019) (affirming increase even though victim had already worked as an "escort" before meeting defendant).  For all these reasons, Dr. Paduch has rebutted the presumption and the government must meet its burden to support this enhancement with "information [that] has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

---

[2] The defense disagrees with this enhancement as related to Groups 1, 2, 3, 4 and 7.

<u>Sexual Act/Sexual Contact (§ 2G1.3(b)(4)(A)(i)).</u>[3]    The defense objects to this enhancement.  In other words, in this case, the Base Offense Level of 28 includes the same conduct described in § 2G1.3(b)(4)(A)(i).  In its objections, the government argued that the application is appropriate because the Base Offense Level would also be 28 for an attempt and, in that instance, a defendant would not automatically receive the two-point enhancement.  That may be so, but the government did not proceed on a theory of attempt and the trial testimony never referred to an attempt.  Time and time again, the Probation Office and the government ask this Court to raise Dr. Paduch's Guidelines calculation beyond the Sentencing Chart.  That should not happen.[4]

<u>"Abuse of Position of Trust or Special Skill" Enhancement (§ 3B1.3).</u>[5]    If the Court applies the enhancement for undue influence, the enhancement under § 3B1.3 should not be applied because under the circumstances of this case both enhancements are based on the same facts, *i.e.*, the doctor/patient relationship.

The Probation Office's basis for the application of U.S.S.G. §2G1.3(b)(2)(B) enhancement is that "Paduch was more than 10 years older than Minor Victim-1 and held a position in the field of urology as a medical professional."  PSR ¶ 80.  *See* Application Note 3(B) ("In a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies.).  The basis for the application of Guideline 3B1.3 states:

> abused his position of private trust and used a special skill, in a manner that significantly facilitated the commission or concealment of the offense. Specially, the defendant used his

---

[3] The defense disagrees with this enhancement as related to Groups 1, 2, 3, 4 and 7.

[4] The defense objects to the application of the enhancement in U.S.S.G. § 2G1.3(b)(4)(A) because it is double counting.  Although *United States v. Watkins*, 667 F.3d 254 (2d Cir. 2012) supports the application of this enhancement, the defense preserves this objection based on the argument that the commission of a sex act or sexual contact is incorporated into the offense under 18 U.S.C. § 2422(b).

[5] The defense disagrees with this adjustment as related to Groups 1, 2, 3, 4 and 7 if the Court applies the "undue influence" enhancement in § 2G1.3(b)(2)(B).

> position as a medical doctor to sexually abuse his patients under
> the guise of medical treatment…

PSR ¶ 84.

The age differential of a doctor should not support an enhancement under § 2G1.3(b)(2)(B) if the physician received an adjustment under § 3B1.3. For example, the average age of a first-year medical student at NYU Grossman is 23.[6] New York Law requires an M.D. (four-years) and an experience requirement (residency of between one and three years). *See* N.Y. Educ. Law § 6524(2) and 8 NYCRR 60.3(a), (b). Thus, by the time the average candidate may apply for a medical license in the state of New York, he or she is between 28-30 years old.

Even if this is not technically double-counting, the Court should give this enhancement little weight when fashioning the final sentence.

Grouping (§ 3D1.4). If the Court accepts the Probation Office's calculation, the grouping analysis in the PSR correctly adds four levels. PSR ¶ 128. However, to the extent the Court accepts Dr. Paduch's objections and offense levels change, he reserves the right to offer a different grouping analysis.

The Sex Offense Guideline should not apply. (§ 4B1.5(b)(1)). The defense objects to the application of a five-level increase pursuant to § 4B1.5(b)(1). The defense acknowledges that the language of this Guideline technically warrants its application in this matter. Dr. Paduch reserves his right to make this argument based on changes to the Guidelines or any other available basis. Even if this is not technically double-counting, the Court should give this enhancement's five-level increase little weight because the same facts have already been used to drive up Dr. Paduch's offense level through enhancements and grouping.

Dr. Paduch's sentence on all counts should run concurrently. (§ 5G1.2(c)). The Probation Office recommends that the sentences for all Counts run concurrently. PSR at 48, 50. Obviously, Dr. Paduch agrees. Dr. Paduch's sentence on all counts of conviction should run

---

[6] https://med.nyu.edu/education/md-degree/md-admissions/by-the-numbers.

concurrently because "the highest statutory maximum is adequate to achieve the total punishment …." U.S.S.G. § 5G1.2(c). The offense carrying the highest punishment in this case is life. Thus, Your Honor has the ability to fashion an appropriate sentence even if all sentences run concurrently.

<u>The manner in which the Court should view the Guidelines calculation.</u>  Based on a more sensible view of the Guidelines, one in which the same conduct is not counted over and over again to drive a defendant's offense level literally off the chart, the Court should view Dr. Paduch's final range (before a variance) as Level 36, CHC I:  188-235.  Whatever calculation results from a strict application of the first step for sentencing, the defense offers that range for consideration.

## VI.    <u>THE STATUTORY FACTORS (18 U.S.C. § 3553)</u>

### A.    <u>The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))</u>

Dr. Paduch maintains his innocence and reserves all rights.  Accepting for purposes of this § 3553(a)(1) analysis only, the conviction (which will be subject to appeal) relates to serious charges.  Dr. Paduch asserts that sentence at or near 10 years is sufficient to satisfy this statutory factor.  Without the benefit of the government's sentencing arguments, Dr. Paduch need not argue any more at this point.

### B.    <u>The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>

1.    <u>Dr. Paduch is precisely the opposite person portrayed by the media and plaintiff lawyers.</u>

The hyperbolic press and the aggressive advertising campaigns by plaintiff lawyers (YouTube videos and websites dedicated to him) all of which began with arrest, not conviction, tried to persuade the tri-state area that Dr. Paduch did nothing but sexually assault every patient for decades.  At trial, Rules of Evidence such as 404(a)(1), 405 and 413, precluded the defense from providing even basic information to combat those unfair and unsubstantiated depictions.

The time has finally arrived for the Court to see and hear the truth about Dr. Paduch's character and dedication to his patients.

As the Court can easily conclude, it is never easy for a convicted defendant to obtain positive statements for sentencing from people other than family. The sad truth is that "friends" and "colleagues" disappear; the people who swore to stand by a defendant "no matter what" are gone. The flight of friends and supporters is all the more prevalent when a defendant is convicted of the present crimes and brutalized by the press and lawyers' advertising campaigns trolling for clients from the moment of an arrest.

Against that backdrop, it is a true testament to Dr. Paduch that he has garnered support from former patients, a parent and colleagues. The video submitted herewith speaks volumes for itself. V-1. The courage and dedication of the individuals who have spoken on Dr. Paduch's behalf is a marker of his character, his abilities as a physician and his dedication to the well-being of his patients and their families.

> 2. Dr. Paduch's efforts and successes during his time at MDC demonstrates a character warrants a reduction in his sentence.

Darius' character is demonstrated by his actions during pretrial detention. He has never received a disciplinary infraction. PSR ¶ 17. Almost immediately after he was incarcerated, Darius began work as an inmate Suicide Watch Companion. As he describes for the Court:

> I have tried to make the most of my time at MDC. I have taken classes and the documents showing them I believe have been sent to the Court. I stated a bible group and have volunteered as possible. I also worked on suicide watch where I am responsible to keep eyes on people as deemed necessary by the MDC. I sit on a folding chair and watch them through a small window or outside their cell.

A5. He received commendations for going above and beyond the requirements for his role.

In August 2023, just months into his pretrial detention, Darius received his first letter of commendation and certificate for his "dedication" and "display of diligence." D26. More recently, on October 15, 2024, MDC's Chief Psychologist, Dr. Schlessinger wrote:

> Suicide Watch Companions maintain a constant visual observation of individuals placed on Suicide Watch in order to ensure their safety and to better facilitate treatment with Psychology Services staff. Suicide Watch companions are selected based on strict criteria including their emotional stability, maturity, work ethic, and continued engagement in prosocial behavior. During his time in this work program, Mr. Paduch has received significant training in recognizing the warning signs, risk/protective factors of suicide and the appropriate procedures for interacting with an individual on Suicide Watch. Since his inclusion in the program on May 2023, Mr. Paduch has served diligently in his role and has often provided assistance beyond the requirements. His participation in this voluntary work detail has been greatly appreciated.

D29. Despite his incarceration, Dr. Paduch remains dedicated to caring for others in difficult situations. That speaks directly to his character.

In addition to his work as a Suicide Watch Companion, Darius has been a recreation aide at MDC. Based on his contributions, he received an "Exemplary Service Award" for "maintaining the highest standards, looking after the smallest detail, and going the extra mile .…" D23. In addition to work as a recreation aide, Dr. Paduch organized a non-denominational bible study group for inmates at MDC. PSR ¶ 18.

Darius attends many programs at MDC while he is not working as a Suicide Watch Companion, volunteering as a recreation aide, or organizing bible study. During his time at MDC, Darius has completed over a dozen classes aimed at a living a physically and mentally healthy life. *In addition to those classes*, Darius completed the following programs:

- Foundations of Leadership;
- The National Parenting Program: Phase One;
- Managing My Emotions;
- Family Psychology Workbook;
- Columbia University – Vergil's Aeneid: A Song of Arms and of a Man;
- Tutor Training;
- Money Smart for Older Adults;

PSR ¶ 17 and D1-24. Dr. Paduch has taken advantage of every opportunity to better himself for life after what will be (putting aside a successful appeal) a sentence of at least 10 years. That demonstrates his character and is worth a reduction in his sentence.

>       3.    The Probation Office agrees that Dr. Paduch's personal history presents
>             mitigating factors.

After its investigation, the Probation Office acknowledges and has summarized mitigating factors for consideration by the Court:

> As a result of the investigation, we identified several mitigating factors for the Court's consideration. The defendant was raised in Poland and immigrated to the United States to complete his residency as part of his medical career. He enlisted in the U.S. Army Reserves as a medical doctor and was honorably discharged several years later. Prior to the revelation of his sexual misconduct, Paduch was an individual whose upbringing and background, commitment to his family, military service, and medical accomplishments would inspire others. He excelled professionally and appeared to be a law-abiding member of the community. As corroborated by the defendant's husband, Mr. Lischer, the defendant is a committed parent who provided emotional, physical, and financial stability for their son. The defendant has had a positive institutional adjustment completing at least 10 institutional programs and organizing a non-denominational Bible study in his unit. Paduch has held work details as an inmate suicide companion and recreation aide. Probation acknowledges the need for the sentence imposed to avoid unwarranted sentencing disparities among similarly situated defendants while also taking into consideration the personal characteristics of the defendant.

PSR at 49.

>       4.    The Conditions at MDC warrant a reduced sentence.[7]

Dr. Paduch seeks a reduction in his sentence based upon the conditions under which he has had to live during his detention at MDC. As one Court in this District stated earlier this year:

> It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

---

[7] The conditions at MDC could also be considered under 18 U.S.C. §§ 3553(a)(2).

*United States v. Chavez*, No. 22-CR-303 (JMF), 2024 U.S. Dist. LEXIS 1525, at *2 (S.D.N.Y.

Jan. 4, 2024).  Just a few months ago, another Court in this District concluded:

> The conditions at the area's jails make time spent there essentially
> the equivalent of either time and a half or two times what would
> ordinarily be served.  Such time is materially different than [time]
> served at a jail or prison elsewhere in the United States.

*United States v. Ray Parish*, 2024 U.S. Dist. LEXIS 151228, at *14 (S.D.N.Y. Aug. 22, 2024)

(internal citations and quotations omitted).

In addition to the murders at MDC over the summer and the maggot infested food, the

Honorable Jesse Furman (just this year) provided a comprehensive overview of the longstanding

inhumane conditions at that facility:[8]

> The conditions at the MDC are dreadful in many respects, but three
> warrant particular emphasis. First, inmates at the MDC spend an
> inordinate amount of time on "lockdown" – that is, locked in their
> cells, prohibited from leaving for visits, calls, showers, classes, or
> exercise. (In Orwellian fashion, the Bureau of Prisons does not
> refer to these periods as "lockdowns"; instead, it refers to them as
> "modified operations." *See* Bureau of Prisons, Annual PREA
> Report CY 2022 (2023), at 1-2. But there is no mistaking what the
> practice entails.) As of the date of this Opinion and Order, inmates
> at the MDC have reportedly been on lockdown for much or all of
> the last three weeks following an assault on staff, with a maximum
> of "two hours outside their cells each day" during a short reprieve.
> Def.'s Letter 2, *United States v. Zeitlin*, No. 23-CR-419 (LAK)
> (S.D.N.Y. Jan. 2, 2024), ECF No. 58; *see also* Dec. 2023 Mem. for
> Inmate Population from Captain Rodriguez, *Zeitlin*, No. 23-CR-
> 419 (LAK) (S.D.N.Y. Jan. 2, 2024), ECF No. 58-1. For far longer,
> lockdowns have been especially common on weekends and
> holidays. *See* Plea Tr. 38-39 ("[P]eople who are detained at the
> MDC are not allowed out of their cells pretty much at a minimum
> three days of the week, Friday, Saturday, Sunday …."). One
> defendant who kept a log of these lockdowns recently reported that
> he had been "locked down for 137 of [the] 245 days" he was
> detained at the MDC, or "more than 50% of his time at the
> facility." Sentencing Mem. at 7, *United States v. Jacobs*, 23-CR-
> 413 (VB) (S.D.N.Y. Nov. 7, 2023), ECF No. 25. Confining
> inmates to their cells in this manner may have been justified during
> the height of COVID-19 pandemic to prevent the spread of a

---

[8] The footnotes contained in the block quote are as they appear in the Court's decision.

deadly disease. *See*, *e.g.*, *Chunn v. Edge*, 465 F. Supp. 3d 168, 179-80, 183, 201 (E.D.N.Y. 2020) ("The MDC's response to COVID-19 has been aggressive and has included, among other steps, massively restricting movement within the facility, enhancing sanitation protocols, and creating quarantine and isolation units. And the data – though limited – suggests that these measures have been quite effective in containing COVID-19 …"). But that is no longer the case – and the Government does not suggest otherwise. Regardless, confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane. *See Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial or certiorari) ("As Members of this Court have recognized, the practice of solitary confinement 'exact[s] a terrible price.'" (quoting *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring))); *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441-43 (3d Cir. 2020) (considering a "comprehensive meta-analysis of the existing literature on solitary confinement" that concluded that solitary confinement is "psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term … damage").

Second, the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates – especially where such care requires the attention of outside providers. *See*, *e.g.*, Women in Prison Comm., Nat'l Ass'n of Women Judges, Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York 2 (2016) (finding that inmates at the MDC were denied essential gynecological care).[9] It has become common for defense counsel to require court intervention to ensure that inmates receive basic care – and, even more shocking, not uncommon for court orders to go unheeded. In one recent case, for example, the MDC repeatedly defied court orders to transfer a defender with a MRSA infection to a medical facility; the defendant was instead "mistake[nly]" sent to the segregated housing unit. *See* Dec. 15, 2023 Hr'g Tr. at 3-5, 17, *United States v. Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023); Dec. 20, 2023 Hr'g Tr. at 5, 9, *Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 20, 2023); *see also* John Annese, *Brooklyn Judge Calls Sunset Park Federal Jail 'an Abomination' After Staff Ignore Order to Send Ailing Inmate to Medical Facility*, N.Y.

---

[9] Critical mental health treatment is similarly lacking. In 2020, for example, Jamel Floyd, an inmate who was placed in solitary confinement despite his known "bipolar disorder and schizophrenia," died upon being pepper sprayed during a manic episode. Office of the Inspector General, Dep't of Justice, Report of Investigation Regarding the Circumstances Surrounding the Death of Inmate Jamel Floyd at the Metropolitan Detention Center (MDC) Brooklyn 7 (2023).

Daily News (Dec. 20, 2023), *available at* https://www.nydailynews.com/2023/12/20/brooklyn-judge-callssunset-park-federal-jail-an-abomination-after-staff-ignore-order-to-send-ailinginmate-to-medical-facility.[10] In another, the MDC defied an order to transport a defendant for surgery to repair his cheek, which had been broken by another inmate at a previous facility; the defendant was eventually informed that his cheek would have to be rebroken before the surgery because it had healed improperly on its own. *See* Initial Medical Evaluation Request, *United States v. Acosta*, No. 23-CR-376 (JLR), ECF No. 5 (Sealed) (S.D.N.Y. July 19, 2023); *see also* Def.'s Bail Mem. 8, *United States v. Irizarry*, No. 23-CR-60 (JMF), ECF No. 47 (S.D.N.Y. Oct. 30, 2023). And in yet another, it was the "position of MDC legal" to defy a court order "to provide the defendant with a special diet . . . appropriate for . . . diabetes." Conf. Tr. at 3, 9, *United States v. Palos-Garcia*, No. 21-CR-340 (JGK) (S.D.N.Y. Jan. 5, 2022), ECF No. 57. Less extreme, but still problematic, denials or delays of needed care have reportedly become commonplace.[11]

Finally, the MDC's physical conditions have long been problematic. *See generally* Order, *United States v. Espinal*, No. 11-CR-537 (JMA) (CLP) (E.D.N.Y. Oct. 17, 2016), ECF No. 39 (collecting "letters relating to the conditions at the Metropolitan Detention Center," which reported visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers); *see also* John Marzulli, *Judge Refuses to Send Women to Brooklyn Jail with "Third World" Conditions*, N.Y. Daily News (Oct. 7, 2016), *available at* https://www.nydailynews.com/2016/

---

[10] Notably, when Judge Irizarry ordered, as a remedy for the MDC's "blatant disregard . . . of a very explicit order," that the Defendant be transferred to a medical facility "forthwith, by no later than tomorrow," an MDC attorney responded that doing so would be an "impossibility" because "[o]ur staffing capabilities are currently – are extremely low." Dec. 15, 2023 Hr'g Tr. at 3, 15, *Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023).

[11] Once again, there are far too many cases to cite. For representative examples, however, *see* Def.'s Letter at 5-6, *United States v. Little*, No. 20-CR-57 (GBD) (S.D.N.Y. Jan. 6, 2022), ECF No. 416 (reporting that the MDC had neglected to transport an inmate with a twisted bowel to an emergency surgery for more than three months, even though she was vomiting daily and unable to defecate for weeks at a time); Def.'s Letter at 1, *United States v. Martinez-Diaz*, No. 16-CR-387-10 (JMF) (S.D.N.Y. Nov. 8, 2021), ECF No. 564 (reporting that an inmate with obstructive sleep apnea had not been able to use his CPAP machine for over eighty-five days because the MDC had failed to provide him with an extension cord); Def.'s Sentencing Mem. at 12, *United States v. Velez*, No. 23-CR-325 (JMF) (S.D.N.Y. Nov. 22, 2023), ECF No. 31 ("Because the MDC lacks sufficient staff to meet Mr. Velez's medical needs of 8 mg of Suboxone 3 times a day, he receives only two-thirds of his required dose. . . . Some days, Mr. Velez does not even receive the prescribed dose."); Def.'s Sentencing Mem. at 7, *United States v. Rivers*, No. 18-CR-192 (WFK) (E.D.N.Y. Feb. 23, 2022), ECF No. 155 (explaining that it took two years for the MDC to provide the defendant with hearing aids despite multiple requests); Def.'s Letter at 1-2, *United States v. Philips*, No. 20-CR-317 (BMC) (E.D.N.Y. Oct. 21, 2021), ECF No. 18 (explaining that the MDC neglected to refill the defendant's asthma inhaler despite multiple requests, and even after the defendant had "a coughing fit, gasping for air and wheezing," leading his cellmate to "scream[] for help").

10/07/exclusive-judge-refuses-to-sendwomen-to-brooklyn-jail-with-third-world-conditions. These problems came to the fore in the winter of 2019, when a power outage left inmates without light and heat for a full week. Following that well-publicized incident, Judge Torres held a hearing at the MDC. She witnessed "abundant water damage . . . like wet tissues hanging from a ceiling" and "black blotchy mold" covering light fixtures. Feb. 5, 2019 Hr'g Tr. at 167, 172, *United States v. Segura-Genao*, 18-CR-219 (AT) (S.D.N.Y. Feb. 5, 2019), ECF No. 211. One inmate told her that he felt as though he was "sleeping under a waterfall." *Id.* at 169. (Judge Torres also spoke with an inmate who said the dressing on a gunshot wound had not been changed for so long that he was beginning to have "flashes in [his] eyes," and another who said he was told by a corrections officer that a bleeding rash was "above [the officer's] pay grade." *Id.* at 176, 180.) Such problems have persisted. In 2021, the MDC carried out "planned maintenance" on the electrical system by enforcing a lockdown "over the course of four nights" with no power and no water. Conf. Tr. at 8-9, *Federal Defenders of NY, Inc. v. Federal Bureau of Prisons*, No. 19-CV-660 (MKB) (E.D.N.Y. Oct. 15, 2021). During this time, inmates' toilets were reportedly "overflowing because . . . officers did not come by with buckets of water," and inmates "were sitting with water on the cell of their floor in the dark with feces on it." *Id.* at 10- 11; *see also* Conf. Tr. at 7, *United States v. Rivers*, No. 18-CR-192 (WFK) (E.D.N.Y. July 30, 2021), ECF No. 151 (reporting that an inmate had been left "without toilet facilities" because "the officers had refused to either have his toilet repaired" or "allow him to use other toilet facilities and to take him there when necessary"). More recently, the Court was advised that many, if not most, of the emergency call buttons in the MDC's main building are not working — even though those buttons are the only way (other than yelling and banging) to call an officer in emergency situations during a lockdown. *See* Letter from Loretta E. Lynch at 4, *Federal Defenders of New York, Inc.*, No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF No. 403 (reporting that the buttons remained "broken" as of November 30, 2023).

As noted, the reason most often given for many, if not all, of these problems is understaffing.[12]    https://www.justice.gov/d9/2023-

---

[12] A recent memo by Rhonda Barnwell, the president of the union local representing the MDC's correctional officers, helps explain why the MDC's staffing shortage translates directly into its inhumane conditions of confinement. *See United States v. Irizarry*, 23-CR-60 (JMF), ECF No. 47-3 (S.D.N.Y. Oct. 30, 2023). According to her memo, "[o]n a daily basis housing units . . . are left . . . unmanned by staff[] and locked down, with the expectation . . . that a single [] Officer is to make rounds, feed, and perform additional correctional duties" on three units during a single shift. *Id.* at 1-2. The frequency of lockdowns "angers the inmates and heightens the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and[/]or inmate medical emergencies." *Id.* at 2.

07/2023.07.20_atj_bop_access_to_counsel_report.pdf,            the situation appears to be getting worse, not better. As noted, the MDC's current staffing levels — approximately 55% of full correctional officer staffing — are the worst in at least three years. *See* ECF No. 28, at 2. Meanwhile, excluding the brief period following closure of the MCC (when hundreds of new prisoners were transferred to the MDC), the inmate population at the MDC, at 1,611, is the largest it has been in three years. *Id.* at 1. The resulting ratio of prisoners to correctional officers — ten to one — is untenable, and there is no 16 That may be so, but it is not an acceptable excuse. Moreover, recent efforts to address the staffing shortage aside, *see, e.g.*, Defs.' Letter at 2 n.3, *Federal Defenders of New York, Inc. v. Federal Bureau of Prisons*, 19-CV-660 (MKB) (PK) (E.D.N.Y.), ECF No. 384 (noting that the BOP has offered higher-than-normal recruitment and retention incentives for new correctional officers at the MDC); *see also* Advisory Grp. Of DOJ Components, Report and Recommendations Concerning Access to Counsel at the Federal Bureau of Prisons' Pretrial Facilities (2023), *available at* https://www.justice.gov/d9/2023-07/2023.07.20_atj_bop_access_to_counsel_report.pdf,            the situation appears to be getting worse, not better. As noted, the MDC's current staffing levels — approximately 55% of full correctional officer staffing — are the worst in at least three years. *See* ECF No. 28, at 2. Meanwhile, excluding the brief period following closure of the MCC (when hundreds of new prisoners were transferred to the MDC), the inmate population at the MDC, at 1,611, is the largest it has been in three years. *Id.* at 1. The resulting ratio of prisoners to correctional officers — ten to one — is untenable, and there is no reason to believe that the staffing side of the equation will change any time soon. It is for that reason that the only option is to reduce — or at least not add unnecessarily to — the prisoner population.

*United States v. Chavez*, No. 22-CR-303 (JMF), 2024 U.S. Dist. LEXIS 1525, at *11-18 (S.D.N.Y. Jan. 4, 2024).

Thus, it is clear that the MDC truly believes it is above the law, including this Court's orders. One can only imagine what it is like to live under the thumb of such an entity. Dr. Paduch has not had to imagine it. He has endured it.

Dr. Paduch experienced many of the issues detailed in Judge Furman's opinion. He is largely deaf in his right ear, but was denied hearing aids in custody. PSR ¶ 156. The need to

hear what is happening in an individual's personal space is particularly critical in the violent world of MDC.  As Dr. Paduch has summarized for the Court:

> As I told the probation officer at my interview, the conditions at MDC are just like what Your Honor has probably already heard and been told.  They are very harsh.  Basic living needs like showers, edible food, the need to not be in solitary or on lockdown, and general living conditions are below what you would expect to be provided.  Basic sanitation like a shower is hard to come by especially when we are lockdown.  I lost 50 pounds since I entered MDC.  The food is barely edible.

A5-6.  *See also* PSR ¶ 19.

After an inmate murder in July of this year, MDC issued a letter that the facility would be placed into modified operations, *i.e.*, MDC would be placed in a near total lockdown.  The letter, addressed to the inmate population states:

> Effective Wednesday, July 17, 2024, MDC Brooklyn was placed on modified operations, following an inmate death. Due to the nature of this incident, a thorough investigation will be conducted to ensure the safety and security of all staff and inmates within MDC Brooklyn. Furthermore, it is the expectation of the Captain that inmates will live in a safe and secure environment. Violence in this setting leads to negative consequences such as injuries, death, prolonged lockdowns, disruption of operations and programs, and increased tension. Therefore, it is imperative all inmates adhere to established rules, expectations and respect one another. As a result of this incident, the inmate population will remain secured until further notice. Legal calls and legal visits will continue as normal, however social visits will be cancelled until further notice. Return to normal operations is strictly based on the investigation's results, in conjunction with inmate behavior and will be assessed daily.

D31.

Based on the conditions at MDC, and in keeping with the Court's conclusions in *Parish*, Dr. Paduch requests a reduction of <u>two days for every day</u> he has spent in custody at MDC.  *See* 2024 U.S. Dist. LEXIS 151228, at *14.

### C.    Promoting Respect for the Law (18 U.S.C. § 3553(a)(2)(A))

Section 3553(a)(2)(A) requires the Court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law and provides just punishment.  For the reasons discussed herein, a sentence at or near 10 years is sufficient.  A sentence any longer would be "a sentence that is disproportionately long in relation to the offense is unjust and likewise fails to promote respect" for the law.  *United States v. Ontiveros*, No. 07-333, 2008 U.S. Dist. LEXIS 58774, at *6 (E.D. Wis. July 24, 2008). *See United States v. Cernik*, No. 07-20215, 2008 U.S. Dist. LEXIS 56462, at *25 (E.D. Mich. July 25, 2008) (citing *Gall v. United States*, 128 S. Ct. 586, 599 (2007)) ("[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in the sentencing").

In addition to at least a decade away from his family, Dr. Paduch has already been confined under harsh conditions as discussed in this submission.  The nature of his offense will render him a sex offender under BOP guidelines, which will require him to serve his sentence in a higher security facility.  *See, e.g.*, BOP Policy 5100.08, Ch. 4, § 16; Ch. 5 (Code F & Table 5-2).  After a life of dedication to his patients and the advancement of his chosen field, Dr. Paduch will never practice medicine again.  Moreover, Dr. Paduch will be subject to sex offender registration.  42 U.S.C. § 16901, et seq; PSR at 52.

Dr. Paduch's life as he, his husband and his son knew it is over.  He has been vilified by the press and plaintiff lawyers since the moment of his arrest.  A search of his name will, for the rest of his life and beyond, return an avalanche of hyperbole, only a narrow sliver of which has ever been tested in court or, for that matter, even challenged.  The advent of the internet ensures that will never disappear and will have global reach.  All this, plus at least a decade in federal prison is sufficient to promote respect for the law, particularly when considered in light of Dr. Paduch's personal and professional history as discussed in this submission and the corresponding exhibits.

### D.    Deterrence (18 U.S.C. § 3553(a)(2)(B))

The Court will sentence Dr. Paduch to serve at least 10 years in federal prison.  While Dr. Paduch maintains his innocence, he submits that a sentence at or near the mandatory sentence of 10 years will achieve deterrence.  His sentence will be widely reported and it cannot be credibly argued that – unlike a white-collar crime sentence for example – a sentence of that length could ever by thought of as "the cost of doing business" or committing the crime such that it will not effectuate deterrence.  Indeed, given that Dr. Paduch is 57 years old, a 10-year sentence, plus supervised release, plus sex offender registration is all the more meaningful to achieve sufficient deterrence.

### E.    Rehabilitation (18 U.S.C. § 3553(a)(2)(D))

Section 3553(a)(2)(D) focuses the Court on a sentence that will be sufficient to provide a defendant with rehabilitative opportunities, whether educational, vocational or otherwise.  Although he maintains his innocence, one thing is certain:  Dr. Paduch will make use of every day of his sentence to better himself and prepare for his release.  His history at MDC proves as much.  His efforts will be all the more successful once he is at an institution that offers more than MDC ever could.

### F.    Sentencing Disparity (18 U.S.C. § 3553(a)(6))

Throughout this case, the government has enjoyed pointing to the cases of Dr. Hadden and Ghislaine Maxwell.  The government certainly will not do so at sentencing because in each of those cases – which the government stated for months provided this Court with guidance – the defendant was sentence to 20 years.  The Probation Office recommends 30 years.  Those sentences are "greater than necessary" to achieve the goals of sentence.  18 U.S.C. § 3553(a).

As the Supreme Court stated in *Gall v. United States*, 128 S. Ct. at 598:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

(*citing Koon v. United States*, 518 U.S. 81, 113 (1996)).  When the Court considers Dr. Paduch's life and work, there would be little disparity in a sentence at or near 10 years.

### G.    Restitution (18 U.S.C. § 3553(a)(7))

The defense objects to the imposition of any restitution unless and until sufficient information is provided.  Plaintiffs' lawyers who represent all the individuals in this case have had more than sufficient time to provide the government with restitution demands and calculations.

The government has had more than enough time to gather its demand for restitution. Now, the government wants an additional 90 days to do what should have been ready well before sentencing.  *See* 18 U.S.C. § 3664(d)(5).  The government provides no timetable for the production of an as yet number of unidentified individuals' claims for restitution.  The defense has no idea how detailed the demands will be, what documentation will be provided, what may be required to challenge such calculations or whether some have already received or are about to receive settlements that would be credited against some claims for restitution.[13]  It is quite possible that a restitution hearing will be required, complete with witness testimony.

Further, depending on when the government intends to produce the restitution demands, Dr. Paduch will almost certainly be unable to even review them in a timely fashion because the BOP will have transferred him.  And more troublingly, Dr. Paduch will be unable to expeditiously, if at all, participate in his counsel's challenge to restitution because, pursuant to BOP guidelines, that bureaucracy can house him within 500 miles of his release address in New Jersey.  BOP PS 5100.08.  That is only a marker; the BOP could send him to the other side of the United States.

Thus, the Court should deny the government's request to adjourn the imposition of restitution without a more defined set of deadlines.  Depending on those deadlines, and because

---

[13] Under 18 U.S.C. § 3664(j)(2), Dr. Paduch may be entitled to a future offset or adjustment of restitution payments.

the imposition of restitution is part of sentencing, Dr. Paduch reserves his right under Federal Rule of Criminal Procedure 43(a)(3) to seek an order from this Court precluding his transfer from MDC until restitution is calculated and a final Judgment of Conviction entered. Given the conditions at MDC, that is not an ideal step, but Dr. Paduch must choose from two of unattractive options: stay at MDC or waive his participation in the calculation of restitution.

Lastly, and while reserving all rights regarding restitution, Dr. Paduch demands all information related to civil awards already provided to any individual seeking restitution. Further, Dr. Paduch requests that the final Judgement of Conviction order that he be kept updated on civil settlements that should be credited against restitution awards. He is entitled to such information to support a future adjustment of the restitution he is required to pay. 18 U.S.C. § 3664(j)(2). Such settlement documentation must be produced to Dr. Paduch to "limit restitution that would result in an overpayment to the victim." *United States v. Nucci*, 364 F.3d 419, 423 (2d Cir. 2004). This Court is well aware of the issue of settlement disclosure. As disclosed in the midst of trial, one individual already received $400,000.00. In the event future cases settle, especially the many from which his name has been removed as a defendant, the issue of overpayment is particularly obvious if Dr. Paduch does not receive notice of settlements through civil counsel. Section 3664(j)(2) is the only safeguard Dr. Paduch had to prevent overpayment, because is no right to contribution in criminal law.

## VII.    A FINAL REQUEST FOR LENIENCY

The Probation Office recommends that Dr. Paduch be sent to federal prison for the remainder of his life. That is not hyperbole. There is no parole in the federal system. Good time credit amounts for, at most, a 15% reduction. 18 U.S.C. § 3624. Dr. Paduch is 57; therefore, accounting for time-served and some possible time off for good time credits, a 30-year sentence would incarcerate him until he is well over 80. Common sense dictates that every year in prison is harder on the mind and body that a life of freedom and that, therefore, every year in prison reduces an inmate's lifespan by more than just that year. Fortunately for the Court and Dr.

Paduch, there scholarly support for the conclusion that time in prison reduces an individual's life expectancy compared to what it would otherwise be on the outside. *See, e.g.*, E10-38.

Friend and neighbor Tom Del Giorno requests a lenient sentence based on Darius' love for and attention to his family:

> He's just such a nice person and a good caring person and to see him having to be separated from his son it's criminal, it's terrible.

> Darius he's not a small guy, he is a big guy, big beard ya know, really tough Polish guy ya know, he looks like he'd kick your ass and to see him so gentle and good with his son was really good to see. I had ███████ up at the house upstate for most of the summer. This was the first summer Darious was being detained. I had a good chance to talk to and spend time with ██████ and he'd say he had to have his phone you know if my dad calls I want to talk to him, because I want to know what's going on and see how he's doing and the phone would ring and he'd just stop everything.

*     *     *     *

Darius has written to the Court regarding his final sentence:

> Please I ask the court for mercy, to restore me as soon as possible to my son who is federally qualified special needs child so I can help him with school and help him grow without any additional trauma in his life. I understand that the Court is required to give me at least 10 years in prison. I ask that the Court add as little time to that as you see fit.

A6.

Robert, Darius' husband, has given this Court a fitting conclusion to this sentencing submission:

> Our son ██████ you know he had a traumatic childhood; he was with two parents that abused drugs he had a couple of situations where he was left at a car accident or left to wander outside the house in his underwear. So he was taken from his parents and put in state custody and he's actually been with us longer than his biological parents so he was in the system, until he was nine when we adopted him.

> There's not much I can do except for; be strong for ███, be strong for Darius while he's in, it's all left to me to do on the outside because he can't do much, so I'm having to be strong for the whole family.

For all these reasons, as well as those presented in the preceding sections, a sentence at or near 10 years is warranted.  A 30-year sentence, or anything near it, is unthinkable and under any assessment of the law and the facts would be "greater than necessary."  18 U.S.C. § 3553(a).

## VIII.  <u>CONCLUSION</u>

For all these reasons, the Court should impose a sentence at or near 10 years and decline to impose any restitution.

Respectfully,

**BALDASSARE & MARA, LLC**

*Attorneys for Defendant Dr. Darius Paduch*

By:  <u>/s Michael Baldassare</u>
Michael Baldassare, Esq.

Date:  November 8, 2024